```
                                           Page 1

1              UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF NORTH DAKOTA

2

3   In Re:                    Bankruptcy No. 25-30002

4   Generations on 1st, LLC,  Chapter 11

5      Debtor, Jointly Administered
       (Main Case).

6   ----------------------------------------------------

7   In Re:                    Bankruptcy No. 25-30003

8   Parkside Place, LLC,      Chapter 11

9      Debtor, Jointly Administered.
    ----------------------------------------------------

10
    In Re:                    Bankruptcy No. 25-30004

11

    The Ruins, LLC,           Chapter 11

12

       Debtor.

13  ----------------------------------------------------

14

15                       DEPOSITION

16                          OF

17                      JESSE CRAIG

18

19

20

21  DATE:           September 23, 2025

22  PLACE:          Vogel Law Firm
                    218 NP Avenue

23                  Fargo, North Dakota

24  TIME:           8:59 a.m.

25  REPORTED BY:    Deanna L. Sager, R.P.R., R.M.R.
```

Page 2

```
 1         A P P E A R A N C E S
 2
   FOR THE DEBTORS:
 3
      The Dakota Bankruptcy Firm
 4    Attorneys at Law
      1630 First Avenue North - Suite B
 5    Fargo, North Dakota  58102
      By:  Maurice VerStandig
 6      mac@dakotabankruptcy.com
 7 FOR JESSE CRAIG AND MULINDA CRAIG:
 8    Schwab, Thompson & Frisk
      Attorneys at Law
 9    820 34th Avenue East - Suite 200
      West Fargo, North Dakota  58078
10    By:  Dan Frisk
        dan@stf.law
11
   FOR RED RIVER STATE BANK:
12
      Vogel Law Firm
13    Attorneys at Law
      218 NP Avenue
14    P.O. Box 1389
      Fargo, North Dakota  58102
15    By:  Caren W. Stanley
        cstanley@vogellaw.com
16
   ALSO PRESENT:
17
      Mulinda Craig, Charles Aarestad, Danielle
18    Harless
19
20
21
22
23
24
25
```

Page 3

```
 1       C O N T E N T S
 2       W I T N E S S E S
 3                    PAGE
 4 JESSE CRAIG
 5    Examination by Ms. Stanley      6
      Examination by Mr. Frisk       192
 6    Examination by Mr. VerStandig  193
      Examination by Ms. Stanley     194
 7    Examination by Mr. Frisk       194
 8 ATTORNEY'S EYES ONLY PORTION
      Pages 164-167
 9
10       E X H I B I T S
```

```
11 EXHIBIT NO.  DESCRIPTION            MARKED
12 Exhibit 1     Invoice 001 Bates          6
               Ruins 2338-2352
13
      Exhibit 2     Invoice 002 Bates        6
14               Bates Ruins 2339
15 Exhibit 3     Invoice 003 Bates          6
               Ruins 2353-2364
16
      Exhibit 4     Invoice 004 Bates        6
17               Ruins 2365-2377
18 Exhibit 5     Invoice 005 Bates          6
               Ruins 2378-2404
19
   Exhibit 6     Invoice 006 Bates          6
20               Ruins 2405-2445
21 Exhibit 7     Red River State Bank       6
               Construction Loan Draw Request
22               and Invoice 007 Bates
               Ruins 2446-2456
23
      Exhibit 8     Red River State Bank     6
24               Construction Draw Request
               and Invoice 008 Bates
25               Ruins 2457-2499
```

Page 4

```
 1       E X H I B I T S  (CONT'D)
 2 EXHIBIT NO.  DESCRIPTION            MARKED
 3 Exhibit 9     Red River State Bank       6
               Construction Draw Request
 4               and Invoices Bates
               Ruins 2500-2534
 5
      Exhibit 10    Application and Certificate   6
 6               for Payment and Invoice 010
               Bates Ruins 2535-2561
 7
      Exhibit 11    Application and Certificate   6
 8               for Payment and Invoice 011
               Bates Ruins 2562-2593
 9
      Exhibit 12    Application and Certificate   6
10               for Payment and Invoice 012
               Bates Ruins 2594-2609
11
      Exhibit 13    Application and Certificate   6
12               for Payment and Invoice 013
               Bates Ruins 2610-2615
13
      Exhibit 14    Application and Certificate   6
14               for Payment and Invoice 014
               Bates Ruins 2616-2624
15
      Exhibit 15    Parkside Place, LLC Proof    77
16               of Claim
17 Exhibit 16    Affidavit of Charles Aarestad   78
               Re: The Parkside Note
18
      Exhibit 17    Affidavit of Charles Aarestad   82
19               Re: The Mulinda Notes
20 Exhibit 18    Generations Proof of Claim   89
21 Exhibit 19    Affidavit of Charles Aarestad   90
               Re: Eighth Generations Note
22
      Exhibit 20    Affidavit of Charles Aarestad   91
23               Re: Generations Notes Nos.
               107 & No. 9
24
   Exhibit 21    The Ruins, LLC Proof of Claim   97
25
```

Page 5

```
 1       E X H I B I T S  (CONT'D)
 2 EXHIBIT NO.   DESCRIPTION           MARKED
 3 Exhibit 22    Memo from Martin Peterson      102
               to Craig Development 1/26/2021
 4
      Exhibit 23    Memo from Martin Peterson to   107
 5               Craig Development 10/19/2020
 6 Exhibit 24    Ruins Project Contract        110
               Disbursement Summary Bates
 7               Ruins 3684
 8 Exhibit 25    Ruins Project Contract        116
               Disbursement Summary Bates
 9               Ruins 3593
10 Exhibit 26    Declaration of Terry Stroh     130
               (T.L. Stroh Architects, Ltd.)
11               Certifying Records Pursuant to
               Federal Rule of Evidence 901(11)
12
      Exhibit 27    Declaration of Rylan Ojala    146
13               (Watertight, Inc.) Certifying
               Records Pursuant to Federal
14               Rule of Evidence 902(11)
15 Exhibit 28    Voluntary Petition for        152
               Non-Individuals Filing for
16               Bankruptcy
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1        P R O C E E D I N G S
2        (Whereupon, the deposition of JESSE
3   CRAIG commenced at 8:59 a.m. as follows:)
4        (Whereupon, Deposition Exhibits
5        1-14 were marked for identi-
     fication by the court reporter.)
6        JESSE CRAIG,
7   HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
     THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
8   TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
9            EXAMINATION
10  BY MS. STANLEY:
11      Q.  Good morning.
12      A.  Good morning.
13      Q.  Can you state your name for the record?
14      A.  Jesse Robert Craig.
15      Q.  And where do you live currently?
16      A.  I live at 1405 First Avenue North in
17  Fargo, North Dakota.
18      Q.  And where are you from originally?
19      A.  I was born in North Carolina.  Grew up
20  in Mandan.  Went to high school in Beulah, North
21  Dakota.
22      Q.  When did you go to Mandan, move to
23  Mandan?
24      A.  Mandan, we moved there when I was
25  probably 18 months old.  So '70.  Early '70s, late

Page 7

1  '70s.
2       Q.  Okay.  What's your educational
3  background?
4       A.  Went to elementary in the Mandan area.
5  Several schools.  I went to junior high in Mandan.
6  And then went to high school in Beulah, North Dakota.
7  Moved down to Bismarck State College when I graduated
8  in '88, '89, went to mechanical engineering.
9  Transferred out to NDSU in Fargo in '91 to finish
10 bioengineering degree and did not finish that.
11      Q.  How far did you get in that?
12      A.  Got about 18 credits left on it, and
13 then I went into real estate.  I was pretty burnt out
14 from taking 21 credits and working full-time.
15      THE COURT REPORTER:  Can I have you
16 speak up a little bit more?
17      THE WITNESS:  Sure.
18      Q.  (Ms. Stanley continuing) So thank you.
19 That gets us to the rules of the deposition.  You're
20 familiar with these of we should try not to talk over
21 each other.  Yes and no answers.  No uh-huhs.  Your
22 attorney explained most of these to you I assume?
23      A.  Yes, I understand.
24      Q.  Okay.  And similar to what your
25 attorney asked yesterday of Red River State Bank

Page 8

1  witnesses, are you currently taking any medications
2  or substances that would cause you to have your
3  testimony be impaired today --
4       A.  No.
5       Q.  -- for any reason?
6       A.  No.  I'll have a dry voice from a
7  muscle relaxer for a back issue.  That's the only
8  thing is I'll be kind of -- hopefully, it'll clear
9  up --
10      Q.  Okay.
11      A.  -- through the day, but I'll raise my
12 vice and talk more articulate.
13      Q.  Have you ever been deposed before?
14      A.  To where?
15      Q.  Have you ever been deposed before?
16      A.  Yes.
17      Q.  And what was that for?
18      A.  Several occasions.  Construction issue
19 on 220 West with H2 Design Build.  And then I had a
20 lease dispute with Newmans on a Veterans Commons
21 project that I owned.
22      Q.  Newman Sign you meant?
23      A.  The Newman family.  Russ and --
24      Q.  Oh.
25      A.  -- Kyle were both partners in that with

Page 9

1  me and Jeff Johnson.
2       Q.  So you've had your deposition taken
3  twice?
4       A.  No.  Again, for a Plains Commerce Bank
5  issue down in Sioux Falls, South Dakota.
6       Q.  So that's three?
7       A.  Three that I can recall, yes.  And I'm
8  sure I was deposed for my divorce.  That's getting
9  back there over a decade.
10      Q.  Did you talk with anyone about this
11 deposition prior to today?
12      A.  Yes.
13      MR. VERSTANDIG:  Objection.  You can
14 indicate whether you spoke to counsel.  Do not answer
15 in connection with anything you did discuss with
16 counsel to prepare for today.
17      A.  Okay.
18      Q.  Anyone other than counsel?
19      A.  Yes.
20      Q.  Who did you talk to?
21      A.  My wife.
22      Q.  Is that it?
23      A.  Yep.
24      Q.  And what was the conversation?
25      A.  Just kind of --

3 (Pages 6 - 9)

Page 10

1         MR. VERSTANDIG: Objection. Whoa.
2 Objection. Privilege.
3         MS. STANLEY: Attorney-client -- or
4 spousal? Marital privilege?
5         MR. VERSTANDIG: Marital. Yeah,
6 spousal.
7      Q.  (Ms. Stanley continuing) And you
8 didn't talk to anybody else?
9      A.  About this deposition today?
10     Q.  Correct.
11     A.  No.
12     Q.  What documents did you look at prior to
13 today for this deposition?
14     A.  The Ruins --
15        MR. VERSTANDIG: Same direction. If I
16 gave you a document that emanated from a third party,
17 you can discuss here. To the extent you looked at my
18 notes, my instructions, my emails, I'm instructing
19 you not to answer in connection with those.
20     A.  Okay. The Ruins timeline when it was
21 started construction so I was aware of that. And how
22 that would have overlapped with Martin Peterson's
23 departure from the bank. I just wanted to get those
24 two dates clear.
25     Q.  So when you say The Ruins timeline, is

Page 11

1 this a document that lays it out, or what do you mean
2 by that?
3      A.  It's Ruins draws that Charles Aarestad
4 had put together that listed all the draws and the
5 dates and the amounts.
6      Q.  So you looked through the draw requests
7 basically.
8      A.  No. I looked at the -- it's a
9 spreadsheet -- Excel spreadsheet that Charles put
10 together.
11     Q.  Okay.
12     A.  Shows the draw date, where it
13 originated from, the amount. Which I think there's a
14 check number in there, a loan number that ties to it
15 also.
16     Q.  Okay. So you just basically looked at
17 that one spreadsheet?
18     A.  Yes.
19     Q.  Nothing else?
20     A.  How far back are we talking that --
21     Q.  In preparing for this deposition today.
22     A.  In preparing for this deposition today?
23     Q.  Yeah.
24     A.  That was the only thing that I've
25 looked at. Prior to that before this deposition was

Page 12

1 set I've had great knowledge of the draw requests
2 with The Ruins and other entities. In preparation
3 for discovery requests and getting that information
4 to you and your clients we, of course, looked at all
5 that.
6      Q.  Okay. Did you turn all the documents
7 over in discovery that we -- that were requested?
8      A.  Probably the only thing that you wanted
9 was complete checking account for Craig Development,
10 and we did not feel comfortable doing that so we
11 objected to that just because there's other entities
12 and other partners of mine that have projects that
13 flow through that also.
14     Q.  So which bank was that with?
15     A.  First Community Credit Union.
16     Q.  And that was just the Craig Development
17 account?
18     A.  Correct. And then we had not received
19 that we could find in discovery The Ruins checking
20 account and the activity on that account that's at
21 Red River State Bank.
22     Q.  Okay. So what about all the documents
23 from subcontractors.
24     A.  Almost all of that or the majority of
25 that flowed through my project managers through

Page 13

1 Prevail. And we do not have access to that any
2 longer. We went and got the computers, went through
3 the hard drives, had our IT guy, and we could not
4 retrieve any of those. So I've got -- any incoming
5 that I had that came from the project managers I
6 turned that over in email requests that you had for
7 discovery.
8      Q.  So when you say Prevail, who are the
9 individuals?
10     A.  Initially the individuals that were
11 owners in that you're asking?
12     Q.  Yes.
13     A.  Jesse Craig, myself, and Jesse Kihl.
14     Q.  Okay. And so as an owner you didn't
15 have access to the documents?
16     A.  We kept separation between the project
17 manager and general contractor. I was up here and
18 Jesse Kihl was on location down there. We were
19 working in a small town so we used a lot of local
20 contractors. There was actually an article in the
21 newspaper about me committing to that for the
22 community. So he knew a lot of those people down
23 there that we were able to use so he had a connection
24 with them, a relationship with them, which actually
25 came in good when it came time to collect draw

4 (Pages 10 - 13)

Page 14

1 requests and lien waivers.
2      Q.  Okay.  So but, again, my question was
3 you didn't have access to the documentation?
4      A.  I would have if I had gone down there
5 early on and grabbed the computers, and things like
6 that.  But, again, I didn't work directly with my IT
7 guy, my attorneys did back when Lee Grossman was
8 involved.
9      Q.  So other than invoices and payment
10 applications and stuff that were in the draw requests
11 provided to Red River State Bank, you don't have
12 access to any other -- just all the pay apps, all the
13 invoices, of that stuff?
14      A.  No.
15      Q.  You have none of those.
16      A.  I don't have them and I didn't request
17 them.  I know you had sent out a lot of subpoenas to
18 the contractors so we haven't seen what was derived
19 from that.  So if I was able to see any of that
20 information you got everything would tie out
21 probably, but -- but I haven't seen that.
22      Q.  Okay.  So the documents that were
23 provided directly from the subcontractors, would
24 there be any reason for you to think that information
25 was not correct?

Page 15

1      A.  Yeah.  Yes.
2      Q.  What?  Why?
3      A.  When we're dealing with little
4 contractors you're talking about, you know,
5 $6 million buildings where a lot of these guys like
6 Kloos Electric, K-L-O-O-S, and Watertight who did the
7 plumbing, they did, like, homes, service calls.  They
8 have never taken on a project of this size.  So when
9 Jesse Kihl started receiving those invoices, those
10 draw requests, they didn't know how to do retainage.
11 And then early on we had where draw requests were
12 never funded on time.  So we had overlapping draw
13 requests.  So if Watertight put an invoice in for a
14 bill in April and it was $75,000, and it didn't get
15 funded within the 30-day time period when the next
16 one came in, then his next draw request was 150,000
17 when he really only wanted 75,000.  And it was just a
18 domino effect like that.  So there was many times
19 where either Jesse Kihl or myself had to work with or
20 like literally via FaceTime talk to the contractor,
21 correct the contract or somehow help them to where
22 they could situate it, you know, going forward.
23      Q.  But you don't have any records of
24 those.  It would only be Prevail that had records of
25 making corrections, and stuff.

Page 16

1      A.  I think there's emails that I provided
2 that I saw when I was going through them that we gave
3 to you that would have discussed some of those.  I
4 know, for instance, like Baete-Forseth, there was a
5 ton of corrections in theirs, but, luckily, that's a
6 little bigger outfit so I was working directly with
7 their accountant or bookkeeper so she was able to do
8 that.  A lot of times it was, like, Jesse or -- it
9 isn't Jesse.  No.  Kloos's -- Rick Kloos's wife, she
10 was doing the payment, like, for him.  So we were
11 working with her trying to get her to understand how
12 to hold back 10 percent retainage.
13      Q.  So if you were working directly
14 with -- did you say it was Kloos's --
15      A.  Baete-Forseth.
16      Q.  Baete-Forseth.  Then that would have
17 gone through your email; right?
18      A.  Correct.
19      Q.  And you would have had records of
20 those?
21      A.  Correct.
22      Q.  And those were -- you believe those
23 were provided?
24      A.  Yes.
25      Q.  What about for Watertight.

Page 17

1      A.  That one, no, they're just
2 not -- again, it's a husband, wife team.  He did not
3 have a bookkeeper.  Everything was through him, and
4 so he was on the job almost all the time working
5 himself.  So that one would have been a Jesse Kihl
6 kind of probably situation.  If there was issues with
7 that, he would have handled that directly on the job
8 site.
9      Q.  Before we get too far afield, let's
10 take a look at the binder that you have in front of
11 you.
12      A.  Okay.
13      Q.  Just for ease of trying to keep
14 documents straight, I'm hoping we can do this --
15 these will be the first 14 documents and they're
16 tabbed.  You have a binder with 14 tabs; correct?
17      A.  Yes.
18      Q.  Okay.  Let's take a look at the first
19 one.
20      A.  Okay.
21      Q.  And it says, "Invoice, 001 Craig
22 Development, LLC" at the top; correct?
23      A.  Yes.
24      Q.  And there's some Bate numbering at the
25 bottom.

5 (Pages 14 - 17)

Page 18

1     A.  Yep.
2     Q.  02 -- Ruins 02338; is that right?
3     A.  Yes.
4     Q.  Okay.  Does this look familiar?
5     A.  Actually, no, it doesn't.
6     Q.  It doesn't.
7     A.  No.
8     Q.  Why doesn't it look familiar?
9     A.  Because the one I looked at last night
10  that I had send to Chris Schilken of Watertown
11  Development Company only showed one draw for the City
12  of Watertown for 475,000.  And I was having an issue
13  trying to find --
14    Q.  Why don't you take a look at No. 2.
15    A.  Yeah.
16    Q.  Is that the one you're talking about?
17    A.  Yep.
18    Q.  Okay.
19    A.  That helps.
20    Q.  Okay.  So No. 1, does that look like --
21    A.  It's looks like something I would have
22  put together, yes.
23    Q.  What about the checkmarks, is that
24  something you would normally do?
25    A.  I would have put checkmarks beside that

Page 19

1  to put in lien waivers to make sure I received all
2  the lien waivers for those.
3     Q.  Okay.  And would you have -- so when
4  doing one of these, would you have been the person
5  that put it together?
6     A.  Normally, no.  Normally we'd use The
7  Title Company.  And I would have just sent the
8  invoices in in a pack, and they would have done the
9  draw requests, the reviews, they would have sent it
10  to the bank for their review and approval before they
11  funded, and then they would have collected the lien
12  waivers.
13    Q.  Okay.  But normally -- but I'm asking
14  about this one.
15    A.  Would I have done that?
16    Q.  Did you put this one together?
17    A.  Looks like it, yes.
18    Q.  Would anybody else have done it like
19  Mulinda?
20    A.  No.
21    Q.  You have a daughter named Jordan;
22  correct?
23    A.  Yes.
24    Q.  What is her last name?
25    A.  Now as married name?

Page 20

1     Q.  Yeah.
2     A.  Horner, H-O-R-N-E-R.
3     Q.  Does she work with the business?
4     A.  No.  She works for Craig Properties,
5  runs that department, and that manages just the
6  apartments in Fargo.
7     Q.  So she only works for Craig Properties?
8     A.  Correct.  Before she started having
9  children we talked about her coming in to be a
10  developer.  She went out with me on some trips, and
11  things like that, out to Montana, but then she
12  decided to have children so that's kind of put that
13  on hold.
14    Q.  So what year did you form Craig
15  Development, LLC?
16    A.  I'd have to say, like, 2015.  It had to
17  have been a little bit before that, though, but right
18  in that area give or take five years.
19    Q.  And what was the purpose of forming
20  that entity?
21    A.  Started doing development downtown and
22  then started looking --
23    Q.  When you say downtown, you mean Fargo?
24    A.  Downtown Fargo.
25    Q.  Okay.

Page 21

1     A.  And then started looking at doing
2  construction.  We built our first building with Terry
3  Stroh and then had the fiasco with 220 West where I
4  hired that out initially and then had to come back in
5  and finish it.
6     Q.  What was the first building with Terry
7  Stroh?
8     A.  The first one that we built was
9  Alexandra Marie.
10    Q.  Okay.  And that's the first building
11  that you built through Craig Development; is that
12  right?
13    A.  It was initially through TL Stroh, but
14  Craig Development helped with that and finished it.
15    Q.  So was Craig Development considered the
16  general contractor on that job?
17    A.  No.  TL Stroh was.
18    Q.  Okay.  So you were considered -- what
19  type of role, then, did you play?
20    A.  I was the owner, and then we helped do
21  all the finishes.  So we picked out all the flooring
22  and then helped with the subs at the end of that.
23    Q.  Okay.  So Alexandra Marie, then you
24  said 220 --
25    A.  220 West.

6 (Pages 18 - 21)

Page 22

1    Q.  -- West.  What about that project, what
2 was -- that type of project was that?
3    A.  It's a 76 apartment -- 76-unit
4 apartment building.
5    Q.  And it's in downtown Fargo?
6    A.  Yes.  220 Tenth Street North.
7    Q.  When about was that one done?
8    A.  When was it finished?
9    Q.  Yeah.
10    A.  2016, 2017.
11    Q.  Okay.  What was the next project after
12 that one?
13    A.  1023 Flats.
14    Q.  Okay.  And what type of project is
15 that?
16    A.  A 15-plex apartment building.
17    Q.  And where is that at?
18    A.  1023 First Avenue South.
19    Q.  In Fargo.
20    A.  Yes.  Sorry.
21    Q.  Did you work with Terry Stroh on that
22 one also?
23    A.  On 1023 Flats?
24    Q.  Yes.
25    A.  He was the architect.

Page 23

1    Q.  Okay.  What was the time frame on that
2 one?  Do you remember the year that one was
3 completed?
4    A.  That would have been completed in 2017.
5    Q.  Okay.  And what was after 1023 Flats?
6    A.  Then we went down to Watertown.
7    Q.  In 2017?
8    A.  No.  That would have been in 2019.
9 2018, 2019 I believe.  I probably got my dates all
10 wrong, but...
11    Q.  Sure.  So what was the first project in
12 Watertown that you worked on?
13    A.  That was The Lofts.
14    Q.  Okay.  And The Lofts took how long to
15 construct from start to finish?
16    A.  About 14 months I believe.  Twelve to
17 14 months typically.
18    Q.  So that would have been completed in...
19    A.  2020.  Right after 2020 or early '21.
20    Q.  Okay.  And then after The Lofts?
21    A.  Parkside.
22    Q.  Was Parkside?
23    A.  Yep.
24    Q.  And that would have started
25 construction when?

Page 24

1    A.  Three months before that ended.  So
2 that's where I looked at that sheet last night on
3 when the start and stop dates were on construction.
4 So Parkside would have started in early '21; right?
5 Yeah.  Even probably late 2020 and into 2021.  And
6 Parkside was '21 to '22, and then Ruins was supposed
7 to be -- no, Generations is in there.  I'm confused.
8 I'm sorry.  Trying to remember all those construction
9 dates and they overlapped.
10    Q.  So with the prior ones that we talked
11 about, Alexandra Marie, 220 West, 1023 Flats, were
12 they all done sort of one after the other, or did
13 they -- the construction overlap?
14    A.  They were one after another.  They
15 weren't overlapped.
16    Q.  Okay.  So this is the first time that
17 there was overlap.  Is that a correct statement?
18    A.  Yeah.  Because we were building in a
19 town of 24,000 people.  So to get a contractor there
20 and keep them there just an economy of scale.  In
21 Fargo you can bid it out on bill.com and you're going
22 to have 60 quotes on concrete alone.  Down there in
23 that town when you're between Sioux Falls and Fargo
24 that are booming it's very hard to get a contractor
25 to that town.  And so when you get them there you

Page 25

1 want to keep them there.
2    Q.  So with the prior projects, Alexandra
3 Marie, 220 West, 1023 Flats, did you work with banks
4 to finance these projects?
5    A.  Yes.
6    Q.  Which banks did you work with for
7 Alexandra Marie?
8    A.  Alexandra Marie was initially done
9 at -- oh, it's been refi'd.  First Community Credit
10 Union I believe.
11    Q.  And how were the draw requests done for
12 that one?
13    A.  Through The Title Company.
14    Q.  What about 220 West.
15    A.  That was Starion.
16    Q.  And how were the draw requests done
17 there?
18    A.  Title Company.
19    Q.  And 1023 Flats, who financed that one?
20    A.  Initially I think that was Plains
21 Commerce Bank.
22    Q.  And you mentioned that you had been
23 deposed by Plains Commerce Bank.  Was that regarding
24 1023 Flats?
25    A.  No.  That was The Lofts.

7 (Pages 22 - 25)

Page 26

1    Q.  So Plains Commerce Bank financed 1023
2  Flats and The Lofts?
3      A.  They were supposed to finance The Lofts
4  and then got cold feet about three hours before the
5  deadline for me to get everything into the city for
6  the construction.  And so they literally just dropped
7  out, didn't give a reason.  And so I had to work with
8  Chris Schilken of Watertown Development Company to
9  pull together a plan quickly, and we ended up having
10  Dacotah Bank in Watertown finance it.
11    Q.  So Lofts was financed by Dacotah Bank.
12    A.  Correct.
13    Q.  Did you sue Plains Commerce Bank?
14    A.  Yes.
15    Q.  And that was regarding The Lofts
16  property?
17    A.  Yes.
18    Q.  And how did that one turn out?
19    A.  We settled.
20    Q.  What were the type of claims you made
21  in that case?
22      THE WITNESS:  Is it confidential or is
23  it a public record?
24      MR. FRISK:  What was the question?
25    Q.  What were the types of claims you made

Page 27

1  in the Plains Commerce case.  That would probably be
2  in the Complaint.
3      A.  We signed an NDA with --
4      MR. FRISK:  You signed an NDA --
5      MR. VERSTANDIG:  Hold on.  Hold on.
6      THE WITNESS:  I'm sorry.  Talking over.
7  My apologies.
8      MR. VERSTANDIG:  As one who doesn't
9  know the answer I can ask this readily without
10  coaching.  Was a Complaint filed in a court of
11  record?
12      THE WITNESS:  Yes.
13      MR. VERSTANDIG:  Okay.  Unless your
14  attorney directs otherwise, I'm going to instruct you
15  that you can indicate what was in the Complaint
16  because it's a matter of public record.
17      THE WITNESS:  Okay.
18      MR. VERSTANDIG:  If there were claims
19  that were threaded or asserted in confidential
20  settlement communications, i.e., I'm going to stress
21  I don't know anything about this so I'm not going to
22  know the answer, if you do not settle with us we will
23  amend to add a claim for willful and wanton battery
24  and we will allege that you have aided and abetted
25  the overthrow of the United States, that may or may

Page 28

1  not be subject to an NDA and your counsel is going to
2  weigh in on that.  But whatever was in the Complaint
3  you can speak to today.
4      A.  I believe it was just damages.
5    Q.  Like a breach of contract?
6      A.  I believe so, yes.  Again, I apologize,
7  I don't know the details of that, but it was pretty
8  much that they had guaranteed with a commitment
9  letter financing and all of these other items and
10  didn't perform.
11    Q.  So similar to what you're alleging in
12  this case then.
13    A.  No.
14      MR. VERSTANDIG:  Object to the form of
15  the question.
16    Q.  How is it different?
17    A.  I've had to get my mind around the fact
18  that I am not in a lawsuit with Red River State Bank,
19  I'm in a lawsuit with the Aarestad family who
20  inherited a bank.
21    Q.  So it's the -- the difference between
22  the claims based on a loan commitment in the Plains
23  Commerce one and the claims you're alleging in this
24  case is simply because it's the Aarestad family?
25    A.  Well --

Page 29

1      MR. VERSTANDIG:  Hold on.  I get to
2  object and then you get to answer.  Object to the
3  form of the question.  I'm going to refrain from
4  speaking objections unless you want me to give them.
5  You can answer.
6    A.  With the Plains Commerce Bank lawsuit
7  they did one act of just not performing on the loan
8  commitment.  Our claims against Charles Aarestad and
9  the bank are much more severe I believe.  I think
10  there is a lot more to it than just one act.  This is
11  also The Ruins project involved the Aarestad family
12  on personal notes, nominee lending.
13    Q.  So what year did you form Craig
14  Properties?
15    A.  That would have been in '95.
16    Q.  1995?
17    A.  Yep.
18    Q.  And what's the purpose of Craig
19  Properties?
20    A.  It manages the properties in Fargo,
21  North Dakota.
22    Q.  So does Craig Properties really have
23  any overlap, if you will, with Craig Development?
24    A.  I was -- when I first started doing
25  development, and things like that, we used the Craig

8 (Pages 26 - 29)

Page 30

1 Properties checking account. It was kind of where
2 all the money goes, and then the Yardi, our property
3 management software, kind of distributes it or is
4 able to keep track of what entity writes what check,
5 and things like that. Does the same thing for the
6 software -- or the software does the same thing --
7      Q. So hang on just a second. So when you
8 say what entity writes what check, so you're -- are
9 you talking about, like, I'm going to pay the check
10 for this apartment building to fix the door?
11     A. Yep. There would be an invoice that
12 would be created. You'd put who the check is going
13 to be made out to, and then on the bottom you put
14 what property it's coming out of, the code for what
15 it's going to be expensed to, and the amount.
16     Q. Okay.
17     A. So then when we run a report or a check
18 register I can tell what checks are written from
19 Craig Properties for what buildings or which ones
20 were written out of Craig Development.
21     Q. Okay. So what type of checks would
22 Craig Development typically write, for what purpose?
23     A. Insurance. Just to distinguish between
24 the two, are you talking during a construction
25 project, or are you talking during, like, a lull when

Page 31

1 I'm just developing --
2      Q. Right. Like, during a construction
3 project. Because Craig Development once the
4 building's done it wouldn't be getting any money;
5 correct?
6      A. Correct. It would be handed over to
7 the property management company. So in Watertown it
8 would be CP Business Management, that's Mindy runs
9 that for her and my twins. That's why the buildings
10 were built5. And then anything in Fargo, North
11 Dakota, would be typically Jordan. And it does have
12 some satellite businesses that we inherited from when
13 I owned Coldwell Banker Real Estate that still
14 manages for it. So that was one of the things when
15 you asked for discovery on the checking account is
16 she has those businesses like the Georgian, you know,
17 real estate -- or Georgian apartments, that real
18 estate runs through her checking account.
19     Q. And you're talking the CP Business
20 Management.
21     A. Yes.
22     Q. Is this the account at Starion?
23     A. Yes.
24     Q. Okay. So Craig Development is the
25 general contractor on the three Watertown projects.

Page 32

1      A. Correct.
2      Q. Correct. So Craig Development would be
3 the one that would be paying the subcontractors;
4 correct?
5      A. Yes. Either -- ultimately, yes.
6      Q. Now why did you hedge that with
7 "ultimately, yes"?
8      A. Because when the checking account
9 was -- when Craig Development was in the Craig
10 Properties checking account, it would be on a Craig
11 Properties check but it would be allotted to Craig
12 Development. And then as we started to get more
13 projects, it just made sense and my accountant pushed
14 for it to start Craig Development's own checking
15 account. That was just a lot cleaner and easier to
16 track. Then it separated everything so that Jordan
17 was just running Craig Properties. I had my own
18 account for reports, and things like that. I had
19 nothing to do with Craig Properties then.
20     Q. Do you have -- when checks get signed
21 for Craig Development, do you have a stamp?
22     A. Yes.
23     Q. Who has access to the stamp?
24     A. Jordan, myself, and Mulinda.
25     Q. And do they have signatory authority

Page 33

1 for this Craig Development checking account?
2      A. If they have a stamp, yes, they would.
3      Q. So you gave them authority to use your
4 stamp.
5          MR. FRISK: Objection. Form.
6      Q. Is that correct?
7          MR. FRISK: Calls for a legal
8 conclusion.
9      Q. Did you give them permission to use
10 your stamp?
11     A. Yes.
12     Q. Did they have to talk to you about
13 when -- when they used the stamp tell you?
14     A. If it was for Craig Development, yes.
15 But I was also a signatory, and I think they used
16 that stamp on Craig Properties checks because I was
17 an owner in that and I ran that company for 25 years.
18 And then I believe on the Starion account also I
19 might be the signatory on the CP business.
20     Q. Did Jordan have any -- let's not be
21 passing notes to the witness.
22         MR. FRISK: Well, you can read it,
23 Caren. I don't care. It's --
24     A. Sorry, I'm talking too much.
25         MR. FRISK: -- nonresponsive, but he

9 (Pages 30 - 33)

Page 34

1  just needs to answer the question and move on because
2  I want to get out of here today.
3        THE WITNESS:  Sorry.
4        MR. FRISK:  So he's nonresponsive.
5  Just answer the question in front of you, Jesse.
6        THE WITNESS:  All right.
7        MR. FRISK:  Don't speculate.  I don't
8  want to be trying to strike my own witness's
9  testimony.
10       THE WITNESS:  All right.
11       Q.  (Ms. Stanley continuing)  Jordan I
12  thought you said had no position with Craig
13  Development.
14       A.  She doesn't.
15       Q.  She doesn't.  So wouldn't she have
16  signed checks for -- with your stamp for Craig
17  Development?
18       A.  No.
19       Q.  She may have signed checks --
20       MR. FRISK:  Objection.  Asked and
21  answered.
22       Q.  Would she have signed checks with your
23  stamp, though, for Craig Properties just to clarify?
24       A.  Yes.  Because ultimately she is
25  managing my real estate portfolio.

Page 35

1        Q.  When did you have the split between the
2  accounts for Craig Development and Craig Properties?
3        A.  I don't recall.  And I know I should
4  because we sent those checking accounts to you guys,
5  but I can't recall a date.  If I had to guess, do you
6  want an approximate?
7        Q.  Yeah.
8        MR. VERSTANDIG:  Don't guess.  Instruct
9  you not to guess.  Nope.
10       A.  Sorry, I don't know.
11       Q.  Okay.  But after the Craig Development
12  account was formed, do you believe that you deposited
13  Craig Development funds in that --
14       MR. FRISK:  Objection.
15       Q.  -- account?
16       MR. FRISK:  Speculation.
17       THE COURT REPORTER:  Excuse me.
18       MS. STANLEY:  You are defending this
19  depo or is Mac?  One or -- one or the other.
20       THE COURT REPORTER:  Excuse me.  I'm
21  going to ask everybody to go one at a time, please.
22  You're really confusing the record.  So from here
23  whoever starts.
24       MR. VERSTANDIG:  Let's be clear about
25  who's here in which capacity.  Mr. Craig is being

Page 36

1  deposed as an individual.  He's not a 30(b)(6)
2  designee today.  As an individual, Mr. Craig has
3  brought his own counsel who is at the table.  I
4  represent the debtor, or debtors in these cases, and
5  as such I'm at the table representing the debtors.
6  That gives both of us standing to lodge objections
7  where appropriate.
8        MS. STANLEY:  So you both plan to lodge
9  objections at the same time?
10       MR. VERSTANDIG:  We're going to try not
11  to talk over each other where possible.  I'm also
12  trying not to coordinate with him because that's
13  improper.  If you'd prefer we whisper and confer we
14  can, but I think that's going to raise far more ire.
15       THE WITNESS:  What was your last
16  question?  Sorry.
17       MS. STANLEY:  I don't remember.  Can
18  you --
19       THE WITNESS:  It's about whether Jordan
20  signed or used --
21       MS. STANLEY:  No, I think we moved on
22  from that.
23       MR. FRISK:  It was --
24       MR. VERSTANDIG:  You were going to
25  guess and then --

Page 37

1        THE WITNESS:  I know, I'm sorry.
2        MR. VERSTANDIG:  -- counsel --
3        THE COURT REPORTER:  Excuse me.  Now we
4  have three people talking at one time.
5        (Off the record conversation.)
6        MS. STANLEY:  What was the last
7  question if you can.
8        THE COURT REPORTER:  "Okay.  But after
9  the Craig Development account was formed, do you
10  believe that you deposited Craig Development funds in
11  that account?"
12       Q.  (Ms. Stanley continuing)  So after
13  there was a split in the bank accounts and you have a
14  Craig Development and a Craig Properties account,
15  were the funds from Craig Development put into the
16  Craig Development account?
17       MR. FRISK:  Answer the question if you
18  recall, Jesse.  Don't speculate.
19       MS. STANLEY:  Quit -- please, Dan,
20  please stop coaching your witness.
21       MR. FRISK:  That's not coaching.
22       MS. STANLEY:  Yes.
23       MR. FRISK:  Okay.
24       A.  So just to clarify, you're asking were
25  the funds from Craig -- that were held in Craig

10 (Pages 34 - 37)

Page 38

1 Properties on Craig Development's behalf moved into
2 the Craig Development checking account? Is that what
3 you're asking?
4     Q. (Ms. Stanley continuing) No. But go
5 ahead and answer that.
6     A. Yes.
7     Q. So you believe that funds that had been
8 in -- Craig Development funds put into Craig
9 Properties were then moved to Craig Development.
10    A. Correct.
11    Q. Okay. But do you recall that time
12 frame or not?
13    A. I don't.
14    Q. Okay. Do you recall how much was
15 transferred?
16    A. I don't.
17    Q. Okay. And from that point on were all
18 funds issued to Craig Development put into the Craig
19 Development account?
20    A. To the best of my knowledge, yes.
21    Q. What would be the purpose in
22 transferring funds from Craig Development to Craig
23 Properties?
24        MR. VERSTANDIG: Object to the form of
25 the question. But you may answer.

Page 39

1     A. If there was a shortfall in
2 the -- again, I'm the owner, excuse me, 100 percent
3 owner in all those entities so if there was a
4 shortfall or one of them needed cash or there was a
5 capital improvement that was done, if I wanted to use
6 funds from my general contracting company that I'd
7 received via fees or development fees or GC fees,
8 then I would have contributed that to it.
9     Q. To keep -- to give money to Craig
10 Properties.
11    A. Well, to give -- ultimately to give
12 money to my building. So like, for instance,
13 Billmeyer Apartments, that needed a new roof. It was
14 $50,000. So I transferred money from Craig
15 Development to Craig Properties for that to use on my
16 building on one of my real estate projects.
17    Q. Okay. So when you're given money from
18 a bank pursuant to a draw request, is it your
19 understanding that the draw request -- if it says a
20 plumber on there for $50,000, do you believe that you
21 have to pay $50,000 to that plumber from those funds?
22        MR. VERSTANDIG: Object to the form of
23 the question. You may answer.
24    A. If that's what they're owed, yes.
25    Q. So when you're putting information

Page 40

1 into -- or sorry. That email came through at that
2 time. Sorry. I got an email. Sorry.
3        MR. VERSTANDIG: When you're putting
4 information into...
5     Q. Into a draw request and it lists
6 various subcontractors, like, ten subcontractors, and
7 you get funds to pay those, are those funds allocated
8 for payments to those ten subcontractors?
9        MR. VERSTANDIG: Object to the form of
10 the question, but you may answer.
11    A. Normally I wouldn't be doing any of
12 that because I'm not a title company. So I wasn't
13 hired to do construction management on any of the
14 projects. I'm not staffed for it. I don't have the
15 software for it. We had to kind of create that. But
16 ultimately, yes.
17    Q. Was Craig Properties' bank account used
18 for personal expenses?
19        MR. VERSTANDIG: Object to the form of
20 the question. Please limit it to a specific time
21 period.
22    Q. In the time period of 2021 to 2023.
23    A. Was it used for personal.
24    Q. Personal, household expenses.
25    A. Not household expenses, but we would

Page 41

1 have probably ran our mortgage through there. We had
2 a 0824 account that was in Yardi that we used for
3 personal items, but most of, like, vehicles, and
4 stuff like that, are all under companies. But it
5 would have paid our mortgage. By then, though, we
6 might have been already starting to transfer that
7 money into the Wells Fargo account and made the
8 mortgage out of there. So there was a transition
9 time period in there also.
10    Q. So is that the only personal expense
11 that you can think of that would have been paid out
12 of Craig Properties?
13    A. When you say out of Craig Properties --
14    Q. Out of the bank account at First
15 Community Credit Union.
16    A. Right. But ultimately, again, it would
17 have been coded under 0824 for me personally for tax
18 reasons. And then, yes, I would have to believe that
19 there was other stuff that was paid out of there such
20 as vacations, and things of that nature.
21    Q. What about $100,000 Valley Imports.
22    A. That was initially to buy a car as an
23 anniversary present for my wife as a surprise. It
24 was later financed and that money was put back.
25    Q. The money was put back you believe.

11 (Pages 38 - 41)

Page 42

1    A.   Should have been, yeah.  Because there
2  is a mortgage on the car -- not mortgage.  Well, I'm
3  going to retract that because, depending on the year,
4  the $100,000 you're talking about might have been an
5  Audi SUV also.  But, yeah, either that would have
6  been paid out of general contracting fees that I had
7  personally or it would have been financed and that
8  money reimbursed.
9    Q.   Do you have another daughter name
10 Sydney?
11   A.   Yes.
12   Q.   Were her tuition payments paid out of
13 the Craig Properties account?
14   A.   Probably.
15   Q.   Were those reimbursed?
16   A.   Well, again, it would have been paid
17 out of the 0824 account which is my personal money.
18   Q.   So when you say 0482 is --
19   A.   0824.
20   Q.   0824.
21   A.   Yes.
22   Q.   Is this a coding within your accounting
23 software?
24   A.   Correct.  Every property has its own
25 code.

Page 43

1    Q.   Okay.  And so you put your personal
2  expenses under this accounting code.
3    A.   Correct.
4    Q.   Was Craig Properties providing any
5  services to Craig Development during 2021 and 2023?
6    A.   No.
7    Q.   So there would be no reason for Craig
8  Development to give money to Craig Properties for
9  services provided then; correct?
10   A.   No, that's not correct.
11   Q.   Why not?
12   A.   Well, for services or for improvements
13 to the buildings?
14   Q.   Okay.  Can you expand on that?
15   A.   Well, like I just had mentioned
16 earlier, if there was Billmeyer Apartments that
17 needed a roof and there wasn't enough money in their
18 account, then as an owner I would have made an owner
19 contribution, an owner draw to Craig Development to
20 an owner contribution to the 0824 account, and then
21 that would have, in turn, borrowed the money to
22 Billmeyer or tracked it through Billmeyer through the
23 improvements made to it.
24   Q.   And then would Billmeyer Apartments owe
25 a debt back to Craig Properties or to Craig

Page 44

1  Development?
2        MR. VERSTANDIG:  I'm going to object
3  and this is going to be an objection -- hold on.
4  We're here for the deposition related to claim
5  objections in three bankruptcy cases and a stay
6  relief motion in one bankruptcy case.  You are
7  entitled to get to know your witness, you're entitled
8  to get to know your witness's background.  You also
9  represent parties who are suing very specific
10 entities under the control and dominion of the
11 witness.  It very much appears that we have departed
12 from a reasonable inquiry into background and
13 commenced taking discovery in connection with
14 litigation that is stayed and that is not the
15 litigation in which this deposition is being taken.
16 So to the extent there is some logical nexus to the
17 matter set for hearing next week, I hope you will
18 arrive upon that shortly.  If we do not arrive upon
19 that shortly, I will commence instructing the witness
20 not to answer.
21       MS. STANLEY:  Craig Development
22 received funds for the construction of the Watertown
23 properties.
24       MR. VERSTANDIG:  Yes.  And you want if
25 ask about that, that's one thing.  But at the moment

Page 45

1  we're talking about --
2        MS. STANLEY:  And what happened, where
3  the funds went.
4        MR. VERSTANDIG:  If you want to ask
5  about where funds destined for Ruins went -- and by
6  the way, where funds destined for the other two went
7  is immaterial to next week.  That's perfectly fine.
8  And setting up anecdotes to get to know the witness
9  and business practices would be fine in a bubble, but
10 we have gone beyond anecdotes to a very careful
11 examination of historical business practices that is
12 beyond any cognizable scope of relevance to the
13 deposition being conducted.
14       MS. STANLEY:  So you're asking me to
15 refrain from asking questions about where the Craig
16 Development money provided by Red River State Bank
17 went?
18       MR. VERSTANDIG:  No.  Let me be very
19 clear about this.  You're asking about money that was
20 provided by your client in connection with the
21 construction of The Ruins before your client
22 tortiously and unlawfully caused said construction to
23 cease.  That is fair play for today.  You're asking
24 about historic construction projects that have been
25 completed, unrelated apartment buildings that are

12 (Pages 42 - 45)

Page 46

1 being managed and the flow of funds associated
2 therewith.  That is not relevant for today.  If you
3 want to ask about where your client's monies went in
4 connection with The Ruins project, that's absolutely
5 permissible.
6        Q.  (Ms. Stanley continuing)  Why would
7 funds deposited for Red River State -- or by Red
8 River State Bank to -- paid to Craig Development be
9 immediately transferred to Craig Properties?  Is
10 there any reason for that?
11        MR. FRISK:  Objection.  Form.  Go ahead
12 and answer.
13     A.  Yeah, any -- any fees that were paid to
14 me on a draw request or paid to Craig Development,
15 when those were in my possession then I would use
16 those as needed.  So if I wanted to transfer money
17 and do improvements on any of my buildings, I would
18 do that.  If I wanted to buy a car, I could do that.
19 That would be the only reason.
20     Q.  If they were -- so are you talking
21 about, like, the fee that Craig Development gets paid
22 to do the general contracting work?
23     A.  Or the developing, yes.  If that money
24 came into Craig Development and I wanted to put it
25 into Craig Properties 0824 account, it's fees that I

Page 47

1 made, was entitled to, and how I used those were up
2 to me personally.
3     Q.  Okay.  But what about fees -- when we
4 look at, for example, draw request No. 1, there are,
5 I don't know, 15 different subcontractors listed.  Is
6 that correct?
7     A.  Yes.
8     Q.  Okay.  And are you talking about, like,
9 the very bottom one that says, "Craig Development
10 Site Staff," that would be considered --
11     A.  That would be me being reimbursed for
12 site staff more than likely.  A lot of these I would
13 have paid already.  And, again, this draw was funded
14 by the TIF, not by --
15     Q.  Okay.
16     A.  -- Red River State Bank.
17     Q.  But I'm asking, you know, what the
18 purpose of providing this information is.  These are
19 reimbursements?
20     A.  Some are.  Some I would have paid in
21 advance because the TIF wasn't funded on time.
22     Q.  Okay.
23     A.  Some of them would have been paid
24 directly to the contractor.  But, yeah, a lot of
25 times on all of the draws I was having to prepay or

Page 48

1 pay these contractors ahead of time.  They didn't --
2 they weren't able to float $100,000 for 90 days until
3 they got funded.  They would have walked off the job.
4     Q.  So if you had prepaid one of these --
5        MR. FRISK:  Objection.  Form.  Calls
6 for speculation.
7     Q.  Which one of these -- are any of these
8 on Exhibit No. 1, can you recall if you prepaid any
9 of these?
10     A.  Walford Construction, he was paid in
11 cash.  And his family owned the Palace --
12     Q.  Okay.
13     A.  -- that I bought, tore down.  It was
14 filled with sex offenders and bedbugs.  But
15 he -- as part of the agreement he was paid to take
16 out all of the cast iron tubs, all the stoves, all
17 the rubbish had to be taken out of that building
18 prior to demo.  The insurance, more than likely I
19 would have paid that.  Utilities I would have paid.
20 The site fencing.  I think those are the major ones.
21 And then the site staff I would have probably paid
22 them ahead of time.
23     Q.  Okay.  So let's look at Clausen or
24 Infrastructure.  That's the Infrastructure Design;
25 correct?

Page 49

1     A.  Yes.
2     Q.  If those had not been prepaid, this is
3 the amount of money that came out of draw 1 that
4 should have gone to Clausen; correct?
5        MR. FRISK:  Objection.  Form.
6     A.  It looks like that, yes.
7     Q.  Okay.  Let's go through the rest -- I
8 just want to get these 14 documents...
9        MR. FRISK:  Can we take a five-minute
10 break so that I can chat with my client?
11        MS. STANLEY:  We haven't even been
12 going an hour yet so I'd prefer if we bop through
13 these 14 documents at least.
14        MR. FRISK:  If we can take a
15 five-minute break I think we can get through the 14
16 documents quicker.  I mean, I just want to move
17 through these quicker.  It's five minutes.  And
18 there's no question in front of him, Caren, so we can
19 take a five-minute break.  That's all I need.
20        MS. STANLEY:  Okay.  It is 9:50.
21        MR. FRISK:  Be right back.
22        (Off the record from 9:50 a.m. to
23 9:55 a.m.)
24     Q.  (Ms. Stanley continuing)  So we've
25 looked at Exhibit No. 1 which is Invoice 001, and I

13 (Pages 46 - 49)

Page 50

1  believe you indicated that this looked to be what was
2  sent by you to the bank; correct?
3      A.  Yes, but not for funding.
4      Q.  This was for TIF money.
5      A.  Correct.
6      Q.  Okay.  Let's take a look at No. 2,
7  please.  And that looks to be -- does that look to be
8  what you sent to the bank?
9      A.  This would have been initially sent to
10  Watertown Development Company for funding.  A copy
11  would have been sent to the bank.
12      Q.  Okay.  Let's look at No. 3, please.
13  And we're going to mark these as sequentially 1
14  through 14.
15      MR. VERSTANDIG:  Let me be clear.  The
16  one that's marked 3 is 3 and the one that's marked 12
17  is 12, and so on.
18      MS. STANLEY:  Correct.
19      MR. VERSTANDIG:  Yeah, sure.
20      Q.  (Ms. Stanley continuing)  No. 3, have
21  you seen this one before?
22      A.  Yes.
23      Q.  And does this look to be -- did you
24  prepare this?
25      A.  I would assume so, yes.

Page 51

1      Q.  Would anybody --
2      MR. FRISK:  Jesse, let her finish the
3  question before you answer.
4      MS. STANLEY:  Dan, please stop.  You
5  can't -- you can't coach your witness on every
6  question.
7      MR. FRISK:  I'm trying not to, Caren,
8  but I just need him to listen to the question before
9  he answers.  You hadn't completed your question yet.
10  Just go ahead.
11      Q.  Did you prepare Exhibit No. 3?
12      A.  I would assume so, yes.
13      Q.  And was this one intended for Red River
14  State Bank to fund?
15      A.  I don't believe so.  In fact, this one
16  I don't think was ever utilized.
17      Q.  By anybody you mean?  By -- for TIF
18  funding or for Red River State Bank funding?
19      A.  Yes, I believe that's the case.  It was
20  initially supposed to be part of the REDI program.
21  I'll just add that.
22      Q.  The South Dakota R-E-D-I --
23      A.  Correct.
24      Q.  -- program?  And that was never
25  pursued; is that correct?

Page 52

1      A.  The decision was made by Charles and
2  myself not to do the REDI program.
3      Q.  Why?
4      A.  There was a lot of delays between
5  Martin and Charles, and I don't know if we all kind
6  of irritated the REDI board, but they were very, very
7  difficult.  There was several emails between Charles
8  and I and the REDI board on kind of the hoops we were
9  trying to jump through, and things like that.
10  Parkside was the first project that was supposed to
11  run through the REDI program so it was kind of the
12  problem child if you will.
13      Q.  And Parkside did not go through REDI
14  program?
15      A.  Parkside, Generations, and REDI did
16  not.  We made the decision collectively not to use
17  the REDI program.
18      Q.  Did they not want you to put in your
19  own money as part of the REDI program?
20      MR. VERSTANDIG:  Object to the form of
21  the question.  It calls for speculation.  You may
22  answer if you know.
23      A.  Yes, they did, and that's where we were
24  talking about whether we could utilize the TIF as the
25  10 to 20 percent in.

Page 53

1      Q.  So they wanted 10 -- you to put 10 to
2  20 percent in?
3      A.  No, they wanted us to put in 10 percent
4  initially.  So a 45/45/10 split.
5      Q.  When you say 45 and 45, what --
6      A.  The REDI program would put in 2 percent
7  money to 45 percent of the debt.
8      Q.  Two percent money?
9      A.  That's the incentive.
10      Q.  Oh, 2 --
11      A.  Two percent interest.
12      Q.  Okay.
13      A.  Sorry.  They would do 45 percent of the
14  mortgage at 2 percent interest.
15      Q.  Okay.
16      A.  The bank would put in 45 percent of the
17  debt, cover 45 percent of the debt at their rate.
18  There would be a shared first mortgage with a blended
19  rate.  And then the contractor would put in
20  10 percent.
21      Q.  Were you resistant to putting in
22  10 percent?
23      A.  No.
24      MR. FRISK:  Objection.  Form.
25      Q.  Let's look at No. 4, please.  I believe

14 (Pages 50 - 53)

Page 54

1 the first page is a Red River State Bank document,
2 but the second page, does the second page look
3 familiar?
4     A.  Yeah.
5     Q.  And is this something that you would
6 have prepared?
7     A.  Yes.
8     Q.  And would you have prepared the
9 invoices after this second cover page?  Or gathered
10 them shall I say.
11     A.  Yes.
12     Q.  Anybody else?
13     A.  Project manager would have.
14     Q.  Provided them to you?
15     A.  Well, possibly, yes.  I would have
16 either received them in the mail via my project
17 manager or email.
18     Q.  Okay.  And what are the -- is this your
19 handwriting along the right side?
20     A.  Yes.
21     Q.  And what do these numbers mean?
22     A.  They correlate to our -- I had an Excel
23 spreadsheet with the construction -- sworn
24 construction statement on it where I could track
25 every draw, draw 1, 2, 3, and then it would go down,

Page 55

1 and so those were the numbers that are tied to my
2 sworn construction statement.
3     Q.  And that's the Excel spreadsheet line?
4     A.  Yes.
5     Q.  Row?
6     A.  Correct.
7     Q.  Okay.  And this looks similar -- or
8 this looks like what you provided to the bank --
9     A.  Yes.
10     Q.  -- for draw 4.  Okay.  Let's look at
11 No. 5.  Same question, does this -- did you prepare
12 this?
13     A.  Yes.
14     Q.  And does this look -- anybody else
15 prepare it?
16     A.  No.
17     Q.  And did you gather these documents
18 after the Exhibit 5 cover sheet?
19     A.  Yes.
20     Q.  And did you provide this to the bank?
21     A.  Yes.
22     Q.  Let's look at No. 6.  Did you prepare
23 this Invoice 5 cover sheet?
24     A.  Yes.
25     Q.  Anybody else?

Page 56

1     A.  No.
2     Q.  Did you gather the documents after the
3 cover sheet, all the invoices that are included with
4 it?
5     A.  Yes.
6     Q.  And did you provide this to the bank?
7     A.  Yes.
8     Q.  Let's look at No. 7.  There's a first
9 page that looks to be a bank document.  Is that
10 correct?
11     A.  Yes.
12     Q.  Would you have Docusigned that?
13     A.  Looks as though I did, yes.
14     Q.  So have you seen this bank cover sheet
15 before?
16     A.  If I signed it I would have, but I
17 don't recall it.
18     Q.  Okay.  Let's look at invoice -- the
19 second page, Invoice 7.  Coincidentally, your
20 attorney wondered why "invoice" is spelled that way
21 on the side.  If you look at the cover sheet.
22     A.  This sheet?
23     Q.  Yeah.  No, no, the second page.
24     A.  I don't have that.
25     Q.  On No. 7?  Which one are you on?

Page 57

1     A.  I don't have it.
2     Q.  What do you have for numbers then?
3     A.  I just have the bank's sheet and then
4 it goes right to that -- from invoice from TL Stroh.
5 Or, no, this is -- this is my first -- or second
6 page.
7         MR. VERSTANDIG:  For what it's worth,
8 there are consecutive Bates stamps.
9         MS. STANLEY:  This one doesn't have any
10 Bates stamps on it.
11         THE WITNESS:  Do you want me to put it
12 back?
13         MS. STANLEY:  Yeah, put it back.
14         MR. VERSTANDIG:  Hold on.  Yours
15 doesn't have a Bates stamp?
16         THE WITNESS:  No.
17         MR. VERSTANDIG:  Yeah, it does.
18         THE WITNESS:  Oh.
19         MR. VERSTANDIG:  Right there.
20         MS. STANLEY:  Oh, it's really tiny.
21         THE WITNESS:  Yeah, it's in a different
22 location.  That's 2448?
23         MS. STANLEY:  Hang on.  Put that back
24 in, please.
25         MR. VERSTANDIG:  Let the reflect that

15 (Pages 54 - 57)

Page 58

1  we're hanging on.
2        MS. STANLEY:  Yeah.
3        THE WITNESS:  This is the first one on
4  that tab.
5        MS. STANLEY:  Okay.  Put it back and
6  then -- let's go off the record for a minute and make
7  sure we have the same.
8        (Off the record from 10:04 a.m. to
9  10:23 a.m.)
10       Q.  (Ms. Stanley continuing)  We're back on
11 the record.  Let's just do a quick page check.
12 Looking at No. 3.  Bate numbering starts at 2353.
13       A.  On No. 3?
14       Q.  Yeah, No. 3.
15       A.  2353, yes.
16       Q.  Okay.  And then it ends at the last
17 page 2364.
18       A.  Yes.
19       Q.  Okay.  And let's look at No. 4.  It
20 begins at 2365.
21       A.  Yes.
22       Q.  And ends at 2377.
23       A.  Yes.
24       Q.  Okay.  And number -- Exhibit 5 begins
25 at 2378?

Page 59

1        A.  Yep.
2        Q.  And it ends at 2404?
3        A.  Yes.
4        Q.  Okay.  No. 6 begins 2405?
5        A.  Yes.
6        Q.  And ends 2445?
7        A.  Yes.
8        Q.  Okay.  And No. 7 begins 2446?
9        A.  Yes.
10       Q.  To 2456.
11       A.  Yes.
12       Q.  So I think when we stopped to double
13 check our pages we had gone through No. 6.  Is that
14 your recollection also?
15       A.  Correct.
16       Q.  Okay.  Number -- so let's look at
17 No. 7.  And does this one look familiar?
18       A.  Yes.
19       Q.  And are you looking at Bate number
20 2449?
21       MR. FRISK:  Hold on.  We still don't
22 have this one in our -- this one.  I don't have that
23 invoice.
24       THE WITNESS:  2446?
25       MR. VERSTANDIG:  Hold on.

Page 60

1        THE WITNESS:  The next page should be
2  the invoice.
3        MR. VERSTANDIG:  Do the Bob Seger thing
4  and turn the page.
5        Q.  (Ms. Stanley continuing)  Okay.  So we
6  all have 2449 is the summary page.  Correct?
7        A.  Correct.
8        Q.  Okay.  And it only identifies Dugan's;
9  is that correct?
10       A.  Yes.
11       Q.  Is that your writing on the right side?
12       A.  No.
13       Q.  The one that says --
14       A.  It doesn't look like my fives or my
15 sevens.  I don't know why that would be, but...  No
16 one else would have made that --
17       Q.  That would only have been you that
18 would make that?
19       A.  Yes.
20       Q.  Okay.
21       A.  It just doesn't look like my numbers.
22       Q.  Does this look like something that you
23 would have put together?
24       A.  Yes.
25       Q.  Does this look like -- is this

Page 61

1  something that you would have given the bank?
2        A.  Yes.
3        Q.  And, again, those numbers on the side,
4  you don't think they look like your handwriting?
5        A.  They don't.  They would have correlated
6  typically to those -- that Excel spreadsheet that we
7  discussed.  But I don't know whose writing that would
8  be.
9        Q.  But do you recall doing this Invoice 7
10 for Dugan's?
11       A.  Yes.
12       Q.  Okay.  Let's look at No. 8.  Beginning
13 Bate number 2457.  Does that match yours?
14       A.  Yes.
15       Q.  Do you have a 2460 Invoice No. 8?
16       A.  Yes.
17       Q.  Okay.  And does that -- is that your
18 work product?  Did you put this together?
19       MR. FRISK:  You're on No. 8, Caren?
20       Q.  Yes.
21       A.  Yes.
22       Q.  And does this Exhibit 8 end 2499 for
23 you?
24       A.  Yes.
25       Q.  Is this -- was this put together by

16 (Pages 58 - 61)

Page 62

1 you?
2     A. Yes.
3     Q. And did you provide this to the bank?
4     A. Yes.
5     Q. Anybody else contribute?
6     A. No. You're talking assembling of this?
7     Q. Right.
8     A. My project managers would have helped
9 assemble certain invoices.
10     Q. Okay. Do you know which ones?
11     A. Which invoices?
12     Q. Yeah.
13     A. No, not without looking at emails.
14     Q. Okay. Let's look at No. 9. Starts
15 with Bate number 2500?
16     A. Yes.
17     Q. And it ends with Bate number 2534?
18     A. Yes.
19     Q. And I have been unable to find a -- one
20 of those summary pages for Exhibit 9. Do you know if
21 there is one?
22     A. Yes, there would have been one.
23     Q. Okay.
24     A. You're talking the invoice page?
25     Q. Yes.

Page 63

1     A. Yeah, no, there should have been one.
2     Q. There should have been one?
3     A. Yes.
4     Q. It looks like there's a Docusign
5 referenced on the very top?
6     A. Of the one that doesn't have a Bates
7 stamp on it? Or it does, 2501? Is that the one
8 you're asking about?
9     Q. 2500. At the very top.
10     A. Oh, here. Yes, there's a Docusign.
11     Q. Okay. And does that look like your
12 Docusign signature?
13     A. Yes.
14     Q. So this would have been provided to the
15 bank by you?
16     A. I believe so, yes.
17     Q. And was this -- do you recall if this
18 draw was funded by Red River State Bank?
19     A. I don't recall.
20     Q. Let's look at No. 11 -- or, yeah, 11.
21 It starts with Bate number 2535?
22     A. Yes.
23     Q. And it ends with 2561?
24     A. Yes.
25     Q. Okay. And if you look at the third

Page 64

1 page, 2537.
2     A. 2537?
3     Q. Yes.
4     A. Okay.
5     Q. Is this the summary invoice page?
6     A. Yes.
7     Q. Does this look like -- did you put this
8 together?
9     A. It looks like I would have, yes.
10     Q. Are those your markings along the right
11 side?
12     A. Yes.
13     Q. And, again, those numbers correspond to
14 the Excel spreadsheet you referenced earlier?
15     A. Yes.
16     Q. And you put this application -- or
17 Invoice 10 together including the documents attached?
18     A. Yes.
19     Q. We're almost done.
20     A. That's fine. Sorry for my voice being
21 so dry.
22     Q. Let's look at No. 11. It starts with
23 2562?
24     A. Yes.
25     Q. Ends with 2593?

Page 65

1     A. Yes.
2     Q. And if you look at the third page.
3 2564?
4     A. Yes.
5     Q. Is that your handwriting along the
6 side?
7     A. Yes.
8     Q. Did you put this one together?
9     A. Yes.
10     Q. And did you put the -- gather the
11 documents supporting this one?
12     A. I, along with my project manager, would
13 have, yes.
14     Q. And when you say project manager, is
15 that Jesse Kihl?
16     A. Mick Stulken was -- kind of handled
17 midstream on The Ruins project then Mick stepped in
18 and took over. He also helped with Jesse Kihl on
19 Generations.
20     Q. Okay. Why did the -- why the change
21 in --
22     A. Just --
23     Q. -- project managers?
24     A. I'm sorry. I talked over you. Jesse
25 Kihl was pretty burnt out after doing this many

17 (Pages 62 - 65)

Page 66

1  projects back to back to back and dealing with the
2  draw request delays.  There's just a lot of
3  interaction, a lot of negativity, animosity from the
4  subs.  So he took Kampeska Builders that I was a part
5  owner in and he started building single family homes.
6      Q.  So he went to work at a different
7  company you also own?
8      A.  He bought me -- so I bought him out of
9  Prevail and he bought me out of Kampeska Builders.
10 And he took Kampeska Builders and he's building
11 single-family homes down there in the market.
12     Q.  So you eventually wound up owning
13 Prevail.
14     A.  Correct.
15     Q.  All by yourself.
16     A.  Still do.  It's just a name right now.
17     Q.  So why do you not have access to those
18 documents?
19     A.  It was in a computer system down in
20 Watertown, South Dakota.  We have an office down
21 there.  So when he left and Mick stepped in, then
22 Mick had control of it.  So he had the email system
23 down there.
24     Q.  Mick did.
25     A.  Yes.

Page 67

1      Q.  And why is that not available anymore?
2      A.  I'd have to talk to my IT guy, but he
3  went back and tried to retrieve everything on those
4  files.  And I think it's probably a similar situation
5  as to Mark Peterson's account just being deleted.
6      Q.  Let's look at No. 12.  It starts with
7  2594?
8      A.  Yes.
9      Q.  Ends with 2609?
10     A.  Yes.
11     Q.  If you look at the third page in there,
12 2596, Invoice 12.  Did you prepare this?
13     A.  Yes.
14     Q.  And did you prepare the documents
15 included?
16     A.  Again, with my project manager we would
17 have got these pulled together.
18     Q.  And did you provide this to the bank?
19     A.  Yes.
20     Q.  Let's look at No. 13.  Begins 2610.
21     A.  Yes.  Oh, no, sorry.  I was on the
22 third page already.  2610, yes.
23     Q.  And 2615?
24     A.  Yes.
25     Q.  And the third page of that, 2612?

Page 68

1      A.  Yes.
2      Q.  That is Invoice 13; correct?
3      A.  Correct.
4      Q.  And did you prepare Invoice 13?
5      A.  With my project manager, yes.
6      Q.  And did you prepare the other documents
7  included with this -- or gather them I should say?
8      A.  Yes.
9      Q.  And did you provide that to the bank?
10     A.  I believe so, but I don't think it was
11 funded.
12     Q.  Okay.  Last one, Exhibit 14.  Starts
13 2616.
14     A.  Yes.
15     Q.  And goes to 2624?
16     A.  Yes.
17     Q.  And look at the third page, 2618.  Did
18 you prepare 2618?
19     A.  Yes.
20     Q.  And did you include -- gather the
21 invoices included with 26 -- or Invoice 14?
22     A.  Along with my project manager, yes.
23     Q.  And did you provide No. 14 to the bank?
24     A.  I believe it was submitted, not funded.
25     Q.  But, yes, you provided it to the bank?

Page 69

1      A.  I believe so, yes.
2      Q.  Okay.  Thank you.  When you take out
3  funds from a bank in your past experience, do
4  they typically require you to provide
5  financial -- personal financial statements?
6          MR. VERSTANDIG:  Object to the form of
7  the question.  I'm going to ask you to rephrase
8  because as stated you just asked him if he goes to
9  withdraw $20 from a bank if he has to provide
10 personal financial statements.
11     Q.  For a construction project in the
12 millions of dollars, would it be normal for you to
13 provide a financial statement to the bank that's
14 giving the money?
15     A.  Yes, they would have to underwrite me.
16     Q.  Okay.  So have you done this before,
17 provided financial statements?
18     A.  Yes.
19     Q.  Did you provide financial statements
20 for these three Watertown projects to the bank?
21     A.  Initially or throughout the process?
22     Q.  Both.
23     A.  I don't recall initially giving
24 them -- financials to Martin.  If he would have asked
25 for them I would have provided them.  But I know

18 (Pages 66 - 69)

Page 70

1 throughout the projects I provided those to the bank,
2 yes.
3      Q.   So you did provide them throughout the
4 project to the bank.
5      A.   Towards the end, yes.
6      Q.   When requested by -- upon the bank's
7 request.
8      A.   Correct.
9      Q.   Okay.  Would you have been the person
10 to gather up the information for those personal
11 financial statements?
12      A.   Yes.
13      Q.   Anybody else assist?
14      A.   No.  Bruce Imholte, he's my old
15 accountant, he would have helped with some of it, but
16 then he kind of semi-retired.  He would have been the
17 only person that would have helped me.
18      Q.   Okay.  To your knowledge have you ever
19 provided false information in a financial statement?
20           MR. FRISK: Objection.  Form.
21      A.   On a financial statement, it's kind of
22 like when Trump got into trouble with his PFS.  We
23 had to put riders on the bottom of everything talking
24 about how things are valued or not valued.  And so
25 that could be construed as like if I put an appraised

Page 71

1 value in there or a value I thought Alexandra Marie
2 was worth, but the appraisal was less or the time had
3 elapsed or appreciation had occurred or cap rates had
4 changed, this could be construed as false information
5 I guess.
6      Q.   Okay.  So do you believe you provided
7 false information?
8           MR. FRISK: Objection.  Form.
9      A.   No.
10      Q.   Have you ever altered any documents --
11           MR. FRISK: Objection.
12      Q.   -- in support of a false -- or in
13 support of a financial statement?
14           MR. FRISK: Objection.  Form.  It also
15 calls for speculation.
16      A.   I'm just trying to recall.
17           MR. FRISK: Hang on a second, Jesse.
18      A.   Sorry.
19           MR. FRISK: If you have an example I'd
20 ask you to show my client.  Otherwise, you're asking
21 him to just speculate.
22      Q.   To your knowledge have you ever altered
23 a document provided in support of a financial
24 statement?
25           MR. VERSTANDIG: Object to the form of

Page 72

1 the question.  Hold on.  I'm still thinking if I'm
2 objecting or not, Jesse.  Object as to altered
3 without sufficient clarifying verbiage thereupon.  To
4 wit, it is unclear if the witness is being asked
5 whether he has edited documents that he himself has
6 prepared and, ergo, altered them in support of a
7 financial statement such as going through a rough
8 draft, a second draft, and a third draft before
9 preparing a final draft.
10      Q.   Have you ever altered the text of a
11 document from a third party provided in support of a
12 financial statement?
13           MR. VERSTANDIG: Object to form, but
14 you can answer.
15      A.   Yes.
16      Q.   Explain that, please.
17      A.   Is there a certain document you're
18 asking about?
19      Q.   Why did you say yes?
20      A.   Because when we were starting
21 litigation with Red River State Bank Charles had
22 requested a personal financial statement.  I had
23 talked to my attorney at that time, and we believed
24 it was kind of a disguise for trying to figure out
25 where I had assets hidden.

Page 73

1      Q.   So what was edited?
2      A.   A bank account number.
3      Q.   You edited a bank account number?
4      A.   Correct.
5      Q.   Which bank?
6      A.   I can't recall.  I know the
7 conversation I had with my attorney.  So I don't know
8 if that's privileged.
9      Q.   So are you saying it was the actual,
10 like, account number for the bank?
11      A.   For the checking account.
12      Q.   For the checking account?
13      A.   Yes.
14      Q.   But you didn't edit the information in
15 the checking account.
16      A.   That I don't believe so.  But I know I
17 didn't sign that PFS as requested by Charles.
18      Q.   But you provided it?
19      A.   I provided it but didn't sign it.
20      Q.   And you provided it knowing it
21 contained incorrect information?
22           MR. VERSTANDIG: Object to the form of
23 the question.
24      A.   It wasn't -- it wasn't done for
25 funding.  This was simply a litigation play in our

19 (Pages 70 - 73)

Page 74

1 eyes.
2     Q.   Were they -- what do you recall was the
3 reason for asking you for the financial statement?
4     A.   So they could see where I had assets or
5 cash.
6     Q.   So what is the time frame on this?
7     A.   I have no idea.  It would have been
8 towards the end of The Ruins.
9     Q.   When it was in litigation.
10     A.   When we started when, yeah, things
11 started -- we had started litigation with Lee
12 Grossman.  You're aware of that.
13     Q.   Yes.
14     A.   And then Charles called me personally
15 and asked me to sit down and try to mitigate it which
16 I did.  And so it was during that time.
17     Q.   Did he ask you to identify where the
18 $600,000 for the last Ruins loan went?
19     MR. VERSTANDIG:  Object to the form of
20 the question.  "He" is a dangling modifier that is
21 going to make for a vicious record.
22     Q.   Did Charles request you provide
23 information about what happened to the $600,000?
24     A.   I believe that was done through you.
25     Q.   Okay.

Page 75

1     A.   When we got that request, that email
2 request on where it went.
3     Q.   So was the request from Charles for the
4 financial statement done after you received the
5 $600,000?
6     A.   Yes.  I believe so.
7     Q.   And did he ask you to show where it
8 went?
9     A.   Again, all I remember is through
10 litigation that we had sent the -- I had sent the
11 information with the breakdown of where it was spent.
12     Q.   Okay.  Is this the only incident you
13 can recall of a altered document in support of a
14 financial statement?
15     MR. FRISK:  Objection.  Form.
16     A.   That I can't recall.  Sorry.  Talking
17 about a long history of banking so not that I can
18 recall.
19     Q.   Have you provided altered documents to
20 other banks?
21     A.   No.
22     MR. VERSTANDIG:  Objection.  Whoa.  I
23 need to object before you answer.
24     THE WITNESS:  I'm sorry.
25     MR. VERSTANDIG:  I'm getting paid to

Page 76

1 sit here and do this.
2     THE WITNESS:  I know.  I'm sorry.
3     MR. VERSTANDIG:  Object to the form of
4 the question.  Relevance.  We are pretty far afield
5 from today's scope.
6     Q.   (Ms. Stanley continuing)  With respect
7 to the claim objections, have you reviewed the recent
8 filings, the affidavits of Charles Aarestad in
9 support of -- explaining the Parkside note?
10     MR. VERSTANDIG:  I'm going to instruct
11 you that you can answer as to your personal review.
12 To the extent you reviewed it with your counsel, just
13 answer in the affirmative or the negative but don't
14 discuss what you and your counsel went over together.
15     Q.   Did you review the Charles Aarestad
16 affidavit regarding the Parkside note?
17     A.   No.  I thought this was in regards to
18 The Ruins so I didn't look at the Parkside note.
19     Q.   Did you ever review the initial
20 Parkside Proof of Claim?
21     A.   On the Chapter 11?
22     Q.   Yes.
23     A.   Yes.
24     Q.   With respect to the Parkside note
25 itself, the first one, the $4.2 million note, you're

Page 77

1 familiar with that one; correct?
2     A.   Is there a certain page I'm supposed to
3 be on?
4     Q.   Well...
5     A.   The 4.2, yes, I'm pretty familiar with
6 it.
7     Q.   You're familiar with that note.  Okay.
8 Do you have any reason to disagree that the balance
9 if you look at the back page of --
10     A.   The back?
11     Q.   Yeah.  This is the Parkside Proof of
12 Claim filed January 9, 2025.
13     A.   Okay.
14     Q.   You're looking at page 6 of 6; correct?
15     A.   Yes.
16     Q.   Do you have any reason to dispute that
17 $4.2 million was owed on that date?
18     A.   No.  I don't dispute that.
19     Q.   And let's look at -- I'll mark this as
20 Exhibit 15.
21     (Whereupon, Deposition Exhibit No.
22        15 was marked for identification by
        the court reporter.)
23     Q.   I'm giving you what we're going to mark
24 as 16.
25

Page 78

1           (Whereupon, Deposition Exhibit No.
             16 was marked for identification by
2            the court reporter.)
3       Q.   This is the Affidavit of Charles
4   Aarestad Re: The Parkside Note.  Did you have a
5   chance to review this Affidavit of Charles Aarestad
6   Re: The Parkside Note?
7       A.   A while back, yes.
8       Q.   Okay.  And do you have any reason to
9   disagree that these payments were made?
10          MR. FRISK:  Objection.  Form.
11      Q.   Starting on page 6, paragraph 14,
12  there's a very long table in there.
13      A.   These would have been -- these would
14  have been through the property management company.
15      Q.   Okay.  But do you have any reason to
16  disagree that these payments were made to Red River
17  State Bank?
18      A.   I'd have no way without looking at
19  Yardi to know whether these were accurate or not.
20      Q.   So the property management company paid
21  on the Parkside note?
22          MR. VERSTANDIG:  Whoa.
23      Q.   Did the property --
24          MR. VERSTANDIG:  Object to the form of
25  the question.

Page 79

1       Q.   Did the property management company pay
2   on the Parkside note?
3           MR. VERSTANDIG:  Object to the form of
4   the question.  You may answer.
5       A.   You had mentioned earlier that when
6   Craig Development was done building the building it
7   was handed over to the property management company.
8       Q.   Okay.
9       A.   So this is during the tenants are
10  living in the property and a CO is achieved and it's
11  handed over, then the management company would have
12  been making the mortgage payments.
13      Q.   Okay.  And when you said CO, that
14  means?
15      A.   Certificate of occupancy.  Sorry.
16      Q.   So that was -- was that normal that the
17  management company then was making payments after the
18  building was completed?
19      A.   They would have handled all the rent
20  collection, all the expenses paid, yes.
21      Q.   Okay.  And, again, you indicated
22  earlier you had no reason to disagree that the amount
23  of -- on the Parkside Proof of Claim?
24      A.   On just the first mortgage is accurate.
25      Q.   Okay.

Page 80

1       A.   The Parkside note is accurate.  The
2   other ones are not.
3       Q.   And when you say the other ones are
4   not, you're referring to --
5       A.   First, the second, and third Mulinda
6   notes.
7           MR. VERSTANDIG:  By the way, it's going
8   to be an ongoing objection.  When you ask about
9   agreement as to the amounts that are due and owing,
10  we'd necessarily note that there is a claim that said
11  amount should be set off by liability to be
12  determined in an adversary proceeding.  My
13  understanding is that we have a lay witness who is
14  proceeding based on numerical values as evidenced by
15  disbursements and payments --
16          MS. STANLEY:  Which is what the hearing
17  is supposed to be about next week; correct?
18          MR. VERSTANDIG:  Correct.  But I'm
19  saying this ought not be construed as some
20  acknowledgment that there is a right to setoff,
21  nor should such be construed as a suggestion that you
22  are irretrievably suggesting there is a right to
23  setoff, and that will be dealt with in different
24  proceedings down the road.
25          MS. STANLEY:  Agreed.

Page 81

1           THE WITNESS:  This is Parkside, not
2   Ruins.
3           MR. VERSTANDIG:  Wherever are due to
4   setoff most.
5           THE WITNESS:  Okay.
6       Q.   (Ms. Stanley continuing)  Tell me what
7   is wrong with the amounts for the first Mulinda note.
8       A.   They're the full amounts for the
9   Mulinda notes, but the Mulinda notes were used to
10  both fund Generations and Parkside draw requests in
11  the same month.  And then they -- those were
12  commingled, and then Red River State Bank also kind
13  of overlapped the mortgages or the -- what's the word
14  I'm looking for.  Total brain fart that one.
15      Q.   Collateral?
16      A.   Cross-collateralized.  Sorry.
17      Q.   Okay.  But do you have any reason to
18  disagree that funds were disbursed on the first
19  Mulinda note?
20      A.   That's correct.  That the funds were
21  disbursed on the first.
22      Q.   The funds were disbursed.  Okay.  And
23  do you have any reason to disagree that some of the
24  first Mulinda note was paid back?
25      A.   Paid back.

21 (Pages 78 - 81)

Page 82

1    Q.  Well, the first Mulinda note the
2  original principal balance was...
3        A.  4.2.
4    Q.  That was the Parkside note.
5        A.  Oh, I'm sorry.
6    Q.  It's very confusing.  I understand.
7  Let's do this.  Let's mark this one as 17.
8            (Whereupon, Deposition Exhibit No.
               17 was marked for identification by
9            the court reporter.)
10        MS. STANLEY:  You can write on that and
11  put 17.
12        THE WITNESS:  Anywhere?
13        MS. STANLEY:  Yeah.
14        MR. VERSTANDIG:  Do you have a copy for
15  your friends?
16        MR. FRISK:  Exhibit 17.
17        MS. STANLEY:  Oh.  Yes.
18        MR. VERSTANDIG:  Thank you.
19        MS. STANLEY:  Sorry.
20    Q.  (Ms. Stanley continuing)  So you've
21  been provided a copy of what we've marked as Exhibit
22  17.  This is the Affidavit of Charles Aarestad Re:
23  The Mulinda Notes.  Do you have that in front of you?
24        A.  Yes.
25    Q.  And the first -- what we're calling the

Page 83

1  first Mulinda note was a promissory note dated
2  April 26, 2021.
3        A.  You're on page 3?
4    Q.  Yes.
5        A.  No. 6?
6    Q.  Seven.
7        A.  Or 7?  Okay.
8    Q.  In the amount of $1,477,500.  And a
9  copy of that note is attached as Exhibit 1A.
10        A.  Okay.
11    Q.  Does that look -- do you recall this
12  note?
13        A.  I recall seeing it, but I didn't sign
14  on it.
15    Q.  Mulinda signed on that one; correct?
16        A.  Yes.  Looks like her signature.
17    Q.  Okay.  And if you look on page 4, turn
18  the page, paragraph 10 shows the disbursements on the
19  Mulinda note.  Does that look -- do you have any
20  recollection of this?
21        A.  The only way I would have seen this is
22  if the Mulinda note tied out to draw requests and I
23  received the funds for the draw requests.
24    Q.  It indicates that they were cashier's
25  checks to Craig Development.

Page 84

1        A.  Yep.
2    Q.  Is that your recollection that you
3  received -- or Craig Development received funds --
4        A.  Yes.
5    Q.  -- from this?  Okay.  And you mentioned
6  earlier that some of it was for Parkside draws and
7  some for Generations draws; is that right?
8        A.  Right.
9    Q.  And did you keep track of that, which
10  ones went to Parkside, which ones went to --
11        A.  Yes.
12    Q.  How did you keep track of that?
13        A.  Again, it would just -- I would have
14  received the funds and the funds would have funded
15  the draw requests.  I would have not had any idea on
16  the actual note or the mortgage.
17    Q.  Because that was Mulinda was signing
18  that?
19        A.  It looks like it, yes.  I wasn't asked
20  to review it or sign on it.
21    Q.  Do you have any idea why Mulinda was
22  asked to sign these notes and not you?
23        MR. FRISK:  Objection.
24        MR. VERSTANDIG:  Objection.
25        MR. FRISK:  Go ahead.  Form.

Page 85

1        MR. VERSTANDIG:  Objection to the form
2  of the question.  Calls for speculation.  Object to
3  the form of the question to the extent it seeks
4  information protected by the marital privilege.
5  Object to the form of the question to the extent it
6  seeks attorney-client information.  Object to the
7  form of the question to the extent it's an effort to
8  solicit hearsay.  You may answer.
9        A.  No because Mulinda's not an owner in
10  the LLCs.  And, again, I don't know why Martin or the
11  bank went down this route.
12    Q.  But you acknowledge that Craig
13  Development received the funds for this.
14        A.  Correct.
15    Q.  And the purpose was for the Generations
16  and Parkside construction.
17        A.  Correct.
18        MR. VERSTANDIG:  Take a pause.  Let me
19  object some more, man.
20    Q.  And, again, what -- was there
21  a -- what was your -- was there any concern with
22  the bank's amount provided in the proof of claim
23  for -- you said that the three Mulinda notes were not
24  correct; is that right?
25        MR. FRISK:  Objection.

22 (Pages 82 - 85)

Page 86

1          MS. STANLEY: I'm trying to recall what
2 he said.
3          MR. FRISK: Okay. To the extent -- go
4 ahead and ask it.
5      A. Right now with your proof of --
6          MR. FRISK: Wait, hang on a second.
7 There's not a question. Reask that question.
8      Q. Let's look again at No. 16. You're on
9 17. On the Proof of Claim.
10         MR. VERSTANDIG: The Proof of Claim is
11 15.
12     Q. Fifteen. Sorry. And page -- the back
13 page. I think you indicated that the Mulinda amounts
14 were not correct. What was the concern with the
15 first Mulinda note?
16     A. Right now on your Proof of Claims the
17 Mulinda note balances are the same on Parkside as
18 they are on Generations.
19     Q. Okay.
20     A. So you're double dipping. The bank's
21 literally trying to get full amount on Parkside and
22 full amount on Generations.
23     Q. Okay.
24     A. So they should be applied where the
25 draw requests were.

Page 87

1      Q. Okay. Do you have any reason to
2 disagree with the number itself?
3          MR. FRISK: Which number?
4      Q. For the first one.
5      A. For the 4 million?
6          MR. VERSTANDIG: Just the first one.
7      Q. First Mulinda note.
8          MR. VERSTANDIG: So object to the form
9 of the question, but you may answer.
10     A. I don't know how the interest is
11 accrued, and I didn't sign on the note so I really
12 haven't reviewed them as far as interest rate, but,
13 yeah, it approximately should be in that amount.
14     Q. Okay. What about the second one, do
15 you have any reason to disagree that that is an
16 accurate amount owing as of the petition date, the
17 second Mulinda note?
18         MR. FRISK: It's the 1.610 is what
19 you're referring to, Caren? 1 million, 6?
20         MS. STANLEY: That one that
21 says -- yes.
22     A. I don't have a lot of knowledge on it,
23 but it looks like it should be pretty close.
24     Q. (Ms. Stanley continuing) Okay. What
25 about the third Mulinda note. Do you have any reason

Page 88

1 to disagree with the amount indicated as owing for
2 the third Mulinda note?
3      A. So in context we're talking about the
4 third Mulinda -- first, second, and third Mulinda
5 notes in an entirety. Those amounts look correct,
6 but they're not applied correctly between Parkside
7 and Generations.
8      Q. Okay. So the concern is not the
9 calculation of the amount, it's how they're applied
10 between the two properties.
11     A. And the fact they're in Mulinda's name.
12     Q. Should they be in your name?
13     A. They should be --
14         MR. VERSTANDIG: Hold on. Objection.
15 Object to the form of the question. Calls for a
16 legal conclusion. Calls for speculation. Completely
17 irrelevant to the scope of today's deposition.
18     A. Can I answer?
19         MR. VERSTANDIG: You can answer.
20     A. I'm going to apologize. Can you repeat
21 that? I am so sorry.
22         MR. VERSTANDIG: She's going to repeat
23 it and --
24         MS. STANLEY: We'll have the court
25 reporter repeat that last question.

Page 89

1          THE WITNESS: And you're going to
2 object?
3          MR. VERSTANDIG: The court reporter --
4          MS. STANLEY: We've already had the
5 objection.
6          THE WITNESS: Okay. Sorry.
7          THE COURT REPORTER: "Should they be in
8 your name?"
9      A. They should be in the LLC's name.
10     Q. (Ms. Stanley continuing) For the
11 property you mean.
12     A. Correct.
13     Q. So like Parkside or Generations.
14     A. Correct.
15     Q. This will be No. 18.
16         (Whereupon, Deposition Exhibit
17          18 was marked for identification
17          by the court reporter.)
18     Q. (Ms. Stanley continuing) Do you recall
19 there were numerous notes for the Generations
20 project? Do you recall that?
21     A. Yes.
22     Q. Do you recall that at the point in time
23 all of those prior notes, seven of them were -- the
24 principal balance was put into the eighth -- what
25 we've been calling the eighth note?

23 (Pages 86 - 89)

Page 90

1    A.  Is there a page you're looking at?
2    Q.  I'll also give you this one.
3    A.  Page 5?
4    Q.  Yeah.  This is, what, 19?
5        THE COURT REPORTER:  Uh-huh.
6    Q.  Nineteen.
7        (Whereupon, Deposition Exhibit
         19 was marked for identification
8        by the court reporter.)
9    Q.  (Ms. Stanley continuing)  So Exhibit 19
10 is the Affidavit of Charles Aarestad Re: the Eighth
11 Generations Note.  Do you have that in front of you?
12   A.  Yes.
13   Q.  And if you look at Exhibit A to that.
14 You're too far.  There's Exhibit A.  This is a
15 promissory note for $8.1 million; is that correct?
16   A.  Yes.
17   Q.  And is that your signature on the third
18 page?
19   A.  Yes.
20   Q.  So do you recall this loan?
21   A.  Yes.
22   Q.  And do you recall that essentially the
23 purpose of this loan was to roll all of the principal
24 balances of the prior loans into this one?
25   A.  Other than the Mulinda notes, yes.

Page 91

1    Q.  Okay.  And do you have any reason to
2 disagree that the eighth Generations note on this
3 Proof of Claim Document No. 18 was 8,485,609?
4        MR. VERSTANDIG:  Hold on.
5    Q.  As of January 6?
6        MR. VERSTANDIG:  Year?
7    Q.  I'm on Exhibit 18, the Proof of Claim.
8        MR. VERSTANDIG:  You said as of
9 January 6.  I'm saying what year.
10   Q.  Oh.  The petition date, 2025.
11       MR. VERSTANDIG:  You may answer.
12   A.  Looks accurate.
13   Q.  Okay.  And I'll also hand you No. 20.
14       (Whereupon, Deposition Exhibit No.
         20 was marked for identification by
15       the court reporter.)
16   Q.  (Ms. Stanley continuing)  Which is the
17 Affidavit of Charles Aarestad Re: Generations Notes
18 1-7 and No. 9.  At the -- it's hard to read because
19 of the court numbering at the back, but Exhibit 9A to
20 this which is way at the end.  There you go.  9A.
21 This is what we have been referring to as Generations
22 Note No. 9.
23   A.  Okay.
24   Q.  Do you recall this note which
25 was -- the note is dated 4/17/23?

Page 92

1    A.  I believe so, yes.
2    Q.  Okay.  And do you recall the purpose of
3 this one -- this note was to move interest from the
4 earlier single notes to this No. 9?
5        MR. VERSTANDIG:  Object to the form of
6 the question.  Specifically object to the
7 classification of the purpose.  Calls for speculation
8 as to the counterparty's intent.  You may answer.
9    A.  This would have been the interest that
10 would have been typically paid monthly during the
11 construction.
12   Q.  Okay.  And it was not paid during the
13 construction?
14   A.  Wasn't ever, no, wasn't requested by
15 Red River State Bank.  I think they were still
16 working on getting participants.
17   Q.  This note is dated 4/17/23.  You were
18 present yesterday when your attorney asked about a
19 notary issue occurring on this date.  What is your
20 recollection of --
21   A.  We actually looked into it when we left
22 here, and Mindy did find a text message that I had
23 sent her on the 15th saying, "Leaving Halstad."
24   Q.  So the 15th was the correct date?
25   A.  It was the correct date that I signed

Page 93

1 the documents.  I don't recall -- it was a Saturday.
2 I don't recall Danielle being there to notarize it.
3 That's the only thing I don't recall, but I was in
4 Halstad.
5    Q.  On that --
6    A.  Yeah, on that date.  I don't recall
7 signing the documents, and stuff like that, but I
8 don't have any reason to say why I wouldn't have.
9    Q.  Okay.  And you were going on vacation
10 right around that time; correct?
11   A.  The next day, I believe we flew out the
12 next morning.
13   Q.  So that was the reason why it would
14 have been done on a Saturday?
15   A.  Yeah.  There was a lot of weird signing
16 places and dates.
17   Q.  So you believe, though, that all the
18 documents that were signed on the 15th you signed
19 them.
20   A.  I believe so, yes.
21   Q.  Do you recall what time that text
22 message was?
23   A.  She showed me her phone.  I don't.
24   Q.  So at this point after looking at that
25 you don't -- you just don't remember if Danielle was

24 (Pages 90 - 93)

Page 94

1 there or not?
2     A.  I don't recall that she was.  She could
3 have been, though, but I don't recall, I'm sorry.
4     Q.  Okay.  Let's look at the -- 18 again
5 which was the Generations amended Proof of Claim.
6 And the very last -- or page 5.
7     Is that this one?
8     A.  What's the date?  9/22/25?  Yes.
9     Q.  Which number is this one?  I --
10     A.  No, I should have had them write it
11 down.  So eighth Generations Note is 19.
12     A.  And I got 20 and 17 here.
13     MR. VERSTANDIG:  This is part of the
14 exhibit?
15     Q.  Yes.
16     A.  This is the one you want to look at?
17     Q.  And then this is 18.
18     A.  Okay.  Thank you.
19     Q.  So we're looking at Exhibit 18 which
20 is -- says -- at the very top it says it's filed
21 9/22/25.
22     A.  Yes.
23     Q.  Okay.  And if we look at page 5.
24     MR. VERSTANDIG:  Page 5 of the exhibit
25 to Exhibit 18.

Page 95

1     Q.  You're right.  At the very top it says
2 page 8 of 8.
3     MR. VERSTANDIG:  Yes.
4     Q.  So there's -- yes.  Thank you for that
5 clarification.
6     Okay.  You see the chart that's on this
7 page 8 of 8 which says 5 at the bottom?
8     A.  Yes.
9     Q.  Okay.  Do you think that is -- do you
10 agree that the first through seventh Generations
11 notes the balance is zero?
12     A.  Once they were combined, yes.
13     Q.  And when you say combined, what do you
14 mean?
15     A.  As you had stated earlier, they had
16 taken all the first seven notes and compiled them
17 into one new mortgage which is now you guys calling
18 the eighth Generations note.
19     Q.  And that was the principal; correct?
20     A.  Correct.
21     Q.  And then the ninth one was the interest
22 from 1 through 7; correct?
23     A.  And the eighth one now has -- I mean,
24 the original mortgage was 8.1 million.  Now this one
25 has got all the per diem interest accumulated to it.

Page 96

1     Q.  Sure.
2     A.  But originally it was 8.1.
3     Q.  Yeah, I think you're right actually.
4 It was 8.1.
5     A.  Thank you.
6     Q.  Yes.
7     A.  I got a win.
8     Q.  You are correct.  And then below that
9 it again identifies the first Mulinda note, second
10 Mulinda note, and third Mulinda note.
11     A.  Yes.
12     Q.  And, again, you earlier indicated these
13 amounts looked correct when we looked at the Parkside
14 Proof of Claim?
15     A.  They're identical.  I think if we
16 pulled out that other exhibit from Parkside the
17 first, second, and third Mulinda notes are the same
18 amounts on both this filing and the Parkside filing.
19     Q.  I believe you are correct.  And -- but
20 so you didn't have a concern about the number, right,
21 it was just the placement here on both Parkside and
22 Generations at the same time.
23     A.  Correct.
24     Q.  Okay.  Okay.  I'm handing you what
25 we're going to mark as 21.

Page 97

1     (Whereupon, Deposition Exhibit No.
    21 was marked for identification by
2     the court reporter.)
3     Q.  (Ms. Stanley continuing)  And this
4 Exhibit 21 is the amended claim for The Ruins that
5 was filed by Red River State Bank on September 12,
6 2025.  Does that look like what you have as well?
7     A.  Yes.
8     Q.  And The Ruins currently has three
9 separate notes; is that correct?
10     A.  Yes.
11     MR. VERSTANDIG:  Whoa.  Take a pause.
12 Object to the form of the question.  The Ruins has
13 three separate notes from Red River State Bank.
14     Q.  Yes.  Thank you.  It has three separate
15 notes from Red River State Bank; correct?
16     A.  There was a fourth note from Charles
17 Aarestad and Randy Aarestad that were at one point in
18 time cross collateralized between my lake home and
19 The Ruins project.  Those have since been paid off.
20     Q.  Okay.
21     A.  So those would be correct then.
22     Q.  But currently as we sit here today,
23 there are three Ruins notes from Red River State
24 Bank; correct?
25     A.  Yes.

25 (Pages 94 - 97)

Page 98

1    Q.   And the first note is in the amount of
2  7.740 million; is that correct?
3    A.   Yes.
4    Q.   That was the original amount of the
5  loan.
6    A.   Correct.
7    Q.   Okay.  And the second note was 2.750
8  million; is that correct?
9    A.   Yes.
10    Q.   And the third note was 600,000; is that
11  correct?
12    A.   Yes.
13    Q.   And that third note was also dated
14  February 17 of 2023.
15    A.   There was an initial note done with the
16  family members of the Aerstads and then that was
17  assigned to Red River State Bank.
18    Q.   Are these the lake home ones you're
19  talking about?
20    A.   Well, they were cross-collaterized on
21  the lake home.  But, no, this one, this $600,000 was
22  initially done with family members.
23    Q.   Okay.
24    A.   And then it was assigned to Red River
25  State Bank so there's a history there.

Page 99

1    Q.   Let's take a look at Exhibit C which is
2  page 13 of 84.
3    A.   Eighteen?
4    Q.   Thirteen of 84.
5    A.   Way back here.
6    Q.   There you go.
7    A.   Okay.
8    Q.   Does that appear to be a $600,000 loan
9  dated February 17, 2023?
10    A.   Yes.
11    MR. VERSTANDIG:  Hold on.  Did you see
12  that redacted in white?
13    MS. STANLEY:  They took out the Social
14  Security numbers.
15    MR. VERSTANDIG:  They did it in white
16  instead of black.  Also four of those aren't Social
17  Security numbers.
18    MS. STANLEY:  Tax ID numbers.
19    MR. VERSTANDIG:  Can we stipulate for
20  the record that it's redacted and there were numbers
21  there or there were not numbers there, whatever it
22  may be?
23    MS. STANLEY:  Sure.
24    MR. VERSTANDIG:  Okay.
25    MS. STANLEY:  That'll work.

Page 100

1    MR. VERSTANDIG:  Keep going.
2    MS. STANLEY:  Do you wish to have a
3  copy of the unredacted version?
4    MR. VERSTANDIG:  No, I've just never
5  seen it redacted in white.
6    Q.   (Ms. Stanley continuing)  Do you recall
7  this -- signing this $600,000 loan?
8    A.   Yes.
9    Q.   And are those your signatures on
10  page 16 of 84?
11    A.   Yes.
12    Q.   And you received the $600,000?
13    A.   Yes.
14    MR. VERSTANDIG:  Whoa, whoa, whoa.
15    Q.   The Ruins received the $600,000?
16    MR. VERSTANDIG:  Thank you.
17    Q.   Well, actually --
18    A.   I think so.
19    Q.   -- there are numerous borrowers
20  identified on this note; correct?
21    MR. VERSTANDIG:  With redacted taxpayer
22  ID numbers no less.
23    Q.   You signed on the third page as a
24  borrower personally; correct?
25    A.   Yes.

Page 101

1    Q.   And you also signed as the authorized
2  member of Craig Development?
3    A.   Yes.
4    Q.   Craig Holdings?
5    A.   Yes.
6    Q.   Craig Properties?
7    A.   Yes.
8    Q.   And The Ruins, LLC.
9    A.   Yes.
10    Q.   And the 600,000 was received by one or
11  all of them?
12    A.   Yeah.  It went into The Ruins.
13    Q.   Looking at page -- going back to the
14  Proof of Claim, No. 21.  Sorry.  You probably want to
15  put the paper clip back on.
16    A.   Oops.
17    Q.   There we go.  No, you're okay.  Six of
18  84.  These are the -- do you have any reason to
19  disagree that the balance on the first Ruins note
20  there in that table is 8.169647?
21    A.   No.
22    Q.   And for the second Ruins note, which
23  was original principal note, was 2.750?
24    A.   It looks accurate.
25    Q.   So the second Ruins note amount looks

26 (Pages 98 - 101)

Page 102

1 accurate?
2      A.  Yes.
3      Q.  And then what about the third Ruins
4 note, the $600,000 one, does that amount look
5 accurate?
6      A.  Yes.
7      MS. STANLEY:  What time is it?
8      MR. VERSTANDIG:  11:30.
9      (Off the record from 11:30 a.m. to
10 12:24 p.m.)
11      (Whereupon, Deposition Exhibit No.
        22 was marked for identification by
12      the court reporter.)
13      Q.  (Ms. Stanley continuing)  Back on the
14 record.  It is 12:24.
15      I'm handing you what we've marked as
16 Exhibit 22.  This is -- does this look like what
17 we've been talking about as The Ruins term sheet?
18      A.  Yes.
19      Q.  Okay.  So you're familiar with this
20 document?
21      A.  Yes.
22      Q.  And can you explain in your own words
23 why you believe Red River State Bank has not lived up
24 to the term sheet?
25      A.  Like we've discussed earlier, the

Page 103

1 biggest thing was that we didn't utilize the REDI
2 program.  And by not utilizing the REDI program
3 inherently Red River State Bank took on additional
4 45 percent of the debt.  And between that and then
5 just the issues -- well, to answer your question, I
6 think that answers your question.
7      Q.  So it was the REDI program?
8      A.  Not using the REDI program.  And then
9 if we're talking just about this term sheet, the REDI
10 program would be the biggest thing on here.
11      Q.  Okay.  And did you not provide emails
12 in your discovery where you were unwilling to
13 provide, you know, capital into the project yourself?
14      A.  At that time I had already contributed
15 some capital into it.  And, yeah, no, of course, I
16 mean -- you're talking with the REDI program or with
17 at the end of The Ruins construction?
18      Q.  With the REDI program.
19      A.  With the REDI program?
20      Q.  The State of South Dakota, I can't
21 remember which department it was, but those people.
22      A.  I didn't want to put my own funds in
23 there because I felt the TIF was adequate.  And the
24 big dispute with the REDI program came down when they
25 wanted to -- any overages over the initial

Page 104

1 construction costs they wanted to do a third a third
2 a third.  Where I took on a third more of the debt,
3 the bank took on a third more of the debt, and then
4 the REDI program took on a third of the debt.
5      Q.  And you found that unacceptable?
6      A.  I had an issue with it.  Charles and I
7 had talked about it via email and in person.  Yeah,
8 they were changing the terms of their agreement.  We
9 were dealing with a global pandemic.  So cost
10 overages, cost overruns, however you want to phrase
11 it, were definitely an issue.
12      Q.  It says the loan amount for both the
13 construction phase and the permanent phase is
14 $7.2 million; correct?
15      A.  Correct.
16      Q.  Isn't the very first Ruins note itself
17 in excess of 7.2 million?
18      A.  Yes.
19      Q.  So Red River State Bank lived up to at
20 least providing 7.2 million, did it not?
21      A.  Yes.
22      Q.  And when it talks about, you know, the
23 construction phase and the permanent phase, is it
24 fair to say that the permanent phase means after it's
25 done, after it's constructed?

Page 105

1      MR. VERSTANDIG:  Object to the form of
2 the question, but you may answer.
3      A.  There's the construction, then there's
4 stabilization, and then the final is how I've looked
5 at the appraisals at.
6      Q.  Okay.
7      A.  But I would say stabilized is when it's
8 been in operation for 12 to 18 months.
9      Q.  And the construction is done though;
10 right?
11      A.  The construction is done.  Certificate
12 of occupancy, it's being rented out, and you're kind
13 of almost turned over your first phase of tenants.
14 When you open an apartment building up you're not
15 going to have 63 tenants ready and waiting so...
16      Q.  So we've never reached the permanent
17 phase on The Ruins; correct?
18      A.  We haven't even reached the
19 stabilization, correct.
20      Q.  So one of the conditions in the
21 permanent phase says completion of the work.  We just
22 mentioned that; right?
23      A.  Yep.
24      Q.  That had to be a condition to getting
25 permanent financing.  The certificate of occupancy

27 (Pages 102 - 105)

Page 106

1  being issued.  Was that another condition?
2      A.  Yes.
3      Q.  No unsatisfied construction liens.  Was
4  that a condition?
5      A.  Yes.
6      Q.  How many construction liens are there
7  unsatisfied right now on The Ruins property?
8          MR. VERSTANDIG:  Object to the form of
9  the question, but you may answer.
10     A.  Around seven -- between five and ten.
11 I couldn't tell you the exact number.
12     Q.  But they're unpaid; correct?
13     A.  Correct.
14     Q.  And have all lien waivers been received
15 at this point?
16     A.  No.
17     Q.  So are you seeking to hold Red River
18 State Bank to the terms and conditions of this term
19 sheet in this litigation?
20         MR. VERSTANDIG:  Object to the form of
21 the question, but you may answer.
22     A.  Partially, yes.
23     Q.  What parts?
24     A.  Well, I mean, the fact that they -- we
25 didn't utilize the REDI program kind of blows this

Page 107

1  thing apart right away.
2      Q.  And that was a joint decision not to
3  use the REDI program; correct?
4      A.  Yes.
5      Q.  So that was your decision as well as
6  the bank.
7      A.  Yes.  And not -- and not agreeing to
8  that, I took a hit on the interest rate and Red River
9  State Bank took on more debt.
10     Q.  Did you actually do the application
11 process all the way through for the REDI program?
12     A.  For which project?
13     Q.  For Ruins.
14     A.  I don't recall.  Honestly, I don't
15 recall.
16     Q.  What about for -- well, let's look at
17 the other ones.  This is 23.  I'll give you a clean
18 one.
19         (Whereupon, Deposition Exhibit No.
20          23 was marked for identification by
20          the court reporter.)
21         MR. VERSTANDIG:  Objection.  Relevance.
22         MS. STANLEY:  You provided this for
23 your claim objection hearing; right?  This was on the
24 list of exhibits.
25         MR. VERSTANDIG:  Yeah, but you're not

Page 108

1  asking for claim objections centric purposes.  You're
2  asking for adversary proceedings centric purposes.
3          MS. STANLEY:  Okay.
4          MR. VERSTANDIG:  If I provide an
5  exhibit and you turn it into a paper airplane and
6  fold it Oragami style into a crane and ask the
7  witness whether or not it resembles true Asian hand
8  folded paper artwork, we can agree that's not
9  relevant.  To the extent I made an ethnic
10 generalization in there I did not mean to offend
11 anyone.
12     Q.  (Ms. Stanley continuing)  Okay.  Let's
13 go back to the Exhibit 22.  So are you asking that
14 Red River State Bank be held to provide at least a
15 $7.2 million note at a ten-year fixed rate?
16     A.  Well, I'd love to have the LTV not to
17 exceed 90 percent of construction costs or appraisal
18 less TIF whichever is lower.  I'd love to have that
19 condition which is kind of where we were going.
20     Q.  Okay.  But --
21     A.  But they weren't going to be doing
22 90 percent because the REDI program wasn't in play.
23     Q.  So, I mean, was this kind of out the
24 window when the REDI -- you indicated that earlier
25 that when the REDI program didn't happen this was

Page 109

1  kind of out the window.
2      A.  Well, yeah, parts of it were.  I mean,
3  I think we had to, you know -- I was faced with a
4  pandemic, Charles was, you know, faced with getting
5  participants and funding and the lending violations,
6  and we tried to work together to try to get this
7  thing -- there's several emails where we're literally
8  telling each other appreciate what each other are
9  doing, but we got to kind of work together to try to
10 get this to the end game.
11     Q.  So are you, in essence, saying, Red
12 River, you should be held to this part, but I
13 shouldn't have to provide a certificate of occupancy?
14         MR. FRISK:  Objection as to form.
15     A.  No.
16     Q.  This has to be taken as a whole;
17 correct?
18         MR. VERSTANDIG:  Object to the form of
19 the question.  You may answer.
20     A.  I didn't sign it.  So it's a proposal,
21 a guideline that we started doing construction with.
22 Things changed during that period of time from when
23 this was presented to when we actually started
24 construction.  So from a legal standpoint I couldn't
25 tell you if this is a contract or not.

28 (Pages 106 - 109)

Page 110

1    Q. So do you feel like you're bound by
2 that?
3        MR. VERSTANDIG: Object to the form of
4 the question.
5    Q. I'm sorry. The Ruins.
6        MR. VERSTANDIG: Object to the form of
7 the question. Calls for a legal conclusion.
8    Q. Is bound by that.
9        MR. VERSTANDIG: Object to the form of
10 the question. Calls for a legal conclusion. Witness
11 is a layperson. You can answer.
12    A. I want to finish the project. That was
13 the whole intent was to get this thing finished, cash
14 flowing, and profitable. And that's why we haven't
15 walked away from this. I could have just walked away
16 from this and let it go, and I didn't. We're
17 fighting to keep this property intact and finished.
18 We got a plan ready to finish it and get it rented.
19 I'm sorry if that doesn't answer your question
20 specifically.
21    Q. Let's look at one of these great big
22 sheets of paper.
23        (Whereupon, Deposition Exhibit No.
24        24 was marked for identification by
24        the court reporter.)
25    Q. (Ms. Stanley continuing) You have a

Page 111

1 really big piece of paper in front of you that is now
2 Exhibit 24. And does this document look familiar?
3    A. Yes.
4    Q. What, to your recollection, is this
5 document?
6    A. This would have been some initial
7 numbers that we would put together. This one's dated
8 two years prior to actually -- almost, well, over a
9 year probably from when we started building. So this
10 was pre-pandemic numbers.
11    Q. And this is for The Ruins project;
12 correct?
13    A. Yes.
14    Q. So pre-pandemic numbers, and what
15 you -- or, I'm sorry, what -- was this done in the
16 capacity of the developer, the general developer
17 Craig Development?
18        MR. VERSTANDIG: Object to the form of
19 the question. I'm not being a smart aleck. I do not
20 understand what you just asked.
21    Q. Was this provided by, you know, what
22 The Ruins thought it could build this for, or
23 was -- were you providing this sort of in your
24 capacity as the --
25    A. Craig Development as the general

Page 112

1 contractor.
2    Q. Okay. Thank you. Sorry, that was a
3 badly-worded question. And so you had gone out and
4 gotten -- had you gone out and gotten estimates from
5 these people?
6    A. No. These are typically based off,
7 like, previous construction projects.
8    Q. Okay. So --
9    A. No bids had been gotten. Sorry to
10 interrupt you.
11    Q. No. So this was sort of based off of
12 the prior construction done on, like, Lofts,
13 Parkside, Generations?
14    A. Yeah. And even Alexandra Marie, and
15 things like that. So kind of have a floating number
16 per unit that calculates these.
17    Q. Okay. And so at the time that was
18 done, which if this date is correct at the top,
19 February 4, 2020, was it your estimate that it would
20 cost $10.6 million to construct this?
21    A. Yes.
22    Q. When you were also referring -- when we
23 looked through the bid sheet -- or, sorry, the draw
24 sheets, you referred to, like, rows on an Excel
25 spreadsheet. Is this the spreadsheet that you're

Page 113

1 talking about?
2    A. It would be kind of based loosely on
3 this, but it's a whole different document that would
4 have, like, columns with draw, one draw, two draw,
5 three draw, four. That would then take down these
6 numbers they're paid out.
7    Q. Okay. Who updated that other
8 spreadsheet that you're talking about?
9    A. Me. I did.
10    Q. Just you?
11    A. Yep.
12    Q. So when you initially approached Red
13 River State Bank about doing The Ruins project, was
14 this how much you were asking for in a loan?
15    A. They courted me. I didn't reach out to
16 them. Martin Peterson reached out to me to do these
17 projects.
18    Q. Okay. But when we were talking with
19 Martin Peterson about doing The Ruins project, was
20 this the amount of funds you thought would be
21 necessary?
22    A. Yes.
23    Q. I'm curious about the
24 architect/engineer one towards the bottom. The
25 6 -- what is the 6 percent?

29 (Pages 110 - 113)

Page 114

1    A.  Usually they just have a floating fee.
2 On the 6 percent he's usually at 4, 4 and a half, but
3 I was talking to him about possibly doing the
4 construction management.  So we kind of put it at
5 that 6 percent.  And, again, that's all the engineers
6 get paid out of that also, not just the architect.
7    Q.  So who are the engineers on The Ruins
8 project?
9    A.  Infrastructure would be.  And then
10 TL Stroh.  And then he usually uses, like, MBN.  M as
11 in Mary, B as in boy, N as in Nancy.
12    Q.  Why is Infrastructure Design Group up
13 at the top under site survey/civil as well?
14    A.  Because they do that part of it as
15 well.  So they have to do the civil plan, and then
16 they also -- I mean, there's a lot of overlap in
17 that.  So when you're working in downtown in like
18 older portions of town, and stuff like that, we run
19 into a lot of issues with infrastructure.  No pun
20 intended, but they had to work on, like, how the size
21 of the piping was coming in for the sewer, the water,
22 things like that.
23    Q.  Okay.  So am I understanding this right
24 that Infrastructure Design kind of has two different
25 components of the work it does, like, it works

Page 115

1 directly with the architect and then it also does,
2 like, site work?
3    A.  Yeah.  I actually have, like, Carl at
4 KLJ is over right now staking out the Borrowed Bucks
5 project.  But they also work with TL Stroh on the
6 engineering side of it with the civil part.
7    Q.  So how is this billed?
8    A.  They would send invoices and they
9 would -- in the description they would say what it
10 was for.
11    Q.  Okay.  And TL Stroh, when he would bill
12 are you -- on The Ruins -- with respect to The Ruins
13 project, did he do a flat fee?
14    A.  I can't recall.
15    Q.  Okay.
16    A.  It's either that or a percentage.  I
17 couldn't tell you what he did.
18    Q.  Has he done it that -- both ways in
19 your experience?
20    A.  Yes.
21    Q.  Was Terry Stroh intending to be a
22 partner in The Ruins project?
23    A.  Early on --
24    MR. VERSTANDIG:  Object.  Whoa.
25    A.  Sorry.

Page 116

1    MR. VERSTANDIG:  Object to the form of
2 the question.  Calls for speculation.  Calls for the
3 solicitation of hearsay.  You may answer.
4    A.  Early on, yes.
5    Q.  Did he say why he didn't want to move
6 forward with it?
7    MR. VERSTANDIG:  Object to the form of
8 the question.  You may answer.
9    A.  Terry is just at the stage of his life
10 where he just doesn't want any hassles and was kind
11 of getting out of his real estate stuff, wasn't
12 building anymore.  So, yeah, it was.  He's still my
13 architect on other stuff.
14    (Whereupon, Deposition Exhibit No.
15    25 was marked for identification by
     the court reporter.)
16    Q.  (Ms. Stanley continuing)  Okay.  I'm
17 handing you what we've marked as Exhibit 25.  Are you
18 familiar with this document?
19    A.  Yes.
20    Q.  It still indicates Tuesday, February 4,
21 2020.  Is that date correct?
22    A.  No.  I wouldn't believe so, no.
23    Q.  Do you have any idea what the time
24 frame of this document would be?
25    A.  This would -- since there's only a

Page 117

1 total complete of 784,000 it would have been really
2 late in the build.  So it had to have been like
3 early -- late 2020, early '23.
4    Q.  Wait, you said late 2020, early --
5    A.  I'm sorry, late '22, early '23 I would
6 believe.
7    Q.  Okay.  What was the last work done on
8 The Ruins project to your recollection?
9    MR. VERSTANDIG:  Object the form of the
10 question.
11    Q.  Construction work done.
12    A.  Like, what trade?  Like, who was the
13 last one out of the building?
14    Q.  Yeah.
15    A.  I was paying Carson Burkhardt, my
16 painter, to watch over The Ruins when we stopped work
17 on it, when funding ceased.  So he was paid monthly
18 to watch that property.
19    Q.  Okay.
20    A.  And Alexis is our property manager now
21 that we got the properties back so she watches it
22 daily also.  So Carson was paid for his time to do
23 that.
24    Q.  So what time frame was that when Carson
25 started watching over it?

30 (Pages 114 - 117)

Page 118

1    A.   Whenever the funding stopped.  I
2  couldn't tell you.  I'd have to look at a ledger on
3  when he was paid.
4    Q.   Who was the last subcontractor to
5  actually do more than an hour or two of work?
6    A.   The electricians.  Sentry.
7    Q.   Sentry.
8    A.   S-E-N-T-R-Y.
9    Q.   Who were the other electricians?
10   A.   Kloos.
11   Q.   Okay.  Thank you.  I was trying to
12  remember.
13   A.   Yeah, he did the trenching in on that.
14  He'll probably be the one to finish it.
15   Q.   So Sentry, if we had their bills, that
16  would be about the last work -- time frame of the
17  last work done do you think?
18   A.   Yeah, because they were prepaid.  I had
19  to prepay them to get the work completed.  Mainly
20  because we needed heat over the winter so that's why
21  they were paramount.
22   Q.   Okay.  So going back to the draw
23  requests, is this more of the actual one that you
24  were talking about where it lined up, you know, you
25  put the number along the side?

Page 119

1    A.   Yeah, No. 1 --
2    MR. VERSTANDIG:  Hold on.  Objection.
3  I have no idea what you just asked.  There's no way
4  that's going to make sense in a transcript.
5    Q.   So previously we looked at the draw
6  requests and you had numbers along the names of the
7  contractors; correct?
8    A.   Yes.
9    Q.   And you said that they matched up with
10  where you filled in information on a spreadsheet;
11  correct?
12   A.   Yes.
13   Q.   Is this the spreadsheet or a version of
14  the spreadsheet?
15   A.   It would be a version of it, but it's
16  missing all the columns with the draws.
17   Q.   And that was a document that you
18  prepared.
19   A.   Yes.
20   Q.   Have you turned over that document?
21   A.   Yes.  It was -- I can't recall if I
22  sent it in discovery, but it was sent to Charles
23  during the construction so he could track it also.
24  But I can't recall if I sent it in discovery or not.
25   Q.   And you were the only person that ever

Page 120

1  entered information on that spreadsheet.
2    A.   Correct.
3    Q.   So I think you indicated this was late
4  '22 or early '23 when this would have been produced;
5  is that correct?
6    A.   Correct.
7    Q.   And is that your signature at the
8  bottom?
9    A.   Yes.
10   Q.   And who -- do you recall who you
11  provided this to?  Did you provide it to the bank?
12   A.   It would been to Charles Aarestad.
13   Q.   Anyone else?
14   A.   No, not that I can recall.
15   Q.   Would this be something provided to the
16  appraiser?
17   MR. VERSTANDIG:  Object to the form of
18  the question.
19   A.   I --
20   MR. VERSTANDIG:  Whoa, whoa, whoa.
21  Object the form of the question.  There's, like,
22  three different appraisals floating around in this
23  case.  I have no idea which one you're referring to.
24   Q.   Okay.  Well, they're all with CBRE.  So
25  did you provide this to CBRE for an appraisal?

Page 121

1    A.   Typically I would have provided this to
2  the bank who would have provided it to CBRE.
3    Q.   So they would just forward it is your
4  understanding?
5    A.   That's the emails I saw.
6    Q.   Looking at just curious about -- so,
7  like, the architect/engineer at the bottom now,
8  Stroh, now it says 4 percent.  Is that right?
9    A.   Yes.
10   Q.   And we're, again, still looking at
11  Exhibit 25.
12   A.   Yes.
13   Q.   So what was your understanding of how
14  Stroh was billing on this project?
15   A.   I'd have to look at his contract.
16   Q.   Okay.  But the number is in yellow and
17  it says 509,775.  So -- and there's the column next
18  to it that says, "Amount Paid."  Is that -- am I
19  interpreting that right that you -- Stroh was paid
20  this amount?
21   A.   The one thing at the end that we had
22  checks that I had made out and in anticipation of
23  paying some of the trades.  But then, like, draw 14
24  wasn't funded.  And so this is when everything kind
25  of started to spiral out of control.  So I couldn't

Page 122

1 tell you without looking at his contract if that
2 was -- if that's accurately that he actually received
3 those funds or not.
4     Q.   Okay.  What's the significance of some
5 being in yellow and some not?
6        A.   Typically the ones in yellow aren't bid
7 out.  Like typically that's -- but on this document I
8 couldn't tell you why they -- why they are.
9        Q.   What did you mean aren't bid out?  I
10 didn't understand that.
11       A.   Typically when I start a construction
12 project like this for my own use I'll highlight or
13 make notations on which ones I've received and
14 accepted bids on.  And I'll do them in yellow.
15       Q.   Just a second.  Just so the record
16 knows, he's looking at Exhibit 24.
17       A.   I would highlight the ones that are
18 completed that I have signed contracts on.  That way
19 I can see which ones I still have to work on to get
20 bids finalized.
21       Q.   Oh.
22       A.   So then when I go to Exhibit 25 I don't
23 know why those are in yellow.
24       Q.   So you don't know if you had actually
25 signed contracts with them or --

Page 123

1        A.   By this time I would have had signed
2 contracts.  Because, like I said, this was towards
3 the end of the build.
4        Q.   So going back again to 25 -- Exhibit
5 25, general conditions, there's no contractor next to
6 that.  Where does that number come from?
7        A.   It's a combination of everything.
8 Porta potty, dumpster, machinery rental, any
9 equipment that we needed to, you know, do it on
10 there.  Anything we needed to buy, smaller items,
11 that all goes into general conditions.
12       Q.   Okay.  What about building demolition.
13 There's no name next to that.
14       A.   That would have ended up being Clausen.
15 C-L-A-U-S-E-N.  Clausen Construction.  They were the
16 ones that did the demo on it.
17       Q.   So according to this, they were paid
18 $258,200 for building demolition?
19       A.   That's what this shows.  It seems
20 pretty light, though, based on the demolition of the
21 Palace.
22       Q.   And then it looks like Limoges, the
23 next one down, is concrete.  That was 1.476 million;
24 is that right?
25       A.   That's what it looks like.

Page 124

1        Q.   So when I look at Exhibit 24 on
2 concrete, the Limoges was 560,000.  That's almost
3 three times the amount, isn't it?
4        A.   Yeah.
5        Q.   Do you have any explanation for why
6 it's so much larger?
7        A.   I know that we had a lot of cost
8 increases with the pandemic, and some went up to
9 40 percent, but I don't recall why that was triple.
10       Q.   Is it possible that -- Limoges did work
11 on Generations, didn't it?
12       A.   Yes, and I believe Parkside also.
13       Q.   And Parkside?
14       A.   I believe so.
15       Q.   And is it possible that some of the
16 Generations invoices were paid out of Ruins draws?
17       A.   I believe that was the case, yeah.
18       Q.   So that does happen.
19       A.   Well, if we look at any of the draw
20 requests there's invoices in there with Generations
21 right on it.  Those were reviewed and approved by Red
22 River State Bank and funded.  So they weren't being
23 hidden.
24       Q.   You don't think any of that was hidden.
25       A.   No.

Page 125

1        Q.   Did anybody, to your knowledge, alter
2 any of the invoices that are attached to the draw
3 requests?
4        A.   On Ruins?
5        Q.   Yes.
6        A.   Many of them were corrected.
7        Q.   What do you mean corrected?
8        A.   You say altered.  They were corrected
9 because, again, like we'd talked about originally,
10 when draws are overlapping they're sending in these
11 draw requests or invoices with no retainage on them.
12 My project managers and I always had to work with the
13 contractor to correct what they were submitting.
14 There was cases where I had to pay people in advance
15 and had to get reimbursed for it also because of the
16 delays.
17       Q.   So when you say corrected, do you mean
18 corrected on that -- a piece of paper that was
19 submitted to the bank, or how was it corrected?
20       A.   Yeah, it would have been given to my
21 project manager and I.  And if it was not correct,
22 they hadn't taken 10 percent retainage out or they
23 were doubling up on draws, or things like that, we
24 would work with them to correct it.  Either they
25 would have corrected it or we would have, but it

32 (Pages 122 - 125)

Page 126

1 would have been with their knowledge.
2      Q.  The subcontractor's knowledge.
3      A.  Correct.
4      Q.  So you were the one, though, that
5 submitted the documents to the bank on the draw
6 requests; correct?
7      A.  Yes.
8      Q.  And did you look through those before
9 they were submitted, the invoices from
10 subcontractors?
11      A.  Most of the time, yes.  I trusted my
12 project managers also.
13      Q.  You're their supervisor; correct?
14      A.  They're independent contractors.  So
15 I'm the general contractor so do I authority over
16 them?  Yes.  But they're independent.  They're not
17 employed.
18      Q.  But, I mean, at the end of the day
19 you're the one asking the bank for money on these
20 draw requests; right?
21      A.  Correct.
22          MR. VERSTANDIG:  Object to the form of
23 the question.  You may answer.
24      Q.  So when you said that you would correct
25 the information from the subcontractors, did you get

Page 127

1 corrected documents?
2      A.  I would have done it or my project
3 manager would have corrected it for them.
4      Q.  Okay.  And is that what was submitted
5 to the bank?
6      A.  Yes.
7      Q.  The corrected ones?
8      A.  Yes.
9      Q.  Did information -- or did bills,
10 invoices for your personal lake home get submitted to
11 the bank on draw requests?
12      A.  Yes.
13      Q.  Did you do that on purpose, or was that
14 a mistake?
15      A.  No, it was on purpose.  Charles was
16 aware of it.  We had put over a million dollars -- or
17 a million dollars worth of debt on to my lake home
18 for The Ruins.  So there had to be an offset.
19      Q.  What was the time frame on
20 the -- you're talking about the two notes that were
21 recently paid off on your lake home?
22      A.  Correct.
23          MS. STANLEY:  Do you remember the time
24 frame on those notes, Charles?
25          (Off the record from 12:55 p.m. to

Page 128

1 12:56 p.m.)
2      Q.  (Ms. Stanley continuing)  Back on the
3 record.  So it's your understanding that invoices for
4 your lake home were approved to be paid by Ruins
5 draws.
6      A.  Yes.
7      Q.  And that was before or after these two
8 loans that were given -- collateralized by the lake
9 home as well.
10      A.  That I don't recall.
11      Q.  You don't recall the timing on that?
12      A.  No.
13      Q.  So if bills for your lake home showed
14 up prior to execution of those notes for the lake
15 home, would that have been proper or improper in your
16 mind?
17          MR. FRISK:  Objection.
18          MR. VERSTANDIG:  Objection.  You go
19 first, I'll go second.
20          MR. FRISK:  I'm going to object to the
21 form.  It calls for speculation.  Probably it's
22 ambiguous.  Probably calls for a legal conclusion.
23 I'll let Mac run with the rest.
24          MR. VERSTANDIG:  No, I adopt those.
25 I'm not sure about the ambiguity, but I like it.

Page 129

1 Definitely calls for a legal conclusion.  Definitely
2 calls for speculation.  Definitely assumes facts not
3 in evidence.  You can answer though.
4      A.  Proper.
5      Q.  That would have been proper?
6      A.  Yes.
7      Q.  Why -- did Charles give you permission
8 to do that before those loans were made?
9      A.  If they were submitted and it was right
10 on the invoice that it was for the lake home.  And
11 there was some waffling where they wanted me to get a
12 different bank to do the financing on the lake home,
13 and I had Starion ready to go to go to it, and then
14 Charles wanted it.  And so then we went that route.
15 So there was some waffling as to who was going to be
16 doing that ahead of time, but there was full
17 knowledge on it.  It wasn't a secret that those were
18 running through there.
19      Q.  What -- you're not aware of any
20 alterations on lake home invoices that were submitted
21 to Red River State Bank, are you?
22          MR. FRISK:  Objection as to form.
23      A.  There were corrected invoices that were
24 submitted just like the other draws.
25      Q.  Okay.  So tell me more about that.

33 (Pages 126 - 129)

Page 130

1 What do you mean by corrected invoices submitted?
2       A.  It's pretty broad.  Are you talking in
3 regards to the lake?
4       Q.  Right.  To the lake.
5       A.  Yeah.
6       Q.  So -- well, let me ask this.  KLJ, did
7 they do any work on The Ruins project?
8       A.  No.  Not that I recall.  It would have
9 been through Stroh if they did.
10      Q.  So any -- unless it was through Stroh,
11 any KLJ invoices submitted would have been for
12 something other than Ruins; correct?
13      A.  I'd have to again look at Stroh's
14 contract or find out if he utilized KLJ at all, but I
15 believe we used Infrastructure.
16      MR. VERSTANDIG:  Can we take 90
17 seconds?
18      MS. STANLEY:  Sure.
19      MR. VERSTANDIG:  Thank you.
20      (Off the record from 1:00 p.m. to
21 1:04 p.m.)
22      (Whereupon, Deposition Exhibit No.
          26 was marked for identification by
23        the court reporter.)
24      Q.  (Ms. Stanley continuing)  Let's look
25 at -- open your binder, please.  We're going to look

Page 131

1 at Exhibit 26 as well, but...  Look at -- open it to
2 number -- draw number 4.
3       MR. VERSTANDIG:  We're on 26?
4       MS. STANLEY:  Yes.
5       MR. VERSTANDIG:  And we're looking for
6 draw number 4?
7       MS. STANLEY:  Yes.  In the binder.
8       MS. CRAIG:  In the binder?
9       MS. STANLEY:  Yeah.  We got to kind of
10 look at two different things at once.
11      MS. CRAIG:  I'm sorry, number 4 you
12 said?
13      MS. STANLEY:  Yes.
14      Q.  (Ms. Stanley continuing)  So looking at
15 draw number 4 on the Invoice 4, you have that page
16 open in the binder.
17      A.  Uh-huh.
18      Q.  It indicates that TL Stroh -- there's a
19 line there, TL Stroh $409,450.  Is that correct?
20      A.  Looks like it, yes.
21      Q.  And it says .74.  Would that be the row
22 on the spreadsheet?
23      A.  Yes.
24      Q.  That we talked about which I think is
25 Exhibits 24 and 25?  Or -- yeah, 24 and 25.  It's

Page 132

1 those exhibits?
2       A.  Looks like it.
3       Q.  Or that -- that is likely row -- is it
4 likely row 74 is the one here that has Stroh's name
5 on it at the bottom?
6       A.  Correct.
7       Q.  Where it says, "Architect/Engineer"?
8       A.  Yeah.
9       Q.  Okay.  So if we look in draw number 4,
10 I do not -- did not see a invoice from TL Stroh for
11 409,000.  Do you have one in yours?
12      A.  That you provided me?
13      Q.  In the -- in the draw request.
14      A.  No.
15      Q.  Okay.  I've handed you also what's
16 Exhibit 26 which is the Declaration of Terry Stroh
17 Certifying Records.  And this was executed yesterday
18 by Mr. Stroh.  And he indicated that Exhibit A was
19 the transactions for The Ruins.  Does this look to
20 be -- Exhibit A look to be correct?
21      A.  I'd have to...
22      MR. FRISK:  Caren, were you asking if
23 it looks to be correct?  Which document looks to be
24 correct?
25      MS. STANLEY:  Exhibit A to No. 26 of

Page 133

1 Terry Stroh's Declaration.
2       MR. FRISK:  Okay.
3       A.  I would have no idea on his accounting.
4       Q.  (Ms. Stanley continuing)  But you don't
5 have any -- I mean, earlier I thought you indicated
6 you were not able to find documents for
7 subcontractors other than what's basically been
8 provided in the draw requests; correct?
9       A.  Like in my files in my office?
10      Q.  Yes.
11      A.  Oh, no, that I don't know.
12      Q.  You don't have any.
13      A.  I don't know.  This is the first I've
14 heard of this so I haven't been asked to go and go
15 back through my records and produce this.
16      Q.  You haven't been asked to go back
17 through your records and look for subcontractor
18 documents?
19      A.  This is the first time that I've heard
20 that we're missing a document in a draw request.  Had
21 I known that, I would have researched and went and
22 found it if it's not in the discovery we provided
23 you.
24      Q.  So did you -- when you were served with
25 all the document requests, did you go look for all of

34 (Pages 130 - 133)

Page 134

1 the subcontractor invoices in your files?
2       MR. FRISK: Objection as to form.
3 He's -- obviously, if there's something missing and
4 he now knows that something's missing he just said he
5 would just go ahead and look to make sure that it was
6 included. It's as simple as that.
7       MS. STANLEY: No, I don't think it's as
8 simple as that because we've been asking for these
9 documents for, like, two years. So I don't think
10 it's that simple.
11     Q. (Ms. Stanley continuing) Did you go
12 back and look for all of the subcontractor documents?
13     A. You're talking invoices?
14     Q. Yes. Invoices.
15     A. Yes.
16     Q. Pay applications, all of the documents
17 from the subcontractors.
18     A. Yes.
19     Q. And you believe you provided all of
20 them?
21     A. Other than the stuff that was with
22 Prevail.
23     Q. So if you haven't provided anything in
24 discovery that's different, do you have any reason to
25 believe that what Mr. Stroh provided directly is

Page 135

1 incorrect?
2       MR. VERSTANDIG: Object to the form of
3 the question. Mr. Stroh's direct provision includes
4 an invoice for $409,450.
5       MS. STANLEY: Yes.
6       MR. VERSTANDIG: Isn't the whole
7 premise of this that there is no invoice for that
8 amount?
9       MS. STANLEY: Let me finish this
10 deposition, okay?
11      MR. VERSTANDIG: Right, but --
12      MS. STANLEY: But I'm asking --
13      MR. VERSTANDIG: You just asked a few
14 minutes ago and that appears to be a false premise
15 that underlies this whole line of questioning; right?
16 Your representation to the witness was that nothing
17 provided by Mr. Stroh would match the number on the
18 previous document. It turns out you flip to whatever
19 page it is and there's an invoice for 409,450.
20      MS. STANLEY: Yep. I was going to get
21 there, Mac.
22      MR. VERSTANDIG: Okay.
23     Q. (Ms. Stanley continuing) So did you go
24 back and look through files for documents from Terry
25 Stroh for The Ruins?

Page 136

1       A. I would have looked at draw requests
2 and I would have went through email tabs that would
3 have had any searches for Terry Stroh and invoices.
4 But typically he would have mailed his invoices to
5 me. I rarely got them via email.
6       Q. Okay.
7       A. They're always paper copies.
8       Q. Okay. So as your attorney kindly
9 referenced earlier, there is -- it's Bates numbered
10 503 on the bottom. And it's an invoice for 409,450;
11 correct?
12      A. Yes.
13      Q. And that appears -- that does appear to
14 match Invoice No. 4 in the draw requests; right?
15      A. Yes.
16      Q. Or when I say Invoice No. 4 I'm talking
17 about the listing of subcontractor amounts.
18      A. Yes.
19      Q. Okay. I would like you to go to
20 number -- draw number 9.
21      MR. FRISK: In the binder?
22      Q. Yes.
23      A. The one with no invoice sheet?
24      Q. Yeah. Yep. Somewhere in here... This
25 was a big one. Oh, did you find it?

Page 137

1       A. 2521?
2       Q. Thank you. 2521.
3       A. I think that's the one you're looking
4 for.
5       Q. Thank you. Bate number 2521. This is
6 another Terry Stroh document; is that correct?
7       A. Yes.
8       Q. And it includes both -- if you look at
9 page -- it's not on there. But it refers to a
10 Northern Technology report for $5,325; right?
11      A. Yes.
12      Q. And did Northern Technology do some
13 work for Stroh Architects?
14      A. Looks like it.
15      Q. Okay. And that would have been, if you
16 look at -- going back to Exhibit 26 which is
17 Mr. Stroh's declaration, that appears to match up
18 with Bate number 500; is that correct?
19      A. Yes.
20      Q. Okay. And that one actually
21 does -- 500 and 501 appears to have the Northern
22 Technologies invoice as well.
23      A. Yes.
24      Q. Okay. Let's take a look at draw
25 No. 11. It's number -- Bate number 25 -- 2565.

35 (Pages 134 - 137)

Page 138

1 You're looking at the -- no, that's fine.  Go ahead
2 and look at the -- we're looking at the invoice
3 listing of contractors.
4      A.  Uh-huh.
5      Q.  And this draw request appears to be
6 asking for $95,000 for Stroh; correct?
7      A.  Yes.
8      Q.  And, again, that says line 74 in your
9 handwriting; right?
10     A.  Yes.
11     Q.  Okay.  And then when we look -- turn
12 the page, Bate number 2565, this appears to be
13 looking for -- this is a $95,000 invoice; correct?
14     A.  Yes.
15     Q.  And what's the date on that?
16     A.  June 15 of '22.
17     Q.  Okay.  Mr. Stroh's documents did not
18 have a $95,000 request.  Can you explain where this
19 one came from?
20         MR. FRISK:  Objection.  Form.  Asking
21 for speculation.
22     A.  Terry ended up doing a lot more work on
23 the project, and so he and I talked about whether he
24 should get paid an additional amount of money or not.
25 But he was never paid the $95,000.

Page 139

1      Q.  So you're saying that he provided you
2 this invoice?
3      A.  No.  He and I had talked about this
4 invoice, but...
5      Q.  What did you talk about the invoice?
6      A.  The extra work he had to do on the
7 elevation changes on the precast for the elevator
8 shaft.
9      Q.  Okay.  So who did -- who made this
10 invoice?
11     A.  I did with Terry's knowledge.
12     Q.  You did with Terry's knowledge.
13     A.  Yep.
14     Q.  So you altered his form and made this
15 invoice yourself?
16         MR. VERSTANDIG:  Object to the form of
17 the question.
18     Q.  Is that correct?
19         MR. VERSTANDIG:  Object to
20 characterization.  Object to the form of the question
21 since you just changed the question, but you may
22 answer.
23     A.  I sent him this as a draft of what we
24 could possibly do as far as a fair amount of money to
25 be paid to him.

Page 140

1      Q.  So you're saying he did -- are you
2 saying that he did $95,000 worth of extra work but
3 you never paid him for that?
4      A.  I think there was negotiations there.
5      Q.  That was a yes or no question.  Did you
6 pay him for that?
7      A.  No.
8         MR. VERSTANDIG:  Objection.
9      A.  Sorry.
10        MR. VERSTANDIG:  Object to the yes or
11 no question.  The witness cannot and will not be
12 directed to answer in one word.  You may answer.
13 Apparently you picked one word anyway.
14     Q.  But this $95,000 invoice got submitted
15 to the bank for -- as part of draw request No. 11;
16 correct?
17     A.  Yes.
18     Q.  And then looking at Exhibit No. 25.
19 Under the architect/engineer line, it says 509,775.
20 Is that including this $95,000?
21     A.  Yes.
22     Q.  But it never was paid to the
23 architect/engineer; correct?
24     A.  Correct.  The decision was made not to.
25     Q.  And so those funds were kept by Craig

Page 141

1 Development?
2      A.  They were --
3         MR. VERSTANDIG:  Whoa.  Object to the
4 form of the question.  Assumes facts not in evidence.
5 Calls for speculation.  Ignores any number of
6 financial principles.  Ignores the underfunding of
7 this project.  Ignores the disbursement of monies to
8 any number of parties.  I'm sure there's other things
9 so I'll just object to form again, but you may
10 answer.
11     A.  It would have been used for the
12 project.
13     Q.  Are there any other documents within
14 the draw requests that you altered similarly?
15     A.  Like we had talked about previously,
16 between my project manager and myself we would have
17 corrected a lot of those, yes.
18     Q.  Is this a correction?
19     A.  No.  This was a negotiation.
20     Q.  I think earlier right at the beginning
21 of our day you mentioned Limoges; correct?
22     A.  Yes.
23     Q.  And said that they were not
24 sophisticated, or I can't remember the term you used.
25 Do you remember?

36 (Pages 138 - 141)

Page 142

1      A.   Limoges we talked about the bid being
2  three times what we initially thought it was going to
3  be.
4      Q.   Oh, it was Watertight that you said
5  that about.
6      A.   Watertight.
7      Q.   Okay.  Sorry.  My -- I got that mixed
8  up.
9          MR. VERSTANDIG:  Just for clarity, I
10 don't think the generalization was that they are not
11 sophisticated people.  I think it was a discussion of
12 their experience relative to the scope of the
13 project.
14         MS. STANLEY:  I wasn't intending to be
15 uncharitable.
16         MR. VERSTANDIG:  So noted.
17     Q.   (Ms. Stanley continuing)  And I think
18 you mentioned an invoice for $155,000 or something
19 thereabout; right?
20     A.   Seventy-five.  They usually billed,
21 like, $75,000 every two -- or every month.
22     Q.   Do you recall back in September,
23 October of last year that I sent -- or my co-counsel
24 sent a letter to Dan Frisk asking about the
25 Watertight invoices and why they didn't match?

Page 143

1      A.   Yeah, we responded.
2      Q.   You responded to that?  So much paper.
3  Okay.  Go ahead and let's turn to No. 10 draw
4  request.  And this one if you're looking at Bates
5  2537, Watertight is listed at the bottom asking for
6  $155,880.20; is that correct?
7      A.   Yes.
8      Q.   And that 64, does that correspond to
9  the line on the spreadsheet?
10     A.   Yes.
11     Q.   Row -- or sorry, row 64?
12     A.   Uh-huh.
13     Q.   Okay.  Turn the page, 2538.  This was
14 the -- I believe this document was the subject of the
15 letter that we wrote -- my co-counsel in South Dakota
16 wrote to Mr. Frisk as I recall.  Is that your
17 recollection?
18     A.   I only recollect the fact that we found
19 the canceled checks in the check ledgers on what was
20 paid, and I gave it to Dan and should have responded
21 with it I believe.
22     Q.   Okay.
23     A.   But I don't recall specifically this
24 invoice.
25     Q.   Okay.  But it's in the draw requests;

Page 144

1  correct?  No. 10?
2      A.   Yes.
3      Q.   And this draw request is asking -- or,
4  I'm sorry, this is payment application No. 1 from
5  Watertight.  Is that right?
6      A.   Yes.
7      Q.   And it's asking for $155,880.20; is
8  that right?
9      A.   Yes.
10     Q.   If you do the math on this, does this
11 make sense?
12         MR. FRISK:  Objection.  Form.
13     A.   Yeah, I don't know.
14     Q.   So if you take -- so it's -- this is
15 indicating that the contract amount was $750,235;
16 correct?
17     A.   Yes.
18     Q.   And this is the first pay application.
19     A.   Looks like that, yes.
20     Q.   Looks like that.  Okay.  So normally
21 the way these work is you -- the document says, you
22 know, you take the contract amount minus prior
23 payments that have been made, but this was the first
24 one.  And then this balance to completion is the
25 contract amount minus what's paid; right?

Page 145

1      A.   That's the contract amount minus
2  retainage minus what's been paid.
3      Q.   Okay.  So you're talking about line
4  numbers 6 and 7.  Or, I'm sorry, 6 and 8.
5          MR. VERSTANDIG:  No.  Objection.
6  Mischaracterizes what he just said.
7      A.   So Jesse Kihl, my project manager,
8  worked with Watertight all the time on all the stuff.
9  If you look at, like, the initial ones they put in
10 they were all handwritten.  We finally got to the
11 point where they were submitting these to Jesse and
12 then he would check them and make sure they were
13 right.  But I guess all I went off of was the payment
14 due.  I didn't look at the rest of it.
15     Q.   So you didn't actually do the math that
16 was on it?
17     A.   No.
18     Q.   Because if you start with $750,000
19 minus 7,502 for the retainage minus $155,880, that
20 doesn't come up to 682, does it?
21         MR. FRISK:  Objection.  Asked and
22 answered.
23     A.   The retainage should be 10 percent of
24 what they're asking for.  So the retainage actually
25 should have been, you know, $15,588.  So that's

37 (Pages 142 - 145)

Page 146

1 completely wrong.
2      Q.   Completely wrong?
3      A.   Yes.
4      Q.   Okay.  So let's take a look at -- it
5 would help if I marked this one.  This is Exhibit 27.
6           (Whereupon, Deposition Exhibit No.
7           27 was marked for identification by
           the court reporter.)
8      MR. FRISK:  What number are we on?
9      MR. VERSTANDIG:  Twenty-seven.
10      Q.   (Ms. Stanley continuing)  That's
11 Exhibit 27 I just handed you.  A Declaration of Rylan
12 Ojala with Watertight.  And Exhibit A to this was
13 Mr. Ojala's Statement of Mechanic's Lien that was
14 filed against The Ruins, and it also included all of
15 the pay applications.
16      MR. VERSTANDIG:  Just for clarity,
17 Rylan is a mister?
18      MS. STANLEY:  Yes.
19      MR. VERSTANDIG:  Okay.
20      Q.   (Ms. Stanley continuing)  So I'd like
21 you to look at what should be -- I don't understand
22 why it's not stamped that on the bankruptcy court
23 document, but it should be after Exhibit B is page 12
24 of 126.
25      MR. VERSTANDIG:  What's the Bates?

Page 147

1      Q.   The Bates number is 3603.  Oh, it is on
2 there.  It's just really small.  I don't know how
3 that happened.  I think when it printed it must have
4 compressed it somehow.  Do you see that?
5      MR. VERSTANDIG:  Uh-huh.
6      MS. STANLEY:  Where it's actually on
7 there but it's, like, just way down.
8      MR. VERSTANDIG:  Uh-huh.
9      Q.   (Ms. Stanley continuing)  Okay.  So
10 this is a -- appears to be Watertight's pay
11 application No. 1.  Is that correct?
12      A.   Yes.
13      Q.   And Watertight is asking in this pay
14 application No. 1 for $67,521.15; is that correct?
15      A.   That looks accurate, yes.
16      Q.   So do you have any explanation for the
17 discrepancy between what Watertight has provided and
18 what was submitted in the draw request?
19      A.   Not knowing -- Chris Serie submitted
20 this, Rylan submitted this.  But I don't know their
21 accounting practices or why that would be different.
22      Q.   So you previously said that you
23 explained it in Mr. -- Mr. Frisk wrote a letter
24 explaining why this number was $155,880.20.  Do you
25 recall what that explanation was?

Page 148

1      A.   I think we provided canceled checks and
2 ledgers from my Yardi program that show the payment
3 of those.  So I believe they were paid the
4 155,880.20.  Why there's a difference, like I said,
5 you got two different individuals creating these
6 documents so I don't know.
7      Q.   Do you have any reason to think that
8 the documents provided by Watertight and that they
9 filed in a lien -- mechanic's lien claim back in
10 February of 2023 were incorrect?
11      MR. FRISK:  Objection as to form.
12 Calls for speculation.
13      Q.   I'm asking if he has any reason to
14 think that.
15      A.   I think at the end of the day we
16 ultimately arrived at the amount that they're still
17 owed regardless of how their payments were made.
18 Because as a general contractor I work off of the
19 contract amount.  So the biggest thing is not to
20 exceed that contract amount.  But there would have
21 been no reason why, other than, again, if there's an
22 overlap on a draw request, why this was doubled.
23      Q.   Do you believe that all of these funds,
24 155,000, do you know if they went to pay for work
25 done only on The Ruins?

Page 149

1      A.   That I don't know.  If they're
2 submitting it on The Ruins then it should be.
3      Q.   Then it should go to The Ruins project?
4      A.   Correct.
5      Q.   If it was paid to the Generations
6 project, would Generations not owe money to the
7 Ruins?
8      A.   I guess that would be up to the owner
9 of the Generations and the owner of The Ruins.
10      Q.   Isn't that you?
11      A.   It is.
12      Q.   It is?
13      A.   Weird.
14      Q.   Yeah.  So --
15      A.   So I guess from my standpoint I'm
16 either having debt on one property or the other.  But
17 ultimately the debt's owed.
18      Q.   The debt is owed by Generations to The
19 Ruins if that -- if that happened.
20      A.   If the owner so wanted to pursue that,
21 yes.  Because of the overlap you have to be careful
22 of the fact that there might have been the opposite
23 of that happening.  There might have been where
24 The Ruins benefited from something that's
25 Generations.

38 (Pages 146 - 149)

Page 150

1    Q.   Have you done an analysis of this?
2    A.   No.
3    Q.   As the debtor in possession of
4 The Ruins, are you in a -- is the debtor in
5 possession, to your understanding, in a fiduciary
6 relationship to the creditors?
7         MR. VERSTANDIG:  Object to the form of
8 the question.  Calls for a legal conclusion.  Plus
9 witness is here in his individual capacity.
10        MS. STANLEY:  But he just said he's the
11 owner of it and he makes the decisions.
12        MR. VERSTANDIG:  Yes, in his individual
13 capacity he's the owner.  It's not a 30(b)(6)
14 deposition.
15    Q.   (Ms. Stanley continuing)  Did you
16 assist with putting The Ruins schedules together?
17 Assist your counsel?
18        MR. VERSTANDIG:  You can answer yes or
19 no.  You're not going to get into --
20    Q.   Right.
21        MR. VERSTANDIG:  -- the details.
22    A.   What schedules?
23    Q.   The bank -- I'm sorry, the bankruptcy
24 schedules.
25    A.   Did I assist in it?

Page 151

1    Q.   Yeah.
2    A.   Like what was filed like what we talked
3 about earlier?
4    Q.   Like when you first filed -- when
5 The Ruins first filed its bankruptcy case, schedules
6 are filed listing all the debts.
7    A.   Yes, I would have been included in
8 that.
9    Q.   You would have assisted with that?
10    A.   Yes.
11    Q.   Do you know if any debts owed by
12 Generations to The Ruins are identified on that?
13        MR. VERSTANDIG:  Object to the form of
14 the question.  Speculative.
15    A.   No.  I'm sorry.
16        MR. VERSTANDIG:  Speculative.  Assumes
17 facts not in evidence.  Calls for conjecture.  You
18 may answer.
19    A.   The only way I would have done that is
20 if there was an offset.
21    Q.   If there was an offset.  What do you
22 mean by that?
23    A.   If Generations benefited from something
24 from The Ruins, then The Ruins would have benefited
25 from something from Generations.  That happened with

Page 152

1 Parkside and Generations because of the overlap.  We
2 had extra garage heaters from Baete-Forseth on
3 Parkside that we didn't need because they're
4 overengineered.  We used those on the Generations
5 project.
6    Q.   So were those identified on those
7 schedules?
8    A.   Not -- they wouldn't have been
9 because --
10        MR. VERSTANDIG:  Objection.  Relevance.
11    A.   What would have been the reason I
12 guess.  I didn't see that.
13    Q.   I'm handing you Exhibit 28.
14        (Whereupon, Deposition Exhibit No.
            28 was marked for identification by
15        the court reporter.)
16        MR. AARESTAD:  What exhibit number are
17 you on?
18        MS. STANLEY:  Twenty-eight.
19    Q.   (Ms. Stanley continuing)  Exhibit 28 is
20 the schedules that were filed in The Ruins case.
21 Does that look familiar?
22        MR. VERSTANDIG:  Object to the form of
23 the question.  These were amended.
24        MS. STANLEY:  The original schedules?
25        MR. VERSTANDIG:  There's been amended

Page 153

1 schedules on the docket for several months.
2        MS. STANLEY:  Right.  I'm saying these
3 are the original schedules.
4        MR. VERSTANDIG:  So noted.
5    Q.   (Ms. Stanley continuing)  Do you know
6 if Generations is identified as a creditor?
7    A.   I don't know that.
8    Q.   You're not aware of it being identified
9 as a creditor?
10    A.   I don't see it on there, no.
11    Q.   Do you recall if you provided any
12 capital contributions to the Ruins?
13        MR. VERSTANDIG:  Objection.  We touched
14 on this earlier.  It's a relevance objection.  We're
15 here on claim objections.
16        MS. STANLEY:  And we're here on a lift
17 stay.
18        MR. VERSTANDIG:  Yeah, and it's a stay
19 relief motion.  The existence or lack thereof of
20 capital contributions is not one of the grounds for
21 stay relief being sought.  Whether or not a related
22 party exists as a creditor is not one of the grounds
23 for stay relief being sought.  The stay relief motion
24 is confined to adequate protection.
25        MS. STANLEY:  And there's also an

39 (Pages 150 - 153)

Page 154

1  element of bad faith.
2          MR. VERSTANDIG:  If it's your position
3  that you're entitled to stay relief on the grounds of
4  bad faith, I'm going to instruct the debtor to answer
5  questions that relate to that bad faith vis-a-vis the
6  lien security of the creditor, but anything broader
7  than is a fishing expedition on an 1112 motion
8  that hasn't been filed, that no one's on notice of
9  coming in to today, that the witness is not prepared
10 to deal with it, and we have completely departed the
11 agreed upon scope of this deposition.
12         MS. STANLEY:  362(d)(1) is for cause
13 which includes bad faith; correct?
14         MR. VERSTANDIG:  362(d)(1) is for
15 cause.  For cause is not defined in the bankruptcy
16 code.  But if you're suggesting that there is generic
17 grounds that say you can go on a fishing expedition
18 after filing the motion alleged bad faith and then
19 try to find grounds for bad faith thereafter, I think
20 you're running afoul of 9011.
21         MS. STANLEY:  Really.  9011?
22         MR. VERSTANDIG:  It's --
23         THE COURT REPORTER:  I didn't hear what
24 you said.
25         MR. VERSTANDIG:  I'm not filing a 9011

Page 155

1  motion, I'm just saying.  I mean, you've created a
2  paradigm here where there is no longer any contextual
3  restraint on the scope of this deposition.  You've
4  asked questions about litigation in South Dakota
5  that's stayed.  You've asked questions about entities
6  that are not debtors in the bankruptcy.
7          MS. STANLEY:  Well, litigation in South
8  Dakota dealing with why didn't you produce records.
9          MR. VERSTANDIG:  I understand that.
10 You spent a while asking questions concerning claims
11 that are not pursued in the bankruptcy court that are
12 pursued in state litigation in South Dakota under the
13 guise of a deposition notice in the bankruptcy case.
14         MS. STANLEY:  Which encompasses the
15 element of bad faith.
16         MR. VERSTANDIG:  If your position is
17 that bad faith allows you to go on a fishing
18 expedition for anything that involves the principal
19 of a debtor in possession without notice being
20 afforded through a motion or any prefatory briefing
21 and allows you to run roughshod over the automatic
22 stay as it pertains to collateral litigation in
23 another court, I think that is extremely tenuous at
24 best.
25         MS. STANLEY:  I don't even know what

Page 156

1  you just said.
2          MR. VERSTANDIG:  I'm sure she can read
3  it back.
4      Q.  (Ms. Stanley continuing)  Dugan's
5  provided all of the appliances for The Ruins;
6  correct?
7      A.  No.
8      Q.  No?  Who else did?
9      A.  All the needed appliances, or did they
10 provide what we paid them for?  We -- we only put a
11 deposit down for I think $81,000 and they delivered
12 that amount of appliances.  But we did not purchase
13 the remainder of the appliances because we were
14 having so many issues with circuitry, and things like
15 that, during the pandemic, and we just got a rash of
16 bad electrical devices and so we were having issues
17 with fridges, stoves, air conditioners were going out
18 left and right.  So we made the decision collectively
19 not to use Dugan's for the rest of the appliances.
20     Q.  So you put a deposit down of 81,000?
21     A.  Yes.
22     Q.  And did you get appliances for the
23 81,000?
24     A.  Yes.
25     Q.  And how many sets if you will?

Page 157

1      A.  I couldn't tell you because it's not
2  sets.  There were some where we just received air
3  conditioners.  Some have full sets in them on the
4  fourth floor, but we didn't get them for the third
5  floor because the third floor wasn't ready at that
6  time.
7      Q.  So do you have a document from Dugan's
8  that indicates what was received?
9      A.  If I did it would have been attached to
10 the draw request.
11     Q.  Let's look at draw request No. 7 if we
12 can.  This invoice is related only to Dugan's.  When
13 I say Invoice 007 I mean draw request 7; is that
14 right?
15     A.  Yes.
16     Q.  And it requested 185,586.76; is that
17 right?
18     A.  Yes.
19     Q.  And there is an invoice for Bate number
20 2450 that is for $119,965?
21     A.  Correct.  Yes.
22     Q.  And that indicates that 36
23 refrigerators, ranges, dishwashers, washer/dryers
24 were purchased; correct?
25     A.  It's an invoice to be paid for that,

40 (Pages 154 - 157)

Page 158

1 but we did not buy all of those.
2     Q.  So the next page is Bate number 2451.
3 This looks like a -- for $61,981.  Was this the
4 deposit you were talking about, or what is this one?
5     A.  I don't know.  It was -- the deposit
6 was 81,000.
7     Q.  So do you have a delivery invoice or
8 something from Dugan's that says what was actually
9 received?
10     A.  I don't.  I'd have to go down -- boy, I
11 don't even know.  They're out of business.  They went
12 bankrupt.  Gambling debts.  We would have -- and
13 whoever is on site, my project manager would have
14 received that when they delivered it.  Again, I don't
15 deal with that a lot on the on site stuff so I would
16 have just went over whatever was produced for
17 invoices.  Sorry, I don't have serial numbers, or
18 anything.
19     Q.  So draw request No. 7 was funded
20 though; correct?
21     A.  Yes.
22     Q.  And you're saying that only 81,000 was
23 paid to Dugan's?
24     A.  Yes.
25     Q.  What happened with the remainder of the

Page 159

1 money?
2     A.  It's in escrow.  It'll buy the rest of
3 the appliances to finish The Ruins as part of the
4 priming lien.
5     Q.  Who has the escrow?
6     A.  I do.
7     Q.  You took -- where are you holding this
8 money in escrow?
9     A.  In a checking account.
10     Q.  Where?
11     A.  I'm not going to answer that.
12     Q.  Are you asserting your Fifth Amendment
13 right?  Don't ask for advice from your lawyers unless
14 they're going to instruct you not to answer.
15     MR. VERSTANDIG:  Literally that is the
16 one question that you ask a witness where they
17 actually are entitled to get advice from your lawyer.
18     Q.  Your lawyer should not instruct you on
19 how to answer that other than to not answer it.  Can
20 I say that?
21     MR. VERSTANDIG:  Yes.  By the way,
22 we're going to need clarification on two things here
23 to move forward.  One is if you're asking for the
24 name of the depository institution or if you're
25 asking for the name of an account holder.  And, two,

Page 160

1 which overlaps with one, is what you mean by the word
2 "you."  Meaning are you asking Mr. Craig, are you
3 asking Craig Development, are you asking Craig
4 Properties, or are you asking him about which
5 company.  Based upon the answer to that, there may or
6 may not be an objection that may or may not yield an
7 instruction to not answer.  If the request is to
8 identify a depository institution, based upon the
9 history of dealings with these parties, we would have
10 to discuss some sort of protective order which we can
11 do in the hallway.  If the request is simply to
12 ascertain in whose name the monies are being held,
13 there's not going to be an objection from me.  There
14 might be from Mr. Frisk.  I would suggest we take
15 this step by step and start with the name of the
16 account holder.
17     MS. STANLEY:  Well, I would like to
18 know the depository bank first of all.
19     MR. VERSTANDIG:  I'm going to instruct
20 the witness not to answer that absent an agreement as
21 to an attorney's ears only designation based upon the
22 history of tortious interference with banking
23 relationships and several other issues.  But I will
24 stipulate to an attorney's ears and eyes on the
25 transcript protective order if you will.  And then

Page 161

1 we're being to need a bunch of people to leave the
2 room.
3     Q.  (Ms. Stanley continuing)  What is the
4 depository -- who's the account holder where the
5 funds are deposited?
6     MR. VERSTANDIG:  I'm not instructing
7 you on that.  Whether or not Mr. Frisk is up to
8 him.  Account holder means whose name is on the
9 account.
10     A.  Craig Development.
11     Q.  Which depository institute is this held
12 at?
13     MR. VERSTANDIG:  Same objection.  We'd
14 be willing to provide it under seal attorney's eyes,
15 attorney's ears, or we will provide it now with no
16 one else in the room and allow the judge to rule on
17 it subsequently before a transcript is published
18 beyond the deponent and counsel.  I want to be clear.
19 I'm not trying to withhold the information from
20 counsel.  We're concerned about the collateral
21 implications of sharing the names of the financial
22 institutions with whom the debtors and their
23 affiliates have been in relationships especially in a
24 volatile time when they're endeavoring to locate exit
25 financing and there have been unsavory allegations

41 (Pages 158 - 161)

Page 162

1 made to other financial institutions with which they
2 have banking relationships.
3      Q.  Have you provided all of Craig
4 Development's bank statements in discovery?
5      A.  Yes.
6      Q.  Including the information regarding
7 this one?
8      A.  I believe so, yes.
9      Q.  How much is being held in a escrow?
10      A.  Well, let's define escrow.  So it's not
11 in a separate savings account, or anything like that.
12 It's just earmarked for the financing of The Ruins.
13      Q.  What is the amount earmarked?
14      A.  $100,000 for appliances.  A little
15 over.  I think it's -- I think our last quote from
16 Lowe's was, like, 106, or something like that.  It's
17 in our priming lien.  Didn't we just file that I
18 believe?
19      Q.  In your priming lien?
20      A.  I believe we just filed something that
21 was -- Mac mentioned this morning about the
22 contractors and the cash that's going to be coming in
23 to finish The Ruins, we have a plan for that.
24      Q.  Do you have any idea if this -- these
25 funds were ever disclosed in The Ruins bankruptcy

Page 163

1 schedules?
2      A.  No, I doubt they were.
3      Q.  Why not?
4      A.  I guess I didn't -- again, the first
5 time in Chapter 11 bankruptcy so maybe I overlooked
6 it, didn't understand it.  It wasn't meant to be
7 hidden.
8      Q.  And if it wasn't meant to be hidden,
9 why did you say you didn't want to answer that
10 question?
11      A.  Kind of the same thing as before where
12 my concern is any assets that I have are trying to be
13 liened.  I've got vehicles and skid-steers and things
14 that have been paid off at Red River State Bank, yet
15 they hold the titles to them.  So I'm just not
16 comfortable giving them access to all my assets.
17      Q.  You would rather they remain hidden?
18      A.  Not hidden --
19      MR. FRISK:  Objection.
20      MR. VERSTANDIG:  Objection.  Object to
21 the form of the question.  Object to the
22 characterization.  Mr. Frisk will have more
23 objections.
24      MR. FRISK:  I think you covered it.  I
25 would say a mischaracterization.

Page 164

1      MS. STANLEY:  I would like to know the
2 name of the depository bank so if you wish to ask
3 everyone to leave the room, that's fine.
4      MR. VERSTANDIG:  All right.  Everyone
5 who's not named Jesse Craig, who is not an attorney,
6 and who is not a notary public transcribing this
7 deposition, hallway is located over there.  I am one
8 and a half Diet Cokes and half a bottle of Gatorade
9 in today.  After we do this maybe we'll take a
10 five-minute break?
11      MS. STANLEY:  Sure.
12      (Mulinda Craig, Charles Aarestad, and
13 Danielle Harless exited the room.)
14      MR. VERSTANDIG:  Before you answer the
15 question, I'm going to give a very specific
16 instruction and we're going to go from there.
17      THE WITNESS:  Okay.
18      MR. VERSTANDIG:  The question is at
19 what depository institution Craig Development is
20 holding $100,000 in escrow for Ruins; correct?
21      MS. STANLEY:  Yes.
22      MR. VERSTANDIG:  Okay.  My ask, you're
23 going to have to agree on this before the witness
24 answers, goes as follows:  The witness will answer
25 the question.  The answer provided by the witness

Page 165

1 will not be shared with clients, parties, or anyone
2 outside this room except under seal to the court and
3 except for other attorneys working on the case, I'm
4 not trying to exclude from your firm, until such a
5 time as we either reach a further stipulation as to
6 the dissemination of the data or until such a time as
7 a appropriate objection or motion for protective
8 order is ruled upon by the bankruptcy court.
9      MS. STANLEY:  This -- he indicated
10 earlier, though, that he believes this bank statement
11 was provided; correct?
12      THE WITNESS:  Yeah.
13      MR. VERSTANDIG:  So --
14      MS. STANLEY:  So would that be
15 privileged?  How would that be privileged
16 information?
17      MR. VERSTANDIG:  It's not privileged.
18 It's sensitive and I think it goes to the tortious
19 interference, however, I'll also tell you this --
20      MS. STANLEY:  I mean, if it's already
21 been disclosed I don't have to go ask the bank for
22 it, and that was your concern, wasn't it?
23      MR. VERSTANDIG:  I will tell you this.
24 If I can ask -- if I can confer with the witness, and
25 I will ask questions, not give advice, for about 90

42 (Pages 162 - 165)

ATTORNEY'S EYES ONLY

Page 166

1  seconds I may be able to make this easier. But being
2  candid, I don't know the answer to the question as
3  we're sitting here, and unless I know the answer to
4  the question I'm not comfortable doing this without
5  that stipulation. But I'm not going to advise the
6  witness, I'm simply going to garner information.
7         MS. STANLEY: But if it's already been
8  provided through a subpoena and I already have it --
9         MR. VERSTANDIG: The volume --
10        MS. STANLEY: -- you can't restrict me
11 from using it; correct?
12        MR. VERSTANDIG: I can't restrict you
13 from using what you already have, but the volume of
14 documents in this case is well north of 10,000 pages,
15 and judging by --
16        MS. STANLEY: It's 50,000 pages from
17 First Community Credit Union.
18        MR. VERSTANDIG: To be clear, that's
19 north of ten.
20        MS. STANLEY: Yes.
21        MR. VERSTANDIG: My math was good. I
22 mean, look, as a former professional poker player, my
23 read on your face is that you were surprised by that
24 which leads me to believe that this is not something
25 you have stumbled upon already, and if you're about

Page 167

1  to be given information I need to make sure that it's
2  not weaponized. That said, if I can ask him
3  questions in private for 90 seconds without giving
4  advice or coaching I may be --
5         MS. STANLEY: I don't know how you do
6  that without giving advice or coaching.
7         MR. VERSTANDIG: I literally just ask
8  questions. I don't tell -- I don't give
9  instructions.
10        MS. STANLEY: What's your agreement
11 that -- what exactly are you asking for to keep
12 sealed for now?
13        MR. VERSTANDIG: The name of the
14 financial institution. Attorney's eyes, attorney's
15 ears.
16        MS. STANLEY: But if the document's
17 already been produced, I should be able to use the
18 documents that are already produced, are they not?
19        MR. VERSTANDIG: That's an excellent
20 point. If that's your position let me ask the
21 question. Off the record.
22        (Off the record from 1:57 p.m. to
23 2:34 p.m.
24        (Mulinda Craig, Charles Aarestad,
25 Danielle Harless returned to the room.)

Page 168

1         MS. STANLEY: So before we
2  went -- after we went off the record Mr. Craig wrote
3  down on a piece of paper a response to the question
4  and which was I believe which depository institute
5  the funds are being held in. And at that point
6  Mr. VerStandig and Mr. Frisk went out of the room.
7  There's been discussions between Mr. Frisk and
8  Mr. Craig directly, and we are now back on the record
9  at 1:57 p.m. so that was 40 minutes.
10        MR. VERSTANDIG: Sure.
11     Q.  (Ms. Stanley continuing) So to recap,
12 Craig Development -- is this correct, Craig
13 Development is holding funds for the benefit of The
14 Ruins in escrow I believe you used the term?
15     A.  Yeah, I shouldn't have used escrow.
16 It's more earmarked for it. So our intention from
17 the get-go when we did that draw request when the
18 appliances weren't in good shape we still had every
19 intention of finishing the project at that time. And
20 then that's when things started to splinter and fall
21 apart, but I will have the money, it's in the Craig
22 Development checking account at FCCU. It goes up and
23 down just like a developer does, but ultimately I
24 will put the appliances in that property and finish
25 it. That was always the intent. That's why we've

Page 169

1  been fighting so hard to keep the property.
2     Q.  So if the $100,000 was earmarked for
3  The Ruins, why was it not disclosed in the bankruptcy
4  schedules?
5     A.  That's my failure or my error.
6     Q.  Were there other funds that were
7  earmarked for things that did not get paid that went
8  to Craig Development?
9     A.  No.
10    Q.  You're saying it's only the appliances?
11    A.  Well, if any money, like the Terry
12 Stroh one, if that went to Craig Development it would
13 have paid other bills. It didn't sit on a bunch of
14 cash. I mean, when I built those projets I made
15 really good fees off general contracting and
16 developer fees. So if money was drawn on and taken,
17 it would have been used ultimately for the benefit of
18 that property. And that's where wearing these
19 different hats gets a little convoluted because I'm
20 also Ruins, I'm also Craig Development so, you know,
21 does Craig Development, you know, have a personal
22 note for 100 some thousand dollars with The Ruins for
23 documentation purposes. I guess maybe I'm not as
24 astute on that as I should.
25    Q.  Are you saying it does or does not have

43 (Pages 166 - 169)

Page 170

1 a note?
2      A.  I've never done that because I've
3 always known how much is owed, how many appliances
4 are left.
5      Q.  So how many appliances were purchased
6 with money paid to Dugan's?
7      A.  I think the check that was written out
8 to Dugan's was 81,000 and some change.
9      Q.  Okay.  How many appliances?
10      A.  I don't have the delivery slip so I
11 couldn't even tell you.  I believe Charles went
12 through and did a count.  So I believe and trust him
13 that is accurate.  But there's roughly $106,000 left
14 of appliances that need to be put into that property
15 that I intend to do.
16      Q.  But that money is commingled with Craig
17 Development with other funds?
18      A.  Yes.
19      Q.  Are there funds held for The Ruins at
20 other depository institutions?
21      A.  No.
22          MR. VERSTANDIG:  Object to the form of
23 the question as to ambiguity on depository
24 institutions.
25      Q.  Any other bank.

Page 171

1      A.  No.
2      Q.  The Ruins experienced significant water
3 damage in April of 2023; correct?
4      A.  No.
5      Q.  Did it experience any water damage?
6      A.  Yes.
7      Q.  And what did you do about the water
8 damage?
9      A.  We worked with the siding contractor,
10 B&W Construction.  Barry Matson is the -- one of the
11 owners and principal of the construction company.
12 Worked with him on resealing the windows on the
13 outside, re-Tyveking it which was a requirement by
14 the city to keep it closed up on the outside and
15 waterproof.  Did repairs on the inside as far as
16 scraping paint that had peeled, did some drywall
17 repair, started to texture it.  And then I was
18 informed that we can't do major repairs on that
19 property.  Two reasons.  I didn't have a building
20 permit extension at that time, and then it's not
21 allowed on the Chapter 11.  That was my understanding
22 anyway.
23      Q.  So you did not submit a claim to
24 insurance on the water damage; correct?
25      A.  Correct.

Page 172

1      Q.  And did you ask your insurance company
2 to -- or you were aware that Red River State Bank
3 submitted a claim; correct?
4      A.  I had talked to Joe, I forgot his last
5 name, he was the adjuster at Liberty Mutual.  So he
6 and I talked about the claim that was put in.
7 Charles was notified not to put a claim in because he
8 doesn't have the ability to do that as just a named
9 insured.  So there was a letter sent out, and I
10 believe Charles talked to Liberty Mutual on that too.
11 But when Charles said it was a water event or a rain
12 event or a heavy rain event, it would have triggered
13 a different deductible.  And I think -- I'm not
14 trying to pull numbers out of air, but I believe it
15 was 400 some thousand dollars would have been my
16 deductible amount.  So even putting a claim in
17 wouldn't have done anything.  It would have, in fact,
18 actually increased all of our deductible -- or all of
19 our insurance rates on our umbrella policy that was
20 over all the properties down there right now.
21      Q.  So you didn't want to put in a claim
22 because it would increase the deductible?
23      A.  Well, that and we just --
24          MR. VERSTANDIG:  Whoa, whoa.  Object to
25 the form.  Mischaracterizes the answer.  You may

Page 173

1 answer.
2      A.  That was one reason that was given by
3 the insurance company and my agent.  But ultimately
4 when we walked through there we did not see
5 significant water damage.  During construction you're
6 going to have some of that.  I had taken pictures
7 when it did occur and I sent them to Charles to let
8 him know what was occurring.  But, yeah, no, we just
9 didn't find significant damage.  Definitely nowhere
10 near the numbers that you guys are alleging.
11      Q.  Had -- so this was April of '23.  Has
12 any work been done on The Ruins subsequent to April
13 of '23?
14      A.  The city required that we re-Tyvek the
15 outside for some siding that had blown off.  We did
16 that.  And then just mainly keeping the inside
17 secure.  We had kids that were breaking into the
18 International Harvester building I have down there,
19 and they were getting into the hallways of The Ruins
20 until we figured out how they were popping the front
21 doors, all the commercial space doors.  If you grab
22 them hard enough and pop them, they'll pop open.  So
23 after we chained them then it stopped anyone from
24 entering.  There was some graffiti that was done, but
25 nothing of major damage that was done when they got

44 (Pages 170 - 173)

Page 174

1 in there. I think they ended up finding the kids
2 too.
3        MR. VERSTANDIG: Let's protect the part
4 of the record that describes forcible breaking and
5 entering into a building.
6        Q. So would it be a fair characterization
7 that you have received complaints from the city about
8 goings on at The Ruins?
9        A. It's political. I've got a mayor that
10 loves to get on the bandstand and pound his chest and
11 claim that we had squatters in there living which was
12 total crap. That never occurred.
13        Q. But there's been break-ins though;
14 correct?
15        A. Yes.
16        Q. And graffiti?
17        A. Yep. That's been repaired.
18        Q. The discovery answers that were just
19 submitted yesterday indicated that mold tests -- a
20 mold test had been done.
21        A. Correct.
22        Q. Why hasn't this been provided?
23        A. It should have been.
24        Q. What other tests were done?
25        MR. VERSTANDIG: Hold on. Can you

Page 175

1 clarify as to the word test? Can you be a little
2 more specific? Do you mean scientific tests? Do you
3 mean legal assessments?
4        Q. Yes, scientific tests with respect to
5 the condition of the building.
6        A. The only tests were just the mold tests
7 that were done.
8        Q. Just the mold tests?
9        A. Yes.
10        Q. Who did that?
11        A. Prairie Environmental. Jason Biggins.
12        Q. So do you think that was the only test
13 done was the mold test?
14        MR. VERSTANDIG: Two objections. One,
15 clarify if it's still scientific. Two, we should put
16 a time scope on it.
17        Q. Subsequent to April of 2023.
18        A. There was a lot of inspections and
19 people walking through there, but an actual test?
20        Q. So were these inspections the ones
21 requested by Red River State Bank or --
22        A. No. Actually I also had to walk
23 through there with Reid Peterson, the city inspector.
24 He had to go through there before they approved the
25 extension of the building permit, and the fire

Page 176

1 marshal was with us that day also and we went unit by
2 unit, level by level. I can't recall the fire
3 marshal's name. He gave us a report also on that.
4        Q. The fire marshal did?
5        A. Reid Peterson did.
6        Q. Reid Peterson. Have these documents
7 been turned over?
8        A. Should have been in discovery. I know
9 the emails were turned over. I specifically remember
10 printing those off and scanning them in.
11        Q. So the responses that were provided
12 late last night indicate -- this was question
13 number -- Interrogatory No. 3 about examinations,
14 tests, experiments. And it indicated Prairie
15 Environmental Consulting through Jason Biggins,
16 that's the mold test; correct?
17        A. Correct.
18        Q. What is CMI? It says CMI, CMRC
19 conducted a visual inspection of selected units at
20 The Ruins.
21        A. CMI.
22        Q. CMI, CMRC.
23        A. The only other people that have been
24 through there is John Gunkelman. He has JNC
25 Construction or Consulting. But he didn't do a

Page 177

1 report. He just did a visual.
2        Q. Performed air sampling in two unit
3 composite format.
4        A. Oh, that would have been part of Jason
5 Biggin's report.
6        Q. Carried out surface tape lifting
7 samples of suspected areas with written mold report
8 issued?
9        A. That would have been part of Jason's
10 report.
11        Q. Hayes Microbial Consulting. Was that
12 part of Jason's report as well?
13        A. I believe so, yes.
14        Q. And B&W Construction through Barry
15 Matson inspected the windows and Tyvek in December of
16 2024?
17        A. Correct.
18        Q. Interrogatory No. 8 indicated -- or
19 asked for identification of witnesses you could call
20 at trial or any evidentiary hearing, and you
21 indicated Chris Schilken. Can you -- who is
22 Mr. Schilken?
23        A. Director -- or former director of
24 Watertown Development Company.
25        Q. And what would be the purpose of

45 (Pages 174 - 177)

Page 178

1 Mr. Schilken's testimony?
2      A. He would talk about the TIF, the draw
3 requests, how they were handled. TIF eligible costs.
4 He could cover any of that.
5      Q. You also indicated the Aarestad family
6 including Charles, his spouse, and their daughter
7 who's involved in operating the family seed business.
8 Can you explain why the seed business is relevant?
9      A. I believe all of those individuals on
10 the $600,000 third note on The Ruins. I don't know
11 why the seed business is listed.
12      Q. So it's nothing to do with the seed
13 business.
14      A. Not that I know of. Unless they
15 borrowed money from it.
16      MR. VERSTANDIG: We will stipulate the
17 seed business is not relevant to the stay relief
18 motion. I suppose except to the extent the money
19 came out of it, but that would be incidental at best.
20      Q. So that would -- so anything regarding
21 Charles, his spouse, and their daughter --
22      A. I don't know how that came about.
23      MR. VERSTANDIG: I'll stipulate if
24 Mr. Aarestad's daughter is a minor she's assuredly
25 not going to be called to testify. Nor will she be

Page 179

1 named in open court.
2      A. Yeah, they must have meant Randall's
3 daughter.
4      Q. Danielle?
5      A. There's Danielle and there's Alexandra,
6 I believe, and there's maybe another one. Sandra's
7 the mom. She runs that greenery or greenhouse I
8 believe.
9      Q. Are any of the appliances stored off
10 site for The Ruins?
11      A. At this time?
12      Q. Yes.
13      A. No.
14      Q. Were they perviously?
15      A. No. We had to take -- I think there
16 was six air conditioners that we had to borrow for
17 the benefit of, like, Generations and Parkside
18 because we were unable to get appliances during a
19 period of time. So we did take those and use them in
20 Generations or Parkside, but they were kept track of
21 and they're all on site now.
22      Q. On site where?
23      A. At The Ruins.
24      Q. So they were used in Generations and
25 then moved back to The Ruins?

Page 180

1      A. No. We bought -- we purchased new ones
2 when we could. So new ones were used from The Ruins
3 on Parkside and Generations. At least I wasn't aware
4 of it. This is what the property management did.
5 And then they replaced what was used with brand new
6 appliances.
7      Q. So the new appliances are at The Ruins?
8      A. Yes.
9      Q. Okay. And other than six air
10 conditioners, are you aware of other appliances that
11 were earmarked or allocated for The Ruins moving
12 anywhere else?
13      A. No.
14      Q. Were they in storage somewhere in
15 Watertown previously?
16      MR. VERSTANDIG: Object to the form of
17 the question as to the word "they."
18      Q. The appliances.
19      A. Dugan's had everything in storage in
20 Watertown. But we never, again, utilized those
21 because of all the problems we were having with
22 warranties and breakdowns.
23      Q. You don't -- do you have an inventory of
24 appliances in your possession?
25      A. I don't.

Page 181

1      Q. Did you ever take an inventory of the
2 appliances?
3      A. I would not have, no. My project
4 manager would.
5      Q. And you don't have that documentation?
6      A. No.
7      Q. The insurance broker for -- is Summit,
8 is it not?
9      A. Yes.
10      Q. And what was your relationship with
11 Summit?
12      A. With Summit Insurance as an investor in
13 it?
14      Q. Yes.
15      A. I had bought 25 percent of the company.
16 Chris Kottsick is a friend of mine. He approached me
17 on he wanted to grow his business and he was looking
18 for an investor to come in. So I came in for a short
19 period of time for 25 percent, and then when he had
20 grown to where he wanted to he bought me out.
21      Q. So when about did he buy you out?
22      A. About a year ago I believe.
23      Q. Is he still a friend?
24      A. Yeah.
25      Q. And he's the individual what wrote the

46 (Pages 178 - 181)

Page 182

1 letter that was just submitted earlier this week, or
2 was it last week, about -- the insurance letter;
3 correct?
4        A.   There was two of them, yeah.  There was
5 an initial one, I believe, and then the most recent
6 one I'm not sure if that's been changed at all or
7 not.
8        Q.   Is he employed by Liberty Insurance?
9        A.   I have no idea.  I don't believe so.
10 He owns his own company, Summit Insurance.  I think
11 they broker out the insurance to -- I know because I
12 got stuff through Liberty Mutual, Grinnell, State
13 Auto, State Farm.  So as a broker he uses all of
14 those.
15        Q.   When I look at these draw requests a
16 lot of them have excise taxes identified.
17        A.   Yep.
18        Q.   Were these excise taxes paid to the
19 state?
20        A.   Yes.
21        Q.   In what bank account?
22        A.   That I don't know.  I know they're
23 electronic.
24        Q.   So you believe, though, that Craig
25 Development paid the excise taxes.

Page 183

1        A.   We would have paid what was due, yeah.
2 I know there was some changes in regards to, like,
3 labor on painting, and things like that, wasn't
4 eligible for an excise tax, but majority of the taxes
5 would have been paid, yeah.
6        Q.   Do you have to file monthly reports or
7 quarterly reports, or something?
8        A.   Yes.
9        Q.   And did Craig Development do that?
10        A.   Mindy would have filed them for the
11 entity.
12        Q.   Mindy would have filed the reports?
13        A.   Yeah.
14        Q.   Does Mindy have any other roles with
15 Craig Development that you haven't discussed
16 previously?
17        A.   No.  I'm just not tech savvy so when it
18 comes to that stuff I'm just not that guy.
19        MR. VERSTANDIG:  For want of ambiguity
20 she's married to the proprietor.
21        Q.   Can you tell me about your plan -- I
22 have not read the plan that was filed at 5:30 this
23 morning.
24        MR. VERSTANDIG:  It's a page turner.
25        Q.   Yeah, I'm sure.  Can you explain to me

Page 184

1 what your plan is for exit financing?
2        MR. VERSTANDIG:  Objection just to the
3 extent it seeks legal explanations, but you can ask
4 him his lay understanding.
5        Q.   What is your lay understanding of the
6 financing for The Ruins?
7        A.   As far as getting, like, if the plan's
8 approved and the project's finished and stabilized
9 and cash flowing?
10        Q.   Well, how is it going to fund finishing
11 the project?
12        A.   Watertight.  I got to remember all
13 these. B&W.  Limoges.  Cash from me.  And
14 the -- what was the other one.  Oh, the bricklayer,
15 Lakeside.  They're all going to come back.  They've
16 all signed letters of intent.  Limoges hasn't done
17 the letters of intent because he's been swamped with
18 finishing the concrete.  But they're all -- the other
19 ones signed letter of intent to come back, finish the
20 work required on the project without pay.  Ultimately
21 they would then be part of a priority lien and we'd
22 finish the project, get it filled, cash flowing, and
23 then sell or refinance it.
24        Q.   What is the contribution from you?
25        A.   Cash.  About 262,000.  Majority of

Page 185

1 that's going to be for appliances.  And then HVAC,
2 elevator.  Of course, cleaning, project manager.
3 There'll be a multitude of cash that I have to pay to
4 smaller vendors that I'll pay.
5        Q.   Does this 262,000 include the
6 100,000 --
7        A.   Yes.
8        Q.   -- for the appliances --
9        A.   Yes.
10        Q.   -- that we previously discussed?
11        A.   Yes.
12        Q.   Is it currently being held at I believe
13 you said First Community Credit Union; right?
14        A.   Yeah.  It was initially part of that
15 checking account.
16        Q.   So you said --
17        A.   It's still earmarked.
18        Q.   -- initially.  Where did it -- did it
19 go somewhere else?
20        A.   No.  That account, like you had talked
21 about earlier, is kind of a commingled account so
22 there's projects that are done and, you know, land
23 that I buy and that I do so that fluctuates.
24        Q.   But you're saying that there's
25 currently $262,000 in the account?

47 (Pages 182 - 185)

Page 186

1     A. No.
2     Q. What's in the account now?
3     A. I haven't looked at my bank account. I
4 have assets, I can get the funds. That's not an
5 issue.
6     Q. Have you provided these letters of
7 intent from B&W, Watertight, Limoges, and Lakeside?
8     A. Limoges didn't sign one. Just emails
9 and confirmation he's going to be a part of it. But
10 I did provide them to my attorney.
11     MR. VERSTANDIG: Not responsive to any
12 extant discovery requests. I have no doubt a new one
13 will be coming though. And I will add to that we
14 would be happy to provide them for you informally.
15     Q. Have you done an analysis of what it
16 will take to finish The Ruins?
17     A. Yes.
18     Q. Have you put that down on paper?
19     A. Yes.
20     Q. Has that been disclosed in discovery?
21     MR. VERSTANDIG: I'm not going to
22 answer for it. It's obviously --
23     A. I --
24     MR. VERSTANDIG: The amended plan and
25 the disclosure statement both included sum certain

Page 187

1 for what it's worth.
2     A. I mean, all I've done is just put
3 together a Word document that lists it out. Who was
4 still owed for liens and how much was left of it to
5 finish.
6     Q. Uh-huh. How much -- what is the number
7 to finish that you came up with?
8     A. To pay all the liens off or just to
9 finish the project?
10     Q. To finish the project.
11     A. To finish the project I think was a
12 million 358.
13     MR. VERSTANDIG: Note for the record
14 that the plan documents speak for themselves to the
15 extent there's a slight variance.
16     Q. So does this 1.358 include the free
17 work from B&W, Watertight, Limoges?
18     A. It's ultimately not free work. They'll
19 get paid when we refinance or sell the property.
20 But, yes, it does include those.
21     Q. So that 1.3 million is inclusive of the
22 additional work that these subcontractors will be
23 doing; is that right?
24     A. They'll come back and finish the work
25 needed, yes.

Page 188

1     MR. VERSTANDIG: Do you want the number
2 from the plan?
3     MS. STANLEY: Sure.
4     MR. VERSTANDIG: $1,317,352 and no
5 cents.
6     MS. STANLEY: Can I have a couple
7 minutes with my --
8     MR. VERSTANDIG: Absolutely.
9     (Off the record from 3:01 p.m. to
10 3:15 p.m.)
11     Q. (Ms. Stanley continuing) Back on.
12 With respect to just going back to the funds held for
13 the appliances. Do you have a large sum of cash held
14 at home?
15     A. At my home?
16     Q. At your home, yeah.
17     A. No. In a safe, or something?
18     Q. Yeah.
19     A. No.
20     Q. Is there a reason Craig Development
21 would take -- or Craig Properties would take out
22 large sums of cash?
23     A. From where?
24     Q. From the First Community Credit Union
25 bank accounts.

Page 189

1     A. Depending on the time period. It would
2 have been, like, capital improvements like we talked
3 about with the Billmeyer roof and air conditioning
4 units, things like that, but that would have been
5 only -- weddings.
6     Q. Weddings? Give money at -- cash for
7 weddings you mean?
8     A. Well, I had to pay for my daughters'
9 weddings, yeah.
10     Q. From Craig Properties account?
11     A. I don't know exactly where it went
12 honestly. It was given to Jordan. She got married
13 in Hawaii so there was a lot of wires that were sent.
14     Q. Have you looked at the recent motions
15 that were filed about the insurance, Red River's
16 concern about the insurance? For example, the
17 Parkside declaration seems to say that only 32 out of
18 36 units are covered?
19     A. Yes, I saw that.
20     Q. How -- you looked at it. How does --
21 how did the -- do you have any idea how the insurance
22 company thought it was 32 units?
23     MR. VERSTANDIG: Hold on, hold on.
24 What did you say a second ago about someone looked at
25 it?

48 (Pages 186 - 189)

Page 190

1        MS. STANLEY:  If he looked at the
2 filing.
3        MR. VERSTANDIG:  Yeah.
4        MS. STANLEY:  Bankruptcy filing.  The
5 pleading.
6        MR. VERSTANDIG:  No, I understand the
7 question.  Keep going.
8        MS. STANLEY:  It's going to be at the
9 hearing on Monday; right?
10        MR. VERSTANDIG:  Off the record for a
11 second?
12        MS. STANLEY:  Sure.
13        (Off the record.)
14        Q.  (Ms. Stanley continuing)  So you -- or
15 the developer, the owner has to provide information
16 to the insurance company about the property being
17 insured; right?
18        A.  Yes.  Typically I have the property
19 management company do that.
20        Q.  Okay.
21        A.  So the property management company
22 would get the bids, they would forward them to me, I
23 would look at what the costs are and we'd decide on
24 which route to go.  And the property management
25 company makes the payments on it.

Page 191

1        Q.  And that would be CP Business
2 Management?
3        A.  Correct.
4        Q.  So do you know what was in the
5 application as far as the number of units?
6        MR. VERSTANDIG:  Objection.  Relevance.
7 You may answer.
8        A.  When we talked to Chris Kottsick about
9 that I asked him why that was so different.  And he
10 said literally when Liberty Mutual underwrites it
11 they'll just plug in numbers, and what we really look
12 at is the umbrella amount or the amount that the
13 property is insured for.  If there's a partial fire
14 or a complete devastation, the property is gone,
15 they're not going to pay for just 32 out of 36 units.
16 They're going to pay for the umbrella amount or the
17 insured amount.  So, you know, I told him, I said,
18 Just call Liberty Mutual and get it corrected.  So,
19 again, I'm relying on his expertise.
20        Q.  So it has -- has it been corrected at
21 this point or not?
22        A.  I believe so.  He was instructed to get
23 it corrected.  The unit number didn't change the
24 insured amount.
25        Q.  Did it change the premium?

Page 192

1        A.  No.
2        MS. STANLEY:  I don't think I have any
3 more questions.
4        MR. VERSTANDIG:  Dan?
5        EXAMINATION
6 BY MR. FRISK:
7        Q.  I'd like to just clarify something.
8 Jesse, do you recall when you were asked about -- you
9 made mention about when we started litigation there
10 was an account number that was modified.  And you
11 said your attorney -- you asked your attorney.  That
12 attorney wasn't me; correct?
13        A.  Correct.
14        Q.  Did you -- did you just change the
15 account number?
16        A.  I just flip-flopped two numbers on the
17 account number.
18        Q.  Why was that?
19        A.  Charles was -- actions were kind of
20 signaling that we were going to start up litigation
21 again.  So there was demands being made that I pay
22 off the Mulinda notes or refi the properties
23 immediately.  So when he asked for that I guess the
24 knee jerk reaction was that, again, I should have
25 just redacted all but the last four numbers, but I

Page 193

1 didn't.
2        Q.  Was it in an effort to redact it?
3        A.  Yes.
4        Q.  Did you change anything other than
5 the -- was it the last four digits of the account
6 number, or something?
7        A.  Two.
8        Q.  Okay.  Other than that, did you change
9 the contents of the document at all?
10        A.  No.
11        Q.  So the bank statement or cash balance
12 was accurate at that time?
13        A.  I believe so.
14        Q.  And it was just a flip-flop of account
15 numbers to protect the account number?
16        A.  Correct.
17        Q.  Okay.  And it, obviously, wasn't Mac
18 either.
19        A.  No.
20        MR. VERSTANDIG:  Thank you.
21        MR. FRISK:  Other than that, I don't
22 have anything else.
23        EXAMINATION
24 BY MR. VERSTANDIG:
25        Q.  It wasn't Christianna Cathcart, was it?

49 (Pages 190 - 193)

Page 194

1      A.  No.
2          MR. VERSTANDIG:  Nothing further.
3              EXAMINATION
4  BY MS. STANLEY:
5      Q.  Do you recall which bank statement it
6  would have been?  For which bank?
7      A.  I don't.  There was times when I had
8  several different accounts that had to meet a certain
9  criteria.  Charles was trying to put together a file
10  for the feds or the people that come in and audit the
11  bank and so we're building a file.  I think that was
12  an email where he just wanted to have that in place
13  so he didn't -- I don't remember what his terminology
14  was, but didn't want to look bad.
15              EXAMINATION
16  BY MR. FRISK:
17      Q.  You didn't have whiteout like her
18  example today?
19      A.  No.  Charles and I talked probably more
20  to each other during certain periods of time than we
21  did our own wives.
22          MR. FRISK:  I don't have anything else.
23  I guess I don't know...
24          MR. VERSTANDIG:  He'll read.
25          THE COURT REPORTER:  Are you going to

Page 195

1  order the transcript?
2          MS. STANLEY:  Yes, we will order the
3  transcript, and I hate to tell you this, but trial is
4  Monday.
5          THE COURT REPORTER:  Would you like a
6  copy?
7          MR. VERSTANDIG:  Copy being the
8  operative word.  She will pay to order it and I will
9  take the cheap copy.
10          THE COURT REPORTER:  And a copy,
11  Mr. Frisk?
12          MR. FRISK:  No.
13          MR. VERSTANDIG:  We will stipulate that
14  we will read and sign after the transcript is
15  produced to counsel for the creditor with a copy
16  thereof being produced to counsel for the debtor, and
17  we'll handle the errata sheet between and amongst
18  counsel without burdening your office.
19          (Whereupon, the deposition of
20  JESSE CRAIG was concluded at 3:24 p.m.)
21
22
23
24
25

Page 196

1      REPORTER'S CERTIFICATE
2  STATE OF NORTH DAKOTA )
                          ) ss.
3  COUNTY OF CASS        )
4      I hereby certify that I reported the
   deposition of JESSE CRAIG on September 23, 2025, at
5  218 NP Avenue, Fargo, North Dakota, and that the
   witness was by me first duly sworn to tell the whole
6  truth;
       That the testimony was transcribed by me
7  and is a true record of the testimony of the witness;
8
       That the cost of the original has been
9  charged to the party who noticed the deposition, and
   that all parties who ordered copies have been charged
10  at the same rate for such copies;
11      That I am not a relative or employee or
   attorney or counsel of any of the parties, or a
12  relative or employee of such attorney or counsel;
13      That I am not financially interested in the
   action and have no contract with the parties,
14  attorneys, or persons with an interest in the action
   that affects or has a substantial tendency to affect
15  my impartiality;
16      That the right to read and sign the
   deposition transcript by the witness was reserved.
17
       Witness my hand this 27th day of September,
18  2025.
19
20
21  _Deanna Sager_
22
   Deanna Sager - R.P.R., R.M.R.
23  Notary Public
   Cass County, North Dakota
24  My commission expires July 28, 2026.
25

Page 197

1          Veritext Legal Solutions
              1100 Superior Ave
2                 Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   September 27, 2025
5
   To: Mr. VerStandig
6
   Case Name: Generations On 1St LLC, Et Al v.
7
   Veritext Reference Number: 7619960
8
   Witness:  Jesse Craig      Deposition Date:  9/23/2025
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

50 (Pages 194 - 197)

Page 198

```
 1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 7619960
 3     CASE NAME: Generations On 1St LLC, Et Al v.
       DATE OF DEPOSITION: 9/23/2025
 4     WITNESS' NAME: Jesse Craig
 5     In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7     I have made no changes to the testimony
       as transcribed by the court reporter.
 8
       _____
 9     Date          Jesse Craig
10     Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
              Statement; and
14     Their execution of this Statement is of
              their free act and deed.
15
       I have affixed my name and official seal
16
       this _____ day of _____, 20____.
17
       _____
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25
```

Page 199

```
 1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 7619960
 3     CASE NAME: Generations On 1St LLC, Et Al v.
       DATE OF DEPOSITION: 9/23/2025
 4     WITNESS' NAME: Jesse Craig
 5     In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7     I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
 8     well as the reason(s) for the change(s).
 9     I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     _____
       Date          Jesse Craig
14
       Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18        in the appended Errata Sheet;
       They signed the foregoing Sworn
19        Statement; and
       Their execution of this Statement is of
20        their free act and deed.
21     I have affixed my name and official seal
22     this _____ day of _____, 20____.
23     _____
       Notary Public
24
25     Commission Expiration Date
```

Page 200

```
 1              ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 7619960
 3     PAGE/LINE(S) /      CHANGE      /REASON
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
20     Date          Jesse Craig  _____
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23     _____
       Notary Public
24
       _____
25     Commission Expiration Date
```

51 (Pages 198 - 200)

**[& - 185,586.76]**                                                    Page 1

| & |
|---|
| **&**   2:8 4:23 |

**0**

**001**   3:12 17:21
   49:25
**002**   3:13
**003**   3:15
**004**   3:16
**005**   3:18
**006**   3:19
**007**   3:22
   157:13
**008**   3:24
**010**   4:6
**011**   4:8
**012**   4:10
**013**   4:12
**014**   4:14
**02**   18:2
**02338**   18:2
**0482**   42:18
**0824**   41:2,17
   42:17,19,20
   43:20 46:25

**1**

**1**   3:12 18:20
   47:4 48:8 49:3
   49:25 50:13
   54:25 87:19
   95:22 119:1
   144:4 147:11
   147:14 154:12

154:14
**1,317,352**   188:4
**1,477,500**   83:8
**1-14**   6:4
**1-7**   91:18
**1.3**   187:21
**1.358**   187:16
**1.476**   123:23
**1.610**   87:18
**1/26/2021**   5:3
**10**   4:5 16:12
   52:25 53:1,1,3
   53:20,22 64:17
   83:18 125:22
   143:3 144:1
   145:23
**10,000**   166:14
**10.6**   112:20
**10/19/2020**   5:5
**100**   39:2
   169:22
**100,000**   41:21
   42:4 48:2
   162:14 164:20
   169:2 185:6
**102**   5:3
**1023**   22:13,18
   22:23 23:5
   24:11 25:3,19
   25:24 26:1
**106**   162:16
**106,000**   170:13
**107**   4:23 5:4

**10:04**   58:8
**10:23**   58:9
**11**   1:4,8,11 4:7
   5:11,14 63:20
   63:20 64:22
   76:21 137:25
   140:15 163:5
   171:21
**110**   5:6
**1100**   197:1
**1112**   154:7
**116**   5:8
**119,965**   157:20
**11:30**   102:8,9
**12**   4:9 50:16,17
   67:6,12 97:5
   105:8 146:23
**126**   146:24
**12:24**   102:10
   102:14
**12:55**   127:25
**12:56**   128:1
**13**   4:11 67:20
   68:2,4 99:2
**130**   5:10
**1389**   2:14
**14**   4:13 17:15
   17:16 23:16,17
   49:8,13,15
   50:14 68:12,21
   68:23 78:11
   121:23
**1405**   6:16

**146**   5:12
**15**   4:15 22:16
   47:5 77:20,21
   86:11 138:16
**15,588**   145:25
**150,000**   15:16
**152**   5:15
**155,000**   142:18
   148:24
**155,880**   145:19
**155,880.20**
   143:6 144:7
**155,880.20.**
   147:24 148:4
**15th**   92:23,24
   93:18
**16**   4:17 77:24
   78:1 86:8
   100:10
**1630**   2:4
**164-167**   3:8
**17**   4:18 82:7,8
   82:11,16,22
   86:9 94:12
   98:14 99:9
**17953**   196:21
**18**   4:20 6:25
   7:12 89:15,16
   91:3,7 94:4,17
   94:19,25 105:8
**1820**   197:2
**185,586.76**
   157:16

**[19 - 26]**

| | | | |
|---|---|---|---|
| **19**  4:21 90:4,7 | 116:21 117:3,4 | **2338-2352**  3:12 | 123:4,5 131:25 |
| 90:9 94:11 | **2021**  24:5 | **2339**  3:14 | 131:25 137:25 |
| **192**  3:5 | 40:22 43:5 | **2353**  58:12,15 | 140:18 181:15 |
| **193**  3:6 | 83:2 | **2353-2364**  3:15 | 181:19 |
| **194**  3:6,7 | **2023**  40:22 | **2364**  58:17 | **25-30002**  1:3 |
| **1995**  29:16 | 43:5 98:14 | **2365**  58:20 | **25-30003**  1:7 |
| **1:00**  130:20 | 99:9 148:10 | **2365-2377**  3:17 | **25-30004**  1:10 |
| **1:04**  130:21 | 171:3 175:17 | **2377**  58:22 | **2500**  62:15 |
| **1:57**  167:22 | **2024**  177:16 | **2378**  58:25 | 63:9 |
| 168:9 | **2025**  1:21 | **2378-2404**  3:18 | **2500-2534**  4:4 |
| **1a**  83:9 | 77:12 91:10 | **24**  5:6 110:23 | **2501**  63:7 |
| **1st**  1:4 197:6 | 97:6 196:4,18 | 111:2 122:16 | **2521**  137:1,2,5 |
| 198:3 199:3 | 197:4 | 124:1 131:25 | **2534**  62:17 |
| **2** | **2026**  196:24 | 131:25 | **2535**  63:21 |
| **2**  3:13 18:14 | **21**  4:24 7:14 | **24,000**  24:19 | **2535-2561**  4:6 |
| 50:6 53:6,10 | 23:19 24:4,6 | **2404**  59:2 | **2537**  64:1,2 |
| 53:14 54:25 | 96:25 97:1,4 | **2405**  59:4 | 143:5 |
| **2.750**  98:7 | 101:14 | **2405-2445**  3:20 | **2538**  143:13 |
| 101:23 | **216-523-1313** | **2445**  59:6 | **2561**  63:23 |
| **20**  4:22 52:25 | 197:3 | **2446**  59:8,24 | **2562**  64:23 |
| 53:2 69:9 | **218**  1:22 2:13 | **2446-2456**  3:22 | **2562-2593**  4:8 |
| 91:13,14 94:12 | 196:5 | **2448**  57:22 | **2564**  65:3 |
| 198:16 199:22 | **22**  5:3 24:6 | **2449**  59:20 | **2565**  137:25 |
| 200:22 | 102:11,16 | 60:6 | 138:12 |
| **200**  2:9 | 108:13 117:5 | **2450**  157:20 | **258,200**  123:18 |
| **2015**  20:16 | 120:4 138:16 | **2451**  158:2 | **2593**  64:25 |
| **2016**  22:10 | **220**  8:19 21:3 | **2456**  59:10 | **2594**  67:7 |
| **2017**  22:10 | 21:24,25 22:6 | **2457**  61:13 | **2594-2609**  4:10 |
| 23:4,7 | 24:11 25:3,14 | **2457-2499**  3:25 | **2596**  67:12 |
| **2018**  23:9 | **23**  1:21 5:4 | **2460**  61:15 | **26**  5:10 68:21 |
| **2019**  23:8,9 | 107:17,19 | **2499**  61:22 | 83:2 130:22 |
| **2020**  23:19,19 | 117:3,5 120:4 | **25**  5:8 33:17 | 131:1,3 132:16 |
| 24:5 112:19 | 173:11,13 | 116:14,17 | 132:25 137:16 |
| | 196:4 | 121:11 122:22 | |

**[2609 - 7619960]**                                                          Page 3

**2609**  67:9
**2610**  67:20,22
**2610-2615**  4:12
**2612**  67:25
**2615**  67:23
**2616**  68:13
**2616-2624**  4:14
**2618**  68:17,18
**262,000**  184:25
   185:5,25
**2624**  68:15
**27**  5:12 146:5,6
   146:11 197:4
**27th**  196:17
**28**  5:15 152:13
   152:14,19
   196:24
**2:34**  167:23

**3**

**3**  3:15 50:12,16
   50:16,20 51:11
   54:25 58:12,13
   58:14 83:3
   176:13
**30**  15:15 36:1
   150:13
**32**  189:17,22
   191:15
**34th**  2:9
**358**  187:12
**3593**  5:9
**36**  157:22
   189:18 191:15

**3603**  147:1
**362**  154:12,14
**3684**  5:7
**3:01**  188:9
**3:15**  188:10
**3:24**  195:20

**4**

**4**  3:16 53:25
   55:10 58:19
   83:17 87:5
   112:19 114:2,2
   116:20 121:8
   131:2,6,11,15
   131:15 132:9
   136:14,16
**4.2**  76:25 77:5
   77:17
**4.2.**  82:3
**4/17/23**  91:25
   92:17
**40**  124:9 168:9
**400**  172:15
**409,000**  132:11
**409,450**  131:19
   135:4,19
   136:10
**44114**  197:2
**45**  53:5,5,7,13
   53:16,17 103:4
**45/45/10**  53:4
**475,000**  18:12

**5**

**5**  3:18 55:11,18
   55:23 58:24
   90:3 94:6,23
   94:24 95:7
**5,325**  137:10
**50,000**  39:14,20
   39:21 166:16
**500**  137:18,21
**501**  137:21
**503**  136:10
**509,775**  121:17
   140:19
**560,000**  124:2
**58078**  2:9
**58102**  2:5,14
**5:30**  183:22

**6**

**6**  3:5,12,13,15
   3:16,18,19,19
   3:21,23 4:3,5,7
   4:9,11,13 15:5
   36:1 55:22
   59:4,13 77:14
   77:14 78:11
   83:5 87:19
   91:5,9 113:25
   113:25 114:2,5
   145:4,4 150:13
**60**  24:22
**600,000**  74:18
   74:23 75:5
   98:10,21 99:8

**100:**7,12,15
   101:10 102:4
   178:10
**61,981**  158:3
**63**  105:15
**64**  143:8,11
**67,521.15**
   147:14
**682**  145:20

**7**

**7**  3:21 56:8,19
   56:25 59:8,17
   61:9 83:7
   95:22 145:4
   157:11,13
   158:19
**7,502**  145:19
**7.2**  104:14,17
   104:20 108:15
**7.740**  98:2
**70**  6:25
**70s**  6:25 7:1
**74**  131:21
   132:4 138:8
**75,000**  15:14,17
   142:21
**750,000**  145:18
**750,235**  144:15
**76**  22:3,3
**7619960**  197:7
   198:2 199:2
   200:2

**[77 - acknowledgment]**                                    Page 4

**77**  4:15
**78**  4:17
**784,000**  117:1

**8**

**8**  3:23 61:12,15
  61:19,22 95:2
  95:2,7,7 145:4
  177:18
**8,485,609**  91:3
**8.1**  90:15 95:24
**8.1.**  96:2,4
**8.169647**
  101:20
**81,000**  156:11
  156:20,23
  158:6,22 170:8
**82**  4:18
**820**  2:9
**84**  99:2,4
  100:10 101:18
**88**  7:8
**89**  4:20 7:8
**8:59**  1:24 6:3

**9**

**9**  4:3,23 62:14
  62:20 77:12
  91:18,22 92:4
  136:20
**9/22/25**  94:8,21
**9/23/2025**
  197:8 198:3
  199:3

**90**  4:21 48:2
  108:17,22
  130:16 165:25
  167:3
**901**  5:11
**9011**  154:20,21
  154:25
**902**  5:14
**91**  4:22 7:9
**95**  29:15
**95,000**  138:6,13
  138:18,25
  140:2,14,20
**97**  4:24
**9:50**  49:20,22
**9:55**  49:23
**9a**  91:19,20

**a**

**a.m.**  1:24 6:3
  49:22,23 58:8
  58:9 102:9
**aaerstads**
  98:16
**aarestad**  2:17
  4:17,18,21,22
  11:3 28:19,24
  29:8,11 76:8
  76:15 78:4,5
  82:22 90:10
  91:17 97:17,17
  120:12 152:16
  164:12 167:24
  178:5

**aarestad's**
  178:24
**abetted**  27:24
**ability**  172:8
**able**  13:23
  14:19 16:7
  30:4 48:2
  133:6 166:1
  167:17
**above**  197:17
**absent**  160:20
**absolutely**  46:4
  188:8
**accepted**
  122:14
**access**  13:1,15
  14:3,12 32:23
  66:17 163:16
**accordance**
  198:5 199:5
**account**  12:9
  12:17,20,20
  30:1 31:15,18
  31:22 32:8,10
  32:15,18 33:1
  33:18 35:12,15
  37:9,11,14,16
  38:2,19 40:17
  41:2,7,14
  42:13,17 43:18
  43:20 46:25
  67:5 73:2,3,10
  73:11,12,15
  159:9,25

**160:16 161:4,8**
  161:9 162:11
  168:22 182:21
  185:15,20,21
  185:25 186:2,3
  189:10 192:10
  192:15,17
  193:5,14,15
**accountant**
  16:7 32:13
  70:15
**accounting**
  42:22 43:2
  133:3 147:21
**accounts**  35:2,4
  37:13 188:25
  194:8
**accrued**  87:11
**accumulated**
  95:25
**accurate**  78:19
  79:24 80:1
  87:16 91:12
  101:24 102:1,5
  147:15 170:13
  193:12
**accurately**
  122:2
**achieved**  79:10
**acknowledge**
  85:12 198:11
  199:16
**acknowledg...**
  80:20

**[act - amount]**                                                                    Page 5

| | | | |
|---|---|---|---|
| **act**  29:7,10 | **adversary** | 104:8 160:20 | **allows**  155:17 |
| 198:14 199:20 | 80:12 108:2 | 167:10 | 155:21 |
| **action**  196:13 | **advice**  159:13 | **ahead**  38:5 | **alter**  125:1 |
| 196:14 | 159:17 165:25 | 46:11 48:1,22 | **alterations** |
| **actions**  192:19 | 167:4,6 | 51:10 84:25 | 129:20 |
| **activity**  12:20 | **advise**  166:5 | 86:4 129:16 | **altered**  71:10 |
| **actual**  73:9 | **affect**  196:14 | 134:5 138:1 | 71:22 72:2,6 |
| 84:16 118:23 | **affects**  196:14 | 143:3 | 72:10 75:13,19 |
| 175:19 | **affidavit**  4:17 | **aided**  27:24 | 125:8 139:14 |
| **actually**  13:20 | 4:18,21,22 | **air**  156:17 | 141:14 |
| 13:24 18:5 | 76:16 78:3,5 | 157:2 172:14 | **ambiguity** |
| 92:21 96:3 | 82:22 90:10 | 177:2 179:16 | 128:25 170:23 |
| 100:17 107:10 | 91:17 | 180:9 189:3 | 183:19 |
| 109:23 111:8 | **affidavits**  76:8 | **airplane**  108:5 | **ambiguous** |
| 115:3 118:5 | **affiliates** | **al**  197:6 198:3 | 128:22 |
| 122:2,24 | 161:23 | 199:3 | **amend**  27:23 |
| 137:20 145:15 | **affirmative** | **aleck**  111:19 | **amended**  94:5 |
| 145:24 147:6 | 76:13 | **alexandra**  21:9 | 97:4 152:23,25 |
| 158:8 159:17 | **affixed**  198:15 | 21:23 24:11 | 186:24 |
| 172:18 175:22 | 199:21 | 25:2,7,8 71:1 | **amendment** |
| **add**  27:23 | **afforded** | 112:14 179:5 | 159:12 |
| 51:21 186:13 | 155:20 | **alexis**  117:20 | **amount**  11:13 |
| **additional** | **afield**  17:9 76:4 | **allegations** | 30:15 49:3 |
| 103:3 138:24 | **afoul**  154:20 | 161:25 | 79:22 80:11 |
| 187:22 | **agent**  173:3 | **allege**  27:24 | 83:8 85:22 |
| **address**  197:15 | **ago**  135:14 | **alleged**  154:18 | 86:21,22 87:13 |
| **adequate** | 181:22 189:24 | **alleging**  28:11 | 87:16 88:1,9 |
| 103:23 153:24 | **agree**  95:10 | 28:23 173:10 | 98:1,4 101:25 |
| **adjuster**  172:5 | 108:8 164:23 | **allocated**  40:7 | 102:4 104:12 |
| **administered** | **agreed**  80:25 | 180:11 | 113:20 121:18 |
| 1:5,9 | 154:11 | **allotted**  32:11 | 121:20 124:3 |
| **adopt**  128:24 | **agreeing**  107:7 | **allow**  161:16 | 135:8 138:24 |
| **advance**  47:21 | **agreement** | **allowed**  171:21 | 139:24 144:15 |
| 125:14 | 48:15 80:9 | | 144:22,25 |

**[amount - april]**                                                          Page 6

| | | | |
|---|---|---|---|
| 145:1 148:16 | 139:22 140:12 | 39:13 43:16,24 | **applications** |
| 148:19,20 | 140:12 141:10 | **apologies**  27:7 | 14:10 134:16 |
| 156:12 162:13 | 150:18 151:18 | **apologize**  28:6 | 146:15 |
| 172:16 191:12 | 154:4 159:11 | 88:20 | **applied**  86:24 |
| 191:12,16,17 | 159:14,19,19 | **apparently** | 88:6,9 |
| 191:24 | 160:5,7,20 | 140:13 | **appraisal**  71:2 |
| **amounts**  11:5 | 163:9 164:14 | **appear**  99:8 | 108:17 120:25 |
| 80:9 81:7,8 | 164:24,25 | 136:13 198:11 | **appraisals** |
| 86:13 88:5 | 166:2,3 172:25 | 199:15 | 105:5 120:22 |
| 96:13,18 | 173:1 186:22 | **appears**  44:11 | **appraised** |
| 136:17 | 191:7 | 135:14 136:13 | 70:25 |
| **analysis**  150:1 | **answered** | 137:17,21 | **appraiser** |
| 186:15 | 34:21 145:22 | 138:5,12 | 120:16 |
| **anecdotes**  45:8 | **answers**  7:21 | 147:10 | **appreciate** |
| 45:10 | 51:9 103:6 | **appended** | 109:8 |
| **animosity**  66:3 | 164:24 174:18 | 199:11,18 | **appreciation** |
| **anniversary** | **anticipation** | **appliances** | 71:3 |
| 41:23 | 121:22 | 156:5,9,12,13 | **approached** |
| **answer**  9:14 | **anybody**  10:8 | 156:19,22 | 113:12 181:16 |
| 10:19 27:9,22 | 19:18 51:1,17 | 159:3 162:14 | **appropriate** |
| 29:2,5 34:1,5 | 54:12 55:14,25 | 168:18,24 | 36:7 165:7 |
| 37:17 38:5,25 | 62:5 70:13 | 169:10 170:3,5 | **approval**  19:10 |
| 39:23 40:10 | 125:1 | 170:9,14 179:9 | **approved** |
| 44:20 46:12 | **anymore**  67:1 | 179:18 180:6,7 | 124:21 128:4 |
| 51:3 52:22 | 116:12 | 180:10,18,24 | 175:24 184:8 |
| 72:14 75:23 | **anyway**  140:13 | 181:2 185:1,8 | **approximate** |
| 76:11,13 79:4 | 171:22 | 188:13 | 35:6 |
| 85:8 87:9 | **apart**  107:1 | **application**  4:5 | **approximately** |
| 88:18,19 91:11 | 168:21 | 4:7,9,11,13 | 87:13 |
| 92:8 103:5 | **apartment**  22:3 | 64:16 107:10 | **apps**  14:12 |
| 105:2 106:9,21 | 22:4,16 30:10 | 144:4,18 | **april**  15:14 |
| 109:19 110:11 | 45:25 105:14 | 147:11,14 | 83:2 171:3 |
| 110:19 116:3,8 | **apartments** | 191:5 | 173:11,12 |
| 126:23 129:3 | 20:6 31:17 | | 175:17 |

**[architect - back]** Page 7

| | | | |
|---|---|---|---|
| **architect** 22:25 | 113:14 126:19 | **assuredly** | **available** 67:1 |
| 113:24 114:6 | 132:22 134:8 | 178:24 | **ave** 197:1 |
| 115:1 116:13 | 135:12 138:6 | **astute** 169:24 | **avenue** 1:22 2:4 |
| 121:7 132:7 | 138:20 142:24 | **attached** 64:17 | 2:9,13 6:16 |
| 140:19,23 | 143:5 144:3,7 | 83:9 125:2 | 22:18 196:5 |
| **architects** 5:10 | 145:24 147:13 | 157:9 199:7 | **aware** 10:21 |
| 137:13 | 148:13 155:10 | **attorney** 7:22 | 74:12 127:16 |
| **area** 7:4 20:18 | 159:23,25 | 7:25 10:3 | 129:19 153:8 |
| **areas** 177:7 | 160:2,3,3,4 | 27:14 56:20 | 172:2 180:3,10 |
| **arrive** 44:18,18 | 167:11 | 72:23 73:7 | **b** |
| **arrived** 148:16 | **assemble** 62:9 | 85:6 92:18 | |
| **article** 13:20 | **assembling** | 136:8 164:5 | **b** 2:4 3:10 4:1 |
| **articulate** 8:12 | 62:6 | 186:10 192:11 | 5:1 36:1 |
| **artwork** 108:8 | **asserted** 27:19 | 192:11,12 | 114:11 146:23 |
| **ascertain** | **asserting** | 196:11,12 | 150:13 |
| 160:12 | 159:12 | **attorney's** 3:8 | **b&w** 171:10 |
| **asian** 108:7 | **assessments** | 160:21,24 | 177:14 184:13 |
| **asked** 7:25 | 175:3 | 161:14,15 | 186:7 187:17 |
| 31:15 34:20 | **assets** 72:25 | 167:14,14 | **back** 8:7 9:9 |
| 69:8,24 72:4 | 74:4 163:12,16 | **attorneys** 2:4,8 | 11:20 14:7 |
| 74:15 84:19,22 | 186:4 | 2:13 14:7 | 16:12 21:4 |
| 92:18 111:20 | **assigned** 98:17 | 165:3 196:14 | 41:24,25 43:25 |
| 119:3 133:14 | 98:24 | **audi** 42:5 | 49:21 57:12,13 |
| 133:16 135:13 | **assignment** | **audit** 194:10 | 57:23 58:5,10 |
| 145:21 155:4,5 | 198:2 199:2 | **authority** 32:25 | 66:1,1,1 67:3 |
| 177:19 191:9 | 200:2 | 33:3 126:15 | 77:9,10 78:7 |
| 192:8,11,23 | **assist** 70:13 | **authorize** | 81:24,25 86:12 |
| **asking** 13:11 | 150:16,17,25 | 199:11 | 91:19 99:5 |
| 19:13 37:24 | **assisted** 151:9 | **authorized** | 101:13,15 |
| 38:3 45:14,15 | **associated** 46:1 | 101:1 | 102:13 108:13 |
| 45:19,23 47:17 | **assume** 7:22 | **auto** 182:13 | 117:21 118:22 |
| 63:8 71:20 | 50:25 51:12 | **automatic** | 123:4 128:2 |
| 72:18 74:3 | **assumes** 129:2 | 155:21 | 133:15,16 |
| 108:1,2,13 | 141:4 151:16 | | 134:12 135:24 |

**[back - believe]**                                                      Page 8

137:16 142:22
148:9 156:3
168:8 179:25
184:15,19
187:24 188:11
188:12 197:15
**background**
7:3 44:8,12
**bad**   154:1,4,5
154:13,18,19
155:15,17
156:16 194:14
**badly**   112:3
**baete**   16:4,15
16:16 152:2
**balance**   77:8
82:2 89:24
95:11 101:19
144:24 193:11
**balances**   86:17
90:24
**bandstand**
174:10
**bank**   2:11 3:21
3:23 4:3 7:25
9:4 10:23
12:14,21 14:11
19:10 25:21,23
26:1,10,11,13
28:18,20 29:6
29:9 37:13
39:18 40:17
41:14 45:16
46:8 47:16

50:2,8,11
51:14,18 53:16
54:1 55:8,20
56:6,9,14 61:1
62:3 63:15,18
67:18 68:9,23
68:25 69:3,9
69:13,20 70:1
70:4 72:21
73:2,3,5,10
78:17 81:12
85:11 92:15
97:5,13,15,24
98:17,25
102:23 103:3
104:3,19
106:18 107:6,9
108:14 113:13
120:11 121:2
124:22 125:19
126:5,19 127:5
127:11 129:12
129:21 140:15
150:23 160:18
162:4 163:14
164:2 165:10
165:21 170:25
172:2 175:21
182:21 186:3
188:25 193:11
194:5,6,11
**bank's**   57:3
70:6 85:22
86:20

**banker**   31:13
**banking**   75:17
160:22 162:2
**bankrupt**
158:12
**bankruptcy**   1:1
1:3,7,10 2:3
5:16 44:5,6
146:22 150:23
151:5 154:15
155:6,11,13
162:25 163:5
165:8 169:3
190:4
**banks**   25:3,6
75:20
**barry**   171:10
177:14
**based**   28:22
80:14 112:6,11
113:2 123:20
160:5,8,21
**basically**   11:7
11:16 133:7
**bate**   17:24
58:12 59:19
61:13 62:15,17
63:21 137:5,18
137:25 138:12
157:19 158:2
**bates**   3:12,13
3:14,15,16,18
3:19,22,24 4:4
4:6,8,10,12,14

5:6,8 57:8,10
57:15 63:6
136:9 143:4
146:25 147:1
**battery**   27:23
**bedbugs**   48:14
**beginning**
61:12 141:20
**begins**   58:20,24
59:4,8 67:20
**behalf**   38:1
**believe**   16:22
23:9,16 25:10
28:4,6 29:9
33:18 35:12
37:10 38:7
39:20 41:18,25
50:1 51:15,19
53:25 63:16
68:10,24 69:1
71:6 73:16
74:24 75:6
92:1 93:11,17
93:20 96:19
102:23 116:22
117:6 124:12
124:14,17
130:15 134:19
134:25 143:14
143:21 148:3
148:23 162:8
162:18,20
166:24 168:4
168:14 170:11

**[believe - built]** Page 9

170:12 172:10
172:14 177:13
178:9 179:6,8
181:22 182:5,9
182:24 185:12
191:22 193:13
**believed** 72:23
**believes** 165:10
**benefit** 168:13
169:17 179:17
**benefited**
149:24 151:23
151:24
**best** 38:20
155:24 178:19
**beulah** 6:20 7:6
**beyond** 45:10
45:12 161:18
**bid** 24:21
112:23 122:6,9
142:1
**bids** 112:9
122:14,20
190:22
**big** 103:24
110:21 111:1
136:25
**bigger** 16:6
**biggest** 103:1
103:10 148:19
**biggin's** 177:5
**biggins** 175:11
176:15

**bill** 15:14
115:11
**bill.com** 24:21
**billed** 115:7
142:20
**billing** 121:14
**billmeyer** 39:13
43:16,22,22,24
189:3
**bills** 118:15
127:9 128:13
169:13
**binder** 17:10
17:16 130:25
131:7,8,16
136:21
**bioengineering**
7:10
**bismarck** 7:7
**bit** 7:16 20:17
**black** 99:16
**blended** 53:18
**blown** 173:15
**blows** 106:25
**board** 52:6,8
**bob** 60:3
**bookkeeper**
16:7 17:3
**booming** 24:24
**bop** 49:12
**born** 6:19
**borrow** 179:16
**borrowed**
43:21 115:4

178:15
**borrower**
100:24
**borrowers**
100:19
**bottle** 164:8
**bottom** 17:25
30:13 47:9
70:23 95:7
113:24 120:8
121:7 132:5
136:10 143:5
**bought** 48:13
66:8,8,9 180:1
181:15,20
**bound** 110:1,8
**box** 2:14
**boy** 114:11
158:10
**brain** 81:14
**brand** 180:5
**breach** 28:5
**break** 49:10,15
49:19 164:10
174:13
**breakdown**
75:11
**breakdowns**
180:22
**breaking**
173:17 174:4
**bricklayer**
184:14

**briefing** 155:20
**broad** 130:2
**broader** 154:6
**broker** 181:7
182:11,13
**brought** 36:3
**bruce** 70:14
**bubble** 45:9
**bucks** 115:4
**build** 8:19
111:22 117:2
123:3
**builders** 66:4,9
66:10
**building** 21:2,6
21:10 22:4,16
24:18 30:10
39:12,16 48:17
66:5,10 79:6,6
79:18 105:14
111:9 116:12
117:13 123:12
123:18 171:19
173:18 174:5
175:5,25
194:11
**building's** 31:4
**buildings** 15:5
30:19 31:9
43:13 45:25
46:17
**built** 21:2,8,11
169:14

[built5 - chapter]                                                              Page 10

**built5** 31:10
**bunch** 161:1
  169:13
**burdening**
  195:18
**burkhardt**
  117:15
**burnt** 7:13
  65:25
**business** 20:3
  31:8,19 33:19
  45:9,11 158:11
  178:7,8,11,13
  178:17 181:17
  191:1
**businesses**
  31:12,16
**buy** 41:22
  46:18 123:10
  158:1 159:2
  181:21 185:23

**c**

**c** 2:1 3:1 6:1
  99:1 123:15
**ca** 197:25
**calculates**
  112:16
**calculation**
  88:9
**call** 177:19
  191:18
**called** 74:14
  178:25

**calling** 82:25
  89:25 95:17
**calls** 15:7 33:7
  48:5 52:21
  71:15 85:2
  88:15,16 92:7
  110:7,10 116:2
  116:2 128:21
  128:22 129:1,2
  141:5 148:12
  150:8 151:17
**canceled**
  143:19 148:1
**candid** 166:2
**cap** 71:3
**capacity** 35:25
  111:16,24
  150:9,13
**capital** 39:5
  103:13,15
  153:12,20
  189:2
**car** 41:22 42:2
  46:18
**care** 33:23
**careful** 45:10
  149:21
**caren** 2:15
  33:23 49:18
  51:7 61:19
  87:19 132:22
**carl** 115:3
**carolina** 6:19

**carried** 177:6
**carson** 117:15
  117:22,24
**case** 1:5 26:21
  27:1 28:12,24
  44:6 51:19
  120:23 124:17
  151:5 152:20
  155:13 165:3
  166:14 197:6
  198:3 199:3
**cases** 36:4 44:5
  125:14
**cash** 39:4 48:11
  74:5 110:13
  162:22 169:14
  184:9,13,22,25
  185:3 188:13
  188:22 189:6
  193:11
**cashier's** 83:24
**cass** 196:3,23
**cast** 48:16
**cathcart**
  193:25
**cause** 6:8 8:2
  154:12,15,15
**caused** 45:22
**cbre** 120:24,25
  121:2
**cease** 45:23
**ceased** 117:17
**centric** 108:1,2

**cents** 188:5
**certain** 62:9
  72:17 77:2
  186:25 194:8
  194:20
**certificate** 4:5,7
  4:9,11,13
  79:15 105:11
  105:25 109:13
  196:1 199:11
**certification**
  198:1 199:1
**certify** 196:4
**certifying** 5:11
  5:13 132:17
**chained** 173:23
**chance** 78:5
**change** 65:20
  170:8 191:23
  191:25 192:14
  193:4,8 197:13
  197:14 199:8
  200:3
**changed** 71:4
  109:22 139:21
  182:6
**changes** 139:7
  183:2 197:12
  198:7 199:7,9
**changing** 104:8
**chapter** 1:4,8
  1:11 76:21
  163:5 171:21

**[characterization - collateralized]**                                    Page 11

| | | | |
|---|---|---|---|
| **characterizati...** | 32:10,14 33:1 | 77:12 79:23 | **cleveland**  197:2 |
| 139:20 163:22 | 35:4 38:2 | 80:10 85:22 | **client**  10:3 |
| 174:6 | 73:11,12,15 | 86:9,10 91:3,7 | 45:20,21 49:10 |
| **charged**  196:9 | 159:9 168:22 | 94:5 96:14 | 71:20 85:6 |
| 196:9 | 185:15 | 97:4 101:14 | **client's**  46:3 |
| **charles**  2:17 | **checkmarks** | 107:23 108:1 | **clients**  12:4 |
| 4:17,18,21,22 | 18:23,25 | 148:9 153:15 | 165:1 |
| 11:3,9 29:8 | **checks**  30:18 | 171:23 172:3,6 | **clip**  101:15 |
| 52:1,5,7 72:21 | 30:21 32:20 | 172:7,16,21 | **close**  87:23 |
| 73:17 74:14,22 | 33:16 34:16,19 | 174:11 | **closed**  171:14 |
| 75:3 76:8,15 | 34:22 83:25 | **claims**  26:20,25 | **cmi**  176:18,18 |
| 78:3,5 82:22 | 121:22 143:19 | 27:18 28:22,23 | 176:21,22 |
| 90:10 91:17 | 148:1 | 29:8 86:16 | **cmrc**  176:18,22 |
| 97:16 104:6 | **chest**  174:10 | 155:10 | **coach**  51:5 |
| 109:4 119:22 | **child**  52:12 | **clarification** | **coaching**  27:10 |
| 120:12 127:15 | **children**  20:9 | 95:5 159:22 | 37:20,21 167:4 |
| 127:24 129:7 | 20:12 | **clarify**  34:23 | 167:6 |
| 129:14 164:12 | **chris**  18:10 | 37:24 175:1,15 | **code**  30:14 |
| 167:24 170:11 | 26:8 147:19 | 192:7 | 42:25 43:2 |
| 172:7,10,11 | 177:21 181:16 | **clarifying**  72:3 | 154:16 |
| 173:7 178:6,21 | 191:8 | **clarity**  142:9 | **coded**  41:17 |
| 192:19 194:9 | **christianna** | 146:16 | **coding**  42:22 |
| 194:19 | 193:25 | **classification** | **cognizable** |
| **chart**  95:6 | **circuitry** | 92:7 | 45:12 |
| **chat**  49:10 | 156:14 | **clausen**  48:23 | **coincidentally** |
| **cheap**  195:9 | **city**  18:11 26:5 | 49:4 123:14,15 | 56:19 |
| **check**  11:14 | 171:14 173:14 | **clean**  107:17 | **cokes**  164:8 |
| 30:4,8,9,12,17 | 174:7 175:23 | **cleaner**  32:15 | **cold**  26:4 |
| 32:11 58:11 | **civil**  114:13,15 | **cleaning**  185:2 | **coldwell**  31:13 |
| 59:13 143:19 | 115:6 198:5 | **clear**  8:8 10:24 | **collateral**  81:15 |
| 145:12 170:7 | 199:5 | 35:24 45:19 | 155:22 161:20 |
| **checking**  12:9 | **claim**  4:16,20 | 50:15 161:18 | **collateralized** |
| 12:19 30:1 | 4:24 27:23 | 166:18 | 81:16 97:18 |
| 31:15,18 32:8 | 44:4 76:7,20 | | 128:8 |

**[collaterized - confined]** Page 12

| | | | |
|---|---|---|---|
| collaterized | commerce 9:4 | 177:24 181:15 | 165:22 189:16 |
| 98:20 | 25:21,23 26:1 | 182:10 189:22 | concerned |
| collect 13:25 | 26:13 27:1 | 190:16,19,21 | 161:20 |
| collected 19:11 | 28:23 29:6 | 190:25 | concerning |
| collection | commercial | compiled 95:16 | 155:10 |
| 79:20 | 173:21 | complaint 27:2 | concluded |
| collectively | commingled | 27:10,15 28:2 | 195:20 |
| 52:16 156:18 | 81:12 170:16 | complaints | conclusion 33:8 |
| college 7:7 | 185:21 | 174:7 | 88:16 110:7,10 |
| column 121:17 | commission | complete 12:9 | 128:22 129:1 |
| columns 113:4 | 196:24 198:19 | 117:1 191:14 | 150:8 |
| 119:16 | 199:25 200:25 | completed 23:3 | concrete 24:22 |
| combination | commitment | 23:4,18 45:25 | 123:23 124:2 |
| 123:7 | 28:8,22 29:8 | 51:9 79:18 | 184:18 |
| combined | committing | 118:19 122:18 | condition |
| 95:12,13 | 13:21 | 197:15 | 105:24 106:1,4 |
| come 21:4 | commons 8:20 | completely | 108:19 175:5 |
| 123:6 145:20 | communicati... | 88:16 146:1,2 | conditioners |
| 181:18 184:15 | 27:20 | 154:10 | 156:17 157:3 |
| 184:19 187:24 | community | completion | 179:16 180:10 |
| 194:10 | 12:15 13:22 | 105:21 144:24 | conditioning |
| comes 183:18 | 25:9 41:15 | components | 189:3 |
| comfortable | 166:17 185:13 | 114:25 | conditions |
| 12:10 163:16 | 188:24 | composite | 105:20 106:18 |
| 166:4 | companies 41:4 | 177:3 | 123:5,11 |
| coming 20:9 | company 18:11 | compressed | conducted |
| 30:14 114:21 | 19:7 25:13,18 | 147:4 | 45:13 176:19 |
| 154:9 162:22 | 26:8 31:7 | computer | confer 36:13 |
| 186:13 | 33:17 39:6 | 66:19 | 165:24 |
| commence | 40:12 50:10 | computers 13:2 | confidential |
| 44:19 | 66:7 78:14,20 | 14:5 | 26:22 27:19 |
| commenced 6:3 | 79:1,7,11,17 | concern 85:21 | confined |
| 44:13 | 160:5 171:11 | 86:14 88:8 | 153:24 |
| | 172:1 173:3 | 96:20 163:12 | |

**[confirmation - correct]**                                                      Page 13

| | | | |
|---|---|---|---|
| **confirmation** | 109:21,24 | 133:4 134:11 | **contribute**   62:5 |
| 186:9 | 112:7,12 114:4 | 135:23 142:17 | **contributed** |
| **confused**   24:7 | 117:11 119:23 | 146:10,20 | 39:8 103:14 |
| **confusing** | 122:11 123:15 | 147:9 150:15 | **contribution** |
| 35:22 82:6 | 171:10,11 | 152:19 153:5 | 43:19,20 |
| **conjecture** | 173:5 176:25 | 156:4 161:3 | 184:24 |
| 151:17 | 177:14 | 168:11 188:11 | **contributions** |
| **connection** | **construed** | 190:14 | 153:12,20 |
| 9:15 10:19 | 70:25 71:4 | **contract**   5:6,8 | **control**   44:10 |
| 13:23 44:13 | 80:19,21 | 15:21 28:5 | 66:22 121:25 |
| 45:20 46:4 | **consulting** | 109:25 121:15 | **conversation** |
| **consecutive** | 176:15,25 | 122:1 130:14 | 9:24 37:5 73:7 |
| 57:8 | 177:11 | 144:15,22,25 | **convoluted** |
| **considered** | **cont'd**   4:1 5:1 | 145:1 148:19 | 169:19 |
| 21:15,18 47:10 | **contained** | 148:20 196:13 | **coordinate** |
| **construct**   23:15 | 73:21 | **contracting** | 36:12 |
| 112:20 | **contents**  193:9 | 39:6 42:6 | **copies**   136:7 |
| **constructed** | **context**   88:3 | 46:22 169:15 | 196:9,10 |
| 104:25 | **contextual** | **contractor** | **copy**   50:10 |
| **construction** | 155:2 | 13:17 15:20 | 82:14,21 83:9 |
| 3:21,24 4:3 | **continuing** | 21:16 24:19,24 | 100:3 195:6,7 |
| 8:18 10:21 | 7:18 10:7 | 31:25 47:24 | 195:9,10,15 |
| 21:2 23:25 | 34:11 37:12 | 53:19 112:1 | **correct**   10:10 |
| 24:3,8,13 26:6 | 38:4 46:6 | 123:5 125:13 | 12:18 14:25 |
| 30:24 31:2 | 49:24 50:20 | 126:15 148:18 | 15:21 16:18,21 |
| 40:13 44:22 | 58:10 60:5 | 171:9 | 17:16,22 19:22 |
| 45:21,22,24 | 76:6 81:6 | **contractors** | 20:8 24:17 |
| 48:10 54:23,24 | 82:20 87:24 | 13:20 14:18 | 26:12 31:5,6 |
| 55:2 69:11 | 89:10,18 90:9 | 15:4 48:1 | 32:1,2,4 33:6 |
| 85:16 92:11,13 | 91:16 97:3 | 119:7 126:14 | 38:10 42:24 |
| 103:17 104:1 | 100:6 102:13 | 138:3 162:22 | 43:3,9,10 47:6 |
| 104:13,23 | 108:12 110:25 | **contracts** | 48:25 49:4 |
| 105:3,9,11 | 116:16 128:2 | 122:18,25 | 50:2,5,18 |
| 106:3,6 108:17 | 130:24 131:14 | 123:2 | 51:23,25 55:6 |

[correct - craig]                                                    Page 14

| | | | |
|---|---|---|---|
| 56:10 59:15 | 147:11,14 | **costs** 104:1 | 179:1 194:25 |
| 60:6,7,9 66:14 | 149:4 154:13 | 108:17 178:3 | 195:5,10 198:7 |
| 68:2,3 70:8 | 156:6 157:21 | 190:23 | **courted** 113:15 |
| 73:4 77:1,14 | 157:24 158:20 | **counsel** 9:14,16 | **cover** 53:17 |
| 80:17,18 81:20 | 164:20 165:11 | 9:18 28:1 36:3 | 54:9 55:18,23 |
| 83:15 85:14,17 | 166:11 168:12 | 37:2 76:12,14 | 56:3,14,21 |
| 85:24 86:14 | 171:3,24,25 | 142:23 143:15 | 178:4 |
| 88:5 89:12,14 | 172:3 174:14 | 150:17 161:18 | **covered** 163:24 |
| 90:15 92:24,25 | 174:21 176:16 | 161:20 195:15 | 189:18 |
| 93:10 95:19,20 | 176:17 177:17 | 195:16,18 | **cp** 31:8,19 |
| 95:22 96:8,13 | 182:3 191:3 | 196:11,12 | 33:19 191:1 |
| 96:19,23 97:9 | 192:12,13 | **count** 170:12 | **craig** 1:17 2:7,7 |
| 97:15,21,24 | 193:16 | **counterparty's** | 2:17 3:4 5:3,5 |
| 98:2,6,8,11 | **corrected** 125:6 | 92:8 | 6:3,6,14 12:9 |
| 100:20,24 | 125:7,8,17,18 | **county** 196:3 | 12:16 13:13 |
| 104:14,15 | 125:19,25 | 196:23 198:10 | 17:21 20:4,7 |
| 105:17,19 | 127:1,3,7 | 199:15 | 20:14 21:11,14 |
| 106:12,13 | 129:23 130:1 | **couple** 188:6 | 21:15 29:13,18 |
| 107:3 109:17 | 141:17 191:18 | **course** 12:4 | 29:22,23,25 |
| 111:12 112:18 | 191:20,23 | 103:15 185:2 | 30:19,20,22 |
| 116:21 119:7 | **correction** | **court** 1:1 6:5 | 31:3,24 32:2,9 |
| 119:11 120:2,5 | 141:18 | 7:15 27:10 | 32:9,10,11,14 |
| 120:6 125:13 | **corrections** | 35:17,20 37:3 | 32:17,19,21 |
| 125:21,24 | 15:25 16:5 | 37:8 77:22 | 33:1,14,16 |
| 126:3,6,13,21 | 197:12 199:17 | 78:2 82:9 | 34:12,16,23 |
| 126:24 127:22 | **correctly** 88:6 | 88:24 89:3,7 | 35:2,2,11,13,25 |
| 130:12 131:19 | **correlate** 54:22 | 89:17 90:5,8 | 36:2 37:9,10 |
| 132:6,20,23,24 | **correlated** 61:5 | 91:15,19 97:2 | 37:14,14,15,16 |
| 133:8 136:11 | **correspond** | 102:12 107:20 | 37:25,25 38:1 |
| 137:6,18 138:6 | 64:13 143:8 | 110:24 116:15 | 38:2,8,8,9,18 |
| 138:13 139:18 | **cost** 104:9,10 | 130:23 146:7 | 38:18,22,22 |
| 140:16,23,24 | 112:20 124:7 | 146:22 152:15 | 39:9,14,15 |
| 141:21 143:6 | 196:8 | 154:23 155:11 | 40:17 41:12,13 |
| 144:1,16 | | 155:23 165:2,8 | 42:13 43:4,5,7 |

**[craig - decade]** Page 15

43:8,19,25,25
44:21 45:15
46:8,9,14,21,24
46:25 47:9
79:6 83:25
84:3 85:12
101:2,4,6
111:17,25
131:8,11
140:25 160:2,3
160:3 161:10
162:3 164:5,12
164:19 167:24
168:2,8,12,12
168:21 169:8
169:12,20,21
170:16 182:24
183:9,15
188:20,21
189:10 195:20
196:4 197:8
198:4,9 199:4
199:13 200:20
**crane** 108:6
**crap** 174:12
**create** 40:15
**created** 30:12
155:1
**creating** 148:5
**credit** 12:15
25:9 41:15
166:17 185:13
188:24

**creditor** 153:6
153:9,22 154:6
195:15
**creditors** 150:6
**credits** 7:12,14
**criteria** 194:9
**cross** 81:16
97:18 98:20
**cstanley** 2:15
**curious** 113:23
121:6
**currently** 6:15
8:1 97:8,22
185:12,25

**d**

**d** 6:1 51:22
154:12,14
**dacotah** 26:10
26:11
**daily** 117:22
**dakota** 1:1,23
2:3,5,9,14 6:17
6:21 7:6 9:5
29:21 31:11
51:22 66:20
103:20 143:15
155:4,8,12
196:2,5,23
**dakotabankru...**
2:6
**damage** 171:3
171:5,8,24
173:5,9,25

**damages** 28:4
**dan** 2:10,10
37:19 51:4
142:24 143:20
192:4
**dangling** 74:20
**danielle** 2:17
93:2,25 164:13
167:25 179:4,5
**data** 165:6
**date** 1:21 11:12
35:5 77:17
87:16 91:10
92:19,24,25
93:6 94:8
112:18 116:21
138:15 197:8
198:3,9,19
199:3,13,25
200:20,25
**dated** 83:1
91:25 92:17
98:13 99:9
111:7
**dates** 10:24
11:5 23:9 24:3
24:9 93:16
**daughter** 19:21
42:9 178:6,21
178:24 179:3
**daughters**
189:8
**day** 8:11 15:15
93:11 126:18

141:21 148:15
176:1 196:17
198:16 199:22
200:22
**days** 48:2
197:18
**deadline** 26:5
**deal** 154:10
158:15
**dealing** 15:3
66:1 104:9
155:8
**dealings** 160:9
**dealt** 80:23
**deanna** 1:25
196:22
**dear** 197:10
**debt** 43:25 53:7
53:17,17 103:4
104:2,3,4
107:9 127:17
149:16,18
**debt's** 149:17
**debtor** 1:5,9,12
36:4 150:3,4
154:4 155:19
195:16
**debtors** 2:2
36:4,5 155:6
161:22
**debts** 151:6,11
158:12
**decade** 9:9

**[december - development]** Page 16

december
  177:15
decide  190:23
decided  20:12
decision  52:1
  52:16 107:2,5
  140:24 156:18
decisions
  150:11
declaration
  5:10,12 132:16
  133:1 137:17
  146:11 189:17
deductible
  172:13,16,18
  172:22
deed  198:14
  199:20
deemed  197:19
defending
  35:18
define  162:10
defined  154:15
definitely
  104:11 129:1,1
  129:2 173:9
degree  7:10
delays  52:4
  66:2 125:16
deleted  67:5
delivered
  156:11 158:14
delivery  158:7
  170:10

demands
  192:21
demo  48:18
  123:16
demolition
  123:12,18,20
departed  44:11
  154:10
department
  20:5 103:21
  197:22
departure
  10:23
depending  42:3
  189:1
depo  35:19
deponent
  161:18
deposed  8:13
  8:15 9:8 25:23
  36:1
deposit  156:11
  156:20 158:4,5
deposited
  35:12 37:10
  46:7 161:5
deposition  1:15
  6:2,4 7:19 9:2
  9:11 10:9,13
  11:21,22,25
  44:4,15 45:13
  77:21 78:1
  82:8 88:17
  89:16 90:7

91:14 97:1
  102:11 107:19
  110:23 116:14
  130:22 135:10
  146:6 150:14
  152:14 154:11
  155:3,13 164:7
  195:19 196:4,9
  196:16 197:8
  197:11 198:1,3
  199:1,3
depository
  159:24 160:8
  160:18 161:4
  161:11 164:2
  164:19 168:4
  170:20,23
derived  14:18
describes  174:4
description
  3:11 4:2 5:2
  115:9
design  8:19
  48:24 114:12
  114:24
designation
  160:21
designee  36:2
destined  45:5,6
details  28:7
  150:21
determined
  80:12

devastation
  191:14
developer
  20:10 111:16
  111:16 168:23
  169:16 190:15
developing
  31:1 46:23
development
  5:3,5 12:9,16
  17:22 18:11
  20:15,21 21:11
  21:14,15 26:8
  29:23,25 30:20
  30:22 31:3,24
  32:2,9,12,21
  33:1,14 34:13
  34:17 35:2,11
  35:13 37:9,10
  37:14,15,16
  38:2,8,9,18,19
  38:22 39:7,15
  43:5,8,19 44:1
  44:21 45:16
  46:8,14,21,24
  47:9 50:10
  79:6 83:25
  84:3 85:13
  101:2 111:17
  111:25 141:1
  160:3 161:10
  164:19 168:12
  168:13,22
  169:8,12,20,21

**[development - doing]**                                                    Page 17

| | | | |
|---|---|---|---|
| 170:17 177:24 | **disagree** 77:8 | **discussions** | **documentation** |
| 182:25 183:9 | 78:9,16 79:22 | 168:7 | 14:3 169:23 |
| 183:15 188:20 | 81:18,23 87:2 | **disguise** 72:24 | 181:5 |
| **development's** | 87:15 88:1 | **dishwashers** | **documents** |
| 32:14 38:1 | 91:2 101:19 | 157:23 | 10:12 12:6,22 |
| 162:4 | **disbursed** | **dispute** 8:20 | 13:15 14:22 |
| **devices** 156:16 | 81:18,21,22 | 77:16,18 | 17:14,15 49:8 |
| **diem** 95:25 | **disbursement** | 103:24 | 49:13,16 55:17 |
| **diet** 164:8 | 5:6,8 141:7 | **dissemination** | 56:2 64:17 |
| **difference** | **disbursements** | 165:6 | 65:11 66:18 |
| 28:21 148:4 | 80:15 83:18 | **distinguish** | 67:14 68:6 |
| **different** 28:16 | **disclosed** | 30:23 | 71:10 72:5 |
| 47:5 57:21 | 162:25 165:21 | **distributes** | 75:19 93:1,7 |
| 66:6 80:23 | 169:3 186:20 | 30:3 | 93:18 126:5 |
| 113:3 114:24 | **disclosure** | **district** 1:1 | 127:1 133:6,18 |
| 120:22 129:12 | 186:25 | **divorce** 9:8 | 134:9,12,16 |
| 131:10 134:24 | **discovery** 12:3 | **docket** 153:1 | 135:24 138:17 |
| 147:21 148:5 | 12:7,19 13:7 | **document** | 141:13 148:6,8 |
| 169:19 172:13 | 31:15 44:13 | 10:16 11:1 | 166:14 167:18 |
| 191:9 194:8 | 103:12 119:22 | 54:1 56:9 | 176:6 187:14 |
| **difficult** 52:7 | 119:24 133:22 | 71:23 72:11,17 | **docusign** 63:4 |
| **digits** 193:5 | 134:24 162:4 | 75:13 91:3 | 63:10,12 |
| **dipping** 86:20 | 174:18 176:8 | 102:20 111:2,5 | **docusigned** |
| **direct** 135:3 | 186:12,20 | 113:3 116:18 | 56:12 |
| **directed** 140:12 | **discrepancy** | 116:24 119:17 | **doing** 12:10 |
| **direction** 10:15 | 147:17 | 119:20 122:7 | 16:10 19:4 |
| **directly** 14:6,23 | **discuss** 9:15 | 132:23 133:20 | 20:21 21:1 |
| 16:6,13 17:7 | 10:17 76:14 | 133:25 135:18 | 29:24 40:11 |
| 47:24 115:1 | 160:10 | 137:6 143:14 | 61:9 65:25 |
| 134:25 168:8 | **discussed** 16:3 | 144:21 146:23 | 108:21 109:9 |
| **director** 177:23 | 61:7 102:25 | 157:7 187:3 | 109:21 113:13 |
| 177:23 | 183:15 185:10 | 193:9 | 113:19 114:3 |
| **directs** 27:14 | **discussion** | **document's** | 129:16 138:22 |
| | 142:11 | 167:16 | 166:4 187:23 |

[dollars - elevator]                                                Page 18

**dollars** 69:12
  127:16,17
  169:22 172:15
**dominion**
  44:10
**domino** 15:18
**door** 30:10
**doors** 173:21
  173:21
**double** 59:12
  86:20
**doubled** 148:22
**doubling**
  125:23
**doubt** 163:2
  186:12
**downtown**
  20:21,23,24
  22:5 114:17
**draft** 72:8,8,8,9
  139:23
**draw** 3:21,24
  4:3 11:6,12
  12:1 13:25
  14:10 15:10,11
  15:12,16 18:11
  19:9 25:11,16
  39:18,19 40:5
  43:19 46:14
  47:4,13 49:3
  54:25,25 55:10
  63:18 66:2
  81:10 83:22,23
  84:15 86:25

  112:23 113:4,4
  113:4,5 118:22
  119:5 121:23
  124:19 125:2
  125:11 126:5
  126:20 127:11
  131:2,6,15
  132:9,13 133:8
  133:20 136:1
  136:14,20
  137:24 138:5
  140:15 141:14
  143:3,25 144:3
  147:18 148:22
  157:10,11,13
  158:19 168:17
  178:2 182:15
**drawn** 169:16
**draws** 11:3,4
  47:25 84:6,7
  119:16 124:16
  125:10,23
  128:5 129:24
**drives** 13:3
**dropped** 26:6
**dry** 8:6 64:21
**dryers** 157:23
**drywall** 171:16
**due** 80:9 81:3
  145:14 183:1
**dugan's** 60:8
  61:10 156:4,19
  157:7,12 158:8
  158:23 170:6,8

  180:19
**duly** 6:7 196:5
**dumpster**
  123:8

**e**

**e** 2:1,1 3:1,2,2
  3:10 4:1 5:1
  6:1,1 20:2
  51:22 118:8
  123:15
**earlier** 43:16
  64:14 79:5,22
  84:6 92:4
  95:15 96:12
  102:25 108:24
  133:5 136:9
  141:20 151:3
  153:14 165:10
  182:1 185:21
**early** 6:25 14:5
  15:11 23:19
  24:4 115:23
  116:4 117:3,3
  117:4,5 120:4
**earmarked**
  162:12,13
  168:16 169:2,7
  180:11 185:17
**ears** 160:21,24
  161:15 167:15
**ease** 17:13
**easier** 32:15
  166:1

**east** 2:9
**economy** 24:20
**edit** 73:14
**edited** 72:5
  73:1,3
**educational** 7:2
**effect** 15:18
**effort** 85:7
  193:2
**eight** 152:18
**eighteen** 99:3
**eighth** 4:21
  89:24,25 90:10
  91:2 94:11
  95:18,23
**either** 15:19
  32:5 42:5
  54:16 115:16
  125:24 149:16
  165:5 193:18
**elapsed** 71:3
**electric** 15:6
**electrical**
  156:16
**electricians**
  118:6,9
**electronic**
  182:23
**element** 154:1
  155:15
**elementary** 7:4
**elevation** 139:7
**elevator** 139:7
  185:2

**[eligible - exhibit]**                                                                 Page 19

| | | | |
|---|---|---|---|
| **eligible** 178:3 | 132:7 140:19 | 168:15 | 45:11 192:5 |
| 183:4 | 140:23 | **especially** | 193:23 194:3 |
| **email** 13:6 | **engineering** 7:8 | 161:23 | 194:15 |
| 16:17 40:1,2 | 115:6 | **essence** 109:11 | **examinations** |
| 54:17 66:22 | **engineers** | **essentially** | 176:13 |
| 75:1 104:7 | 114:5,7 | 90:22 | **example** 47:4 |
| 136:2,5 194:12 | **entered** 120:1 | **estate** 7:13 | 71:19 189:16 |
| 197:17 | 199:9 | 31:13,17,18 | 194:18 |
| **emails** 10:18 | **entering** | 34:25 39:16 | **exceed** 108:17 |
| 16:1 52:7 | 173:24 174:5 | 116:11 | 148:20 |
| 62:13 103:11 | **entire** 198:5 | **estimate** | **excel** 11:9 |
| 109:7 121:5 | 199:5 | 112:19 | 54:22 55:3 |
| 176:9 186:8 | **entirety** 88:5 | **estimates** 112:4 | 61:6 64:14 |
| **emanated** | **entities** 12:2,11 | **et** 197:6 198:3 | 112:24 |
| 10:16 | 39:3 44:10 | 199:3 | **excellent** |
| **employed** | 155:5 | **ethnic** 108:9 | 167:19 |
| 126:17 182:8 | **entitled** 44:7,7 | **event** 172:11,12 | **except** 165:2,3 |
| **employee** | 47:1 154:3 | 172:12 | 178:18 |
| 196:11,12 | 159:17 | **eventually** | **excess** 104:17 |
| **enclosed** | **entity** 20:20 | 66:12 | **excise** 182:16 |
| 197:11 | 30:4,8 183:11 | **everybody** | 182:18,25 |
| **encompasses** | **environmental** | 35:21 | 183:4 |
| 155:14 | 175:11 176:15 | **evidence** 5:11 | **exclude** 165:4 |
| **endeavoring** | **equipment** | 5:14 129:3 | **excuse** 35:17,20 |
| 161:24 | 123:9 | 141:4 151:17 | 37:3 39:2 |
| **ended** 24:1 | **ergo** 72:6 | **evidenced** | **executed** |
| 26:9 123:14 | **errata** 195:17 | 80:14 | 132:17 199:10 |
| 138:22 174:1 | 197:13,18 | **evidentiary** | **execution** |
| **ends** 58:16,22 | 199:7,10,18 | 177:20 | 128:14 198:14 |
| 59:2,6 62:17 | 200:1 | **exact** 106:11 | 199:19 |
| 63:23 64:25 | **error** 169:5 | **exactly** 167:11 | **exhibit** 3:11,12 |
| 67:9 | **escrow** 159:2,5 | 189:11 | 3:13,15,16,18 |
| **engineer** | 159:8 162:9,10 | **examination** | 3:19,21,23 4:2 |
| 113:24 121:7 | 164:20 168:14 | 3:5,5,6,6,7 6:9 | 4:3,5,7,9,11,13 |

**[exhibit - fart]** Page 20

4:15,17,18,20
4:21,22,24 5:2
5:3,4,6,8,10,12
5:15 48:8
49:25 51:11
55:18 58:24
61:22 62:20
68:12 77:20,21
78:1 82:8,16
82:21 83:9
89:16 90:7,9
90:13,14 91:7
91:14,19 94:14
94:19,24,25
96:16 97:1,4
99:1 102:11,16
107:19 108:5
108:13 110:23
111:2 116:14
116:17 121:11
122:16,22
123:4 124:1
130:22 131:1
132:16,18,20
132:25 137:16
140:18 146:5,6
146:11,12,23
152:13,14,16
152:19
**exhibits** 6:4
107:24 131:25
132:1
**existence**
153:19

**exists** 153:22
**exit** 161:24
184:1
**exited** 164:13
**expand** 43:14
**expedition**
154:7,17
155:18
**expense** 41:10
**expensed** 30:15
**expenses** 40:18
40:24,25 43:2
79:20
**experience** 69:3
115:19 142:12
171:5
**experienced**
171:2
**experiments**
176:14
**expertise**
191:19
**expiration**
198:19 199:25
200:25
**expires** 196:24
**explain** 72:16
102:22 138:18
178:8 183:25
**explained** 7:22
147:23
**explaining** 76:9
147:24

**explanation**
124:5 147:16
147:25
**explanations**
184:3
**extant** 186:12
**extension**
171:20 175:25
**extent** 10:17
44:16 76:12
85:3,5,7 86:3
108:9 178:18
184:3 187:15
**extra** 139:6
140:2 152:2
**extremely**
155:23
**eyes** 3:8 74:1
160:24 161:14
167:14

**f**

**face** 166:23
**faced** 109:3,4
**facetime** 15:20
**fact** 28:17
51:15 88:11
106:24 143:18
149:22 172:17
**facts** 129:2
141:4 151:17
**failure** 169:5
**fair** 45:23
104:24 139:24

174:6
**faith** 154:1,4,5
154:13,18,19
155:15,17
**fall** 168:20
**falls** 9:5 24:23
**false** 70:19 71:4
71:7,12 135:14
**familiar** 7:20
18:4,8 54:3
59:17 77:1,5,7
102:19 111:2
116:18 152:21
**family** 8:23
28:19,24 29:11
48:11 66:5,11
98:16,22 178:5
178:7
**far** 7:11 11:20
17:9 36:14
76:4 87:12
90:14 139:24
171:15 184:7
191:5
**fargo** 1:23 2:5
2:9,14 6:17 7:9
20:6,23,24
22:5,19 24:21
24:23 29:20
31:10 41:7
196:5
**farm** 182:13
**fart** 81:14

[fccu - flats]                                                    Page 21

| | | | |
|---|---|---|---|
| **fccu**  168:22 | **files**  67:4 133:9 | **find**  12:19 | 24:16 25:9 |
| **february**  98:14 | 134:1 135:24 | 18:13 62:19 | 29:24 41:14 |
| 99:9 112:19 | **filing**  5:15 | 92:22 130:14 | 52:10 53:18 |
| 116:20 148:10 | 96:18,18 | 133:6 136:25 | 54:1 56:8 57:5 |
| **federal**  5:11,13 | 154:18,25 | 154:19 173:9 | 58:3 76:25 |
| **feds**  194:10 | 190:2,4 | 197:11 | 79:24 80:5 |
| **fee**  46:21 114:1 | **filings**  76:8 | **finding**  174:1 | 81:7,18,21,24 |
| 115:13 | **filled**  48:14 | **fine**  45:7,9 | 82:1,25 83:1 |
| **feel**  12:10 110:1 | 119:10 184:22 | 64:20 138:1 | 86:15 87:4,6,7 |
| **fees**  39:7,7,7 | **final**  72:9 105:4 | 164:3 | 88:4 95:10,16 |
| 42:6 46:13,25 | **finalized** | **finish**  7:9,10 | 96:9,17 98:1 |
| 47:3 169:15,16 | 122:20 | 21:5 23:15 | 101:19 104:16 |
| **feet**  26:4 | **finally**  145:10 | 51:2 110:12,18 | 105:13 128:19 |
| **felt**  103:23 | **finance**  25:4 | 118:14 135:9 | 133:13,19 |
| **fencing**  48:20 | 26:3,10 | 159:3 162:23 | 144:18,23 |
| **fiasco**  21:3 | **financed**  25:19 | 168:24 184:19 | 151:4,5 160:18 |
| **fication**  6:5 | 26:1,11 41:24 | 184:22 186:16 | 163:4 166:17 |
| **fiduciary**  150:5 | 42:7 | 187:5,7,9,10,11 | 185:13 188:24 |
| **fifteen**  86:12 | **financial**  69:5,5 | 187:24 | 196:5 |
| **fifth**  159:12 | 69:10,13,17,19 | **finished**  21:14 | **fishing**  154:7 |
| **fighting**  110:17 | 70:11,19,21 | 22:8 110:13,17 | 154:17 155:17 |
| 169:1 | 71:13,23 72:7 | 184:8 | **five**  20:18 49:9 |
| **figure**  72:24 | 72:12,22 74:3 | **finishes**  21:21 | 49:15,17,19 |
| **figured**  173:20 | 75:4,14 141:6 | **finishing** | 106:10 142:20 |
| **file**  162:17 | 161:21 162:1 | 168:19 184:10 | 164:10 |
| 183:6 194:9,11 | 167:14 | 184:18 | **fives**  60:14 |
| **filed**  27:10 | **financially** | **fire**  175:25 | **fix**  30:10 |
| 77:12 94:20 | 196:13 | 176:2,4 191:13 | **fixed**  108:15 |
| 97:5 146:14 | **financials** | **firm**  1:22 2:3 | **flat**  115:13 |
| 148:9 151:2,4 | 69:24 | 2:12 165:4 | **flats**  22:13,23 |
| 151:5,6 152:20 | **financing**  28:9 | **first**  2:4 6:7,16 | 23:5 24:11 |
| 154:8 162:20 | 105:25 129:12 | 12:15 17:15,18 | 25:3,19,24 |
| 183:10,12,22 | 161:25 162:12 | 21:2,6,8,10 | 26:2 |
| 189:15 | 184:1,6 | 22:18 23:11 | |

[flew - funding]                                                          Page 22

| | | | |
|---|---|---|---|
| **flew** 93:11 | 75:15 76:3 | **found** 104:5 | 128:17,20 |
| **flip** 135:18 | 78:10,24 79:3 | 133:22 143:18 | 129:22 132:22 |
| 192:16 193:14 | 84:25 85:1,3,5 | **four** 99:16 | 133:2 134:2 |
| **float** 48:2 | 85:7 87:8 | 113:5 192:25 | 136:21 138:20 |
| **floating** 112:15 | 88:15 92:5 | 193:5 | 142:24 143:16 |
| 114:1 120:22 | 97:12 105:1 | **fourth** 97:16 | 144:12 145:21 |
| **floor** 157:4,5,5 | 106:8,20 | 157:4 | 146:8 147:23 |
| **flooring** 21:21 | 109:14,18 | **frame** 23:1 | 148:11 160:14 |
| **flop** 193:14 | 110:3,6,9 | 38:12 74:6 | 161:7 163:19 |
| **flopped** 192:16 | 111:18 116:1,7 | 116:24 117:24 | 163:22,24 |
| **flow** 12:13 46:1 | 117:9 120:17 | 118:16 127:19 | 168:6,7 192:6 |
| **flowed** 12:25 | 120:21 126:22 | 127:24 | 193:21 194:16 |
| **flowing** 110:14 | 128:21 129:22 | **free** 187:16,18 | 194:22 195:11 |
| 184:9,22 | 134:2 135:2 | 198:14 199:20 | 195:12 |
| **fluctuates** | 138:20 139:14 | **fridges** 156:17 | **front** 17:10 |
| 185:23 | 139:16,20 | **friend** 181:16 | 34:5 49:18 |
| **fold** 108:6 | 141:4,9 144:12 | 181:23 | 82:23 90:11 |
| **folded** 108:8 | 148:11 150:7 | **friends** 82:15 | 111:1 173:20 |
| **follows** 6:3,8 | 151:13 152:22 | **frisk** 2:8,10 3:5 | **full** 7:14 81:8 |
| 164:24 | 163:21 170:22 | 3:7 26:24 27:4 | 86:21,22 |
| **forcible** 174:4 | 172:25 180:16 | 33:5,7,22,25 | 129:16 157:3 |
| **foregoing** | **format** 177:3 | 34:4,7,20 | **fund** 51:14 |
| 198:13 199:18 | **formed** 35:12 | 35:14,16 36:23 | 81:10 184:10 |
| **forgot** 172:4 | 37:9 | 37:17,21,23 | **funded** 15:12 |
| **form** 20:14 | **former** 166:22 | 46:11 48:5 | 15:15 19:11 |
| 28:14 29:3,13 | 177:23 | 49:5,9,14,21 | 47:13,21 48:3 |
| 33:5 38:24 | **forming** 20:19 | 51:2,7 53:24 | 63:18 68:11,24 |
| 39:22 40:9,19 | **forseth** 16:4,15 | 59:21 61:19 | 84:14 121:24 |
| 46:11 48:5 | 16:16 152:2 | 70:20 71:8,11 | 124:22 158:19 |
| 49:5 52:20 | **forward** 15:22 | 71:14,17,19 | **funding** 50:3 |
| 53:24 69:6 | 116:6 121:3 | 75:15 78:10 | 50:10 51:18,18 |
| 70:20 71:8,14 | 159:23 190:22 | 82:16 84:23,25 | 73:25 109:5 |
| 71:25 72:13 | 197:15 | 85:25 86:3,6 | 117:17 118:1 |
| 73:22 74:19 | | 87:3,18 109:14 | |

**[funds - going]**                                                    Page 23

**funds**  35:13
  37:10,15,25
  38:7,8,18,22
  39:6,21 40:7,7
  44:22 45:3,5,6
  46:1,7 69:3
  81:18,20,22
  83:23 84:3,14
  84:14 85:13
  103:22 113:20
  122:3 140:25
  148:23 161:5
  162:25 168:5
  168:13 169:6
  170:17,19
  186:4 188:12
**further**  165:5
  194:2

**g**

**g**  6:1
**gambling**
  158:12
**game**  109:10
**garage**  152:2
**garner**  166:6
**gather**  55:17
  56:2 65:10
  68:7,20 70:10
**gathered**  54:9
**gatorade**  164:8
**gc**  39:7
**general**  13:17
  21:16 31:25

  39:6 42:6
  46:22 111:16
  111:25 123:5
  123:11 126:15
  148:18 169:15
**generalization**
  108:10 142:10
**generations**  1:4
  4:20,21,23
  24:7 52:15
  65:19 81:10
  84:7 85:15
  86:18,22 88:7
  89:13,19 90:11
  91:2,17,21
  94:5,11 95:10
  95:18 96:22
  112:13 124:11
  124:16,20
  149:5,6,9,18,25
  151:12,23,25
  152:1,4 153:6
  179:17,20,24
  180:3 197:6
  198:3 199:3
**generic**  154:16
**georgian**  31:16
  31:17
**getting**  9:8 12:3
  31:4 75:25
  92:16 105:24
  109:4 116:11
  173:19 184:7

**give**  20:18 26:7
  29:4 33:9 39:9
  39:11,11 43:8
  90:2 107:17
  129:7 164:15
  165:25 167:8
  189:6
**given**  39:17
  61:1 125:20
  128:8 167:1
  173:2 189:12
**gives**  36:6
**giving**  69:14,23
  77:23 163:16
  167:3,6
**global**  104:9
**go**  6:22 35:21
  38:4 46:11
  49:7 51:10
  52:13 54:25
  58:6 84:25
  86:3 91:20
  99:6 101:17
  108:13 110:16
  122:22 128:18
  128:19 129:13
  133:14,14,16
  133:25 134:5
  134:11 135:23
  136:19 138:1
  143:3 149:3
  154:17 155:17
  158:10 164:16
  165:21 168:17

  175:24 185:19
  190:24
**goes**  30:2 57:4
  68:15 69:8
  123:11 164:24
  165:18 168:22
**going**  15:22
  16:2 24:21
  27:14,20,21
  28:1 29:3 30:9
  30:12,15 35:21
  36:10,14,24
  42:3 44:2,3
  49:12 50:13
  69:7 72:7
  74:21 76:10
  77:23 80:7
  88:20,22 89:1
  93:9 96:25
  100:1 101:13
  105:15 108:19
  108:21 118:22
  119:4 123:4
  128:20 129:15
  130:25 135:20
  137:16 142:2
  150:19 154:4
  156:17 159:11
  159:14,22
  160:13,19
  162:22 164:15
  164:16,23
  166:5,6 173:6
  178:25 184:10

[going - hidden]                                    Page 24

184:15 185:1
186:9,21
188:12 190:7,8
191:15,16
192:20 194:25
**goings** 174:8
**good** 6:11,12
13:25 166:21
168:18 169:15
**gotten** 112:4,4
112:9
**grab** 173:21
**grabbed** 14:5
**graduated** 7:7
**graffiti** 173:24
174:16
**great** 12:1
110:21
**greenery** 179:7
**greenhouse**
179:7
**grew** 6:19
**grinnell** 182:12
**grossman** 14:7
74:12
**grounds** 153:20
153:22 154:3
154:17,19
**group** 114:12
**grow** 181:17
**grown** 181:20
**guaranteed**
28:8

**guess** 35:5,8,9
36:25 71:5
145:13 149:8
149:15 152:12
163:4 169:23
192:23 194:23
**guideline**
109:21
**guise** 155:13
**gunkelman**
176:24
**guy** 13:3 14:7
67:2 183:18
**guys** 15:5 35:4
95:17 173:10

**h**

**h** 3:10 4:1 5:1
20:2
**h2** 8:19
**half** 114:2
164:8,8
**hallway** 160:11
164:7
**hallways**
173:19
**halstad** 92:23
93:4
**hand** 91:13
108:7 196:17
**handed** 31:6
79:7,11 132:15
146:11

**handing** 96:24
102:15 116:17
152:13
**handle** 195:17
**handled** 17:7
65:16 79:19
178:3
**handwriting**
54:19 61:4
65:5 138:9
**handwritten**
145:10
**hang** 30:7
57:23 71:17
86:6
**hanging** 58:1
**happen** 108:25
124:18
**happened** 45:2
74:23 147:3
149:19 151:25
158:25
**happening**
149:23
**happy** 186:14
**hard** 13:3
24:24 91:18
169:1 173:22
**harless** 2:18
164:13 167:25
**harvester**
173:18
**hassles** 116:10

**hate** 195:3
**hats** 169:19
**hawaii** 189:13
**hayes** 177:11
**he'll** 118:14
194:24
**hear** 154:23
**heard** 133:14
133:19
**hearing** 44:17
80:16 107:23
177:20 190:9
**hearsay** 85:8
116:3
**heat** 118:20
**heaters** 152:2
**heavy** 172:12
**hedge** 32:6
**held** 37:25
108:14 109:12
160:12 161:11
162:9 168:5
170:19 185:12
188:12,13
**help** 15:21
146:5
**helped** 21:14
21:20,22 62:8
65:18 70:15,17
**helps** 18:19
**hidden** 72:25
124:23,24
163:7,8,17,18

**[high - indicated]** Page 25

**high** 6:20 7:5,6
**highlight**
    122:12,17
**hired** 21:4
    40:13
**historic** 45:24
**historical** 45:11
**history** 75:17
    98:25 160:9,22
**hit** 107:8
**hold** 16:12
    20:13 27:5,5
    29:1 44:3
    57:14 59:21,25
    72:1 88:14
    91:4 99:11
    106:17 119:2
    163:15 174:25
    189:23,23
**holder** 159:25
    160:16 161:4,8
**holding** 159:7
    164:20 168:13
**holdings** 101:4
**home** 97:18
    98:18,21
    127:10,17,21
    128:4,9,13,15
    129:10,12,20
    188:14,15,16
**homes** 15:7
    66:5,11
**honestly**
    107:14 189:12

**hoops** 52:8
**hope** 44:17
**hopefully** 8:8
**hoping** 17:14
**horner** 20:2
**hour** 49:12
    118:5
**hours** 26:4
**household**
    40:24,25
**huh** 90:5
    131:17 138:4
    143:12 147:5,8
    187:6
**huhs** 7:21
**husband** 17:2
**hvac** 185:1

**i**

**i.e.** 27:20
**idea** 74:7 84:15
    84:21 116:23
    119:3 120:23
    133:3 162:24
    182:9 189:21
**identi** 6:4
**identical** 96:15
**identification**
    77:21 78:1
    82:8 89:16
    90:7 91:14
    97:1 102:11
    107:19 110:23
    116:14 130:22

    146:6 152:14
    177:19
**identified**
    100:20 151:12
    152:6 153:6,8
    182:16
**identifies** 60:8
    96:9
**identify** 74:17
    160:8
**ignores** 141:5,6
    141:7
**imholte** 70:14
**immaterial**
    45:7
**immediately**
    46:9 192:23
**impaired** 8:3
**impartiality**
    196:15
**implications**
    161:21
**imports** 41:21
**improper** 36:13
    128:15
**improvement**
    39:5
**improvements**
    43:12,23 46:17
    189:2
**incentive** 53:9
**incident** 75:12
**incidental**
    178:19

**include** 68:20
    185:5 187:16
    187:20
**included** 56:3
    67:15 68:7,21
    134:6 146:14
    151:7 186:25
    197:13
**includes** 135:3
    137:8 154:13
**including** 64:17
    140:20 162:6
    178:6
**inclusive**
    187:21
**incoming** 13:4
**incorporated**
    199:12
**incorrect** 73:21
    135:1 148:10
**increase** 172:22
**increased**
    172:18
**increases** 124:8
**independent**
    126:14,16
**indicate** 9:14
    27:15 176:12
**indicated** 50:1
    79:21 86:13
    88:1 96:12
    108:24 120:3
    132:18 133:5
    165:9 174:19

**[indicated - invoice]**                                              Page 26

176:14 177:18
177:21 178:5
**indicates**  83:24
116:20 131:18
157:8,22
**indicating**
144:15 197:13
**individual**  36:1
36:2 150:9,12
181:25
**individuals**
5:15 13:9,10
148:5 178:9
**informally**
186:14
**information**
12:3 14:20,24
39:25 40:4
47:18 70:10,19
71:4,7 73:14
73:21 74:23
75:11 85:4,6
119:10 120:1
126:25 127:9
161:19 162:6
165:16 166:6
167:1 190:15
**informed**
171:18
**infrastructure**
48:24,24 114:9
114:12,19,24
130:15

**inherently**
103:3
**inherited**  28:20
31:12
**initial**  76:19
98:15 103:25
111:6 145:9
182:5
**initially**  13:10
21:4,13 25:8
25:20 41:22
50:9 51:20
53:4 69:21,23
98:22 113:12
142:2 185:14
185:18
**inquiry**  44:12
**ins**  174:13
**inside**  171:15
173:16
**inspected**
177:15
**inspection**
176:19
**inspections**
175:18,20
**inspector**
175:23
**instance**  16:4
39:12
**institute**  161:11
168:4
**institution**
159:24 160:8

164:19 167:14
**institutions**
161:22 162:1
170:20,24
**instruct**  27:14
35:8 76:10
154:4 159:14
159:18 160:19
**instructed**
191:22
**instructing**
10:18 44:19
161:6
**instruction**
160:7 164:16
**instructions**
10:18 167:9
**insurance**
30:23 48:18
171:24 172:1
172:19 173:3
181:7,12 182:2
182:8,10,11
189:15,16,21
190:16
**insured**  172:9
190:17 191:13
191:17,24
**intact**  110:17
**intend**  170:15
**intended**  51:13
114:20
**intending**
115:21 142:14

**intent**  92:8
110:13 168:25
184:16,17,19
186:7
**intention**
168:16,19
**interaction**
66:3
**interest**  53:11
53:14 87:10,12
92:3,9 95:21
95:25 107:8
196:14
**interested**
196:13
**interference**
160:22 165:19
**international**
173:18
**interpreting**
121:19
**interrogatory**
176:13 177:18
**interrupt**
112:10
**inventory**
180:23 181:1
**investor**  181:12
181:18
**invoice**  3:12,13
3:15,16,18,19
3:22,24 4:6,8
4:10,12,14
15:13 17:21

[invoice - kloos's]                                                          Page 27

30:11 49:25
55:23 56:18,19
56:20 57:4
59:23 60:2
61:9,15 62:24
64:5,17 67:12
68:2,4,21
129:10 131:15
132:10 135:4,7
135:19 136:10
136:14,16,23
137:22 138:2
138:13 139:2,4
139:5,10,15
140:14 142:18
143:24 157:12
157:13,19,25
158:7
**invoices**   4:4
14:9,13 15:9
19:8 54:9 56:3
62:9,11 68:21
115:8 124:16
124:20 125:2
125:11 126:9
127:10 128:3
129:20,23
130:1,11 134:1
134:13,14
136:3,4 142:25
158:17
**involved**   14:8
29:11 178:7

**involves**   155:18
**ire**   36:14
**iron**   48:16
**irrelevant**
88:17
**irretrievably**
80:22
**irritated**   52:6
**issue**   8:7,18 9:5
18:12 92:19
104:6,11 186:5
**issued**   38:18
106:1 177:8
**issues**   17:6
103:5 114:19
156:14,16
160:23
**it'll**   8:8 159:2
**items**   28:9 41:3
123:10

**j**

**january**   77:12
91:5,9
**jason**   175:11
176:15 177:4
**jason's**   177:9
177:12
**jeff**   9:1
**jerk**   192:24
**jesse**   1:17 2:7
3:4 6:2,6,14
13:13,13,18
15:9,19 16:8,9

17:5 34:5
37:18 51:2
65:15,18,24
71:17 72:2
145:7,11 164:5
192:8 195:20
196:4 197:8
198:4,9 199:4
199:13 200:20
**jnc**   176:24
**job**   17:4,7
21:16 48:3
**joe**   172:4
**john**   176:24
**johnson**   9:1
**joint**   107:2
**jointly**   1:5,9
**jordan**   19:21
31:11 32:16,24
33:20 34:11
36:19 189:12
**judge**   161:16
**judging**   166:15
**july**   196:24
**jump**   52:9
**june**   138:16
**junior**   7:5

**k**

**k**   15:6
**kampeska**   66:4
66:9,10
**keep**   17:13
24:20 25:1

30:4 39:9 84:9
84:12 100:1
110:17 167:11
169:1 171:14
190:7
**keeping**   173:16
**kept**   13:16
140:25 179:20
**kids**   173:17
174:1
**kihl**   13:13,18
15:9,19 17:5
65:15,18,25
145:7
**kind**   8:8 9:25
17:6 20:12
30:1,3 40:15
52:5,8,11
65:16 70:16,21
72:24 81:12
105:12 106:25
108:19,23
109:1,9 112:15
113:2 114:4,24
116:10 121:24
131:9 163:11
185:21 192:19
**kindly**   136:8
**klj**   115:4 130:6
130:11,14
**kloos**   15:6
118:10
**kloos's**   16:9,9
16:14

**[knee - limoges]** Page 28

| | | | |
|---|---|---|---|
| **knee** 192:24 | 189:11 191:4 | **larger** 124:6 | 200:1 |
| **knew** 13:22 | 191:17 194:23 | **late** 6:25 24:5 | **lending** 29:12 |
| **know** 14:17 | **knowing** 73:20 | 117:2,3,4,5 | 109:5 |
| 15:4,10,22 | 147:19 | 120:3 176:12 | **letter** 28:9 |
| 16:4 27:9,21 | **knowledge** | **law** 1:22 2:4,8 | 142:24 143:15 |
| 27:22 28:7 | 12:1 38:20 | 2:12,13 | 147:23 172:9 |
| 31:16 35:3,10 | 70:18 71:22 | **lawsuit** 28:18 | 182:1,2 184:19 |
| 37:1 44:7,8 | 87:22 125:1 | 28:19 29:6 | 197:19 |
| 45:8 47:5,17 | 126:1,2 129:17 | **lawyer** 159:17 | **letters** 184:16 |
| 52:5,22 60:15 | 139:11,12 | 159:18 | 184:17 186:6 |
| 61:7 62:10,20 | **known** 133:21 | **lawyers** 159:13 | **level** 176:2,2 |
| 69:25 73:6,7 | 170:3 | **lay** 80:13 184:4 | **liability** 80:11 |
| 73:16 76:2 | **knows** 122:16 | 184:5 | **liberty** 172:5 |
| 78:19 85:10 | 134:4 | **layperson** | 172:10 182:8 |
| 87:10 103:13 | **kottsick** 181:16 | 110:11 | 182:12 191:10 |
| 104:22 109:3,4 | 191:8 | **lays** 11:1 | 191:18 |
| 111:21 118:24 | **kyle** 8:25 | **leads** 166:24 | **lien** 14:1 19:1,2 |
| 122:23,24 | **l** | **lease** 8:20 | 19:11 106:14 |
| 123:9 124:7 | | **leave** 161:1 | 146:13 148:9,9 |
| 133:11,13 | **l** 1:25 15:6 | 164:3 | 154:6 159:4 |
| 144:13,22 | 123:15 | **leaving** 92:23 | 162:17,19 |
| 145:25 147:2 | **labor** 183:3 | **ledger** 118:2 | 184:21 |
| 147:20 148:6 | **lack** 153:19 | **ledgers** 143:19 | **liened** 163:13 |
| 148:24 149:1 | **lake** 97:18 | 148:2 | **liens** 106:3,6 |
| 151:11 153:5,7 | 98:18,21 | **lee** 14:7 74:11 | 187:4,8 |
| 155:25 158:5 | 127:10,17,21 | **left** 7:12 66:21 | **life** 116:9 |
| 158:11 160:18 | 128:4,8,13,14 | 92:21 156:18 | **lift** 153:16 |
| 164:1 166:2,3 | 129:10,12,20 | 170:4,13 187:4 | **lifting** 177:6 |
| 167:5 169:20 | 130:3,4 | **legal** 33:7 | **light** 123:20 |
| 169:21 173:8 | **lakeside** 184:15 | 88:16 109:24 | **likely** 47:12 |
| 176:8 178:10 | 186:7 | 110:7,10 | 48:18 132:3,4 |
| 178:14,22 | **land** 185:22 | 128:22 129:1 | **limit** 40:20 |
| 182:11,22,22 | **large** 188:13,22 | 150:8 175:3 | **limoges** 123:22 |
| 183:2 185:22 | | 184:3 197:1 | 124:2,10 |

**[limoges - looks]**                                                    Page 29

| | | | |
|---|---|---|---|
| 141:21 142:1 | **live** 6:15,16 | **longer** 13:2 | 138:2,11 145:9 |
| 184:13,16 | **lived** 102:23 | 155:2 | 145:14 146:4 |
| 186:7,8 187:17 | 104:19 | **look** 10:12 | 146:21 152:21 |
| **line** 55:3 | **living** 79:10 | 17:10,18 18:4 | 157:11 166:22 |
| 131:19 135:15 | 174:11 | 18:8,14,20 | 182:15 190:23 |
| 138:8 140:19 | **llc** 1:4,8,11 4:15 | 47:4 48:23 | 191:11 194:14 |
| 143:9 145:3 | 4:24 17:22 | 50:6,7,12,23 | **looked** 10:17 |
| 197:13 199:7 | 20:15 101:8 | 53:25 54:2 | 11:6,8,16,25 |
| 200:3 | 197:6 198:3 | 55:10,14,22 | 12:4 18:9 24:2 |
| **lined** 118:24 | 199:3 | 56:8,18,21 | 49:25 50:1 |
| **list** 107:24 | **llc's** 89:9 | 58:19 59:16,17 | 92:21 96:13,13 |
| **listed** 11:4 47:5 | **llcs** 85:10 | 60:14,21,22,25 | 105:4 112:23 |
| 143:5 178:11 | **loan** 3:21 11:14 | 61:4,12 62:14 | 119:5 136:1 |
| 199:7,17 | 28:22 29:7 | 63:11,20,25 | 186:3 189:14 |
| **listen** 51:8 | 74:18 90:20,23 | 64:7,22 65:2 | 189:20,24 |
| **listing** 136:17 | 98:5 99:8 | 67:6,11,20 | 190:1 |
| 138:3 151:6 | 100:7 104:12 | 68:17 76:18 | **looking** 20:22 |
| 199:7 | 113:14 | 77:9,19 83:11 | 21:1 58:12 |
| **lists** 40:5 187:3 | **loans** 90:24 | 83:17,19 86:8 | 59:19 62:13 |
| **literally** 15:20 | 128:8 129:8 | 88:5 90:13 | 77:14 78:18 |
| 26:6 86:21 | **local** 13:19 | 94:4,16,23 | 81:14 90:1 |
| 109:7 159:15 | **locate** 161:24 | 97:6 99:1 | 93:24 94:19 |
| 167:7 191:10 | **located** 164:7 | 102:4,16 | 101:13 121:6 |
| **litigation** 44:14 | **location** 13:18 | 107:16 110:21 | 121:10 122:1 |
| 44:15 72:21 | 57:22 | 111:2 118:2 | 122:16 131:5 |
| 73:25 74:9,11 | **lodge** 36:6,8 | 121:15 124:1 | 131:14 137:3 |
| 75:10 106:19 | **lofts** 23:13,14 | 124:19 126:8 | 138:1,2,13 |
| 155:4,7,12,22 | 23:20 25:25 | 130:13,24,25 | 140:18 143:4 |
| 192:9,20 | 26:2,3,11,15 | 131:1,10 132:9 | 181:17 |
| **little** 7:16 15:3 | 112:12 | 132:19,20 | **looks** 18:21 |
| 16:6 20:17 | **logical** 44:16 | 133:17,25 | 19:17 49:6 |
| 162:14 169:19 | **long** 23:14 | 134:5,12 | 50:7 55:7,8 |
| 175:1 | 75:17 78:12 | 135:24 137:8 | 56:9,13 63:4 |
| | | 137:16,24 | 64:9 83:16 |

**[looks - matter]**                                                                              Page 30

84:19 87:23
91:12 101:24
101:25 123:22
123:25 131:20
132:2,23,23
137:14 144:19
144:20 147:15
158:3
**loosely**  113:2
**lot**  13:19,22
14:17 15:5
16:8 29:10
32:15 47:12,24
52:4 66:2,3
87:22 93:15
114:16,19
124:7 138:22
141:17 158:15
175:18 182:16
189:13
**love**  108:16,18
**loves**  174:10
**lowe's**  162:16
**lower**  108:18
**ltv**  108:16
**luckily**  16:5
**lull**  30:25

**m**

**m**  114:10
**mac**  2:6 35:19
128:23 135:21
162:21 193:17

**machinery**
123:8
**madam**  197:10
**made**  26:20,25
30:13 32:13
41:7 43:18,23
47:1 52:1,16
60:16 78:9,16
108:9 121:22
129:8 139:9,14
140:24 144:23
148:17 156:18
162:1 169:14
192:9,21 198:7
**mail**  54:16
**mailed**  136:4
**main**  1:5
**major**  48:20
171:18 173:25
**majority**  12:24
183:4 184:25
**make**  19:1 58:6
60:18 74:21
119:4 122:13
134:5 144:11
145:12 166:1
167:1
**makes**  150:11
190:25
**making**  15:25
79:12,17
**man**  85:19
**managed**  46:1

**management**
30:3 31:7,8,20
40:13 78:14,20
79:1,7,11,17
114:4 180:4
190:19,21,24
191:2
**manager**  13:17
54:13,17 65:12
65:14 67:16
68:5,22 117:20
125:21 127:3
141:16 145:7
158:13 181:4
185:2
**managers**
12:25 13:5
62:8 65:23
125:12 126:12
**manages**  20:5
29:20 31:14
**managing**
34:25
**mandan**  6:20
6:22,23,24 7:4
7:5
**marie**  21:9,23
24:11 25:3,7,8
71:1 112:14
**marital**  10:4,5
85:4
**mark**  50:13
67:5 77:19,23
82:7 96:25

**marked**  3:11
4:2 5:2 6:4
50:16,16 77:21
78:1 82:8,21
89:16 90:7
91:14 97:1
102:11,15
107:19 110:23
116:14,17
130:22 146:5,6
152:14
**market**  66:11
**markings**  64:10
**married**  19:25
183:20 189:12
**marshal**  176:1
176:4
**marshal's**
176:3
**martin**  5:3,4
10:22 52:5
69:24 85:10
113:16,19
**mary**  114:11
**match**  61:13
135:17 136:14
137:17 142:25
**matched**  119:9
**math**  144:10
145:15 166:21
**matson**  171:10
177:15
**matter**  27:16
44:17

**[maurice - motion]**                                            Page 31

| | | | |
|---|---|---|---|
| **maurice** 2:5 | **mention** 192:9 | **minor** 178:24 | 42:17 43:8,17 |
| **mayor** 174:9 | **mentioned** | **minus** 144:22 | 43:21 45:16,19 |
| **mbn** 114:10 | 25:22 43:15 | 144:25 145:1,2 | 46:16,23 49:3 |
| **mean** 11:1 | 79:5 84:5 | 145:19,19 | 50:4 52:19 |
| 20:23 49:16 | 105:22 141:21 | **minute** 49:9,15 | 53:7,8 69:14 |
| 51:17 54:21 | 142:18 162:21 | 49:19 58:6 | 126:19 138:24 |
| 89:11 95:14,23 | **message** 92:22 | 164:10 | 139:24 149:6 |
| 103:16 106:24 | 93:22 | **minutes** 49:17 | 159:1,8 168:21 |
| 108:10,23 | **mick** 65:16,17 | 135:14 168:9 | 169:11,16 |
| 109:2 114:16 | 66:21,22,24 | 188:7 | 170:6,16 |
| 122:9 125:7,17 | **microbial** | **mischaracteri...** | 178:15,18 |
| 126:18 130:1 | 177:11 | 163:25 | 189:6 |
| 133:5 151:22 | **midstream** | **mischaracteri...** | **monies** 46:3 |
| 155:1 157:13 | 65:17 | 145:6 172:25 | 141:7 160:12 |
| 160:1 165:20 | **midwest** | **missing** 119:16 | **montana** 20:11 |
| 166:22 169:14 | 197:17 200:1 | 133:20 134:3,4 | **month** 81:11 |
| 175:2,3 187:2 | **million** 15:5 | **mistake** 127:14 | 142:21 |
| 189:7 | 76:25 77:17 | **mister** 146:17 | **monthly** 92:10 |
| **meaning** 160:2 | 87:5,19 90:15 | **mitigate** 74:15 | 117:17 183:6 |
| **means** 79:14 | 95:24 98:2,8 | **mixed** 142:7 | **months** 6:25 |
| 104:24 161:8 | 104:14,17,20 | **modified** | 23:16,17 24:1 |
| **meant** 8:22 | 108:15 112:20 | 192:10 | 105:8 153:1 |
| 163:6,8 179:2 | 123:23 127:16 | **modifier** 74:20 | **morning** 6:11 |
| **mechanic's** | 127:17 187:12 | **mold** 174:19,20 | 6:12 93:12 |
| 146:13 148:9 | 187:21 | 175:6,8,13 | 162:21 183:23 |
| **mechanical** 7:8 | **millions** 69:12 | 176:16 177:7 | **mortgage** 41:1 |
| **medications** | **mind** 28:17 | **mom** 179:7 | 41:5,8 42:2,2 |
| 8:1 | 128:16 | **moment** 44:25 | 53:14,18 79:12 |
| **meet** 194:8 | **mindy** 31:8 | **monday** 190:9 | 79:24 84:16 |
| **member** 101:2 | 92:22 183:10 | 195:4 | 95:17,24 |
| **members** 98:16 | 183:12,14 | **money** 30:2 | **mortgages** |
| 98:22 | **mine** 12:12 | 31:4 39:9,12 | 81:13 |
| **memo** 5:3,4 | 181:16 | 39:14,17 41:7 | **motion** 44:6 |
| | | 41:24,25 42:8 | 153:19,23 |

**[motion - note]**                                                    Page 32

| | n | | |
|---|---|---|---|
| 154:7,18 155:1 | | 159:22 161:1 | **non**  5:15 |
| 155:20 165:7 | **n**  2:1 3:1,1,2 | 167:1 170:14 | **nonresponsive** |
| 178:18 | 6:1 20:2 | **needed**  39:4,13 | 33:25 34:4 |
| **motions**  189:14 | 114:11 118:8 | 43:17 46:16 | **nope**  35:9 |
| **move**  6:22 34:1 | 123:15 | 118:20 123:9 | **normal**  69:12 |
| 49:16 92:3 | **name**  6:13 | 123:10 156:9 | 79:16 |
| 116:5 159:23 | 19:24,25 42:9 | 187:25 | **normally**  18:24 |
| **moved**  6:24 7:7 | 66:16 88:11,12 | **needs**  34:1 | 19:6,6,13 |
| 36:21 38:1,9 | 89:8,9 123:13 | **negative**  76:13 | 40:11 144:20 |
| 179:25 | 132:4 159:24 | **negativity**  66:3 | **north**  1:1,23 |
| **moving**  180:11 | 159:25 160:12 | **negotiation** | 2:4,5,9,14 6:16 |
| **mulinda**  2:7,17 | 160:15 161:8 | 141:19 | 6:17,19,20 7:6 |
| 4:19 19:19 | 164:2 167:13 | **negotiations** | 22:6 29:21 |
| 32:24 80:5 | 172:5 176:3 | 140:4 | 31:10 166:14 |
| 81:7,9,9,19,24 | 197:6 198:3,4 | **never**  15:8,12 | 166:19 196:2,5 |
| 82:1,23 83:1 | 198:15 199:3,4 | 51:24 100:4 | 196:23 |
| 83:15,19,22 | 199:21 | 105:16 138:25 | **northern** |
| 84:17,21 85:23 | **named**  19:21 | 140:3,22 170:2 | 137:10,12,21 |
| 86:13,15,17 | 164:5 172:8 | 174:12 180:20 | **nos**  4:23 |
| 87:7,17,25 | 179:1 | **new**  39:13 | **notarize**  93:2 |
| 88:2,4,4 90:25 | **names**  119:6 | 95:17 180:1,2 | **notarized** |
| 96:9,10,10,17 | 161:21 | 180:5,7 186:12 | 197:14 |
| 164:12 167:24 | **nancy**  114:11 | **newman**  8:22 | **notary**  92:19 |
| 192:22 | **nature**  41:20 | 8:23 | 164:6 196:23 |
| **mulinda's**  85:9 | **nda**  27:3,4 28:1 | **newmans**  8:20 | 197:25 198:10 |
| 88:11 | **ndsu**  7:9 | **newspaper** | 198:18 199:15 |
| **multitude** | **near**  173:10 | 13:21 | 199:23 200:23 |
| 185:3 | **necessarily** | **nexus**  44:16 | **notations** |
| **muscle**  8:7 | 80:10 | **night**  18:9 24:2 | 122:13 |
| **mutual**  172:5 | **necessary** | 176:12 | **note**  4:17,21 |
| 172:10 182:12 | 113:21 | **nineteen**  90:6 | 76:9,16,18,24 |
| 191:10,18 | **need**  49:19 51:8 | **ninth**  95:21 | 76:25 77:7 |
| | 75:23 152:3 | **nominee**  29:12 | 78:4,6,21 79:2 |
| | | | 80:1,10 81:7 |

**[note - objection]**                                      Page 33

| | | | |
|---|---|---|---|
| 81:19,24 82:1 | **noticed**  196:9 | 64:13 99:14,17 | 117:9 120:17 |
| 82:4 83:1,1,9 | **notified**  172:7 | 99:18,20,21 | 120:21 126:22 |
| 83:12,19,22 | **np**  1:22 2:13 | 100:22 111:7 | 128:20 135:2 |
| 84:16 86:15,17 | 196:5 | 111:10,14 | 139:16,19,20 |
| 87:7,11,17,25 | **number**  11:14 | 113:6 119:6 | 140:10 141:3,9 |
| 88:2 89:25 | 11:14 58:24 | 145:4 158:17 | 150:7 151:13 |
| 90:11,15 91:2 | 59:16,19 61:13 | 172:14 173:10 | 152:22 163:20 |
| 91:22,24,25 | 62:15,17 63:21 | 191:11 192:16 | 163:21 170:22 |
| 92:3,17 94:11 | 73:2,3,10 87:2 | 192:25 193:15 | 172:24 180:16 |
| 95:18 96:9,10 | 87:3 94:9 | 199:7 | **objected**  12:11 |
| 96:10 97:16 | 96:20 106:11 | **numerical** | **objecting**  72:2 |
| 98:1,7,10,13,15 | 112:15 118:25 | 80:14 | **objection**  9:13 |
| 100:20 101:19 | 121:16 123:6 | **numerous** | 10:1,2 33:5 |
| 101:22,23,25 | 131:2,2,6,11,15 | 89:19 100:19 | 34:20 35:14 |
| 102:4 104:16 | 132:9 135:17 | **o** | 44:3 46:11 |
| 108:15 169:22 | 136:20,20 | | 48:5 49:5 |
| 170:1 178:10 | 137:5,18,25,25 | **o**  3:1 6:1 15:6,6 | 53:24 70:20 |
| 187:13 197:12 | 138:12 141:5,8 | 20:2 | 71:8,11,14 |
| **noted**  142:16 | 146:8 147:1,24 | **object**  28:14 | 75:15,22 78:10 |
| 153:4 | 152:16 157:19 | 29:2,2 38:24 | 80:8 84:23,24 |
| **notes**  4:19,23 | 158:2 176:13 | 39:22 40:9,19 | 85:1,25 88:14 |
| 10:18 29:12 | 187:6 188:1 | 44:2 52:20 | 89:5 107:21,23 |
| 33:21 80:6 | 191:5,23 | 69:6 71:25 | 109:14 119:2 |
| 81:9,9 82:23 | 192:10,15,17 | 72:2,13 73:22 | 128:17,18 |
| 84:22 85:23 | 193:6,15 197:7 | 74:19 75:23 | 129:22 134:2 |
| 88:5 89:19,23 | 197:13 | 76:3 78:24 | 138:20 140:8 |
| 90:25 91:17 | **numbered** | 79:3 85:2,5,6 | 144:12 145:5 |
| 92:4 95:11,16 | 136:9 | 85:19 87:8 | 145:21 148:11 |
| 96:17 97:9,13 | **numbering** | 88:15 89:2 | 152:10 153:13 |
| 97:15,23 | 17:24 58:12 | 92:5,6 97:12 | 153:14 160:6 |
| 127:20,24 | 91:19 | 105:1 106:8,20 | 160:13 161:13 |
| 128:14 192:22 | **numbers**  54:21 | 109:18 110:3,6 | 163:19,20 |
| **notice**  154:8 | 55:1 57:2 | 110:9 111:18 | 165:7 184:2 |
| 155:13,19 | 60:21 61:3 | 115:24 116:1,7 | 191:6 |

**[objections - opposite]**                                              Page 34

| | | | |
|---|---|---|---|
| **objections**  29:4 | **ohio**  197:2 | 77:7,13 78:8 | 144:20 145:3 |
| 36:6,9 44:5 | **ojala**  5:12 | 78:15 79:8,13 | 146:4,19 147:9 |
| 76:7 108:1 | 146:12 | 79:21,25 81:5 | 164:17,22 |
| 153:15 163:23 | **ojala's**  146:13 | 81:17,22 83:7 | 170:9 180:9 |
| 175:14 | **okay**  7:2,24 | 83:10,17 84:5 | 190:20 193:8 |
| **obviously** | 8:10 9:17 | 86:3,19,23 | 193:17 |
| 134:3 186:22 | 10:20 11:11,16 | 87:1,14,24 | **old**  6:25 70:14 |
| 193:17 | 12:6,22 13:14 | 88:8 89:6 91:1 | **older**  114:18 |
| **occasions**  8:18 | 14:2,22 17:12 | 91:13,23 92:2 | **once**  31:3 95:12 |
| **occupancy** | 17:18,20 18:4 | 92:12 93:9 | 131:10 |
| 79:15 105:12 | 18:18,20 19:3 | 94:4,18,23 | **one's**  111:7 |
| 105:25 109:13 | 19:13 20:25 | 95:6,9 96:24 | 154:8 |
| **occur**  173:7 | 21:10,18,23 | 96:24 97:20 | **ones**  24:10 |
| **occurred**  71:3 | 22:11,14 23:1 | 98:7,23 99:7 | 30:19 48:20 |
| 174:12 | 23:5,14,20 | 99:24 101:17 | 62:10 80:2,3 |
| **occurring** | 24:16 27:13,17 | 102:19 103:11 | 84:10,10 98:18 |
| 92:19 173:8 | 30:16,21 31:24 | 105:6 108:3,12 | 107:17 122:6 |
| **october**  142:23 | 35:11 37:8,23 | 108:20 112:2,8 | 122:13,17,19 |
| **offend**  108:10 | 38:11,14,17 | 112:17 113:7 | 123:16 127:7 |
| **offenders**  48:14 | 39:17 43:1,14 | 113:18 114:23 | 145:9 175:20 |
| **office**  66:20 | 47:3,8,15,22 | 115:11,15 | 180:1,2 184:19 |
| 133:9 195:18 | 48:12,23 49:7 | 116:16 117:7 | **ongoing**  80:8 |
| **official**  198:15 | 49:20 50:6,12 | 117:19 118:11 | **oops**  101:16 |
| 199:21 | 53:12,15 54:18 | 118:22 120:24 | **open**  105:14 |
| **offset**  127:18 | 55:7,10 56:18 | 121:16 122:4 | 130:25 131:1 |
| 151:20,21 | 58:5,16,19,24 | 123:12 127:4 | 131:16 173:22 |
| **oh**  8:24 25:9 | 59:4,8,16 60:5 | 129:25 132:9 | 179:1 |
| 53:10 57:18,20 | 60:8,20 61:12 | 132:15 133:2 | **operating** |
| 63:10 67:21 | 61:17 62:10,14 | 135:10,22 | 178:7 |
| 82:5,17 91:10 | 62:23 63:11,25 | 136:6,8,19 | **operation** |
| 122:21 133:11 | 64:4 65:20 | 137:15,20,24 | 105:8 |
| 136:25 142:4 | 68:12 69:2,16 | 138:11,17 | **operative**  195:8 |
| 147:1 177:4 | 70:9,18 71:6 | 139:9 142:7 | **opposite** |
| 184:14 | 74:25 75:12 | 143:3,13,22,25 | 149:22 |

[oragami - palace]                                                    Page 35

| | | p | pages  3:8 59:13 |
|---|---|---|---|
| **oragami**  108:6 | **overruns** | | 62:20 166:14 |
| **order**  160:10 | 104:10 | **p**  2:1,1 6:1 | 166:16 |
| 160:25 165:8 | **overthrow** | **p.m.**  102:10 | **paid**  41:5,11,19 |
| 195:1,2,8 | 27:25 | 127:25 128:1 | 42:6,12,16 |
| **ordered**  196:9 | **owe**  43:24 | 130:20,21 | 46:8,13,14,21 |
| **original**  82:2 | 149:6 | 167:22,23 | 47:13,20,23 |
| 95:24 98:4 | **owed**  39:24 | 168:9 188:9,10 | 48:10,15,19,19 |
| 101:23 152:24 | 77:17 148:17 | 195:20 | 48:21 75:25 |
| 153:3 196:8 | 149:17,18 | **p.o.**  2:14 | 78:20 79:20 |
| **originally**  6:18 | 151:11 170:3 | **pack**  19:8 | 81:24,25 92:10 |
| 96:2 125:9 | 187:4 | **page**  3:3 54:1,2 | 92:12 97:19 |
| **originated** | **owing**  80:9 | 54:2,9 56:9,19 | 113:6 114:6 |
| 11:13 | 87:16 88:1 | 56:23 57:6 | 117:17,22 |
| **ought**  80:19 | **own**  32:14,17 | 58:11,17 60:1 | 118:3 121:18 |
| **outfit**  16:6 | 34:8 36:3 | 60:4,6 62:24 | 121:19 123:17 |
| **outside**  165:2 | 42:24 52:19 | 64:1,5 65:2 | 124:16 127:21 |
| 171:13,14 | 66:7 102:22 | 67:11,22,25 | 128:4 138:24 |
| 173:15 | 103:22 122:12 | 68:17 77:2,9 | 138:25 139:25 |
| **overages** | 182:10 194:21 | 77:14 78:11 | 140:3,22 |
| 103:25 104:10 | **owned**  8:21 | 83:3,17,18 | 143:20 144:25 |
| **overengineered** | 31:13 48:11 | 86:12,13 90:1 | 145:2 148:3 |
| 152:4 | **owner**  13:14 | 90:3,18 94:6 | 149:5 156:10 |
| **overlap**  24:13 | 21:20 33:17 | 94:23,24 95:2 | 157:25 158:23 |
| 24:17 29:23 | 39:2,3 43:18 | 95:7 99:2 | 163:14 169:7 |
| 114:16 148:22 | 43:18,19,20 | 100:10,23 | 169:13 170:6 |
| 149:21 152:1 | 66:5 85:9 | 101:13 131:15 | 182:18,25 |
| **overlapped** | 149:8,9,20 | 135:19 137:9 | 183:1,5 187:19 |
| 10:22 24:9,15 | 150:11,13 | 138:12 143:13 | **paint**  171:16 |
| 81:13 | 190:15 | 146:23 158:2 | **painter**  117:16 |
| **overlapping** | **owners**  13:11 | 183:24 197:13 | **painting**  183:3 |
| 15:12 125:10 | 171:11 | 197:15 199:7 | **palace**  48:11 |
| **overlaps**  160:1 | **owning**  66:12 | 200:3 | 123:21 |
| **overlooked** | **owns**  182:10 | | |
| 163:5 | | | |

**[pandemic - personally]**                                           Page 36

**pandemic**
  104:9 109:4
  111:10,14
  124:8 156:15
**paper**  101:15
  108:5,8 110:22
  111:1 125:18
  136:7 143:2
  168:3 186:18
**paradigm**
  155:2
**paragraph**
  78:11 83:18
**paramount**
  118:21
**parkside**  1:8
  4:15,17 23:21
  23:22 24:4,6
  52:10,13,15
  76:9,16,18,20
  76:24 77:11
  78:4,6,21 79:2
  79:23 80:1
  81:1,10 82:4
  84:6,10 85:16
  86:17,21 88:6
  89:13 96:13,16
  96:18,21
  112:13 124:12
  124:13 152:1,3
  179:17,20
  180:3 189:17
**part**  48:15
  51:20 52:19

66:4 94:13
109:12 114:14
115:6 140:15
159:3 174:3
177:4,9,12
184:21 185:14
186:9 199:9
**partial**  191:13
**partially**
  106:22
**participants**
  92:16 109:5
**parties**  44:9
  141:8 160:9
  165:1 196:9,11
  196:13
**partner**  115:22
**partners**  8:25
  12:12
**parts**  106:23
  109:2
**party**  10:16
  72:11 153:22
  196:9
**passing**  33:21
**past**  69:3
**pause**  85:18
  97:11
**pay**  14:12 30:9
  39:21 40:7
  48:1 79:1
  125:14 134:16
  140:6 144:18
  146:15 147:10

147:13 148:24
184:20 185:3,4
187:8 189:8
191:15,16
192:21 195:8
**paying**  32:3
  117:15 121:23
**payment**  4:6,8
  4:10,12,14
  14:9 16:10
  144:4 145:13
  148:2
**payments**  40:8
  42:12 78:9,16
  79:12,17 80:15
  144:23 148:17
  190:25
**peeled**  171:16
**people**  13:22
  24:19 37:4
  103:21 112:5
  125:14 142:11
  161:1 175:19
  176:23 194:10
**percent**  16:12
  39:2 52:25
  53:2,3,6,7,8,11
  53:13,14,16,17
  53:20,22 103:4
  108:17,22
  113:25 114:2,5
  121:8 124:9
  125:22 145:23
  181:15,19

**percentage**
  115:16
**perfectly**  45:7
**perform**  28:10
**performed**
  177:2
**performing**
  29:7
**period**  15:15
  40:21,22 41:9
  109:22 179:19
  181:19 189:1
**periods**  194:20
**permanent**
  104:13,23,24
  105:16,21,25
**permissible**
  46:5
**permission**
  33:9 129:7
**permit**  171:20
  175:25
**person**  19:4
  70:9,17 104:7
  119:25
**personal**  29:12
  40:18,23,24
  41:3,10 42:17
  43:1 69:5,10
  70:10 72:22
  76:11 127:10
  169:21
**personally**
  41:17 42:7

**[personally - previously]**                                    Page 37

| | | | |
|---|---|---|---|
| 47:2 74:14 | **plains** 9:4 | **poker** 166:22 | **premium** |
| 100:24 198:11 | 25:20,23 26:1 | **policy** 172:19 | 191:25 |
| 199:15 | 26:13 27:1 | **political** 174:9 | **prepaid** 48:4,8 |
| **persons** 196:14 | 28:22 29:6 | **pop** 173:22,22 | 49:2 118:18 |
| **pertains** 155:22 | **plan** 26:9 36:8 | **popping** 173:20 | **preparation** |
| **perviously** | 110:18 114:15 | **porta** 123:8 | 12:2 |
| 179:14 | 162:23 183:21 | **portfolio** 34:25 | **prepare** 9:16 |
| **peterson** 5:3,4 | 183:22 184:1 | **portion** 3:8 | 50:24 51:11 |
| 113:16,19 | 186:24 187:14 | **portions** | 55:11,15,22 |
| 175:23 176:5,6 | 188:2 | 114:18 | 67:12,14 68:4 |
| **peterson's** | **plan's** 184:7 | **position** 34:12 | 68:6,18 |
| 10:22 67:5 | **play** 21:19 | 154:2 155:16 | **prepared** 54:6 |
| **petition** 5:15 | 45:23 73:25 | 167:20 | 54:8 72:6 |
| 87:16 91:10 | 108:22 | **possession** | 119:18 154:9 |
| **pfs** 70:22 73:17 | **player** 166:22 | 46:15 150:3,5 | **preparing** |
| **phase** 104:13 | **pleading** 190:5 | 155:19 180:24 | 11:21,22 72:9 |
| 104:13,23,23 | **please** 35:21 | **possible** 36:11 | **prepay** 47:25 |
| 104:24 105:13 | 37:19,20 40:20 | 124:10,15 | 118:19 |
| 105:17,21 | 50:7,12 51:4 | **possibly** 54:15 | **present** 2:16 |
| **phone** 93:23 | 53:25 57:24 | 114:3 139:24 | 41:23 92:18 |
| 197:3 | 72:16 130:25 | **potty** 123:8 | **presented** |
| **phrase** 104:10 | 197:11,11 | **pound** 174:10 | 109:23 |
| **picked** 21:21 | **plex** 22:16 | **practices** 45:9 | **pretty** 7:13 |
| 140:13 | **plug** 191:11 | 45:11 147:21 | 28:7 65:25 |
| **pictures** 173:6 | **plumber** 39:20 | **prairie** 175:11 | 76:4 77:5 |
| **piece** 111:1 | 39:21 | 176:14 | 87:23 123:20 |
| 125:18 168:3 | **plumbing** 15:7 | **pre** 111:10,14 | 130:2 |
| **piping** 114:21 | **plus** 150:8 | **precast** 139:7 | **prevail** 13:1,8 |
| **place** 1:8,22 | **point** 38:17 | **prefatory** | 15:24 66:9,13 |
| 4:15 194:12 | 89:22 93:24 | 155:20 | 134:22 |
| **placement** | 97:17 106:15 | **prefer** 36:13 | **previous** 112:7 |
| 96:21 | 145:11 167:20 | 49:12 | 135:18 |
| **places** 93:16 | 168:5 191:21 | **premise** 135:7 | **previously** |
| | | 135:14 | 119:5 141:15 |

**[previously - property]**                                    Page 38

| | | | |
|---|---|---|---|
| 147:22 180:15 | **problem**  52:12 | **project**  5:6,8 | 66:1 69:20 |
| 183:16 185:10 | **problems** | 8:21 12:25 | 70:1 112:7 |
| **priming**  159:4 | 180:21 | 13:5,16 15:8 | 113:17 185:22 |
| 162:17,19 | **procedure** | 22:1,2,11,14 | **projets**  169:14 |
| **principal**  82:2 | 198:5 199:5 | 23:11 29:11 | **promissory** |
| 89:24 90:23 | **proceeding** | 30:25 31:3 | 83:1 90:15 |
| 95:19 101:23 | 80:12,14 | 46:4 52:10 | **proof**  4:15,20 |
| 155:18 171:11 | **proceedings** | 54:13,16 62:8 | 4:24 76:20 |
| **principles** | 80:24 108:2 | 65:12,14,17,23 | 77:11 79:23 |
| 141:6 | **process**  69:21 | 67:16 68:5,22 | 85:22 86:5,9 |
| **printed**  147:3 | 107:11 | 69:11 70:4 | 86:10,16 91:3 |
| **printing**  176:10 | **produce**  133:15 | 89:20 97:19 | 91:7 94:5 |
| **prior**  9:11 | 155:8 | 103:13 107:12 | 96:14 101:14 |
| 10:12 11:25 | **produced** | 110:12 111:11 | **proper**  128:15 |
| 24:10 25:2 | 120:4 158:16 | 113:13,19 | 129:4,5 |
| 48:18 89:23 | 167:17,18 | 114:8 115:5,13 | **properties**  20:4 |
| 90:24 111:8 | 195:15,16 | 115:22 117:8 | 20:7 29:14,19 |
| 112:12 128:14 | **product**  61:18 | 121:14 122:12 | 29:20,22 30:1 |
| 144:22 | **production** | 125:12,21 | 30:19 32:10,11 |
| **priority**  184:21 | 197:15,17,22 | 126:12 127:2 | 32:17,19 33:16 |
| **private**  167:3 | **professional** | 130:7 138:23 | 34:23 35:2 |
| **privilege**  10:2,4 | 166:22 | 141:7,12,16 | 37:14 38:1,9 |
| 85:4 | **profitable** | 142:13 145:7 | 38:23 39:10,15 |
| **privileged**  73:8 | 110:14 | 149:3,6 152:5 | 40:17 41:12,13 |
| 165:15,15,17 | **program**  51:20 | 158:13 168:19 | 42:13 43:4,8 |
| **probably**  6:25 | 51:24 52:2,11 | 181:3 184:11 | 43:25 44:23 |
| 12:8 14:21 | 52:14,17,19 | 184:20,22 | 46:9,25 88:10 |
| 17:6 23:9 24:5 | 53:6 103:2,2,7 | 185:2 187:9,10 | 101:6 117:21 |
| 27:1 41:1 | 103:8,10,16,18 | 187:11 | 160:4 172:20 |
| 42:14 48:21 | 103:19,24 | **project's**  184:8 | 188:21 189:10 |
| 67:4 101:14 | 104:4 106:25 | **projects**  12:12 | 192:22 |
| 111:9 118:14 | 107:3,11 | 25:2,4 31:25 | **property**  26:16 |
| 128:21,22 | 108:22,25 | 32:13 39:16 | 30:2,14 31:7 |
| 194:19 | 148:2 | 40:14 45:24 | 42:24 78:14,20 |

[property - question]                                                      Page 39

78:23 79:1,7
79:10 89:11
106:7 110:17
117:18,20
149:16 168:24
169:1,18
170:14 171:19
180:4 187:19
190:16,18,21
190:24 191:13
191:14
**proposal**
109:20
**proprietor**
183:20
**protect**  174:3
193:15
**protected**  85:4
**protection**
153:24
**protective**
160:10,25
165:7
**provide**  55:20
56:6 62:3
67:18 68:9,23
69:4,9,13,19
70:3 74:22
103:11,13
108:4,14
109:13 120:11
120:25 156:10
161:14,15
186:10,14

190:15
**provided**  14:11
14:23 16:1,23
43:9 45:16,20
54:14 55:8
63:14 68:25
69:17,25 70:1
70:19 71:6,23
72:11 73:18,19
73:20 75:19
82:21 85:22
107:22 111:21
120:11,15
121:1,2 132:12
133:8,22
134:19,23,25
135:17 139:1
147:17 148:1,8
153:11 156:5
162:3 164:25
165:11 166:8
174:22 176:11
186:6
**providing**  43:4
47:18 104:20
111:23
**provision**  135:3
**public**  26:23
27:16 164:6
196:23 198:10
198:18 199:15
199:23 200:23
**published**
161:17

**pull**  26:9
172:14
**pulled**  67:17
96:16
**pun**  114:19
**purchase**
156:12
**purchased**
157:24 170:5
180:1
**purpose**  20:19
29:18 30:22
38:21 47:18
85:15 90:23
92:2,7 127:13
127:15 177:25
**purposes**  108:1
108:2 169:23
**pursuant**  5:11
5:13 39:18
**pursue**  149:20
**pursued**  51:25
155:11,12
**pushed**  32:13
**put**  11:4,9
15:13 18:22,25
19:1,5,16
20:12 30:12,13
37:15 38:8,18
41:24,25 43:1
46:24 52:18
53:1,3,6,16,19
57:11,13,23
58:5 60:23

61:18,25 64:7
64:16 65:8,10
70:23,25 82:11
89:24 101:15
103:22 111:7
114:4 118:25
127:16 145:9
156:10,20
168:24 170:14
172:6,7,21
175:15 186:18
187:2 194:9
**putting**  39:25
40:3 53:21
150:16 172:16

**q**

**quarterly**
183:7
**question**  14:2
26:24 28:15
29:3 34:1,5
36:16 37:7,17
38:25 39:23
40:10,20 49:18
51:3,6,8,9
52:21 55:11
69:7 72:1
73:23 74:20
76:4 78:25
79:4 85:2,3,5,7
86:7,7 87:9
88:15,25 92:6
97:12 103:5,6

**[question - recent]**                                                      Page 40

| | | | |
|---|---|---|---|
| 105:2 106:9,21 | **r.m.r.** 1:25 | **ready** 105:15 | 63:17,19 69:23 |
| 109:19 110:4,7 | 196:22 | 110:18 129:13 | 71:16 73:6 |
| 110:10,19 | **r.p.r.** 1:25 | 157:5 | 74:2 75:13,16 |
| 111:19 112:3 | 196:22 | **real** 7:13 31:13 | 75:18 83:11,13 |
| 116:2,8 117:10 | **rain** 172:11,12 | 31:17,17 34:25 | 86:1 89:18,20 |
| 120:18,21 | **raise** 8:11 | 39:16 116:11 | 89:22 90:20,22 |
| 126:23 135:3 | 36:14 | **really** 15:17 | 91:24 92:2 |
| 139:17,20,21 | **ran** 33:17 41:1 | 29:22 35:22 | 93:1,2,3,6,21 |
| 140:5,11 141:4 | **randall's** 179:2 | 57:20 87:11 | 94:2,3 100:6 |
| 150:8 151:14 | **randy** 97:17 | 111:1 117:1 | 107:14,15 |
| 152:23 159:16 | **ranges** 157:23 | 147:2 154:21 | 115:14 119:21 |
| 163:10,21 | **rarely** 136:5 | 169:15 191:11 | 119:24 120:10 |
| 164:15,18,25 | **rash** 156:15 | **reask** 86:7 | 120:14 124:9 |
| 166:2,4 167:21 | **rate** 53:17,19 | **reason** 8:5 | 128:10,11 |
| 168:3 170:23 | 87:12 107:8 | 14:24 26:7 | 130:8 142:22 |
| 176:12 180:17 | 108:15 196:10 | 43:7 46:10,19 | 143:16,23 |
| 190:7 | **rates** 71:3 | 74:3 77:8,16 | 147:25 153:11 |
| **questioning** | 172:19 | 78:8,15 79:22 | 176:2 192:8 |
| 135:15 | **rather** 163:17 | 81:17,23 87:1 | 194:5 |
| **questions** 45:15 | **reach** 113:15 | 87:15,25 91:1 | **recap** 168:11 |
| 154:5 155:4,5 | 165:5 | 93:8,13 101:18 | **receipt** 197:18 |
| 155:10 165:25 | **reached** 105:16 | 134:24 148:7 | **received** 12:18 |
| 167:3,8 192:3 | 105:18 113:16 | 148:13,21 | 19:1 39:7 |
| **quick** 58:11 | **reaction** 192:24 | 152:11 173:2 | 44:22 54:16 |
| **quicker** 49:16 | **read** 33:22 | 188:20 197:14 | 75:4 83:23 |
| 49:17 | 91:18 156:2 | 199:8 200:3 | 84:3,3,14 |
| **quickly** 26:9 | 166:23 183:22 | **reasonable** | 85:13 100:12 |
| **quit** 37:19 | 194:24 195:14 | 44:12 | 100:15 101:10 |
| **quote** 162:15 | 196:16 198:5,6 | **reasons** 41:18 | 106:14 122:2 |
| **quotes** 24:22 | 198:12 199:5,6 | 171:19 | 122:13 157:2,8 |
| **r** | 199:17 | **recall** 9:7 35:3 | 158:9,14 174:7 |
| **r** 2:1 6:1 20:2,2 | **readily** 27:9 | 35:5 37:18 | **receiving** 15:9 |
| 51:22 118:8 | **reading** 197:19 | 38:11,14 48:8 | **recent** 76:7 |
| | | 56:17 61:9 | 182:5 189:14 |

**[recently - repairs]**                                                        Page 41

| | | | |
|---|---|---|---|
| **recently** 127:21 | 97:15,23 98:17 | **refi'd** 25:9 | **relative** 6:7 |
| **recollect** | 98:24 102:23 | **refinance** | 142:12 196:11 |
| 143:18 | 103:3 104:19 | 184:23 187:19 | 196:12 |
| **recollection** | 106:17 107:8 | **reflect** 57:25 | **relaxer** 8:7 |
| 59:14 83:20 | 108:14 109:11 | **refrain** 29:3 | **relevance** |
| 84:2 92:20 | 113:12 124:21 | 45:15 | 45:12 76:4 |
| 111:4 117:8 | 129:21 163:14 | **refrigerators** | 107:21 152:10 |
| 143:17 | 172:2 175:21 | 157:23 | 153:14 191:6 |
| **record** 6:13 | 189:15 | **regarding** | **relevant** 46:2 |
| 26:23 27:11,16 | **redact** 193:2 | 25:23 26:15 | 108:9 178:8,17 |
| 35:22 37:5 | **redacted** 99:12 | 76:16 162:6 | **relief** 44:6 |
| 49:22 58:6,8 | 99:20 100:5,21 | 178:20 | 153:19,21,23 |
| 58:11 74:21 | 192:25 | **regardless** | 153:23 154:3 |
| 99:20 102:9,14 | **redi** 51:20 52:2 | 148:17 | 178:17 |
| 122:15 127:25 | 52:6,8,11,13,15 | **regards** 76:17 | **relying** 191:19 |
| 128:3 130:20 | 52:17,19 53:6 | 130:3 183:2 | **remain** 163:17 |
| 167:21,22 | 103:1,2,7,8,9 | **register** 30:18 | **remainder** |
| 168:2,8 174:4 | 103:16,18,19 | **reid** 175:23 | 156:13 158:25 |
| 187:13 188:9 | 103:24 104:4 | 176:5,6 | **remember** 23:2 |
| 190:10,13 | 106:25 107:3 | **reimbursed** | 24:8 36:17 |
| 196:7 199:9 | 107:11 108:22 | 42:8,15 47:11 | 75:9 93:25 |
| **records** 5:11,13 | 108:24,25 | 125:15 | 103:21 118:12 |
| 15:23,24 16:19 | **reference** 197:7 | **reimburseme...** | 127:23 141:24 |
| 132:17 133:15 | 198:2 199:2 | 47:19 | 141:25 176:9 |
| 133:17 155:8 | **referenced** 63:5 | **relate** 154:5 | 184:12 194:13 |
| **red** 2:11 3:21 | 64:14 136:9 | **related** 44:4 | **rent** 79:19 |
| 3:23 4:3 7:25 | 198:11 199:15 | 153:21 157:12 | **rental** 123:8 |
| 12:21 14:11 | **referred** 112:24 | **relationship** | **rented** 105:12 |
| 28:18 45:16 | **referring** 80:4 | 13:24 150:6 | 110:18 |
| 46:7,7 47:16 | 87:19 91:21 | 181:10 | **repair** 171:17 |
| 51:13,18 54:1 | 112:22 120:23 | **relationships** | **repaired** |
| 63:18 72:21 | **refers** 137:9 | 160:23 161:23 | 174:17 |
| 78:16 81:12 | **refi** 192:22 | 162:2 | **repairs** 171:15 |
| 92:15 97:5,13 | | | 171:18 |

**[repeat - right]**                                                                          Page 42

| | | | |
|---|---|---|---|
| **repeat**  88:20,22 | 15:16 39:18,19 | 197:25 | **retract**  42:3 |
| 88:25 | 40:5 46:14 | **requirement** | **retrieve**  13:4 |
| **rephrase**  69:7 | 47:4 66:2 70:7 | 171:13 | 67:3 |
| **replaced**  180:5 | 74:22 75:1,2,3 | **resealing** | **returned** |
| **report**  30:17 | 132:13 133:20 | 171:12 | 167:25 197:18 |
| 137:10 176:3 | 138:5,18 | **researched** | **review**  19:10 |
| 177:1,5,7,10,12 | 140:15 143:4 | 133:21 | 76:11,15,19 |
| **reported**  1:25 | 144:3 147:18 | **resembles** | 78:5 84:20 |
| 196:4 | 148:22 157:10 | 108:7 | 197:12 198:1 |
| **reporter**  6:5 | 157:11,13 | **reserved** | 199:1 |
| 7:15 35:17,20 | 158:19 160:7 | 196:16 | **reviewed**  76:7 |
| 37:3,8 77:22 | 160:11 168:17 | **resistant**  53:21 | 76:12 87:12 |
| 78:2 82:9 | 199:9,11 | **respect**  76:6,24 | 124:21 |
| 88:25 89:3,7 | **requested**  12:7 | 115:12 175:4 | **reviews**  19:9 |
| 89:17 90:5,8 | 70:6 72:22 | 188:12 | **rick**  16:9 |
| 91:15 97:2 | 73:17 92:14 | **responded** | **riders**  70:23 |
| 102:12 107:20 | 157:16 175:21 | 143:1,2,20 | **right**  16:17 |
| 110:24 116:15 | **requests**  11:6 | **response**  168:3 | 18:2 20:17 |
| 130:23 146:7 | 12:1,3 13:6 | **responses** | 21:12 23:19 |
| 152:15 154:23 | 14:1,10 15:10 | 176:11 | 24:4 31:2 34:6 |
| 194:25 195:5 | 15:11,13 19:9 | **responsive** | 34:10 41:16 |
| 195:10 198:7 | 25:11,16 81:10 | 186:11 | 49:21 54:19 |
| **reporter's** | 83:22,23 84:15 | **rest**  49:7 | 57:4,19 60:11 |
| 196:1 | 86:25 118:23 | 128:23 145:14 | 62:7 64:10 |
| **reports**  32:18 | 119:6 124:20 | 156:19 159:2 | 66:16 80:20,22 |
| 183:6,7,12 | 125:3,11 126:6 | **restraint**  155:3 | 84:7,8 85:24 |
| **represent**  36:4 | 126:20 127:11 | **restrict**  166:10 | 86:5,16 93:10 |
| 44:9 | 133:8,25 136:1 | 166:12 | 95:1 96:3,20 |
| **representation** | 136:14 141:14 | **retainage**  15:10 | 105:10,22 |
| 135:16 | 143:25 178:3 | 16:12 125:11 | 106:7 107:1,23 |
| **representing** | 182:15 186:12 | 125:22 145:2 | 114:23 115:4 |
| 36:5 | **require**  69:4 | 145:19,23,24 | 121:8,19 |
| **request**  3:21,24 | **required** | **retired**  70:16 | 123:24 124:21 |
| 4:3 14:16 | 173:14 184:20 | | 126:20 129:9 |

**[right - saying]**                                              Page 43

| | | | |
|---|---|---|---|
| 130:4 135:11 | **roles** 183:14 | 102:17 103:17 | **run** 30:17 |
| 135:15 136:14 | **roll** 90:23 | 104:16 105:17 | 52:11 114:18 |
| 137:10 138:9 | **roof** 39:13 | 106:7 107:13 | 128:23 155:21 |
| 141:20 142:19 | 43:17 189:3 | 110:5 111:11 | **running** 32:17 |
| 144:5,8,25 | **room** 161:2,16 | 111:22 113:13 | 129:18 154:20 |
| 145:13 150:20 | 164:3,13 165:2 | 113:19 114:7 | **runs** 20:5 31:8 |
| 153:2 156:18 | 167:25 168:6 | 115:12,12,22 | 31:18 179:7 |
| 157:14,17 | **rough** 72:7 | 117:8,16 | **russ** 8:23 |
| 159:13 164:4 | **roughly** 170:13 | 124:16 125:4 | **rylan** 5:12 |
| 172:20 185:13 | **roughshod** | 127:18 128:4 | 146:11,17 |
| 187:23 190:9 | 155:21 | 130:7,12 | 147:20 |
| 190:17 196:16 | **route** 85:11 | 132:19 135:25 | **s** |
| **river** 2:11 3:21 | 129:14 190:24 | 146:14 148:25 | |
| 3:23 4:3 7:25 | **row** 55:5 | 149:2,3,7,9,19 | **s** 2:1 3:1,2,2,2 |
| 12:21 14:11 | 131:21 132:3,4 | 149:24 150:4 | 3:10 4:1 5:1 |
| 28:18 45:16 | 143:11,11 | 150:16 151:5 | 6:1 15:6 118:8 |
| 46:7,8 47:16 | **rows** 112:24 | 151:12,24,24 | 123:15 197:15 |
| 51:13,18 54:1 | **rubbish** 48:17 | 152:20 153:12 | 199:8,8 200:3 |
| 63:18 72:21 | **ruins** 1:11 3:12 | 156:5 159:3 | **safe** 188:17 |
| 78:16 81:12 | 3:14,15,17,18 | 162:12,23,25 | **sager** 1:25 |
| 92:15 97:5,13 | 3:20,22,25 4:4 | 164:20 168:14 | 196:22 |
| 97:15,23 98:17 | 4:6,8,10,12,14 | 169:3,20,22 | **samples** 177:7 |
| 98:24 102:23 | 4:24 5:6,7,8,9 | 170:19 171:2 | **sampling** 177:2 |
| 103:3 104:19 | 10:14,20,25 | 173:12,19 | **sandra's** 179:6 |
| 106:17 107:8 | 11:3 12:2,19 | 174:8 176:20 | **satellite** 31:12 |
| 108:14 109:12 | 18:2 24:6 | 178:10 179:10 | **saturday** 93:1 |
| 113:13 124:22 | 29:11 45:5,21 | 179:23,25 | 93:14 |
| 129:21 163:14 | 46:4 65:17 | 180:2,7,11 | **savings** 162:11 |
| 172:2 175:21 | 74:8,18 76:18 | 184:6 186:16 | **savvy** 183:17 |
| **river's** 189:15 | 81:2 97:4,8,12 | **rule** 5:11,14 | **saw** 16:2 121:5 |
| **road** 80:24 | 97:19,23 | 161:16 | 189:19 |
| **robert** 6:14 | 100:15 101:8 | **ruled** 165:8 | **saying** 73:9 |
| **role** 21:19 | 101:12,19,22 | **rules** 7:19 | 80:19 91:9 |
| | 101:25 102:3 | 198:5 199:5 | 92:23 109:11 |

**[saying - several]**                                                      Page 44

139:1 140:1,2
153:2 155:1
158:22 169:10
169:25 185:24
**says**  17:21
39:19 47:9
60:13 87:21
94:20,20 95:1
95:7 104:12
105:21 121:8
121:17,18
131:21 132:7
138:8 140:19
144:21 158:8
176:18
**scale**  24:20
**scanning**
176:10
**schedules**
150:16,22,24
151:5 152:7,20
152:24 153:1,3
163:1 169:4
**schilken**  18:10
26:8 177:21,22
**schilken's**
178:1
**school**  6:20 7:6
**schools**  7:5
**schwab**  2:8
**scientific**  175:2
175:4,15
**scope**  45:12
76:5 88:17

142:12 154:11
155:3 175:16
**scraping**
171:16
**seal**  161:14
165:2 198:15
199:21
**sealed**  167:12
**searches**  136:3
**second**  30:7
54:2,2,9 56:19
56:23 57:5
71:17 72:8
80:5 86:6
87:14,17 88:4
96:9,17 98:7
101:22,25
122:15 128:19
189:24 190:11
**seconds**  130:17
166:1 167:3
**secret**  129:17
**secure**  173:17
**security**  99:14
99:17 154:6
**see**  14:19 74:4
95:6 99:11
122:19 132:10
147:4 152:12
153:10 173:4
**seed**  178:7,8,11
178:12,17
**seeing**  83:13

**seeking**  106:17
**seeks**  85:3,6
184:3
**seems**  123:19
189:17
**seen**  14:18,21
50:21 56:14
83:21 100:5
**seger**  60:3
**selected**  176:19
**sell**  184:23
187:19
**semi**  70:16
**send**  18:10
115:8
**sending**  125:10
**sense**  32:13
119:4 144:11
**sensitive**
165:18
**sent**  14:17 19:7
19:9 35:4 50:2
50:8,9,11
75:10,10 92:23
119:22,22,24
139:23 142:23
142:24 172:9
173:7 189:13
**sentry**  118:6,7
118:15
**separate**  97:9
97:13,14
162:11

**separated**  32:16
**separation**
13:16
**september**  1:21
97:5 142:22
196:4,17 197:4
**sequentially**
50:13
**serial**  158:17
**serie**  147:19
**served**  133:24
**service**  15:7
**services**  43:5,9
43:12
**set**  12:1 44:17
80:11
**setoff**  80:20,23
81:4
**sets**  156:25
157:2,3
**setting**  45:8
**settle**  27:22
**settled**  26:19
**settlement**
27:20
**seven**  83:6
89:23 95:16
106:10 146:9
**sevens**  60:15
**seventh**  95:10
**seventy**  142:20
**several**  7:5 8:18
52:7 109:7

**[several - sorry]**                                                           Page 45

153:1 160:23
194:8
**severe**  29:9
**sewer**  114:21
**sex**  48:14
**shaft**  139:8
**shape**  168:18
**shared**  53:18
165:1
**sharing**  161:21
**sheet**  24:2
55:18,23 56:3
56:14,21,22
57:3 102:17,24
103:9 106:19
112:23 136:23
195:17 197:13
199:7,10,18
200:1
**sheets**  110:22
112:24
**short**  181:18
**shortfall**  39:1,4
**shortly**  44:18
44:19
**show**  71:20
75:7 148:2
**showed**  18:11
93:23 128:13
**shown**  197:16
**shows**  11:12
83:18 123:19
**side**  54:19
56:21 60:11

61:3 64:11
65:6 115:6
118:25
**siding**  171:9
173:15
**sign**  8:22 73:17
73:19 83:13
84:20,22 87:11
109:20 186:8
195:14 196:16
**signaling**
192:20
**signatory**  32:25
33:15,19
**signature**  63:12
83:16 90:17
120:7 196:21
197:14
**signatures**
100:9
**signed**  27:3,4
32:20 34:16,19
34:22 36:20
56:16 83:15
92:25 93:18,18
100:23 101:1
122:18,25
123:1 184:16
184:19 198:13
199:18
**significance**
122:4
**significant**
171:2 173:5,9

**signing**  84:17
93:7,15 100:7
197:19
**similar**  7:24
28:11 55:7
67:4
**similarly**
141:14
**simple**  134:6,8
134:10
**simply**  28:24
73:25 160:11
166:6
**sincerely**
197:21
**single**  66:5,11
92:4
**sioux**  9:5 24:23
**sir**  197:10
**sit**  74:15 76:1
97:22 169:13
**site**  17:8 47:10
47:12 48:20,21
114:13 115:2
158:13,15
179:10,21,22
**sitting**  166:3
**situate**  15:22
**situation**  17:6
67:4
**six**  101:17
179:16 180:9
**size**  15:8
114:20

**skid**  163:13
**slight**  187:15
**slip**  170:10
**small**  13:19
147:2
**smaller**  123:10
185:4
**smart**  111:19
**social**  99:13,16
**software**  30:3,6
30:6 40:15
42:23
**solicit**  85:8
**solicitation**
116:3
**solutions**  197:1
200:1
**something's**
134:4
**sophisticated**
141:24 142:11
**sorry**  22:20
24:8 27:6
33:24 34:3
35:10 36:16
37:1 40:1,2,2
53:13 64:20
65:24 67:21
71:18 75:16,24
76:2 79:15
81:16 82:5,19
86:12 88:21
89:6 94:3
101:14 110:5

**[sorry - starion]**                                                    Page 46

| | | | |
|---|---|---|---|
| 110:19 111:15 | 92:7 116:2 | **staff**  47:10,12 | 99:13,18,23,25 |
| 112:2,9,23 | 128:21 129:2 | 48:21 | 100:2,6 102:7 |
| 115:25 117:5 | 138:21 141:5 | **staffed**  40:14 | 102:13 107:22 |
| 131:11 140:9 | 148:12 | **stage**  116:9 | 108:3,12 |
| 142:7 143:11 | **speculative** | **staking**  115:4 | 110:25 116:16 |
| 144:4 145:4 | 151:14,16 | **stamp**  32:21,23 | 127:23 128:2 |
| 150:23 151:15 | **spelled**  56:20 | 33:2,4,10,13,16 | 130:18,24 |
| 158:17 | **spent**  75:11 | 34:16,23 57:15 | 131:4,7,9,13,14 |
| **sort**  24:12 | 155:10 | 63:7 | 132:25 133:4 |
| 111:23 112:11 | **spiral**  121:25 | **stamped** | 134:7,11 135:5 |
| 160:10 | **splinter**  168:20 | 146:22 | 135:9,12,20,23 |
| **sought**  153:21 | **split**  35:1 37:13 | **stamps**  57:8,10 | 142:14,17 |
| 153:23 | 53:4 | **standing**  36:6 | 146:10,18,20 |
| **south**  9:5 22:18 | **spoke**  9:14 | **standpoint** | 147:6,9 150:10 |
| 51:22 66:20 | **spousal**  10:4,6 | 109:24 149:15 | 150:15 152:18 |
| 103:20 143:15 | **spouse**  178:6 | **stanley**  2:15 | 152:19,24 |
| 155:4,7,12 | 178:21 | 3:5,6 6:10 7:18 | 153:2,5,16,25 |
| **space**  173:21 | **spreadsheet** | 10:3,7 34:11 | 154:12,21 |
| **speak**  7:16 28:3 | 11:9,9,17 | 35:18 36:8,17 | 155:7,14,25 |
| 187:14 | 54:23 55:3 | 36:21 37:6,12 | 156:4 160:17 |
| **speaking**  29:4 | 61:6 64:14 | 37:19,22 38:4 | 161:3 164:1,11 |
| **specific**  40:20 | 112:25,25 | 44:21 45:2,14 | 164:21 165:9 |
| 44:9 164:15 | 113:8 119:10 | 46:6 49:11,20 | 165:14,20 |
| 175:2 | 119:13,14 | 49:24 50:18,20 | 166:7,10,16,20 |
| **specifically** | 120:1 131:22 | 51:4 57:9,13 | 167:5,10,16 |
| 92:6 110:20 | 143:9 | 57:20,23 58:2 | 168:1,11 188:3 |
| 143:23 176:9 | **squatters** | 58:5,10 60:5 | 188:6,11 190:1 |
| **specified**  6:8 | 174:11 | 76:6 80:16,25 | 190:4,8,12,14 |
| **speculate**  34:7 | **ss**  196:2 | 81:6 82:10,13 | 192:2 194:4 |
| 37:18 71:21 | **stabilization** | 82:17,19,20 | 195:2 |
| **speculation** | 105:4,19 | 86:1 87:20,24 | **starion**  25:15 |
| 35:16 48:6 | **stabilized** | 88:24 89:4,10 | 31:22 33:18 |
| 52:21 71:15 | 105:7 184:8 | 89:18 90:9 | 129:13 |
| 85:2 88:16 | | 91:16 97:3 | |

**[start - submitted]**                                        Page 47

| | | | |
|---|---|---|---|
| **start**  23:15 | 106:18 107:9 | **step**  160:15,15 | 137:6,13 138:6 |
| 24:3 32:14 | 108:14 113:13 | **stepped**  65:17 | 169:12 |
| 122:11 145:18 | 124:22 129:21 | 66:21 | **stroh's**  130:13 |
| 160:15 192:20 | 155:12 163:14 | **stf.law**  2:10 | 132:4 133:1 |
| **started**  10:21 | 172:2 175:21 | **stipulate**  99:19 | 135:3 137:17 |
| 15:9 20:8,21 | 182:12,13,19 | 160:24 178:16 | 138:17 |
| 20:22 21:1 | 196:2 198:10 | 178:23 195:13 | **stuff**  14:10,13 |
| 23:24 24:4 | 199:15 | **stipulation** | 15:25 41:4,19 |
| 29:24 32:12 | **stated**  69:8 | 165:5 166:5 | 93:7 114:18 |
| 66:5 74:10,11 | 95:15 | **stop**  24:3 37:20 | 116:11,13 |
| 74:11 109:21 | **statement** | 51:4 | 134:21 145:8 |
| 109:23 111:9 | 24:17 54:24 | **stopped**  59:12 | 158:15 182:12 |
| 117:25 121:25 | 55:2 69:13 | 117:16 118:1 | 183:18 |
| 168:20 171:17 | 70:19,21 71:13 | 173:23 | **stulken**  65:16 |
| 192:9 | 71:24 72:7,12 | **storage**  180:14 | **stumbled** |
| **starting**  41:6 | 72:22 74:3 | 180:19 | 166:25 |
| 72:20 78:11 | 75:4,14 146:13 | **stored**  179:9 | **style**  108:6 |
| **starts**  35:23 | 165:10 186:25 | **stoves**  48:16 | **subcontractor** |
| 58:12 62:14 | 193:11 194:5 | 156:17 | 118:4 133:17 |
| 63:21 64:22 | 198:13,14 | **straight**  17:14 | 134:1,12 |
| 67:6 68:12 | 199:19,19 | **street**  22:6 | 136:17 |
| **state**  2:11 3:21 | **statements** | **stress**  27:20 | **subcontractor's** |
| 3:23 4:3 6:13 | 69:5,10,17,19 | **strike**  34:8 | 126:2 |
| 7:7,25 12:21 | 70:11 162:4 | **stroh**  5:10,10 | **subcontractors** |
| 14:11 28:18 | **states**  1:1 27:25 | 21:3,7,13,17 | 12:23 14:23 |
| 45:16 46:7,8 | **stay**  44:5 | 22:21 57:4 | 32:3 40:6,6,8 |
| 47:16 51:14,18 | 153:17,18,21 | 114:10 115:5 | 47:5 126:10,25 |
| 54:1 63:18 | 153:23,23 | 115:11,21 | 133:7 134:17 |
| 72:21 78:17 | 154:3 155:22 | 121:8,14,19 | 187:22 |
| 81:12 92:15 | 178:17 | 130:9,10 | **subject**  28:1 |
| 97:5,13,15,23 | **stayed**  44:14 | 131:18,19 | 143:14 |
| 98:17,25 | 155:5 | 132:10,16,18 | **submit**  171:23 |
| 102:23 103:3 | **steers**  163:13 | 134:25 135:17 | **submitted** |
| 103:20 104:19 | | 135:25 136:3 | 68:24 125:19 |

**[submitted - talking]** Page 48

126:5,9 127:4
127:10 129:9
129:20,24
130:1,11
140:14 147:18
147:19,20
172:3 174:19
182:1
**submitting**
125:13 145:11
149:2
**subpoena**
166:8
**subpoenas**
14:17
**subs** 21:22 66:4
**subscribed**
198:10 199:14
200:21
**subsequent**
173:12 175:17
**subsequently**
161:17
**substances** 8:2
**substantial**
196:14
**sue** 26:13
**sufficient** 72:3
**suggest** 160:14
**suggesting**
80:22 154:16
**suggestion**
80:21

**suing** 44:9
**suite** 2:4,9
197:2
**sum** 186:25
188:13
**summary** 5:6,8
60:6 62:20
64:5
**summit** 181:7
181:11,12
182:10
**sums** 188:22
**superior** 197:1
**supervisor**
126:13
**support** 71:12
71:13,23 72:6
72:11 75:13
76:9
**supporting**
65:11
**suppose** 178:18
**supposed** 24:6
26:3 51:20
52:10 77:2
80:17
**sure** 7:17 9:8
19:1 23:11
50:19 58:7
96:1 99:23
128:25 130:18
134:5 141:8
145:12 156:2
164:11 167:1

168:10 182:6
183:25 188:3
190:12
**surface** 177:6
**surprise** 41:23
**surprised**
166:23
**survey** 114:13
**suspected**
177:7
**suv** 42:5
**swamped**
184:17
**sworn** 6:7
54:23 55:2
196:5 198:10
198:13 199:14
199:18 200:21
**sydney** 42:10
**system** 66:19
66:22

**t**

**t** 3:1,1,2,10 4:1
5:1 118:8
**t.l.** 5:10
**tab** 58:4
**tabbed** 17:16
**table** 36:3,5
78:12 101:20
**tabs** 17:16
136:2
**take** 17:10,18
18:14 20:18

48:15 49:9,14
49:19 50:6
69:2 85:18
97:11 99:1
113:5 130:16
137:24 144:14
144:22 146:4
160:14 164:9
179:15,19
181:1 186:16
188:21,21
195:9
**taken** 9:2 15:8
44:15 48:17
95:16 109:16
125:22 169:16
173:6
**talk** 7:20 8:12
9:10,20 10:8
15:20 33:12
36:11 67:2
139:5 178:2
**talked** 20:9
24:10 65:24
72:23 104:7
125:9 131:24
138:23 139:3
141:15 142:1
151:2 172:4,6
172:10 185:20
189:2 191:8
194:19
**talking** 11:20
15:4 18:16

**[talking - think]**                                                    Page 49

27:6 30:9,24
30:25 31:19
33:24 37:4
42:4 45:1
46:20 47:8
52:24 62:6,24
70:23 75:16
88:3 98:19
102:17 103:9
103:16 113:1,8
113:18 114:3
118:24 127:20
130:2 134:13
136:16 145:3
158:4
**talks**  104:22
**tape**  177:6
**tax**  41:17 99:18
183:4
**taxes**  182:16,18
182:25 183:4
**taxpayer**
100:21
**team**  17:2
**tech**  183:17
**technologies**
137:22
**technology**
137:10,12
**tell**  30:18 33:13
81:6 106:11
109:25 115:17
118:2 122:1,8
129:25 157:1

165:19,23
167:8 170:11
183:21 195:3
196:5
**telling**  109:8
**ten**  40:6,8
106:10 108:15
166:19
**tenants**  79:9
105:13,15
**tendency**
196:14
**tenth**  22:6
**tenuous**  155:23
**term**  102:17,24
103:9 106:18
141:24 168:14
**terminology**
194:13
**terms**  104:8
106:18
**terry**  5:10 21:2
21:6 22:21
115:21 116:9
132:16 133:1
135:24 136:3
137:6 138:22
169:11
**terry's**  139:11
139:12
**test**  174:20
175:1,12,13,19
176:16

**testified**  6:8
**testify**  6:7
178:25
**testimony**  8:3
34:9 178:1
196:7,7 198:6
198:7 199:6,9
199:12
**tests**  174:19,24
175:2,4,6,6,8
176:14
**text**  72:10
92:22 93:21
**texture**  171:17
**thank**  7:18 69:2
82:18 94:18
95:4 96:5
97:14 100:16
112:2 118:11
130:19 137:2,5
193:20
**theirs**  16:5
**thereabout**
142:19
**thereof**  153:19
195:16
**therewith**  46:2
**thing**  8:8 11:24
12:8 30:5,6
44:25 60:3
93:3 103:1,10
107:1 109:7
110:13 121:21
148:19 163:11

**things**  14:5
20:11 29:25
30:5 31:14
32:18 41:20
52:9 70:24
74:10 109:22
112:15 114:22
125:23 131:10
141:8 156:14
159:22 163:13
168:20 169:7
183:3 185:23
189:4
**think**  11:13
14:24 16:1
25:20 29:9
33:15 36:14,21
41:11 48:20
49:15 51:16
59:12 61:4
67:4 68:10
86:13 92:15
95:9 96:3,15
100:18 103:6
109:3 118:17
120:3 124:24
131:24 134:7,9
137:3 140:4
141:20 142:10
142:11,17
147:3 148:1,7
148:14,15
154:19 155:23
156:11 162:15

**[think - transactions]**

Page 50

| | | | |
|---|---|---|---|
| 162:15 163:24 | 113:5 120:22 | 194:20 | **told** 191:17 |
| 165:18 170:7 | 124:3 142:2 | **timeline** 10:20 | **ton** 16:5 |
| 172:13 174:1 | **tie** 14:20 | 10:25 | **took** 23:14 |
| 175:12 179:15 | **tied** 55:1 83:22 | **times** 15:18 | 65:18 66:4,10 |
| 182:10 187:11 | **ties** 11:14 | 16:8 47:25 | 99:13 103:3 |
| 192:2 194:11 | **tif** 47:14,21 | 124:3 142:2 | 104:2,3,4 |
| **thinking** 72:1 | 50:4 51:17 | 194:7 | 107:8,9 159:7 |
| **third** 10:16 | 52:24 103:23 | **timing** 128:11 | **top** 17:22 63:5 |
| 63:25 65:2 | 108:18 178:2,3 | **tiny** 57:20 | 63:9 94:20 |
| 67:11,22,25 | **time** 1:24 7:14 | **title** 19:7 25:13 | 95:1 112:18 |
| 68:17 72:8,11 | 13:25 15:12,15 | 25:18 40:12 | 114:13 |
| 80:5 87:25 | 17:4 23:1 | **titles** 163:15 | **tore** 48:13 |
| 88:2,4,4 90:17 | 24:16 35:21 | **tl** 21:13,17 57:4 | **tortious** 160:22 |
| 96:10,17 98:10 | 36:9 37:4 | 114:10 115:5 | 165:18 |
| 98:13 100:23 | 38:11 40:2,20 | 115:11 131:18 | **tortiously** |
| 102:3 104:1,1 | 40:22 41:9 | 131:19 132:10 | 45:22 |
| 104:2,2,3,4 | 47:21 48:1,22 | **today** 8:3 9:11 | **total** 81:14 |
| 157:4,5 178:10 | 71:2 72:23 | 9:16 10:9,13 | 117:1 174:12 |
| **thirteen** 99:4 | 74:6,16 89:22 | 11:21,22 28:3 | **touched** 153:13 |
| **thirty** 197:18 | 93:10,21 96:22 | 34:2 36:2 | **towards** 70:5 |
| **thompson** 2:8 | 97:18 102:7 | 45:23 46:2 | 74:8 113:24 |
| **thought** 34:12 | 103:14 109:22 | 97:22 154:9 | 123:2 |
| 71:1 76:17 | 112:17 116:23 | 164:9 194:18 | **town** 13:19 |
| 111:22 113:20 | 117:22,24 | **today's** 76:5 | 24:19,23,25 |
| 133:5 142:2 | 118:16 123:1 | 88:17 | 114:18 |
| 189:22 | 126:11 127:19 | **together** 11:4 | **track** 30:4 |
| **thousand** | 127:23 129:16 | 11:10 18:22 | 32:16 54:24 |
| 169:22 172:15 | 133:19 145:8 | 19:5,16 26:9 | 84:9,12 119:23 |
| **threaded** 27:19 | 157:6 161:24 | 60:23 61:18,25 | 179:20 |
| **three** 9:6,7 24:1 | 163:5 165:5,6 | 64:8,17 65:8 | **tracked** 43:22 |
| 26:4 31:25 | 168:19 171:20 | 67:17 76:14 | **trade** 117:12 |
| 37:4 44:5 | 175:16 179:11 | 109:6,9 111:7 | **trades** 121:23 |
| 69:20 85:23 | 179:19 181:19 | 150:16 187:3 | **transactions** |
| 97:8,13,14,23 | 189:1 193:12 | 194:9 | 132:19 |

**[transcribed - understand]**                                    Page 51

**transcribed**
196:7 198:7
**transcribing**
164:6
**transcript**
119:4 160:25
161:17 195:1,3
195:14 196:16
197:11,12
198:5,12 199:5
199:11,17
**transfer** 41:6
46:16
**transferred** 7:9
38:15 39:14
46:9
**transferring**
38:22
**transition** 41:8
**trenching**
118:13
**trial** 177:20
195:3
**tried** 67:3
109:6
**triggered**
172:12
**triple** 124:9
**trips** 20:10
**trouble** 70:22
**true** 108:7
196:7
**trump** 70:22

**trust** 170:12
**trusted** 126:11
**truth** 6:7,7,7
196:6
**try** 7:20 36:10
74:15 109:6,9
154:19
**trying** 16:11
17:13 18:13
24:8 34:8
36:12 51:7
52:9 71:16
72:24 86:1,21
118:11 161:19
163:12 165:4
172:14 194:9
**tubs** 48:16
**tuesday** 116:20
**tuition** 42:12
**turn** 12:6 26:18
43:21 60:4
83:17 108:5
138:11 143:3
143:13
**turned** 13:6
105:13 119:20
176:7,9
**turner** 183:24
**turns** 135:18
**twelve** 23:16
**twenty** 146:9
152:18
**twice** 9:3

**twins** 31:9
**two** 10:24
30:24 45:6
53:8,11 88:10
111:8 113:4
114:24 118:5
127:20 128:7
131:10 134:9
142:21 148:5
159:22,25
171:19 175:14
175:15 177:2
182:4 192:16
193:7
**type** 21:19 22:2
22:14 26:20
30:21
**types** 26:25
**typically** 23:17
30:22 31:11
61:6 69:4
92:10 112:6
121:1 122:6,7
122:11 136:4
190:18
**tyvek** 173:14
177:15
**tyveking**
171:13

| **u** |
| --- |

**u** 123:15
**uh** 7:21 90:5
131:17 138:4

143:12 147:5,8
187:6
**ultimately** 32:5
32:7 34:24
39:11 40:16
41:16 148:16
149:17 168:23
169:17 173:3
184:20 187:18
**umbrella**
172:19 191:12
191:16
**unable** 62:19
179:18
**unacceptable**
104:5
**uncharitable**
142:15
**unclear** 72:4
**under** 41:4,17
43:2 44:10
114:13 140:19
155:12 161:14
165:2
**underfunding**
141:6
**underlies**
135:15
**understand**
7:23 16:11
82:6 111:20
122:10 146:21
155:9 163:6
190:6

**[understanding - verstandig]**                                    Page 52

| | | | |
|---|---|---|---|
| **understanding** | **unwilling** | **vacation**  93:9 | 73:22 74:19 |
| 39:19 80:13 | 103:12 | **vacations**  41:20 | 75:22,25 76:3 |
| 114:23 121:4 | **updated**  113:7 | **valley**  41:21 | 76:10 78:22,24 |
| 121:13 128:3 | **use**  13:23 19:6 | **value**  71:1,1 | 79:3 80:7,18 |
| 150:5 171:21 | 33:3,9 39:5,15 | **valued**  70:24 | 81:3 82:14,18 |
| 184:4,5 | 46:15 52:16 | 70:24 | 84:24 85:1,18 |
| **underwrite** | 107:3 122:12 | **values**  80:14 | 86:10 87:6,8 |
| 69:15 | 156:19 167:17 | **variance** | 88:14,19,22 |
| **underwrites** | 179:19 | 187:15 | 89:3 91:4,6,8 |
| 191:10 | **used**  13:19 | **various**  40:6 | 91:11 92:5 |
| **union**  12:15 | 29:25 33:13,15 | **vehicles**  41:3 | 94:13,24 95:3 |
| 25:10 41:15 | 36:20 40:17,23 | 163:13 | 97:11 99:11,15 |
| 166:17 185:13 | 41:2 47:1 81:9 | **vendors**  185:4 | 99:19,24 100:1 |
| 188:24 | 130:15 141:11 | **verbiage**  72:3 | 100:4,14,16,21 |
| **unit**  22:3 | 141:24 152:4 | **veritext**  197:1,7 | 102:8 105:1 |
| 112:16 176:1,2 | 168:14,15 | 200:1 | 106:8,20 |
| 177:2 191:23 | 169:17 179:24 | **veritext.com.** | 107:21,25 |
| **united**  1:1 | 180:2,5 | 197:17 | 108:4 109:18 |
| 27:25 | **uses**  114:10 | **version**  100:3 | 110:3,6,9 |
| **units**  176:19 | 182:13 | 119:13,15 | 111:18 115:24 |
| 189:4,18,22 | **using**  103:8 | **verstandig**  2:5 | 116:1,7 117:9 |
| 191:5,15 | 166:11,13 | 3:6 9:13 10:1,5 | 119:2 120:17 |
| **unlawfully** | **usually**  114:1,2 | 10:15 27:5,8 | 120:20 126:22 |
| 45:22 | 114:10 142:20 | 27:13,18 28:14 | 128:18,24 |
| **unpaid**  106:12 | **utilities**  48:19 | 29:1 35:8,24 | 130:16,19 |
| **unredacted** | **utilize**  52:24 | 36:10,24 37:2 | 131:3,5 135:2 |
| 100:3 | 103:1 106:25 | 38:24 39:22 | 135:6,11,13,22 |
| **unrelated** | **utilized**  51:16 | 40:3,9,19 44:2 | 139:16,19 |
| 45:25 | 130:14 180:20 | 44:24 45:4,18 | 140:8,10 141:3 |
| **unsatisfied** | **utilizing**  103:2 | 50:15,19 52:20 | 142:9,16 145:5 |
| 106:3,7 | **v** | 57:7,14,17,19 | 146:9,16,19,25 |
| **unsavory** | | 57:25 59:25 | 147:5,8 150:7 |
| 161:25 | **v**  197:6 198:3 | 60:3 69:6 | 150:12,18,21 |
| | 199:3 | 71:25 72:13 | 151:13,16 |

**[verstandig - weird]**                                        Page 53

152:10,22,25
153:4,13,18
154:2,14,22,25
155:9,16 156:2
159:15,21
160:19 161:6
161:13 163:20
164:4,14,18,22
165:13,17,23
166:9,12,18,21
167:7,13,19
168:6,10
170:22 172:24
174:3,25
175:14 178:16
178:23 180:16
183:19,24
184:2 186:11
186:21,24
187:13 188:1,4
188:8 189:23
190:3,6,10
191:6 192:4
193:20,24
194:2,24 195:7
195:13 197:5
**veterans**  8:20
**vice**  8:12
**vicious**  74:21
**violations**
 109:5
**vis**  154:5,5
**visual**  176:19
 177:1

**vogel**  1:22 2:12
**vogellaw.com**
 2:15
**voice**  8:6 64:20
**volatile**  161:24
**volume**  166:9
 166:13
**voluntary**  5:15

**w**

**w**  2:15 3:2
**waffling**  129:11
 129:15
**wait**  86:6 117:4
**waiting**  105:15
**waived**  197:19
**waivers**  14:1
 19:1,2,12
 106:14
**walford**  48:10
**walk**  175:22
**walked**  48:3
 110:15,15
 173:4
**walking**  175:19
**want**  25:1 29:4
 34:2,8 35:6
 44:24 45:4
 46:3 49:8,16
 52:18 57:11
 94:16 101:14
 103:22 104:10
 110:12 116:5
 116:10 161:18

163:9 172:21
183:19 188:1
194:14
**wanted**  10:23
 12:8 15:17
 39:5 46:16,18
 46:24 53:1,3
 103:25 104:1
 129:11,14
 149:20 181:17
 181:20 194:12
**wanton**  27:23
**warranties**
 180:22
**washer**  157:23
**watch**  117:16
 117:18
**watches**  117:21
**watching**
 117:25
**water**  114:21
 171:2,5,7,24
 172:11 173:5
**waterproof**
 171:15
**watertight**  5:13
 15:6,13 16:25
 142:4,6,25
 143:5 144:5
 145:8 146:12
 147:13,17
 148:8 184:12
 186:7 187:17

**watertight's**
 147:10
**watertown**
 18:10,12 23:6
 23:12 26:8,10
 31:7,25 44:22
 50:10 66:20
 69:20 177:24
 180:15,20
**way**  45:6 56:20
 78:18 80:7
 83:21 91:20
 99:5 107:11
 119:3 122:18
 144:21 147:7
 151:19 159:21
**ways**  115:18
**we've**  49:24
 82:21 89:4,25
 102:15,17,25
 105:16 116:17
 134:8 168:25
**weaponized**
 167:2
**wearing**  169:18
**weddings**  189:5
 189:6,7,9
**week**  44:17
 45:7 80:17
 182:1,2
**weigh**  28:2
**weird**  93:15
 149:13

**[wells - wrote]**                                                      Page 54

| | | | |
|---|---|---|---|
| **wells** 41:7 | 172:24 | 154:9 159:16 | 122:19 124:10 |
| **went** 6:20 7:4,5 | **wife** 9:21 16:9 | 160:20 164:17 | 125:12,24 |
| 7:6,8,13 13:2,2 | 17:2 41:23 | 164:23,24,25 | 130:7 137:13 |
| 20:10 23:6 | **willful** 27:23 | 165:12,24 | 138:22 139:6 |
| 45:3,5,6,17 | **willing** 161:14 | 166:6 196:5,7 | 140:2 144:21 |
| 46:3 66:6 67:3 | **win** 96:7 | 196:16,17 | 148:18,24 |
| 74:18 75:2,8 | **window** 108:24 | 197:8,11 198:1 | 173:12 184:20 |
| 76:14 84:10,10 | 109:1 | 198:4,11 199:1 | 187:17,18,22 |
| 85:11 101:12 | **windows** | 199:4,15 | 187:24 |
| 124:8 129:14 | 171:12 177:15 | **witness's** 34:8 | **worked** 23:12 |
| 133:21 136:2 | **winter** 118:20 | 44:8 | 145:8 171:9,12 |
| 145:13 148:24 | **wires** 189:13 | **witnesses** 8:1 | **working** 7:14 |
| 158:11,16 | **wish** 100:2 | 177:19 | 13:19 16:6,11 |
| 168:2,2,6 | 164:2 | **witness'** 197:14 | 16:13 17:4 |
| 169:7,12 | **wit** 72:4 | **wives** 194:21 | 92:16 114:17 |
| 170:11 176:1 | **withdraw** 69:9 | **wondered** | 165:3 |
| 189:11 | **withhold** | 56:20 | **works** 20:4,7 |
| **west** 2:9 8:19 | 161:19 | **word** 81:13 | 114:25 |
| 21:3,25 22:1 | **witness** 7:17 | 140:12,13 | **worth** 57:7 |
| 24:11 25:3,14 | 26:22 27:6,12 | 160:1 175:1 | 71:2 127:17 |
| **whichever** | 27:17 33:21 | 180:17 187:3 | 140:2 187:1 |
| 108:18 | 34:3,6,10 | 195:8 | **wound** 66:12 |
| **whisper** 36:13 | 36:15,19 37:1 | **worded** 112:3 | **write** 30:22 |
| **white** 99:12,15 | 37:20 44:7,11 | **words** 102:22 | 82:10 94:10 |
| 100:5 | 44:19 45:8 | **work** 14:6 | **writes** 30:4,8 |
| **whiteout** | 51:5 57:11,16 | 15:19 20:3 | **writing** 60:11 |
| 194:17 | 57:18,21 58:3 | 22:21 25:3,6 | 61:7 |
| **whoa** 10:1 | 59:24 60:1 | 26:7 46:22 | **written** 30:18 |
| 75:22 78:22 | 72:4 75:24 | 61:18 66:6 | 30:20 170:7 |
| 97:11 100:14 | 76:2 80:13 | 99:25 105:21 | 177:7 |
| 100:14,14 | 81:1,5 82:12 | 109:6,9 114:20 | **wrong** 23:10 |
| 115:24 120:20 | 89:1,6 108:7 | 114:25 115:2,5 | 81:7 146:1,2 |
| 120:20,20 | 110:10 135:16 | 117:7,11,16 | **wrote** 143:15 |
| 141:3 172:24 | 140:11 150:9 | 118:5,16,17,19 | 143:16 147:23 |

**[wrote - zero]**                                    Page 55

| 168:2 181:25 | 173:8 179:2 |
|---|---|
| **x** | 181:24 182:4 |
| **x**   3:10 4:1 5:1 | 183:1,5,13,25 |
| **y** | 185:14 188:16 |
| | 188:18 189:9 |

**y**   118:8

**yardi**   30:2 41:2
  78:19 148:2

**yeah**   10:5
  11:23 15:1
  18:15 20:1
  22:9 24:5,18
  35:7 42:1,5
  46:13 47:24
  50:19 54:4
  56:23 57:13,17
  57:21 58:2,14
  62:12 63:1,20
  74:10 77:11
  82:13 87:13
  90:4 93:6,15
  96:3 101:12
  103:15 104:7
  107:25 109:2
  112:14 115:3
  116:12 117:14
  118:13,18
  119:1 124:4,17
  125:20 130:5
  131:9,25 132:8
  136:24 143:1
  144:13 149:14
  151:1 153:18
  165:12 168:15

190:3

**year**   20:14 23:2
  29:13 42:3
  91:6,9 108:15
  111:9 142:23
  181:22

**years**   20:18
  33:17 111:8
  134:9

**yellow**   121:16
  122:5,6,14,23

**yep**   9:23 18:1
  18:17 23:23
  29:17 30:11
  59:1 84:1
  105:23 113:11
  135:20 136:24
  139:13 174:17
  182:17

**yesterday**   7:25
  92:18 132:17
  174:19

**yield**   160:6

| **z** |
|---|

**zero**   95:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.