IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| In re: | ) | Case No. 25-30003 |
| | ) | (Chapter 11) |
| PARKSIDE PLACE, LLC | ) | |
| | ) | |
| Debtor | ) | |
| | ) | Jointly Administered |

**SECOND AMENDED CHAPTER 11 PLAN
OF REORGANIZATION OF GENERATIONS ON 1ST, LLC**

Comes now Generations on 1st, LLC ("Generations" or the "Debtor" or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1121(b) of Title 11 of the United States Code, and provides the following second amended plan of reorganization (the "Plan") for the Debtor:

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT ISSUED PURSUANT TO SECTION 1125(b) OF TITLE 11 OF THE UNITED STATES CODE IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018 AND IN THIS PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

ARTICLE I

DEFINITIONS; RULES OF INTERPRETATION; COMPUTATION OF TIME

1.1   **Scope of Definitions.**  For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings assigned to them in Article I of the Plan.  Any term used herein that is not defined herein, but that is used in Title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules

1

of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

    1.2    **Definitions.**

    a.    "Administrative Claim" means all Claims that have been allowed pursuant to an order of the Bankruptcy Court and that are entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code.

    b.    "Administrative Claims Bar Date" means the thirtieth (30th) calendar day succeeding the Effective Date, subject to the allowances of Section 1.4 hereof.

    c.    "Administrative Claims Bar Date" means the last date for a person to file any applications or requests for payment of Administrative Claims and shall be specifically defined as the first business day next succeeding the thirtieth calendar day following the Confirmation Date.

    d.    "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, provided to each Holder of a Claim entitled to vote to accept or reject this Plan.

    e.    "Bankruptcy Case" means the above-captioned jointly administered proceeding.

    f.    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of North Dakota.

    g.    "Business Day" means any day that is not a Saturday, a Sunday or "legal holiday" in the District of Columbia as such term is defined in Bankruptcy Rule 9006(a).

    h.    "Cash on Hand" means the cash and cash equivalents held by the Debtor on the Effective Date.

    i.    "Causes of Action" means, any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtor, whether arising before or after the Petition Date, including, without limitation, those which are: (i) against any party that has filed a Claim herein; (ii) property of any Estate under and pursuant to Section 541 of the Bankruptcy Code; (iii) for subrogation and contribution; (iv) for turnover; (v) for avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (vi) to determine the extent, validity and priority of liens and encumbrances; (vii) for surcharge under Section 506(c) of the Bankruptcy Code; (viii) for subordination under Section 510 of the Bankruptcy Code; (ix) related to federal or state securities laws; (x) direct or derivative claims or causes of action of any type or kind; (xi) for professional malpractice against professionals employed by any Debtor; (xii) against any and all current and/or former officers and directors of any Debtor; (xiii) under and pursuant to any policies

of insurance maintained by any Debtor; (xiv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xv) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xvi) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; and (xvii) or may be available to any Debtor against any third party(ies) under any legal or equitable theory, whether or not specifically identified or described herein.

      j.      "Claim" has the meaning ascribed in Section 101(5) of the Bankruptcy Code.

      k.      "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

      l.      "Confirmation" shall mean the entry of an order of the Bankruptcy Court confirming the Plan in accordance with Section 1129 of the Bankruptcy Code

      m.      "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

      n.      "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

      o.      "Creditor" has the meaning ascribed in Section 101(10) of the Bankruptcy Code and shall refer to any Holder of a Claim against any Debtor or Holder of any Claim against Property of Debtor as defined in Section 102(2) of the Bankruptcy Code.

      p.      "Disclosure Statement" means the Disclosure Statement with respect to this Plan, as may be amended.

      q.      "Distribution" means each distribution of Cash to Holders of Allowed Claims pursuant to and under the terms of this Plan by the Debtor on each Distribution Date.

      r.      "Effective Date" shall mean the date fourteen days after the Confirmation Date.

      s.      "Equity Interest" means any ownership interest or share in the Debtor (including, without limitation all rights to obtain such an interest or share in any Debtor).

      t.      "Estate" means the estate created in this case for the Debtor pursuant to Section 541 of the Bankruptcy Code.

      u.      "File, Filed or Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

      v.      "Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired; (ii) in the event of a motion for reconsideration or rehearing is filed, such motion shall have been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event of an appeal is filed and pending, a stay pending appeal has not been

entered; provided, however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable; and provided further, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

w. "Holder" means a Person holding a Claim or any authorized agent who has completed, executed and delivered a Ballot in accordance with the applicable voting instructions.

x. "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind affecting any asset or any property of the Debtor contemplated by Section 101(37) of the Bankruptcy Code.

y. "Person" has the meaning ascribed in Section 101(41) of the Bankruptcy Code.

z. "Petition Date" means October 17, 2023, the date on which the Debtor commenced this case by filing a petition for relief pursuant to Section 301 of the Bankruptcy Code.

aa. "Plan Payment Commencement Date" shall mean the first business day of the first calendar month next succeeding the Effective Date.

bb. "Priority Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under Sections 507(a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

cc. "Priority Scheme" shall mean the priorities for the payment of claims as set forth in 11 U.S.C. § 507.

dd. "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

ee. "Professional" means any professional employed or to be compensated pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

ff. "Real Estate" means that certain parcel of real property, and those various improvements thereupon, commonly known as 26 1st Avenue SW, Watertown, South Dakota 57201.

gg. "Schedules" means the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

hh. "Secured Claim" means a Claim that is secured by a Lien on, or security interest in, property of any Debtor, or that has the benefit of rights of setoff under Section 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, which value shall be determined as provided in Section 506 of the Bankruptcy Code.

4

ii. "U.S. Trustee" shall mean the Office of the United States Trustee.

1.3 **Interpretation.** For purposes of the Plan, (a) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference herein to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (c) unless otherwise specified, all references herein to Articles, Sections, Schedules and Exhibits are references to Articles, Sections, Schedules and Exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in their entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.4 **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES

2.1 **Administrative Expense Claims**. On the Effective Date or at such time as otherwise agreed, the holder of an allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim, cash in an amount equal to the unpaid portion of such allowed Claim. Upon information and belief, the only administrative expense claimant herein is counsel for the Debtor, who holds a retainer that should cover a portion—albeit likely not all—of counsel's fees. The Cash on Hand shall be used to satisfy any portion of this Administrative Claim not secured by counsel's retainer. Should the Cash on Hand be inadequate to pay any Administrative Claim over and above the subject retainer, counsel for the Debtor—through the docketing of this Plan—affirmatively agrees to permit such deficiency to be paid over a period of time equal to six months from the Plan Payment Commencement Date.

To facilitate the orderly payment of Administrative Claims, <u>all Administrative Claims must be asserted no later than the Administrative Claims Bar Date in order to be allowed and eligible for payment. Parties who fail to assert Administrative Claims in accordance with the Administrative Bar Date will be forever barred from receiving distributions under the Plan as Administrative Claim holders</u>. Administrative Claims remain subject to approval of the Bankruptcy Court as a condition precedent to payment.

2.2 **U.S. Trustee's Fees.** The United States Trustee shall receive payment, on or before the Effective Date, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. Any U.S. Trustee's fees owed subsequent to the Effective Date will be paid from the Debtor's operating revenue. The Cash on Hand shall be used to pay these fees.

5

2.3 **Full Satisfaction, Discharge and Release**.  The payments, distributions and other treatment afforded to Holders of allowed Administrative Claims against the Debtor under this Article II shall be in full and complete satisfaction, discharge and release of such allowed Claims.

## ARTICLE III

### CLASSIFICATION, IMPAIRMENT AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR

3.1 **Generally.**  All Claims and Equity Interests, except Administrative Expense Claims, are placed in Classes as set forth below.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled or paid prior to the Effective Date, and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes. A breakdown of each Claim holder, and the Class(es) in which they are correlatively placed, is attached hereto as Exhibit A.[1]

3.2 **Identification and Treatment of Classes.**  The following are the designations for, and treatment of, the Classes of Claims against—and Equity Interests in—the Debtor:

3.2.1 **Class 1 – Disputed Secured Claim of Red River State Bank.**   Class 1 consists of the secured Claim of Red River State Bank ("RRSB") in the amount of $11,200,000.00, net of payments made during the life of the Bankruptcy Case (to the extent such payments have caused a diminution of the principal obligation). As noted in the pending case of *Generations on 1st, et al. v. Red River State Bank*, Case No. 25-07009 (Bankr. D.N.D. 2025) (the "Adversary Proceeding"), the Debtor holds various civil Claims against RRSB that, once adjudicated, are reasonably expected to significantly setoff the total size of the Claim of RRSB in this case. And it is thusly impossible, as of present, to fully assess the secured Claim of RRSB. However, whatever the allowed Secured Claim of RRSB may ultimately be, such will be retired through the making of regular monthly payments, beginning on the Plan Payment Commencement Date, based on (i) a 30-year amortization schedule; (ii) a 4.350% interest rate (being the rate agreed upon by the parties at the time RRSB solicited the Debtor's business); and (iii) a seven-year balloon obligation. RRSB will retain its Lien on the Real Estate, in a sum equal to the allowed outstanding debt, until such a time as the debt is retired *en toto*.

It is quite possible the Adversary Proceeding will pend until after the Effective Date. If so, there will not be any certainty as to the total allowed Secured Claim of RRSB as of the Effective Date, but it will nonetheless benefit both the Debtor and RRSB for payments against the yet-to-be-liquidated to be made (as has been done through cash collateral payments post-petition).

---

[1] As noted on Exhibit A, several Claims are—or will be—subject to objections. The numbers on Exhibit A reflect the sums the Debtor believes, upon diligent inquiry, to be the most likely result of each such objection (saving and excepting the Claim of RRSB which, as discussed *infra*, § 3.2.1, is expressly intended to not serve as a figure suggestive of the ultimate objection resolution). For the avoidance of doubt, however, whether or not a Claim is marked as "disputed" on Schedule A is *not* dispositive or binding as to whether an objection thereto may be subsequently filed; the "disputed" column is for informal reference only.

As such, monthly payments of $55,754.92 will be made until such a time as the total amount of RRSB's allowed Secured Claim is determined through the Adversary Proceeding. This figure is derived by assuming the allowed Secured Claim of RRSB will be $11.2 million, net of setoffs. For the avoidance of doubt, however, this estimate should not be construed as an admission of liability in any sum certain; there is a rather distinct possibility the total debt will prove significantly lesser once the Adversary Proceeding is finally adjudicated.

Upon final adjudication of the Adversary Proceeding, the monthly payments due to RRSB will be reamortized to account for (i) the Bankruptcy Court's determination of the actual sum due and owing, net of setoffs; and (ii) payments made post-petition (whether through cash collateral payments or otherwise).

Class 1 is an impaired Class.

3.2.2 **Class 2 – Allowed Secured Claim of Watertown Development Company.** Class 2 shall consist of the allowed Secured Claim of Watertown Development Company ("WDC"). This obligation is derivative of a tax increment financing ("TIF") arrangement pursuant to Section 11-9-1, *et seq*. of the South Dakota Codified Laws (the "TIF Arrangement"). The TIF Arrangement provides that an advance of funding to the Debtor shall be repaid through a combination of (i) payments from the Debtor; and (ii) a grant from the city of Watertown, South Dakota (the "City of Watertown").[2] WDC has filed a proof of claim indicating a total indebtedness of $2,122,790.70.[3] The TIF Arrangement, in turn, provides that WDC shall receive forward-looking tax revenues from the City of Watertown for a fixed duration of time. There accordingly exist two components to the manner in which this Class shall be paid: (i) funds to be paid by the City of Watertown, pursuant to the TIF Arrangement; and (ii) funds to be paid by the Debtor, also pursuant to the TIF Arrangement.

The funds to be paid by the City of Watertown will continue to be remitted by the municipal entity. While inherent in any chapter 11 plan, the Debtor does affirmatively covenant to continue paying property taxes, in a timely and proper fashion, so as to ensure the availability of monies to be utilized by the City of Watertown to pay its portion of this Claim. The Debtor further observes that the pledge of monies from the City of Watertown, to WDC, shall be unimpaired and unhampered by this Bankruptcy Case, with the Debtor claiming no right to redirect the payment of its tax revenues on a forward-looking basis. Should the Real Estate be sold, the obligation to pay property taxes will, as a matter of law independent of this Plan, necessarily pass to any successor title holder.

---

[2] The grant is actually from the City of Watertown to the Debtor, but the Debtor, as part of the TIF process, has agreed to pay the grant proceeds over to WDC.

[3] The Debtor intends to investigate this sum and, if appropriate, may thereafter lodge a partial objection to the Claim of WDC. The subject proof of claim does an excellent job of breaking down the putative debt but does not reflect any payments having been made thereupon, even though the assignment of grant proceeds should have fetched certain payments prior to the Petition Date.

The funds to be paid by the Debtor, in turn, equal $52,441.70 (being equal to the gross obligation less the sum to be repaid through property taxes, under the TIF Arrangement) *plus* any shortfall in the amount of WDC's claim not covered by forward-looking tax revenues. It is inherently difficult to estimate what, if any, shortfall may occur, insofar as the taxes on the Real Estate have generally increased since the conclusion of construction and, in sync with prevailing economic and inflationary trends, are expected to continue to increase on a go-forward basis.

To reconcile this ambiguity, the Debtor will make two series of payments to WDC. *First*, the Debtor shall pay $52,441.70 to WDC over the course of fifteen (15) years, through equal monthly payments of $376.96, with the debt accruing interest at 3.58% until retired (being the blended interest rate derived at by weighting the three separate debt tranches referenced in the proof of claim filed by WDC).

*Second*, every five (5) years (commencing on the fifth anniversary of the Effective Date), the Debtor will reconcile the payments made to WDC—pursuant to the foregoing provision and pursuant to the payment of taxes—and will pay, through a newly-issues five (5) year promissory note, also accruing interest at 3.58% and amortized in a straight line manner, any then-extant shortfall. *Provided, however,* that should such a reconciliation reveal an overpayment of monies to WDC, the Debtor shall, instead of tendering a new five (5) year promissory note, instead reamortize the payments called for in the foregoing provision (contemplating payments over a fifteen [15] year period) to account for the overpayment.

By way of anecdote only, if the reconciliation five (5) years from the Effective Date reveals a shortfall of $10,000.00 in payments from tax revenues, the Debtor will then issue to WDC a promissory note for $10,000.00, to be paid over five (5) years, accruing interest at 3.58%. The Debtor would then pay WDC an *additional* $182.28 per month (being the straight line amortized obligation under such a note) for five (5) years. The reconciliation process would then commence anew, with a new note being issued or, if an overpayment has occurred, the monthly payments of $376.96 (against the anticipated shortfall of $52,441.70) being accordingly reduced.

WDC shall retain its mortgage on the Real Estate in a sum equal to the Debtor's obligation hereunder ($52,441.70) until such a time as that obligation is retired, with the subject Lien being reduced in a sum equal to the amount of principal tendered with each monthly payment.

Notwithstanding any provision to the contrary in the TIF Agreement or any related loan documents, the Class 2 obligation shall *not* become immediately due and owing upon a sale of the Real Estate, though the portion thereof payable by the Debtor under this Plan ($52,441.70 plus any obligation under the five [5] year reconciliation provision) shall be payable, in full, upon a sale of the Real Estate. And, for the avoidance of doubt, the Debtor will continue to honor its grant of funds from the City of Watertown to WDC. (The Debtor does not believe the grant to be an executory contract capable of being assumed or rejected herein, insofar as such is more akin to the giving of a security interest. However, to whatever extent the grant may be deemed an executory contract, such is hereby assumed.)

Class 2 is an impaired Class.

   3.2.3 **Class 3 – Codington County Treasurer.** Class 3 shall consist of the Claim of the Codington County Treasurer. As noted in the proof of claim filed by this creditor, the subject taxes came due post-petition. The Debtor has since paid these taxes. However, to whatever extent not already paid by the Debtor, these are being paid in the ordinary course by the Debtor. The Debtor accordingly disputes that the Codington County Treasurer holds an allowable pre-petition Claim but, equally, will continue to pay taxes in a timely manner, thereby mooting any dispute.

   Class 3 is an unimpaired Class.

   3.2.4 **Class 4 – Watertown Municipal Utilities**. Class 4 consists of the unpaid pre-petition utility charges incurred by the former operator of the Real Estate. This Claim came as a surprise to the Debtor since HME Companies, LLC ("HME")—the receiver that had operated the Real Estate pre-petition—had affirmatively represented, on the record during a hearing on first day motions, that all utilities had been paid. This Claim will be paid, *pari passu*, with those of Class 5, Class 6 and Class 7 claimholders, over a period of five (5) years from the Plan Payment Commencement Date.

   Class 4 is an impaired Class.

   3.2.5 **Class 5 – General Unsecured Trade Creditors**. Class 5 consists of the Claims of CP Business Management, White Glove Cleaning, HME, and Cannon Electric LLC. Each of these Claims are derivative of obligations attendant to the care and maintenance of the Real Estate, whether directly (as with White Glove Cleaning and Cannon Electric LLC) or derivatively (as with CP Business Management and HME, both of which assert themselves to have fronted monies for the payment of ordinary trade creditors during their respective times operating the Real Estate pre-petition). This Class will be paid, *pari passu*, with Class 4, Class 6 and Class 7, over a period of five (5) years from the Plan Payment Commencement Date.

   Class 5 is an impaired Class.

   3.2.6 **Class 6 – Unsecured Claim of Red River State Bank.** Class 6 consists of the Claim of Red River State Bank that is both an allowed Claim and an unsecured Claim. This claim is in the amount of $2,678,457.38, subject to setoff. This claim is also likely to be reduced based on the allocation of various notes on which Mulinda Craig ("Ms. Craig") is personally obligated, secured by the Real Estate, and upon which a separate debtor in bankruptcy—Parkside Place LLC ("Parkside")—is also bound. These obligations will be paid by the Debtor and Parkside in such a manner as to ensure they are paid in full, without any "double" payment thereupon being made. This Class will be paid, *pari passu*, with Class 4, Class 5 and Class 7, over a period of five (5) years from the Plan Payment Commencement Date.

   Class 6 is an impaired Class.

9

3.2.7   **Class 7 – Unsecured Claim of Blacktail Investments, LLC**. Class 7 consists of the unsecured Claim of Blacktail Investments, LLC ("Blacktail"),[4] being monies loaned directly to Generations for the sole and express purpose of retaining bankruptcy counsel. Insofar as this Claim is not comparable to that of a trade creditor, nor comparable to that of a construction lender with a putative deficiency, this Claim is separately classified. This Class will be paid, *pari passu*, with Class 4, Class 5 and Class 6, over a period of five (5) years from Plan Payment Commencement Date.

Class 7 is an impaired Class.

3.2.8   **Class 8 – Equity.** Class 8 consists of the Debtor's Equity Interest. The Debtor's Equity Interest shall remain unchanged insofar as this Plan proposes to pay all Claim Holders in full.

Class 8 is an unimpaired Class.

## ARTICLE IV

## MEANS OF IMPLEMENTING THE PLAN

4.1   **Appointment of Chief Restructuring Officer**. To the extent not already employed in such capacity before confirmation of the Plan, Michael Schmitz shall commence serving as the Debtor's chief restructuring officer ("CRO") on the Effective Date. Mr. Schmitz will be paid for his services at his usual and customary hourly rate. Until such a time as the whole of the Class 1 obligation is paid, in full, Mr. Schmitz may only be removed as CRO (i) by virtue of his own resignation; or (ii) by order of this Honorable Court, for good cause shown. If Mr. Schmitz is so removed, he shall be replaced by an independent, non-Insider third party fiduciary holding one or more professional degrees, with said appointment to be approved by the Bankruptcy Court. The CRO will be the Debtor's chief executive and have final decision making authority as to all operations of the Debtor. For want of ambiguity, the CRO shall have, *inter alia*, the power to bring suits in the name of the Debtor, without any limitation except for those imposed by non-bankruptcy law (ie, good faith, the requirement to state a valid claim for relief, standing, etc.).

4.2   **Operation of Real Estate**. Since reassuming operation of the Real Estate post-petition, the Debtor has been able to abide by a budget with relative precision and draw a profit from operations, all the while making cash collateral payments to RRSB. The Debtor will continue to do so post-confirmation, making plan payments in lieu of cash collateral payments. The actual logistics of the underlying business are neither novel nor complex; Generations collects rents from tenants, expends money on the care and upkeep of the Real Estate, pays trade creditors as obligations come due, and earns an industry-competitive profit in so doing. The Debtor has used CP Business Management as a property manager since coming back into possession of the Real Estate and will continue to do so, with that election alone saving palpable monies over the rates being charged by HME—the receiver handpicked by RRSB to operate the Real Estate pre-petition.

---

[4] It is believed this Claim may have been assigned post-petition. Should such an assignment have occurred, any evidence thereof—properly docketed in the Bankruptcy Case—will be honored, with payments made to the then-current Claim holder.

10

The foregoing notwithstanding, the CRO shall have the right—but not the obligation—to discharge CP Business Management if the CRO believes such to be a prudent exercise of his or her business judgment.

4.3     **Assumption of Leases and Executory Contracts**. In furtherance of Section 4.1 hereof, Generations assumes all of the leases and executory contracts delineated on Schedule G, *see* DE #1 at pp. 25-38, *except* Generations expressly rejects the putative contract with HME listed on line 2.24 thereof to the extent (i) Generations is actually a party thereto; and (ii) the subject putative contract has not already been terminated or otherwise rejected. Generations does not believe any cure payments are required in furtherance of this acceptance of contracts and leases insofar as Generations is the landlord on each lease and is current on payment obligations on each executory contract. Accordingly, the cure sum for these leases and contracts is fixed at $0.00.[5]

4.4     **Sale of Real Estate**. The Debtor does *not* presently intend to sell the Real Estate. However, the Debtor shall have the absolute right to do so at any time before the final payment is made under this Plan. Should such a sale occur, the proceeds thereof shall be used to retire the obligations set forth in Articles II and III hereof, in accord with the Priority Scheme established in those Articles and otherwise established by controlling law. Upon such a sale, however, the Debtor shall *not* be bound to pay the portion of the Class 2 Claim that is to be retired through the tendering of ordinary property taxes, with such obligation being expressly treated in Section 3.2.2 hereof. In the event of a sale, such shall be free of tax to the greatest extent permitted by Section 1146 of the Bankruptcy Code.

4.5     **Refinance of Debt**. Should the Debtor not first elect to engage a sale as contemplated by Section 4.3 hereof, on or before the seventh anniversary of the Effective Date, the Debtor will refinance the debt due and owing to RRSB, using the proceeds of said refinancing to retire the obligation to RRSB. Pursuant to the allowances of Section 364 of the Bankruptcy Code, any such refinancing shall result in a lender assuming the first lien position then-formerly held by RRSB, with the resulting Lien being senior to that of WDC.

4.6     **Litigation Against RRSB**. The Debtor (through the CRO) will continue to pursue the Adversary Proceeding post-confirmation, aiming to use the litigation to minimize the debt owed to RRSB. For want of ambiguity, Generations does *not* posit that RRSB is likely to be subject to a judgment that will result in a freestanding collection of funds; the Adversary Proceeding, rather, is aimed at reducing to judgment civil liability that can be used to set off part of the debt to RRSB, thereby increasing the free cash flow of Generations.

4.7     **Other Causes of Action**. The Debtor (through the CRO) will assess the existence—and desirability of pursuing—other Causes of Action, against parties other than RRSB, including—but not limited to—any potential Causes of Action against Insiders of the Debtor. A

---

[5] For want of ambiguity, to the extent the Debtor herein assumes any lease to which the counterparty is in default or upon which eviction proceedings have been commenced, such assumption ought not be construed as a waiver of said default but, rather, as an action in furtherance of the preservation of rights to collect unpaid rent and to pursue appropriate nonbankruptcy remedies.

11

preliminary analysis suggests there may exist legitimate claims against HME, though there exist very real concerns that the legal fees attendant to pursuing such claim could near—if not exceed—the sum of any actual recovery, thereby militating against bringing such claims. There is also a belief that there may exist Causes of Action against one or more insiders of RRSB, including claims related to the solicitation of a bribe and claims related to the commission of wire fraud, the attempted commission of bank fraud, and the commission—or attempted commission—of other activities subsumed within the definitional ambit of Section 1961 of Title 18 of the United States Code. For self-evident reasons, the Debtor elects to not herein publish its litigation plans and strategy, other than to observe: (i) Generations is committed to bringing any Causes of Action that may financially benefit the Debtor's Estate (including meritorious claims against Insiders, if any are found to be extant and prudently pursued following a good faith analysis of the same by the CRO); (ii) Generations is committed to *not* bringing any Causes of Action that will primarily—if not wholly—serve to merely enrich counsel; and (iii) Generations is acutely aware of the good faith rigors attendant to the filing of any litigation and will, accordingly, seasonably forbear from bringing claims unless and until Generations is sufficiently satisfied that there exists a good faith basis to do so.

4.8    **Time of Payments**. The Class 1 and Class 2 Claims shall be paid on a monthly basis, on or before the 15th day of each successive calendar month, commencing in the calendar month next succeeding the month in which the Effective Date occurs (or, if the Effective Date is prior to the 14th day of a given calendar month, then in the calendar month in which the Effective Date occurs). All other Claims will be paid not less than quarterly, commencing in the first calendar quarter next succeeding the Effective Date, with the Debtor free to make such payments in irregular sums, in the business judgment of the CRO, based on the Debtor's then-extant cash on hand and analysis of necessary cash reserves for the payment of insurance, taxes, professional fees (including those of the CRO), and ordinary operating expenses. No distribution shall be made to the Class 8 equity holder, on account of said equity interest, unless and until all other Classes are paid in full, though the Class 8 equity interest may be reimbursed for out-of-pocket expenses incurred for the benefit of the Debtor, should the CRO find such reimbursements to be appropriate on a case-by-case basis.

4.9    **De Minimis Distributions**. The provisions of Section 4.8 hereof notwithstanding, the Debtor shall not distribute to the holder of any Claim any payment in a sum of less than $100.00 and shall, instead, either (i) pay such Claim, in full, on the first anniversary of the Effective Date, if the gross Claim is for a sum of less than $100.00; or (ii) defer payments to such Claimant, until such a time as the gross sum to be distributed to such payment exceeds $100.00; *except* (iii) if the final payment due to any Claimant is for a sum less than $100.00, the Debtor shall nonetheless make the final payment at such a time as the Claim would otherwise be paid hereunder.

4.10    **Third Party Injunction**. THE HOLDER OF THE CLASS 1 OR CLASS 2 CLAIM SHALL BE ENJOINED FROM INITIATING OR CONTINUING ANY COLLECTION OR ENFORCEMENT ACTION AGAINST ANY INSIDER OR THEIR PROPERTY, ON ACCOUNT OF ANY DEBT OWED BY ANY INSIDER ON ACCOUNT OF A GUARANTY OF AN OBLIGATION OWED BY THE DEBTOR, ABSENT AN UNCURED DEFAULT BY

THE DEBTOR WITH RESPECT TO THE PAYMENTS PROVIDED FOR IN THIS PLAN ON THE CLASS 1 OR CLASS 2 CLAIM (RESPECTIVELY). TO THE EXTENT ANY STATUTE OF LIMITATION APPLIES TO ANY CLAIM AFFECTED BY THIS SECTION, THE APPLICABLE STATUTE OF LIMITATIONS SHALL BE TOLLED AND SUCH LIMITATION PERIOD SHALL NOT BEGIN TO RUN THE OCCURRENCE OF AN UNCURED DEFAULT UNDER THE PLAN.

4.11　**Cash Payments**. All payments due to Claim Holders under this Plan shall commence being made on the Plan Payment Commencement Date unless a different date is indicated in connection with the treatment of a specified Claim or Class. All payments will be made in the lawful currency of the United States, via check, wire, or ACH transfer, in the discretion of the Debtor.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

5.1　**Delivery of Distributions**. Distributions and deliveries to Holders of allowed Claims shall be made at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such Holders if no proof of claim is filed).

5.2　**No Interest Unless Otherwise Provided**. No interest shall be paid on any Claim unless, and only to the extent permitted, under the terms of the Plan.

5.3　**Undistributed Property**. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, such Unclaimed Property shall be forfeited by such Holder. Unclaimed Property shall be (i) first redistributed, to pay the Claims of all other Claimants in accord with the priority scheme established herein; and (ii) second, if extant after all Claims have been paid in full, then—and only then—donated to The University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond in the manner she deems most charitably fit.

## ARTICLE VI

## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

6.1　**Conditions to Effectiveness of Plan.** The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied or waived by the Plan Proponent: (a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponent, and such Confirmation Order shall be a Final Order; and (b) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to Section 1125 of the Bankruptcy Code.

6.2　**Notice of Confirmation of the Plan.** Notice of entry of the Confirmation Order shall be provided as required by Bankruptcy Rule 3020(c)(2).

# ARTICLE VII

## RETENTION OF JURISDICTION

**7.1** **Retention of Jurisdiction.** Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the chapter 11 case of the Debtor and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b) to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c) to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(d) to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(e) to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(f) to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(g) to enter a final decree closing this Chapter 11 case.

**7.2** **Abstention and Other Courts.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this section of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

# ARTICLE VIII

## RELEASE FOR PLAN PROPONENT AND PROFESSIONALS

**8.1** **Limitation of Liability in Connection with the Case, the Plan, and Related Documents.** Pursuant to § 1125(e) of the Bankruptcy Code; the Debtor and its Professionals, representatives, successors, and assigns; and the Plan Proponent (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted

14

to be taken in connection with or related to the Case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1     **Severability.**  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Plan Proponents may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the Holder of any Claim or Equity Interest.

9.2     **Binding Effect.**  Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the Holders of Claims and Equity Interests, and such Persons' respective successors and assigns.

9.3     **Transfer Tax Exemption.**  Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, deeds of trust, mortgages, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, including the sale of the Real Estate provided for under this Plan, shall not be subject to any stamp tax or other similar tax, including, but not limited to, transfer and recordation tax on the sale of the Real Estate.

9.4     **Governing Law.**  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of North Dakota shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

9.5     **Timing of Distributions.**  Any Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

9.6     **Revocation or Withdrawal of Plan.**  The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn

or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred. If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the such entity or any Person in any further proceedings involving such entity.

9.7  **Nonmaterial Modifications.** The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to Holders of Claims and Equity Interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

9.8  **Material Modifications.** Modifications of the Plan may be proposed in writing by the Plan Proponents at any time prior to Confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

9.9  **Cramdown.** This section shall constitute the Plan Proponent's request, if necessary, pursuant to Section 1129(b)(1) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of Section 1129(a)(8) of the Bankruptcy Code may not be met.

9.10  **No Recourse.** No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Estate, the Trustee and his professionals, the Debtor, or the Plan Proponent and its professionals, other than the right to receive Distributions in accordance with the terms of the Plan.

9.11  **Notices.** Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
*Counsel for the Debtor*

9.12  **Default.** A default under this Plan shall be deemed to occur if (i) the Debtor fails to perform any obligation(s) hereunder; (ii) notice of such failure is given to the Debtor, both in the care of its registered agent in the State of North Dakota *and* in the care of its bankruptcy counsel *and* by publication upon the docket of this bankruptcy case; and (iii) said failure remains, uncured, for a period of thirty (30) days following the giving of such notice. Upon such a default, any

impacted party—alongside the U.S. Trustee—shall have all remedies available under the Bankruptcy Code as well as all remedies available under applicable nonbankruptcy law.

9.13  **Saturday, Sunday, or Legal Holiday.**  If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

9.14  **Successors and Assigns.**  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

9.15  **Entry of a Final Decree**.  The Debtor may file a motion with the Bankruptcy Court to obtain the entry of a final decree upon completion of Plan payments or on such other time as the Debtor determines appropriate.

                                                           Respectfully submitted,

Dated: February 10, 2026                  By: /s/ Maurice B. VerStandig
                                                   Maurice B. VerStandig, Esq.
                                                   The Dakota Bankruptcy Firm
                                                   1630 1st Avenue N
                                                   Suite B PMB 24
                                                   Fargo, North Dakota 58102-4246
                                                   Phone: (701) 394-3215
                                                   mac@dakotabankruptcy.com
                                                   *Counsel for the Debtor*