IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| In re: | ) | Case No. 25-30003 |
| | ) | (Chapter 11) |
| PARKSIDE PLACE, LLC | ) | |
| | ) | |
| Debtor | ) | |
| | ) | Jointly Administered |

**DISCLOSURE STATEMENT FOR SECOND AMENDED
CHAPTER 11 PLAN OF REORGANIZATION OF GENERATIONS ON 1st, LLC**

Comes now Generations on 1st, LLC ("Generations," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), and provides the following disclosure statement (the "Disclosure Statement") correlative to its second amended plan of reorganization (the "Plan"):

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT "A" AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN,

1

EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PARTY IS AUTHORIZED BY THE PLAN PROPONENT TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR, IF ANY, SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION CONTAINED THEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT. THIS DISCLOSURE STATEMENT AND PLAN SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE SECURED CREDITORS OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement and the Plan annexed hereto as Exhibit "A" are being furnished by the Plan Proponent to holders of Claims pursuant to Section 1125 of the Bankruptcy Code, to permit creditors the opportunity to either accept or reject the Plan (and the transactions contemplated thereby, as disclosed herein), as necessary. Capitalized terms in this Disclosure Statement, to the extent not otherwise defined herein, shall have the same definition that is assigned to capitalized terms in the Plan.

I. **Introduction, History of Debtor, and Discussion of Assets and Liabilities**

Formed on March 4, 2020, Generations was created for purposes of constructing and operating a residential apartment building at 26 1st Avenue in Watertown, South Dakota (the "Real Estate"). Wholly owned by Jesse Craig ("Mr. Craig"), the Debtor anticipated being constructed in delayed synchronicity with at least two other regional projects—Parkside Place and the Ruins—in such a manner that a synergy would exist whereby contractors could travel to Watertown, perform work on one project, finish such work, and then seamlessly transition to the next project.

A number of factors went into initial development of the Real Estate, including an assessment of the housing demand in Watertown, the availability of tax increment financing ("TIF") from the local government, and the promised provision of both construction and completion funding from Red River State Bank ("RRSB"). The Debtor commenced operations with detailed projections, and seized upon the industry experience of Mr. Craig. Yet Generations' development thereafter proceeded in a hardly-typical manner.

Myriad disputes presently exist between RRSB and the Debtor concerning what did—and did not—happen along the way. Where appropriate, this Disclosure Statement addresses the Debtor's position as to those disputes, which are most pertinently being advanced through the pending case of *Generations on 1st, et al. v. Red River State Bank*, Case No. 25-07009 (Bankr. D.N.D. 2025) (the "Adversary Proceeding"). However, more broadly, it may be safely posited that (i) the COVID-19 pandemic occasioned certain construction delays directly attributable to workers becoming sick with the eponymous illness; (ii) the same pandemic occasioned an increase in certain material costs, as prices fluctuated in a historically-volatile manner; (iii) numerous disagreements arose between RRSB and the Debtor; (iv) a loan default was called; (v) the Real Estate was placed in receivership; and (vi) this bankruptcy case was filed in an effort to find a path to sever the asset from the hands of a receiver the Debtor found to be inefficient, whilst creating a framework for the payment of all creditors' claims in full.

Specifically, Generations petitioned for chapter 11 protection on January 6, 2025. In subsequently-amended schedules, the Debtor disclosed assets valued at just over $14.8 million and liabilities of just over $10 million. A later-filed stipulation with RRSB served to increase the liabilities to a sum closer to $15 million. The Debtor's assets are comprised of the Real Estate (including a fully-complete, fully-rented building thereupon), cash, and cash equivalents. Most debts are owed to RRSB and trade creditors.

Generations has remained a debtor-in-possession at all times since, with the Debtor's reorganization being primarily focused on (i) advancement of the Adversary Proceeding; (ii) prosecution of a claim objection, against RRSB, aimed at ascertaining various disbursement and payment histories; and (iii) the placement of the Real Estate in the hands of a seasoned and top-quality property manager, who has succeeded in increasing rental values and occupancy rates. The Debtor has timely filed all operating reports and appropriately sought to extend—and received an extension of—the exclusivity period in which to solicit votes on a plan of reorganization. Various disputes concerning the use of cash collateral have played a role in the Debtor's case, though each such dispute has—thus far—been resolved prior to a hearing thereupon actually commencing.

## II. The Chapter 11 Confirmation Process

The chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) class of creditors whose claims against the Debtor will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their claims without modification or changes to their right to payment are deemed to have accepted the Plan and do not vote. Only creditors whose claims are "impaired" or their right to payment terms is modified or changed are entitled to vote in favor of accepting or rejecting the Plan. A class of claims is "impaired" if the amount to be paid to the class provides the claimants in that class with less than full payment of the allowed claims in that class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such class requires that at least one-half of the creditors in the class who cast accepting votes on the Plan, and hold at least two-thirds of the total dollar amount of the claims in that class casting votes on the Plan. A class of claims that is likely to receive nothing under the Plan is not entitled to vote thereon and, to the contrary, is presumed to have rejected the Plan.

As indicated in the instructions accompanying the ballot (the "Ballot"), which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be delivered to the Plan Proponent's counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

Pursuant to Federal Rule of Bankruptcy Procedure 3017, a Ballot shall be mailed only to "creditors and equity security holders entitled to vote on the plan." The Plan consists of eight classes of claims entitled to vote on the Plan, and thus those classes will receive ballots. All other classes of claims are presumed to have accepted the Plan.

## III. Litigation

As noted *passim*, the Adversary Proceeding has proven an outsized part of the Debtor's reorganizational efforts. Alongside two related entities (also debtors in bankruptcy), Generations has sued RRSB for (i) the avoidance of a release and waiver in favor of RRSB; (ii) deceit; (iii) fraud; and (iv) declaratory relief. The litigation was tested by a motion to dismiss, thoroughly briefed by the parties and argued to the United States Bankruptcy Court for the District of North Dakota (the "Bankruptcy Court"). Subsequent briefing on geographic ties ensued, so as to aid in resolution of a choice-of-laws dispute. As of the filing of this Disclosure Statement, several claims of the Debtor have survived early dispositive motions practice and an amended complaint has been docketed with an answer thereto having been filed.

The core of Generations claims against RRSB is a contention that the bank is the recipient of a fraudulent conveyance, in the form of a forbearance agreement containing both a broad release and an increase in applicable interest rates. Generations also contends that RRSB lacked the authority and resources to honor lending commitments, leading to the bank acting in an irrational manner at odds with prevailing industry norms and, ultimately, causing the institution to service the loans—and declare defaults—in a predatorily aggressive and bad faith manner. RRSB clearly

4

disputes any liability and is vigorously contesting the Adversary Proceeding through the services of preeminent counsel.

For purposes of this Disclosure Statement, it is important to emphasize that Generations has extraordinary confidence in its litigation claims but such pursuits—like all tort-based causes of action—are assuredly not guaranteed to be successful. It is equally meritorious of note that Generations does not assert—and never has asserted—that the litigation claims, even if successful, will wipe out the debt owed to RRSB. The Debtor posits, rather, that the Adversary Proceeding will hopefully create a judgment that can be used to partially setoff the claim of RRSB in this bankruptcy proceeding.

Critically, the Plan is *not* dependent upon success in the Adversary Proceeding. Rather, in an effort to ensure Generations may emerge from chapter 11 before the litigation reaches a conclusion (a process that may take some measure of time), the Plan proposes to pay RRSB's claim based on an estimated sum (which is not significantly lower than that asserted by RRSB), with payments to be reamortized once the Adversary Proceeding concludes and a precise sum may be calculated. The Debtor fervently asserts the Plan is feasible even if the Adversary Proceeding is not ultimately successful, with Plan payments being pegged to future rental streams and takeout financing. Success in the Adversary Proceeding will make Plan obligations easier (and, in the biased view of the Debtor, advance the interests of justice); success in the Adversary Proceeding, however, is *not* a condition precedent to the making of payments to creditors under the Plan.

### IV.     Summary of the Plan and Treatment of Claims and Interests

The Plan provides for the following classifications of creditors' claims and the rights of the equity holder:

**Class 1 – Disputed Secured Claim of Red River State Bank.**     Class 1 consists of the secured Claim of Red River State Bank ("RRSB") in the amount of $11,200,000.00, net of payments made during the life of the Bankruptcy Case (to the extent such payments have caused a diminution of the principal obligation). As noted in the pending case of *Generations on 1st, et al. v. Red River State Bank*, Case No. 25-07009 (Bankr. D.N.D. 2025) (the "Adversary Proceeding"), the Debtor holds various civil Claims against RRSB that, once adjudicated, are reasonably expected to significantly setoff the total size of the Claim of RRSB in this case. And it is thusly impossible, as of present, to fully assess the secured Claim of RRSB. However, whatever the allowed Secured Claim of RRSB may ultimately be, such will be retired through the making of regular monthly payments, beginning on the Plan Payment Commencement Date, based on (i) a 30-year amortization schedule; (ii) a 4.350% interest rate (being the rate agreed upon by the parties at the time RRSB solicited the Debtor's business); and (iii) a seven-year balloon obligation. RRSB will retain its Lien on the Real Estate, in a sum equal to the allowed outstanding debt, until such a time as the debt is retired *en toto*.

It is quite possible the Adversary Proceeding will pend until after the Effective Date. If so, there will not be any certainty as to the total allowed Secured Claim of RRSB as of the Effective Date, but it will nonetheless benefit both the Debtor and RRSB for payments against the yet-to-be-liquidated to be made (as has been done through cash collateral payments post-petition).

5

As such, monthly payments of $55,754.92 will be made until such a time as the total amount of RRSB's allowed Secured Claim is determined through the Adversary Proceeding. This figure is derived by assuming the allowed Secured Claim of RRSB will be $11.2 million, net of setoffs. For the avoidance of doubt, however, this estimate should not be construed as an admission of liability in any sum certain; there is a rather distinct possibility the total debt will prove significantly lesser once the Adversary Proceeding is finally adjudicated.[1]

Upon final adjudication of the Adversary Proceeding, the monthly payments due to RRSB will be reamortized to account for (i) the Bankruptcy Court's determination of the actual sum due and owing, net of setoffs; and (ii) payments made post-petition (whether through cash collateral payments or otherwise).

Class 1 is an impaired class.

**Class 2 – Allowed Secured Claim of Watertown Development Company.** Class 2 shall consist of the allowed Secured Claim of Watertown Development Company ("WDC"). This obligation is derivative of a tax increment financing ("TIF") arrangement pursuant to Section 11-9-1, *et seq*. of the South Dakota Codified Laws (the "TIF Arrangement"). The TIF Arrangement, in turn, provides that WDC shall receive forward-looking tax revenues from the City of Watertown for a fixed duration of time. There accordingly exist two components to the manner in which this Class shall be paid: (i) funds to be paid by the City of Watertown, pursuant to the TIF Arrangement; and (ii) funds to be paid by the Debtor, also pursuant to the TIF Arrangement.

The funds to be paid by the City of Watertown will continue to be remitted by the municipal entity. While inherent in any chapter 11 plan, the Debtor does affirmatively covenant to continue paying property taxes, in a timely and proper fashion, so as to ensure the availability of monies to be utilized by the City of Watertown to pay its portion of this Claim. The Debtor further observes that the pledge of monies from the City of Watertown, to WDC, shall be unimpaired and unhampered by this Bankruptcy Case, with the Debtor claiming no right to redirect the payment of its tax revenues on a forward-looking basis. Should the Real Estate be sold, the obligation to pay property taxes will, as a matter of law independent of this Plan, necessarily pass to any successor title holder.

The funds to be paid by the Debtor, in turn, equal $52,441.70 (being equal to the gross obligation less the sum to be repaid through property taxes, under the TIF Arrangement) *plus* any shortfall in the amount of WDC's claim not covered by forward-looking tax revenues. It is inherently difficult to estimate what, if any, shortfall may occur, insofar as the taxes on the Real

---

[1] In support of the feasibility of this Plan, Generations will introduce cash flow projections derivative of empirical, historic operational data, with the quality of data improving every month as Generations settles back into operating its eponymous assets without (i) being under the weight of an assignment of rents that did not so much as allow monies to be used to pay utilities or insurance; or (ii) being under an overly-expensive and fancifully inefficient receivership that resulted in poor stewardship of the Real Estate.

6

Estate have generally increased since the conclusion of construction and, in sync with prevailing economic and inflationary trends, are expected to continue to increase on a go-forward basis.

To reconcile this ambiguity, the Debtor will make two series of payments to WDC. *First*, the Debtor shall pay $52,441.70 to WDC over the course of fifteen (15) years, through equal monthly payments of $376.96, with the debt accruing interest at 3.58% until retired (being the blended interest rate derived at by weighting the three separate debt tranches referenced in the proof of claim filed by WDC).

*Second*, every five (5) years (commencing on the fifth anniversary of the Effective Date), the Debtor will reconcile the payments made to WDC—pursuant to the foregoing provision and pursuant to the payment of taxes—and will pay, through a newly-issues five (5) year promissory note, also accruing interest at 3.58% and amortized in a straight line manner, any then-extant shortfall. *Provided, however,* that should such a reconciliation reveal an overpayment of monies to WDC, the Debtor shall, instead of tendering a new five (5) year promissory note, instead reamortize the payments called for in the foregoing provision (contemplating payments over a fifteen [15] year period) to account for the overpayment.

By way of anecdote only, if the reconciliation five (5) years from the Effective Date reveals a shortfall of $10,000.00 in payments from tax revenues, the Debtor will then issue to WDC a promissory note for $10,000.00, to be paid over five (5) years, accruing interest at 3.58%. The Debtor would then pay WDC an *additional* $182.28 per month (being the straight line amortized obligation under such a note) for five (5) years. The reconciliation process would then commence anew, with a new note being issued or, if an overpayment has occurred, the monthly payments of $376.96 (against the anticipated shortfall of $52,441.70) being accordingly reduced.

WDC shall retain its mortgage on the Real Estate in a sum equal to the Debtor's obligation hereunder ($52,441.70) until such a time as that obligation is retired, with the subject Lien being reduced in a sum equal to the amount of principal tendered with each monthly payment.

Notwithstanding any provision to the contrary in the TIF Agreement or any related loan documents, the Class 2 obligation shall *not* become immediately due and owing upon a sale of the Real Estate, though the portion thereof payable by the Debtor under this Plan ($52,441.70 plus any obligation under the five [5] year reconciliation provision) shall be payable, in full, upon a sale of the Real Estate. And, for the avoidance of doubt, the Debtor will continue to honor its grant of funds from the City of Watertown to WDC. (The Debtor does not believe the grant to be an executory contract capable of being assumed or rejected herein, insofar as such is more akin to the giving of a security interest. However, to whatever extent the grant may be deemed an executory contract, such is hereby assumed.)

Class 2 is an impaired Class.

**Class 3 – Codington County Treasurer.** Class 3 shall consist of the Claim of the Codington County Treasurer. As noted in the proof of claim filed by this creditor, the subject taxes came due post-petition. The Debtor has since paid these taxes. However, to whatever extent not already paid by the Debtor, these are being paid in the ordinary course by the Debtor. The Debtor

7

accordingly disputes that the Codington County Treasurer holds an allowable pre-petition Claim but, equally, will continue to pay taxes in a timely manner, thereby mooting any dispute.

Class 3 is an impaired class.

**Class 4 – Class 4 – Watertown Municipal Utilities**. Class 4 consists of the unpaid pre-petition utility charges incurred by the former operator of the Real Estate. This Claim came as a surprise to the Debtor since HME Companies, LLC ("HME")—the receiver that had operated the Real Estate pre-petition—had affirmatively represented, on the record during a hearing on first day motions, that all utilities had been paid. This Claim will be paid, *pari passu*, with those of Class 5, Class 6 and Class 7 claimholders, over a period of five (5) years from the Plan Payment Commencement Date.

Class 4 is an impaired Class.

**Class 5 – General Unsecured Trade Creditors**. Class 5 consists of the Claims of CP Business Management, White Glove Cleaning, HME, and Cannon Electric LLC. Each of these Claims are derivative of obligations attendant to the care and maintenance of the Real Estate, whether directly (as with White Glove Cleaning and Cannon Electric LLC) or derivatively (as with CP Business Management and HME, both of which assert themselves to have fronted monies for the payment of ordinary trade creditors during their respective times operating the Real Estate pre-petition). This Class will be paid, *pari passu*, with Class 4, Class 6 and Class 7, over a period of five (5) years from the Plan Payment Commencement Date.

Class 5 is an impaired class.

**Class 6 – Unsecured Claim of Red River State Bank.** Class 6 consists of the Claim of Red River State Bank that is both an allowed Claim and an unsecured Claim. This claim is in the amount of $2,678,457.38, subject to setoff. This claim is also likely to be reduced based on the allocation of various notes on which Mulinda Craig ("Ms. Craig") is personally obligated, secured by the Real Estate, and upon which a separate debtor in bankruptcy—Parkside Place LLC ("Parkside")—is also bound. These obligations will be paid by the Debtor and Parkside in such a manner as to ensure they are paid in full, without any "double" payment thereupon being made. This Class will be paid, *pari passu*, with Class 4, Class 5 and Class 7, over a period of five (5) years from the Plan Payment Commencement Date, in a sum adjusted to ensure the full retirement of Ms. Craig's notes between this Plan and that of Parkside.

Class 6 is an impaired class.

**Class 7 – Unsecured Claim of Blacktail Investments, LLC**. Class 7 consists of the unsecured Claim of Blacktail Investments, LLC ("Blacktail"), being monies loaned directly to Generations for the sole and express purpose of retaining bankruptcy counsel. Insofar as this Claim is not comparable to that of a trade creditor, nor comparable to that of a construction lender with a putative deficiency, this Claim is separately classified. This Class will be paid, *pari passu*, with Class 4, Class 5 and Class 6, over a period of five (5) years from Plan Payment Commencement Date.

Class 7 is an impaired class.

**Class 8 – Equity.** Class 8 consists of the Debtor's equity interest. The Debtor's equity interest shall remain unchanged insofar as this Plan proposes to pay all Claim Holders in full.

Class 8 is an unimpaired class.

**Full Satisfaction and Release**. The payments, distributions and other treatment afforded to holders of allowed claims and interests under the Plan shall be in full and complete satisfaction, discharge and release of such allowed claims or interests against the Debtor.

V.  **Cash Flow Analysis**

During the pendency of this bankruptcy case, the Debtor has operated as a going concern, making monthly reports on its operations. Insofar as this case has now spanned more than a year, and insofar as the residential rental business is not overly-seasonal in nature, the Debtor believes historic cash flows to be indicative of likely future performance, albeit understanding that rents—and correlative operating expenses—have a tendency to rise in accord with general inflationary and market-wide economic trends.

| Month | Cash Receipts | Disbursements | Profit (Loss) |
|---|---|---|---|
| Feb-25 | $72,983.00 | $40,390.00 | $32,593.00 |
| Mar-25 | $65,324.00 | $58,618.00 | $16,534.00 |
| Apr-25 | $65,536.00 | $100,130.00 | ($34,594.00) |
| May-25 | $66,466.00 | $60,826.00 | $5,640.00 |
| Jun-25 | $80,014.00 | $60,837.00 | $19,177.00 |
| Jul-25 | $77,727.00 | $59,562.00 | $18,165.00 |
| Aug-25 | $81,411.00 | $64,877.00 | $16,534.00 |
| Sep-25 | $81,849.00 | $59,347.00 | $22,502.00 |
| Oct-25 | $80,770.00 | $96,048.00 | ($15,278.00) |
| Nov-25 | $86,088.00 | $140,568.00 | ($54,480.00) |
| Dec-25 | $80,181.00 | $88,020.00 | ($7,839.00) |
| Total | $838,349.00 | $829,223.00 | $18,954.00 |

In analyzing the foregoing table, it is important to observe that large disbursements have often correlated to the making of irregular payments to RRSB, as part of cash collateral stipulations, so as to—by design—reduce the Debtor's cash on hand and pay down the principal balance of the debt owed to RRSB. Yet even with these irregular payments (in addition to the making of regular monthly adequate protection payments), the Debtor has shown a profit of $18,954.00 during the eleventh month period commencing in the first month after the petition date and running through the last month for which a correlative report is available as of the filing of this Disclosure Statement.

Additionally, attached hereto as Exhibit B is the Debtor's most recent cash collateral budget, which breaks down monthly expenditures by category and offers a deeper understanding of cash outflows that are no in furtherance of debt service payments.

### VI. Designation and Treatment of Unclassified Claims

**Administrative Expense Claims**. On the Effective Date or at such time as otherwise agreed, the holder of an allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim, cash in an amount equal to the unpaid portion of such allowed Claim. Upon information and belief, the only administrative expense claimant herein is counsel for the Debtor, who holds a retainer that should cover a portion—albeit likely not all—of counsel's fees. The Cash on Hand shall be used to satisfy any portion of this Administrative Claim not secured by counsel's retainer. Should the Cash on Hand be inadequate to pay any Administrative Claim over and above the subject retainer, counsel for the Debtor—through the docketing of this Plan—affirmatively agrees to permit such deficiency to be paid over a period of time equal to six months from the Effective Date.

**Estimate of Legal Fees.** The Debtor estimates the unpaid fees of its bankruptcy counsel, as of the filing of this Disclosure Statement, to be approximately $40,000.00. The Debtor further estimates it is likely the fees of counsel will increase, by $10,000.00 to $20,000.00, between the filing of this Disclosure Statement and the Effective Date. Counsel is holding a retainer of $9,278.67 that will be credited against any allowed claim for legal fees and reimbursement of out-of-pocket expenses.

**Estimate of CRO Fees.** The Plan calls for appointment of a chief restructuring officer ("CRO") but Generations has moved, prior to the filing of this Disclosure Statement, for the appointment of a CRO during the pendency of the bankruptcy proceeding. Should such application be granted, administrative obligations will accrue in favor of the CRO. The Debtor has budgeted monies as part of its cash collateral budget to pay these obligations. It is possible the budgeted sum will prove inadequate. If so, there may be a small claim in favor of the CRO. The Debtor believes any such claim would be unlikely to exceed $5,000.00.

**U.S. Trustee's Fees.** The United States Trustee shall receive payment, on or before the Effective Date, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. Any U.S. Trustee's fees owed subsequent to the Effective Date will be paid from the Debtor's operating revenue. The Cash on Hand shall be used to pay these fees.

**Estimate of U.S. Trustee's Fees.** The Debtor does not estimate any U.S. Trustee's fees to be unpaid but notes that a *de minimis* sum of money, likely not to exceed $1,000.00, may be due to the U.S. Trustee on the Effective Date.

### VII. Connection with Insiders

The Debtor's property manager is presently CP Business Management, LLC ("CPB"). CPB is operated by Mulinda Craig ("Ms. Craig"), the wife of the Debtor's sole equity holder, who

10

draws compensation for her work with CPB. Additionally, CPB is jointly owned by Ms. Craig and Jesse Craig ("Mr. Craig"), the Debtor's sole equity holder.

The Plan contemplates that CPB will continue to manage the Debtor's property post-confirmation. The Debtor believes CPB, notwithstanding (or, perhaps, due to) the entity's insider connection, is not only the most devoted potential property manager but, too, the highest quality property manager available in the Watertown, South Dakota marketplace (a marketplace that, unsurprisingly, is not teeming with property management companies).

### VIII. Claims Against Insiders

RRSB has alleged the Debtor to hold several million dollars worth of claims against insiders, including Mr. Craig, one or more relatives of Mr. Craig, and other entities under the ownership and control of Mr. Craig. RRSB generally posits these claims to emanate from alleged fraudulent conveyances of the Debtor's monies. The Debtor has, thus far, indicated a belief that such claims are generally without merit and are pegged to a generalized misunderstanding of the flow of monies through multiple construction projects funded by the same financial institution.

The foregoing notwithstanding, the Plan proposes to employ the CRO (if he is not first employed) to operate the Debtor and, as part of said operation, to investigate claims against insiders. The CRO is *not* an insider, has no connection to the Debtor or any of the aforementioned insiders, and will independently investigate—and, should such investigation so warrant, prosecute—claims against insiders.

### IX. Takeout Financing / Potential Sale

The Plan contemplates refinancing by a third party lender, in the years following the Effective Date, while offering the Debtor the option—but not the mandate—to achieve such refinancing sooner. The Plan also allows for a potential sale of the Debtor's real estate asset. Debtor has been in touch with a potential lender as well as potential asset purchasers. For reasons related to the fraught relationship between the Debtor and RRSB, and experience-informed concerns about the development of proverbial "cold feet" if these potential counterparties are prematurely exposed to the subpoena powers held by RRSB, the Debtor is electing to not identify either counterparty herein.

However, the Debtor specifically notes that (i) the potential lender is *not* an Insider (as that term as defined in the Bankruptcy Code); and (ii) the potential buyer is *not* an Insider. The Debtor will continue to explore other potential financing and sale options as well, and certainly has not foreclosed working with counterparties as-yet-unidentified. Parties in interest should note that any refinancing negotiations are in early stages, with no formalized term sheet being agreed to by the parties, just as are potential sale negotiations.

### X. Key Dates

As noted above, *see, supra,* n.4, numerous terms are defined in the Plan and used herein. Readers can cross-reference the Plan to ascertain those definitions. However, certain dates are particularly critical to understanding the Plan and its dynamics, some of which are as follows:

The "Petition Date" is January 6, 2025; and

The "Effective Date" is 14 days after entry of an order confirming the Plan.

XI.     **Bar Date for Filing Claims**

The bar date for filing a proof of claim in this case was March 17, 2025 for all creditors (except a governmental unit, which had a bar date of July 7, 2025). The failure to file or deliver a proof of claim or a proof of interest by the applicable bar date constitutes a bar against the assertion, allowance or distribution on account of any such claim or interest.

XII.    **Acceptance and Confirmation of Plan**

Except as discussed below, a prerequisite to the confirmation of the Plan is the acceptance of the Plan by each impaired class. A class is impaired unless, with respect to each claim or interest in such class, the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (a) cures any such default that occurred before or after the Petition Date (other than "ipso facto" defaults as specified in Section 365(b)(2) of the Bankruptcy Code); (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In order to carry a designated class for purposes of confirmation of the Plan, the affirmative vote of holders of claims in each such class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class who actually vote on the Plan, other than a holder who has been designated by the Court as in bad faith having accepted or rejected the Plan, or whose acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of chapter 11 of the Bankruptcy Code is required. If the requisite acceptances from holders of allowed claims in each class of claims are obtained, and the Plan is confirmed, the Plan will be binding on all holders of claims and interests, including those who did not vote or who voted to reject the Plan (or those who are deemed to reject the Plan).

The Plan Proponent reserves the right to seek to confirm the Plan pursuant to the cramdown provisions of Section 1129(b) of the Bankruptcy Code. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interest accepts a plan of reorganization. In the event that an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if (i) the Plan satisfies all other requirements of Section 1129(a) of the Bankruptcy Code, and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not accepted the Plan.

A plan of reorganization does not discriminate unfairly if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are identical with those of the non-accepting class, and (b) no class receives payments

in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that the Plan satisfies these requirements with respect to each class.

The Bankruptcy Code establishes different tests for secured creditors, unsecured creditors and interest holders to determine if the Plan is "fair and equitable." The tests may be summarized as follows:

(a) Secured Creditors: either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value as of the Effective Date equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii), above.

(b) Unsecured Creditors: either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and equity interests that are junior to the claims of the non-accepting Class do not receive any property under the Plan on account of such claims and interests.

(c) Equity Interest Holders: either (i) each interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any of its interest or (b) the value of its interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive any property under the Plan.

The Plan Proponent believes that the Plan is "fair and equitable" to interest holders, unsecured creditors, and secured creditors.

The Plan Proponent reserves all rights to modify or withdraw the Plan at any time prior to the Effective Date.

XIII.    **Alternatives to Confirmation and Consummation of the Plan**

The alternatives to the confirmation and consummation of the Plan include (1) the preparation and presentation of an alternative plan of reorganization and (2) the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Plan Proponent believes that neither alternative provides any greater return to its creditors.

**Alternative Plans of Reorganization.** While it is always possible to tweak a plan of reorganization slightly—or alter such a plan fundamentally—the Debtor does not believe an alternative plan would be in the best interests of creditors. The Plan in this case is a careful and thoughtful byproduct of the weighting of competing interests, moored to fundamental notions of fairness and equity. The Plan provides for all creditors to be paid, in full, over a period of time, while also maximizing the potential for the Debtor to emerge as a healthy business with a robust future.

**Liquidation Under Chapter 7 of the Bankruptcy Code.** If no plan can be confirmed, it is the Plan Proponent's firm belief that liquidation under chapter 7 would result in lesser distribution than proposed by the Plan. Specifically, a fire sale of the Real Property would likely

fetch a grossly discounted value. Liquidation would also likely force a compromise of the Adversary Proceeding in unfavorable terms, with the Debtor lacking the cash to pay outside counsel to pursue the litigation and with it being unlikely a trustee could be likely to procure counsel to assume the claims on a contingency basis.

**Liquidation Analysis.** Should a chapter 7 liquidation occur, or should the Debtor liquidate through chapter 11, it is reasonably anticipated the following would best reflect the likely outcome of such a liquidation:

| Asset | Scheduled Value | Liquidation Discount | Liquidation Value |
|---|---|---|---|
| Cash on Hand | n/a | 0.00% | $135,914.00 |
| 26 1st Avenue SW Watertown, South Dakota 57201 | $14,500,000.00 | 30.00% | $10,150,000.00 |
| Claims Against Red River State Bank | n/a | Unknown | $50,000.00 |
| Claims Against Others | n/a | Unknown | Unknown |
| Total | | | $10,335,914.00 |

The foregoing liquidation analysis makes various assumptions that may not be accurate. First, the cash on hand figure is likely inaccurate, as such is taken from the Debtor's last monthly report *before* monies were paid to RRSB pursuant to a cash collateral order, but also before new monthly rents were collected. The cash on hand also does not account for the forthcoming payment of property taxes. So the cash on hand may be lower than projected.

Second, the 30% discount for the value of the Debtor's real estate is an approximation based on historic experiences—in unrelated cases—evidencing the "fire sale" discount commanded by properties sold by a bankruptcy trustee. Watertown, South Dakota is a niche market; a sale of the asset may fetch more—or less—depending on the environment in which the asset is sold. Similarly, while the 30% discount is intended to include fees of any brokers or trustees, such fees may be more or less depending on then-extant market forces (with the commissions of realtors, notably, being more readily negotiable in the present day than they have historically been in years gone by).

Third, the notion that Red River State Bank would pay $50,000.00 to settle litigation is an assumption untethered to any binding or formal basis. The bank might be willing to pay more and might insist on paying less. The bank might also choose to litigate in lieu of settling. Whether or not the bank would insist on part or all of settlement monies taking the form of a setoff is also a variable that is not presently known and that cannot be predicted to any degree of certainty.

Fourth, the Debtor cannot effectively estimate the size of claims held against others, including insiders. Potential claims against insiders are discussed separately herein; to the extent

14

the Debtor holds claims against third parties other than insiders, it is believed such claims may be relatively small. It is unlikely such claims would be settled for more than $100,000.00 in a liquidation environment but it is also unclear if any such claims are extant or could even be brought in good faith.

The foregoing notwithstanding, there is at least the appearance that a liquidation would fetch monies less than those secured by the claim of RRSB, and a liquidation would accordingly invite a distribution of funds only to (i) RRSB, through said liquidation; (ii) WDC, through the future payment of property taxes; (iii) a chapter 7 trustee or liquidating trustee; and (iv) any professionals aiding in the sale process (assuming, even then, RRSB is agreeable to the fees and commissions of such individuals being carved out from the secured claim of RRSB).

XIV. **Risks**

It is neither possible nor pragmatic to contemplate all risks occasioned by the Plan in this case or the plan of reorganization in almost any chapter 11 case. The Debtor has, however, endeavored to identify pertinent risks throughout this Disclosure Statement, including furnishing a discussion of the risks of not being successful in the Adversary Proceeding and the risks of something going awry with the completion financing and correlative completion of construction.

Other risks naturally face any operator of an apartment building, but most such risks are mitigated through insurance, which the Debtor holds and always has held. It does merit notation, however, that insofar as Generations operates in the insular market of Watertown, any long-term impairment of the community, leading to a dissipation of the population, would likely work an adverse impact upon the Debtor and the Debtor's ability to fully perform under the Plan. It is not clear what, if any, indicia of such an impairment are extant, and Generations firmly believes in the community of Watertown, but the Debtor also recognizes the need to offer a holistic risk assessment in this Disclosure Statement.

There is also always a risk of the Debtor's building experiencing other market-based economic difficulties, including a dissipation in the prevailing rate of rents should the national—or local—economy experience a downturn. The Debtor does not believe this is a significant risk insofar as Generations' insiders already operate apartment buildings in Watertown and have extensive knowledge of the local market, local economic factors, housing demand, and the elasticity of rental rates.

XV. **Distribution**

**Delivery of Distributions**. Distributions and deliveries to holders of allowed claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed).

**No Interest Unless Otherwise Provided**. No interest shall be paid on any claim unless, and only to the extent permitted, under the terms of the Plan.

**Undistributed Property**. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, such Unclaimed Property shall be forfeited by such Holder. Unclaimed Property

15

shall be donated to The University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond in the manner she deems most charitably fit.

### XVI. Retention of Jurisdiction

Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b) to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c) to enable the Debtor to prosecute any and all Causes of Action and to recover any transfers, assets, properties or damages to which it may be entitled under applicable provisions of the Plan, the Bankruptcy Code or any federal, state or local laws, including avoidance actions;

(d) to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(e) to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(f) to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(g) to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(h) to enter a final decree closing this Chapter 11 case.

### XVII. Certain Tax Consequences

The following discussion summarizes certain federal income tax consequences to the Debtor and Debtors' holders of claims and equity interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect

16

significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special categories of taxpayers who are holders of claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each creditor holds its claim directly.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponent has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**Certain Federal Income Tax Consequences to Debtor.** Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes. Thus, the Debtor is not subject to taxes imposed under chapter 1 of the Tax Code. Accordingly, any net operating income or losses generated by the Debtor during a taxable year ("NOLs") will pass through to the equity interest.

Upon a sale of the Debtor' property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and Debtors' adjusted tax basis in the property that may be subject to capital gains tax will pass through to equity interest. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject. If the sale of the property results in a gain and such property was used in Debtors' trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**Certain Federal Income Tax Consequences to Creditors.** The federal income tax consequences of the Plan to a creditor will depend upon several factors, including but not limited to: (i) whether the creditor's claim (or portion thereof) constitutes a claim for principal or interest; (ii) whether the creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the creditor has taken

17

a bad debt deduction with respect to its claim. In addition, if a claim is a "security" for tax purposes, different rules may apply.

**CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.**

A creditor receiving solely cash in exchange for its claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the allowed claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the allowed claim representing accrued and unpaid interest, as further discussed below.

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the creditor, the nature of the allowed claim in the creditor's hands, the purpose and circumstances of its acquisition, the creditor's holding period of the allowed claim, and the extent to which the creditor previously claimed a deduction for the worthlessness of all or a portion of the allowed claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a creditor in satisfaction of an allowed claim may be allocated to the portion of such claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the creditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the creditor in respect of the principal amount of the allowed claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the creditor with respect to the allowed claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**Federal Income Tax Consequences to Holders of Equity Interests Receiving Distributions.**
Holders of allowed equity interests receiving distributions will generally recognize loss or gain in the amount of each such holder's adjusted tax basis in the equity interest. The character of any recognized loss or gain (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the equity interest.

A gain or loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Importance of Obtaining Professional Tax Assistance. No holder of a claim or equity interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or equity interest. Accordingly, each holder of a claim or equity interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.**

## XVIII.    Miscellaneous Provisions

**Severability.**  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or equity interest or transaction, the Plan Proponent may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the holder of any claim or equity interest.

**Binding Effect.**  Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the holders of claims and equity interests, and such persons' respective successors and assigns.

**Governing Law.**  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the State of North Dakota shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Timing of Distributions.**  Any distribution required to be made hereunder on a day other than a business day shall be due and payable on the next succeeding business day.

**Revocation or Withdrawal of Plan.**  The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.  If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the such entity or any person in any further proceedings involving such entity.

**Nonmaterial Modifications.**   The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to holders of claims and equity interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**Material Modifications.** Modifications of the Plan may be proposed in writing by the Plan Proponent at any time prior to confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**Notices.** Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
*Counsel for the Debtor*

**Successors and Assigns.** The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

### XIX.     Confirmation Request

The Plan Proponent respectfully urges all parties entitled to vote on the Plan to do so in favor of the Plan, and respectfully pray this Honorable Court confirm the Plan.

Respectfully submitted,

Dated: February 10, 2026

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*