UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| In re: | Case No.: 25-30002 |
| --- | --- |
| | Chapter 11 |
| Generations on 1st, LLC, | |
| Debtor. | |

DISCLOSURE STATEMENT OBJECTION

(GENERATIONS ONLY)

Red River State Bank (the "Bank") hereby objects to approval of the Disclosure Statement (the "Disclosure Statement") [ECF 315] for the Second Amended Chapter 11 Plan of Reorganization (the "Plan") [ECF 314] filed by Generations on 1st, LLC (the "Debtor" or "Generations").

Introduction

1. In the first instance, the Bank objects to approval of the Disclosure Statement because Debtor has not satisfied the legal requirements set forth in 11 U.S.C. § 1125. In addition to such technical grounds for disapproval, the Bank is willing and able to supply admissible evidence to demonstrate that the Debtor has not filed this case or proposed the Plan in good faith. Ultimately, the Disclosure Statement should not be approved because it is fundamentally misleading and its approval would enable the Debtor to utilize the Chapter 11 process for a bad faith purpose.

2. Big picture, the Bank is concerned that the Disclosure Statement perpetuates a false narrative about why three related real estate projects fell into default before the Petition

Date. The Bank has conducted extensive discovery and made documentary evidence available to all parties in the case on the docket. Such evidence confirms that the Bank's loan proceeds, which were intended for the benefit of Generations, were diverted to statutory insiders. Nonetheless, the Debtor continues to advance a Disclosure Statement that downplays the significance of the injunctions proposed for the benefit of such insiders, the fact that insiders are making no contributions to Debtor's efforts to reorganize, and the cost of such relief to the actual recovery of specific creditors in the case.

3. The "new" Plan and Disclosure Statement also have many of the same fundamental defects as the original plan. The Plan's classification of claims does not follow any logic or basic requirements under the Code, suggesting its primary purpose is to gerrymander the voting process. The newly added cash flow analysis is incomplete and based on inaccurate and misleading representations about the Debtor's profitability during the pendency of these cases. It also fails to list all of the actual payments due under the Plan. Lastly, Debtor has failed to provide a traditional liquidation analysis that is sufficiently complete as to permit creditors to determine whether the Plan satisfies the best interests of creditors or complies with the absolute priority rule.

## Legal Standard for Approval

4. "The primary purpose of a disclosure statement is to give creditors the information they need to decide whether to accept the plan." In re Monnier Bros., 755 F.2d 1336, 1342 (8th Cir. 1985). To that end, the Bankruptcy Code requires the Disclosure Statement to contain "adequate information," which is defined as:

> "[I]nformation of a kind, and in sufficient detail, as far as is reasonably practical in light of the nature and history of the debtor and the condition of the debtor's books and records…that would

2

> enable such a hypothetical investor of the relevant class to make an informed judgment about the plan…"

11 U.S.C. § 1125(a)(1).

5. Simply put, "adequate information" is what allows creditors "to vote intelligently on the plan." In re Farmland Indus., Inc., 286 B.R. 888, 892 (Bankr. W.D. Mo. 2002). To evaluate whether the information provided by the plan proponent is "adequate," many Courts in our Circuit have considered and weighed the following types of information:

(1) the events which led to the filing of a bankruptcy petition;

(2) a description of the available assets and their value;

(3) the anticipated future of the company;

(4) the source of information stated in the disclosure statement;

(5) a disclaimer;

(6) the present condition of the debtor while in Chapter 11;

(7) the scheduled claims;

(8) the estimated return to creditors under a Chapter 7 liquidation;

(9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

(10) the future management of the debtor;

(11) the Chapter 11 plan or a summary thereof;

(12) the estimated administrative expenses, including attorneys' and accountants' fees;

(13) the collectability of accounts receivable;

(14) financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

3

(15) information relevant to the risks posed to creditors under the plan;

(16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(17) litigation likely to arise in a nonbankruptcy context;

(18) tax attributes of the debtor; and

(19) the relationship of the debtor with the affiliates.

See, e.g., In re Puff, No. BR 10-01877, 2011 WL 2604759, at *3 (Bankr. N.D. Iowa June 30, 2011).

6. To be adequate, a disclosure statement does not need to include information from every category in the preceding list. The Court has discretion to determine which types of information, and how much detail, is adequate on a case-by-case basis. Id. The court may also determine that specific omissions render a disclosure statement substantially incomplete, materially inaccurate, or misleading to creditors.

7. One of the only "hard and fast" requirements for the content of a disclosure statement is set forth Federal Rule of Bankruptcy Procedure 3016(b). If a plan includes an injunction, Rule 3016(b) requires the plan proponent to make an express disclosure of such injunction in "conspicuous language (bold, italic, or underlined text)."

8. It is the Debtor, as plan proponent, who bears the burden of proving the adequacy of its Disclosure Statement. In accord with Section 1125(a)(2), creditors should not be presumed or expected to obtain the information they need to evaluate a plan by unusual means. If such information is readily available to the Debtor, but it has strategically opted to omit it from the Disclosure Statement, creditors should not be expected to uncover or deduce

4

such information before they can vote on the Plan. Rather, it is the Debtor who should bear the burden of redrafting its Disclosure Statement to provide such information to its creditors.

9. Lastly, a Court may deny approval of a disclosure statement if a plan is facially unconfirmable as a matter of law. It is a waste of resources to approve a disclosure statement, for example, if the plan impermissibly classifies creditors or the proposed plan treatment clearly violates confirmation standards such as priority rules, or cramdown requirements. In Re Atlanta West VI, 91 B.R. 620, 622 (Bkr. N. D. Ga. 1988).

Specific Deficiencies of the Debtor's Disclosure Statement

10. <u>Incomplete Description of Events Leading to CH 11</u>: As discussed in the introduction to this objection, the Disclosure Statement fundamentally "hides the ball" about the role of statutory insiders in this case, and the existence of admissible evidence of prepetition self-dealing and misappropriation of funds, as key events leading up to the Debtor's bankruptcy filing. Instead, Debtor devotes the bulk of its explanation to wholly unproven allegations against the Bank, and generic claims about the existence of a global pandemic several years before the Petition Date, to explain how and why it ended up in receivership and then bankruptcy. [Generations, ECF 315, pp. 3-5]

11. <u>Chapter 11 Confirmation Process</u>. Debtor's description of the voting process is misleading. The Disclosure Statement should be amended to explain that the votes of insiders must be disregarded and similarly situated unsecured creditors should not be categorized into multiple classes to increase the probability of an "impaired accepting class," *i.e.,* gerrymandering.

12. <u>Description of Bank's Claim</u>: In Article IV, Debtor's description of the Bank's proposed treatment fundamentally misleads creditors about what treatment of secured claims

5

is permitted under the Bankruptcy Code, which in turn misleads creditors about the feasibility of the Plan and cash available to pay other claims. [ECF 315, pp. 5-6]. The Disclosure Statement should be amended to comply with the "fair and equitable" requirement in Chapter 11 and Debtor should delete the legally inaccurate statement that the allowed amount of the secured portion of the Bank's total claim can be diminished by post-petition interest payments. This statement is also misleading because the stipulated post-petition payments made by GO1 to the Bank were not even sufficient to pay all of the interest that accrued after the petition date, so it is not possible that such payments decreased the Bank's prepetition claim.

13.   As explained in the Bank's Proof of Claim, the Bank's claim against Generations is based on several promissory notes, with different terms, most of which have already matured. [POC No. 1; ECF 97, 177]. Debtor provides no legal support for its claim that it can cherry pick the rate of interest or the amortization schedule for the Bank's promissory notes, nor is there any legal support for the Debtor's claim that it can reinstate debt that matured before the Petition Date in Debtor's case, or that it could do so at a non-market rate of interest and with no additional interest to account for default risk. See 11 U.S.C. § 1124(2) and 11 U.S.C. § 1129(b); cf. In re Topp, 75 F.4th 959 (8th Cir. 2023); In re Moshe, 567 B.R. 450 (Bankr. E.D.N.Y. 2017) (proposed Chapter 11 plan that provided for curing debtor's prepetition mortgage default, not by plan payments at contractual default rate of 24%, but by payments at significantly lower pre-default rate of 8%, was patently unconfirmable and prevented bankruptcy court from approving debtor's disclosure statement). Debtor has also provided no information about its ability to pay a balloon seven years from now unless such claim is based on the "take out financing" already discussed *infra*.

14. The Disclosure Statement should be amended to remove the Debtor's statement that the Adversary Proceeding is "reasonably expected to significantly setoff the total size of the Claim of RRSB in this case." [ECF 315, p. 5] Debtor has no factual basis for this claim, and it misleads creditors into believing the Adversary Proceeding will dramatically improve feasibility of the Plan.

15. <u>Description of WDC Claim</u>: Debtor's description of the secured claim of Watertown Development Corporation ("<u>WDC</u>") as "impaired" is not accurate. [ECF 315, pp. 6-7] Debtor has revised this section of the Plan and Disclosure Statement in cooperation with WDC counsel. The reconciliation process described in the Plan and Disclosure Statement is intended to eliminate a deficiency for WDC and to guarantee that WDC is always receiving the "benefit of its bargain." Thus, the Disclosure Statement should be amended to indicate that WDC is unimpaired and not entitled to vote.

16. <u>Description of Priority Claims</u>: The description of Codington County's priority tax claim in the Disclosure Statement is inaccurate and misleading. [ECF 315, pp. 7-8]. The County's proof of claim indicates that it is owed approximately $76,500 for a priority tax claim. [POC 3-1] The Disclosure Statement should not indicate that the County's claim is impaired or imply it is entitled to vote, rather it should explain that priority tax claims are typically not classified in a plan and/or they are not entitled to priority under the Bankruptcy Code. <u>See</u> 11 U.S.C. §§ 507(a)(8) and 1123(a)(1). Failing to correct this classification misleads creditors about voting in this case. Additionally, the Disclosure Statement indicates that the County's priority claim is $0 because it was already paid after the petition date in this case. There is no evidence to support the accuracy of this claim. They County still have a valid,

7

timely proof of claim that asserts a priority claim. Debtor has not objected and the County has not withdrawn such proof of claim.

17. <u>Description of Unsecured Claims</u>. The classification of unsecured claims in the Plan and Disclosure Statement has no basis in applicable Bankruptcy law. Debtor should not be permitted to solicit a plan that arbitrarily classifies holders of non-priority unsecured claims into Classes 4, 5, 6, and 7. [ECF 315, p. 8] This section of the Disclosure Statement should also be amended to clarify that the votes of statutory and non-statutory insiders must be disregarded under the Bankruptcy Code. Debtor should clarify whether Blacktail is an insider, whether its claim is properly asserted against the Debtor as opposed to an insider, and whether Blacktail has assigned its claim. The Plan indicates that the Blacktail claim was assigned, but there is no evidence on the docket to support this claim.

18. <u>Description of Equity Interests</u>. The Disclosure Statement currently indicates that equity interests shall "remain unchanged." [ECF 315, p. 9] First, the Disclosure Statement should explain that the votes of statutory insiders like Jesse R. Craig are disregarded under Section 1129(a)(10) and that Mr. Craig is not entitled to receive a distribution under the Plan until he resolves his liability to the estate under Sections 547, 584, and 550, per Section 502(d). Second, the Disclosure Statement incorrectly implies that equity is typically entitled to a distribution in Chapter 11. The Disclosure Statement fails to explain that holders of equity interests are not entitled to receive a distribution under the Plan, including retention of their prepetition equity, unless Debtor complies with the absolute priority rule in this case. 11 U.S.C. § 1129. Alternatively, the Disclosure Statement should be amended to describe the "new value" exception to the absolute priority rule and quantify the new capital, if any, that will be contributed to fund the reorganization and whether it is equivalent in value to the interest

8

retained by the insider. If the Debtor is not proposing a plan that satisfies either the absolute priority rule or the new value exception, then the Disclosure Statement should not be approved because the Plan is patently unconfirmable as a matter of law.

19. <u>Plan Injunction:</u> The Disclosure Statement does not disclose the injunction set forth in the Plan for the benefit of statutory insiders, as expressly required by Rule 3016(b). The Disclosure Statement should be amended to include an express disclosure that complies with Rule 3016, to explain the legal standard for approving third party releases and injunctions, and the fact that insiders have offered no consideration in exchange for the injunction they will receive under the Debtor's Plan.

20. <u>Satisfaction and Release</u>. The Disclosure Statement can be read to mean that any payments or distributions under the Plan, and even proposed plan treatment regardless of the status of implementation, constitutes "full and complete satisfaction" of such claims. [ECF 315, p. 9] This statement should be amended to clarify what Debtor intended by this language.

21. <u>Cash Flow Analyis and Feasibility:</u> The Disclosure Statement includes a new section called "Cash Flow Analysis" that is incomplete, inaccurate, and misleading to creditors. [ECF 315, p. 9]. First, the numbers in the Disclosure Statement do not match the Debtor's monthly operating reports in the case. Second, the description of "disbursements" and "profit" is materially misleading. The Debtor has not made full debt service payments on account of its secured debt in the case. Debtor's monthly payment was negatively amortized during the pendency of the case. The stipulated adequate protection payment is also less than the payments due under the Plan. It is incorrect and misleading to characterize this underpayment as producing a profit and/or confirming that the Debtor can afford to make all of the payments due under the Plan. Third, Debtor's description of the DIP account balances

9

and distributions to the Bank during the case is inaccurate and misleading. As explained in several cash collateral stipulations filed in this case, a prepetition receiver was holding prepetition rents in the sum of $211,201.59 for Generations. [ECF 91, 159, 160] These funds were transferred into the Debtor's DIP account after the petition date. The Bank maintains that such prepetition rents were assigned to it prior to the petition date. Debtor has "released" such funds from the DIP account to the Bank as a stipulated resolution of the Parties' dispute. It is incorrect to characterize such funds as an indication of the Debtor's profitability, the success of the Debtor's current management, or its ability to cash flow and generate plan payments. The Disclosure Statement should be revised to remove inaccurate and misleading statements about cash flow and plan feasibilty. Additionally, the Disclosure Statement should not be approved until the Debtor appends a traditional cash flow analysis, as opposed to a recycled cash collateral budget, so that Debtor can demonstrate a "payment waterfall," or a feasibility analysis, as is customary in Chapter 11 plans of reorganization. Without a feasibility analysis, creditors lack adequate information to determine how the Plan will affect their potential recovery and whether the Plan will simply result in deepening insolvency and a delayed conversion to Chapter 7. See In re Cardinal Congregate I, 121 B.R. 760 (Bankr. S.D. Ohio 1990) (Chapter 11 debtor's disclosure statement which identified "net cash flow" as source of funds for satisfaction of allowed claims and interests, had to clearly state how "net cash flow" was defined and calculated); In re Dakota Rail, Inc., 104 B.R. 138 (Bankr. D. Minn. 1989) (financial projections must be substantiated and not misleading).

22.  Administrative Expenses Inadequate Information re Administrative Solvency. As evidenced by the numerous cash collateral stipulations filed in this case, all the Debtor's "Cash on Hand" is subject to the Bank's liens. In fact, the Bank maintains that the prepetition

10

rents collected by the prepetition receiver are not even property of the estate under Section 541. The Disclosure Statement should be amended to clarify that the Bank has not consented to the use of its collateral to pay administrative expenses in this case, unless as expressly memorialized in one of the cash collateral stipulations on the docket in this case. If the Debtor lacks access to the Bank's collateral for payment of its administrative expenses, Debtor should indicate what alternative source of payment is available to ensure the estate is administratively solvent.

23. Debtor should not be allowed to rely upon existing DIP account balances to create the illusion that the Debtor is profitable and administratively solvent. Debtor's monthly operating reports confirm it is still holding prepetition rents collected by the receiver in its DIP account. The Disclosure Statement willfully conceals the fact that such funds are not property of the estate under Section 541; they were legally assigned from the Debtor to the Bank prior to the Petition Date and held in trust by the receiver. Moreover, any post-petition rents are currently subject to the Bank's liens and Debtor has only been permitted access to such funds by stipulation. The Disclosure Statement should explain that unless the Bank consents, administrative creditors like Debtor's counsel are not legally entitled to payment of their administrative expenses from a secured creditor's collateral. <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 2000 WL 684180, - S.Ct. – (May 30, 2000). If Debtor does not have a source of unencumbered cash that is sufficient to pay its administrative expenses, the Plan is unconfirmable as a matter of law under Section 1129(a)(9) and Debtor's should not be permitted to incur unnecessary administrative expenses to solicit an unconfirmable Plan.

24. <u>Claims Against Insiders</u>. A description of the potential avoidance actions against insiders has been added to the Disclosure Statement, but it is buried on page 11 of 20. [ECF

11

315, p. 11] First, the gross value of documented prepetition transfers to insiders is several million dollars. The Disclosure Statement should be amended to include this information in the description of "Litigation." [ECF 315, p. 4] The Disclosure Statement should also be amended to refer parties to the information available on the docket about the potential value of such claims. The Disclosure Statement should be amended to disclose that the Debtor did not previously investigate potential claims against insiders, and it sought appointment of a CRO, in response to Mr. Jesse Craig's personal conflict of interest.

25. <u>Take-Out Financing:</u> Debtor has not provided any information that will allow creditors to make an informed judgment about the viability of the "take out financing" described in the Plan. [ECF 315, p. 11] The Disclosure Statement should be amended to explain that Debtor's prior attempts to obtain such financing have failed because it is significantly overleveraged by many millions of dollars, Debtor cannot currently satisfy the standard loan to value ratio required to qualify for such financing, and equity interest holders are not willing to make a standard capital contribution to facilitate such a refinancing. Debtor casually states that it could obtain such financing at some point in the future but obscures the fact that Debtor cannot satisfy standard conditions precedent to such financing without several million dollars' worth of passive asset appreciation or a multi-million-dollar capital contribution from equity within the next few years. The Disclosure Statement implies take-out financing could easily or routinely occur, and that it could be used to make plan payments, when in fact all empirical evidence suggests it is very unlikely to occur. The Disclosure Statement should not be approved if it contains incomplete or materially misleading information about take-out financing and its impact on plan feasibility.

26. <u>Inaccurate Information re Best Interests of Creditors Test:</u> The Disclosure Statement should not be approved because it does not include an accurate or complete liquidation analysis, and as a result, it misleads creditors about whether the Plan satisfies the "best interests of creditors" test. [ECF 315, p. 14.] Debtor assigns no value to avoidable transfers and declares that such claims "may be relatively small," when in fact the gross value of such avoidance actions are worth several million dollars. This misleads creditors about the cost of choosing the Plan (which prioritizes the interests of the equity interest holder and other insiders) versus their possible recovery in Chapter 7. <u>Id.</u> Debtor claims, without providing any supporting factual information, that liquidation under chapter 7 would "fetch" less money and result in no distributions to unsecured creditors – but Debtor provides no evidence to support such claim. [ECF 315, p. 15]. At a minimum, the Disclosure Statement should provide adequate information about the potential recovery general unsecured creditors will forgo if they vote in favor of the Plan. The Bank further urges the Court not to approve a Disclosure Statement and allow solicitation for a Plan that fails to satisfy the best interests of creditors test and is thus unconfirmable on its face under Section 1129(a)(7).

27. <u>Incomplete Disclosure re Sale of Real Estate</u>: The Plan refers to a possible future sale of the Debtor's Real Estate. [ECF 315, p. 11] Debtor implies that a sale would generate funds to pay off the Bank. The Disclosure Statement fails to provide any valuation information to support Debtor's statement that a sale would be sufficient to pay off the Bank's claim. Second, if the value of the collateral was sufficient to pay off the Bank's claim, the Plan would not provide the Bank with an allowed unsecured claim.

28. The Disclosure Statement also fails to disclose that the Bank has an absolute right to credit bid under Section 363(k) in any such bankruptcy sale. <u>RadLAX Gateway Hotel,</u>

13

LLC v. Amalgamated Bank, 566 U.S. 639 (2012). By failing to disclose the Bank's credit bid rights, the Disclosure Statement is thus misleading about the Debtor's ability to use a sale to generate cash to make plan payments, and by implication, its ability to "free up" cash to pay unsecured creditors in this case.

29. Acceptance and Confirmation of Plan. The Disclosure Statement contains inaccurate and misleading information about whether the Plan satisfies the confirmation requirements under the Bankruptcy Code. First, the Disclosure Statement should be amended to clarify that Debtor is not entitled to solicit votes from insiders for the purpose of determining acceptance of the Plan. Second, the Disclosure Statement should be amended to remove the false claim that Debtor's proposed classification of unsecured claims does not "discriminate unfairly" and satisfies the "fair and equitable" test in Chapter 11. [ECF 315, pp. 12-13] Third, the Disclosure Statement obscures the fact that the proposed distribution to equity under the Plan does not satisfy the "fair and equitable" test, *i.e.*, the absolute priority rule, for unsecured creditors. [ECF 315, p. 13].

30. Risks Related to the Plan: The Disclosure Statement should not be approved because it does not accurately describe the risks associated with the Plan. [ECF 315, p. 15] Debtor does not explain the risk that it would not be able to sell its real property or obtain take out financing to fund its obligations under the Plan. Debtor does not explain the risk to feasibility of the fact that the Plan does not have a customary capital reserve to address major repairs over the 5+ year post-confirmation time period. As explained throughout this objection, the Disclosure Statement does not provide adequate information about the likelihood that post-petition cashflow will not be sufficient to fund plan payments, the likelihood that the case is

administratively insolvent, and the likelihood that the Debtor will have to file another bankruptcy case in the near future.

31. The Plan and Disclosure Statement do not describe any remedies for post-confirmation defaults, and thus lacks an "adequate means of implementation," as required by 11 U.S.C. §§ 1123(a)(5) and 1129(a)(1). The Plan and Disclosure Statement should be amended accordingly before solicitation begins to ensure that stakeholders are properly informed about their rights in the event of a post-confirmation plan default.

## Conclusion

To authorize solicitation of the Plan would be to allow the insiders to continue their bad faith use of the Chapter 11 process at the expense of stakeholders in this case. The Plan does not require such insiders to make any contribution to the Debtor's reorganization in exchange for benefits potentially worth several million dollars. The Disclosure Statement not only fails to disclose such information to creditors, it affirmatively minimizes and obscures the fundamental conflict of interest that permeates the Plan. The Debtor's transparent purpose for pursuing confirmation in this case is not to reorganize, but to lure hopeful creditors into granting a long-term injunction to insiders. The Plan has other instances of bad faith, including gerrymandering with the aim of cramming down confirmation over objecting creditors. The Bank respectfully submits the Disclosure Statement is inadequate as a matter of law, and the Plan is facially unconfirmable under 11 U.S.C. § 1129(a)(1) or § 1129(a)(3). And most importantly, the Debtor is unlikely to carry its burden to prove the Plan is proposed in good faith. For all the foregoing reasons, the Bank urges the Court to deny approval of the Disclosure Statement.

Dated: March 11, 2026

**VOGEL LAW FIRM**

BY: <u>*/s/ Kesha L. Tanabe*</u>
    Kesha L. Tanabe
    ktanabe@vogellaw.com
    Caren W. Stanley (#06100)
    cstanley@vogellaw.com
    Drew J. Hushka (#08230)
    dhushka@vogellaw.com
    218 NP Avenue
    Fargo, ND 58107-1389
    701.237.6983
    **ATTORNEYS FOR RED RIVER STATE BANK**

16

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In re:<br><br>Generations on 1st, LLC,<br><br>　　　　　Debtor. | Case No.: 25-30002<br>Chapter 11 |

**CERTIFICATE OF SERVICE**

　　The undersigned hereby certifies that it caused the Disclosure Statement objection of Red River State Bank to be filed in the above-captioned case, which caused CM/ECF service upon all registered parties to the case.

Dated: March 11, 2026

　　　　　　　　　　　　　　　　　　　　　　*/s/ Kesha L. Tanabe*