**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| **In Re:** | Case No.:  25-30003 |
| | Chapter 11 |
| Parkside Place, LLC, | |
| **Debtor.** | |

**DISCLOSURE STATEMENT FOR**

**CREDITOR'S FIRST AMENDED PLAN OF LIQUIDATION**

**FOR PARKSIDE PLACE, LLC**

## 1.    INTRODUCTION

### 1.1    *What is the Purpose of this Disclosure Statement?*

Red River State Bank ("RRSB" or the "Plan Proponent") has filed a First Amended Plan of Liquidation (the "Plan") for Parkside Place, LLC (the "Debtor"). This Disclosure Statement is intended to provide "adequate information" about the Debtor and the Plan, as defined in Section 1125(b) of Bankruptcy Code, to allow creditors to make an informed judgment about the Plan. If this Disclosure Statement is approved by the Bankruptcy Court, it will be used to solicit votes from creditors for or against the Plan. The Plan Proponent strongly urges you to read this Disclosure Statement because it contains a  summary of the Plan and important information concerning the Debtor's history and finances. The Disclosure Statement also provides information about alternatives to the Plan. A copy of the  Plan accompanies this Disclosure Statement as a separate document. Note, the Plan includes a table of definitions. You should refer to the Plan for the definitions of capitalized terms used in the Disclosure Statement. Cites to "ECF" numbers are references to motions, affidavits, and orders that have been filed on the docket in the Bankruptcy Case.

### 1.2    *Brief Description of the Debtor and Its Bankruptcy Filing*

The Debtor is owned by Mr. Jesse Craig and historically, it was managed by his spouse, Ms. Mulinda Craig, through a business entity they own called CP Business Management, Inc. The Debtor's principal asset is an apartment building located at 8  2nd St. NE (the "Project") in Watertown, South Dakota (the "City"). The Project consists of a single, four-story apartment building with attached parking and approximately 3,803 square feet of ground floor commercial space. The building was built in 2021 and it has a useful life of approximately 55 years total. The residential portion of the building includes 36 apartment units. The occupancy rate of the building is over 95%, which is considered "stabilized" for a building of its kind. The apartments are leased at

1

market rate and generate consistent monthly income for the Debtor. An average one-bedroom apartment in the Project rents for approximately $1,090 per month.

Prior to the Petition Date, the Project went into default according to the terms of its secured notes with Red River State Bank. Gross rents were not sufficient to pay all expenses and debt service as they came due. In October 2024, a South Dakota state court appointed a receiver (called HME), an independent third party, to collect rents and operate the Project. Debtor filed this Chapter 11 bankruptcy case on January 6, 2025. [ECF 1]

### 1.3    Brief Summary of the Creditor's Plan: Why Liquidation vs. Reorganization?

The Plan provides two sources of recovery for creditors: a sale process and a creditor trust. First, RRSB has agreed to liquidate 100% of its Real Estate Collateral to fund the Plan. Sale Proceeds will be used to pay Administrative Claims, Priority Tax Claims, UST quarterly fees, RRSB's Class 1 Secured Claim, and all Class 4 Convenience Class claims.

Second, the Plan will establish a Creditor Trust to fund the investigation and prosecution of any and all Causes of Action owned by the Debtor. Proceeds from the Sale of Real Estate Collateral of no less than $50,000 will be allocated to fund the work of the Creditor Trust.  All proceeds of litigation or settlement will be distributed pro rata to Class 3 general unsecured Creditors.

### 1.4    Confirmation of Plan.

1.4.1   **Requirements.** The requirements for Confirmation of the Plan are set forth in detail in Section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

(a)    **Acceptance by Impaired Classes.** Except to the extent that the cramdown provisions of Section 1129(b) of the Bankruptcy Code may be invoked, each Class of Claims must either vote to accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b)    **Feasibility.** The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c)    **"Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all Holders of Claims. To satisfy this requirement, the Bankruptcy Court must determine that each Holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d)    **"Cramdown" Provisions.** Under certain circumstances which are set forth in detail in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the

Plan even though a Class of Claims or Equity Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of Insiders (as defined in the Bankruptcy Code), if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Plan Proponent will invoke the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to holders of Equity Interests since under the Plan, the Class in which Equity Interests reside are deemed to have rejected the Plan. Should any voting Class fail to accept the Plan, the Plan Proponent will also invoke the "cramdown" provision as to such Class.

1.4.2   *Procedure.* To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code (the "*Confirmation Hearing*"). The Bankruptcy Court has set _____, at [•] [•].m. Central Standard Time, for the Confirmation Hearing.

1.4.3   *Objection to Confirmation.* Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set _____, at [•] [•].m. Central Time, as the deadline for filing and serving upon the Plan Proponent's counsel, and the United States Trustee's Office, objections to Confirmation of the Plan. Objections to Confirmation must be filed with the Bankruptcy Court at the following address:

U.S. Bankruptcy Court for the District of North Dakota
655 1st Avenue North, #210
Fargo, ND  58102

with a copy served upon counsel to the Plan Proponent:

Kesha L. Tanabe, Esq.
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
Email: ktanabe@vogellaw.com

and a copy served upon the Office of the United States Trustee:

United States Trustee
Suite 1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

1.4.4   *Effect of Confirmation.* Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall  irrevocably vest in the liquidating Debtor for purposes of administration, by the Plan Proponent, of all of its respective rights, title, and interest in and to all assets.  The Plan provides for the wind down of the Debtor's affairs, continued liquidation and  conversion of all of  the  Debtor's remaining assets to cash and the distribution of  the  net  proceeds realized therefrom, in addition to Cash on Hand on the Effective Date of the Plan, to  Holders of allowed Claims in accordance with the relative priorities  established  in  the  Bankruptcy Code.  The Plan does not provide for a distribution to

3

Holders of Equity Interests, and their votes are not being solicited. The Plan contemplates the creation of a Creditor Trust and the appointment of a Creditor Trustee to pursue any unreleased Causes of Action and to make Distributions to Holders of allowed Claims. Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Holders of Equity Interests, and other parties-in-interest, regardless of whether they cast a ballot ("***Ballot***") to accept or reject the Plan.

### 1.5    *Voting on the Plan.*

1.5.1    *Impaired Claims or Equity Interest.* Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving distributions or other treatment under the Plan may vote on the Plan. Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.

1.5.2    *Eligibility.* In order to vote on the Plan, a Holder of a Claim must have timely filed or been assigned a timely filed proof of Claim, unless its Claim is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules of Assets and Liabilities (the "***Schedules***"). Holders having a Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

1.5.3    *Binding Effect.* Whether a Holder of a Claim votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, a Holder of a Claim will not be included in the vote: (i) for purposes of accepting or rejecting the Plan; or (ii) for purposes of determining the number of Persons voting on the Plan.

1.5.4    *Procedure.* Members of Classes 1, 2, and 4 are unimpaired and not entitled to vote. Class 3 may vote to accept or reject the Plan. Classes 5 and 6 are comprised entirely of Insiders and their votes are disregarded for purposes of plan confirmation. In the event that the Court determines Classes 5 and 6 are eligible to vote, they shall be deemed to reject the Plan. In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> Kesha L. Tanabe
> Vogel Law Firm
> 218 NP Avenue
> Fargo, ND  58107-1389

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery at the address set forth above on or before 4:00 p.m. Central Standard Time on [_____.] Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(i)    Ballots received that do not evidence the amount or evidence an incorrect amount of such Holder's Claim shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim has been filed by such Holder, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan upon request to the Court by either the Debtor or such Holder of a Claim;

(ii)   Ballots received that do not identify the Holder of the Claim, whether or not signed by the Holder, shall not be counted as a vote to accept or reject the Plan;

(iii)  Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Holder's Claim and that are otherwise properly completed may be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan upon request to the Court by either the Plan Proponent or such Holder of a Claim; and

(iv)   Ballots that are completed, except that such Holder of a Claim failed to vote to accept or reject the Plan, shall not be counted as a vote to accept or reject the Plan.

## 1.6    *Acceptance of the Plan.*

1.6.1    *Holder Acceptance.* As a Holder of a Claim, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for "cramdown" of any non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code. At least one impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan. You are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim and the name of the Holder of the Claim.

1.6.2    *Cramdown Election.* If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of Insiders, the Plan Proponent may attempt to invoke the "cramdown" provisions of the Bankruptcy Code. Cramdown may be an available remedy, because the Plan Proponent believes that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

1.7    *Sources of Information.* The information contained in this Disclosure Statement has been obtained from the Debtor's books and records, from formal discovery in the bankruptcy case, and from motions and other papers filed with the Bankruptcy Court by the Debtor, the Plan Proponent and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the assets of the Debtor is based upon an estimation of such value. You are strongly urged to consult with your financial and legal advisors to understand fully the Plan and Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits. If any conflicts exist between the Plan and Disclosure Statement, the terms of the Plan shall control.

### 1.8   Additional Information.

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact counsel for the Plan Proponent:

Kesha L. Tanabe, Esq.
Vogel Law Firm
218 NP Avenue
Fargo, ND  58107-1389
Email: ktanabe@vogellaw.com

## 2.   THE DEBTOR

### 2.1   Description of the Debtor.

The Debtor's principal asset is a single, four-story apartment building with attached parking located in Watertown, South Dakota. The Debtor filed a Chapter 11 bankruptcy case on January 6, 2025.  Prior to filing for bankruptcy, the secured creditor commenced a foreclosure proceeding in Codington County, South Dakota. The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession pursuant to  sections 1107(a) and 1108 of the Bankruptcy Code.

### 2.2   The Debtor's Ownership and Other Statutory Insiders.

The Debtor is wholly owned by Mr. Jesse R. Craig. Other statutory "Insiders" include Mr. Craig's spouse, Mulinda "Mindy" Craig, as well as his two daughters: Jordan Horner and Sydney Craig. Mr. Craig also owns and controls several related entities such as Craig Holdings, LLC, Craig Properties, LLC, Craig Development, LLC, and CP Business Management, Inc. Ms. Craig currently performs the majority of the Debtor's administrative and management services through an entity called CP Business Management, Inc. Two Affiliates of the Debtor are currently in bankruptcy proceedings pending before the Bankruptcy Court: The Ruins, LLC and Generations on 1st, LLC.

### 2.3   The Debtor's Debt Structure.

As of the Petition Date, Debtor has two secured creditors. By prior stipulation, Debtor has allowed RRSB's Class 1 Claim in the amount of $5,400,000. [ECF 177]. RRSB has a valid first priority Lien in the Real Estate Collateral, in accordance with the terms of the Subordination Agreement.  RRSB's collateral also includes all Rents produced by the Real Estate Collateral, pursuant to an Assignment of Rents. Watertown Development Company ("WDC") also has a Secured Claim against the Debtor. WDC submitted Proof of Claim No. 5 for $1,605,415.95. WDC's

6

Claim is secured by a valid second priority Lien in the Real Estate Collateral, per the Subordination Agreement. WDC is also secured by a valid first priority Lien in the TIF Revenue. The TIF Revenue is a future stream of income resulting from payment of real estate tax associated with Parkside Place, in the ordinary course, over the remaining life of the TIF Agreements. The Debtor was managed by a prepetition receiver, and thus most of its prepetition expenses were paid in the ordinary course. As a result, the Debtor has 4 or fewer unpaid trade creditors and all but one of such unsecured claims is under $5,000. Debtor's does, however, owe a substantial deficiency claim to RRSB and WDC, and a prepetition Priority Tax Claim of $41,423.24 to Codington County. Insiders have asserted unsecured claims against the Debtor, but the Plan Proponent disputes such Claims in part due to standard claim objections and in part because such parties have unresolved liability to the estate and thus, they are not currently entitled to receive a distribution under the Plan.

### 2.4    The Debtor's Employment of Professionals.

The Debtor requested and obtained the authority to employ the Dakota Bankruptcy Firm as its counsel. On the Debtor's motion, the Bankruptcy Court subsequently appointed Edward T. Gavin, CTP to serve as the Chief Restructuring Officer of the Debtor (the "CRO").  The Debtor, CRO, and RRSB originally intended to file and propose the Plan jointly, but on Wednesday, June 10, 2026, counsel to Jesse and Mulinda Craig asserted that Mr. Gavin was not authorized to make decisions in this case unless such decisions were made "in association with" Mr. Craig, because he is the managing member of the Debtor. Counsel to the Craigs made such argument to preclude the Debtor and CRO from authorizing walk-through inspections and/or appraisals needed to facilitate a sale of the Real Estate Collateral in this case. To avoid the additional waste and delay of litigating a superfluous issue, the Debtor, CRO and RRSB made a last-minute, pragmatic decision to revise the Plan to be filed by RRSB as the sole plan proponent.

### 2.5    Adversary Proceeding Against RRSB. In the Adversary Proceeding, the Debtor sued RRSB for (i) the avoidance of a release and waiver in favor of RRSB; (ii) deceit; (iii) fraud; and (iv) declaratory relief. The litigation was tested by a motion to dismiss, thoroughly briefed by the parties and argued to the Bankruptcy Court. As of the filing of this Disclosure Statement, several claims of the Debtor have survived early dispositive motions practice. The core of Debtor's claims against RRSB is a contention that RRSB is the recipient of a fraudulent conveyance, in the form of a forbearance agreement containing both a broad release and an increase in applicable interest rates. Parkside also contends that RRSB lacked the authority and resources to honor lending commitments. RRSB strongly disputes any liability and is vigorously contesting any liability or wrongdoing in the Adversary Proceeding. Moreover, because RRSB loaned significantly more money to Debtor than contemplated by the parties' original term sheet and the Debtor never paid anything towards the disputed interest rate increase, RRSB contends Debtor was not damaged by its conduct.

### 2.6    Adversary Proceeding Against Insiders.  In a second adversary proceeding, RRSB sued several Insiders, including Mr. Craig, his adult daughter Jordan Horner and two LLCs owned by Mr. Craig. The complaint alleges the LLCs obtained in excess of $3.4 million in loan proceeds from Debtor, without providing reasonably equivalent value for receipt of such funds, and that Mr. Craig and Ms. Horner should be personally liable for the LLCs' improper receipt of loan proceeds.

The Insiders have moved to dismiss the complaint, arguing that only the Debtor itself may pursue such claims. To date, the Insiders have not disputed the factual allegations raised in the complaint.

### 2.7    Claims Against the Debtor.

2.7.1    *Administrative Expenses.* Plan Proponent anticipates that Administrative Expenses as of the Effective Date will be $100,000 or less, part of which will be satisfied by a prepetition retainer of approximately $9,800. Counsel to the Debtor recently filed a First Interim Application for Compensation requesting $29,660.47. [ECF 413]

2.7.2    *Priority Tax Claims.* As of the date of the Disclosure Statement, the amount of Priority Tax Claims filed against the Debtor is approximately $41,423.24. The Plan Proponent estimates that $41,423.24 in Priority Tax Claims will be allowed and unpaid as of the Effective Date of the Plan.

2.7.3    *UST Fees.* The Plan Proponent estimates that the distributions under the Plan will obligate the estate to pay UST fees of approximately $46,350. Such fees will be paid in full on the Effective Date.

2.7.4    *Class 1 Secured Claim of Red River State Bank.* Class 1 consists of the Secured Claim of RRSB. By prior stipulation, RRSB's Class 1 Claim has been allowed in the amount of $5,440,000. [ECF 177]. RRSB's Class 1 Claim is secured by a valid, first-priority Lien in the Real Estate and Rents. Upon closing of a Sale, RRSB shall be entitled to receive sale proceeds up to $5,440,000. The Parkside Note shall be reinstated until the Closing Date. Monthly plan payments of $19,500 shall be due to RRSB on the 1st day of each month after the Confirmation Date, through and including the payment due on November 1, 2026. If the VKB Transaction does not close on or before December 1, 2026, monthly plan payments of $27,000 shall be due to RRSB on the 1st day of each month beginning on December 1, 2026. Class 1 is not impaired by the Plan and deemed to accept.

2.7.5    *Class 2 Secured Claim of Watertown Development Company.*   Class 2 consists of the allowed Secured Claim of WDC. WDC's Claim shall be allowed in the amount of $1,605,415.95. Pursuant to the Subordination Agreement, WDC has a valid, second priority Lien in the Real Estate. The Plan Proponent does not anticipate that the proceeds of the Sale of Real Estate Collateral will be sufficient to allow a distribution of Sale Proceeds to Class 2. However, WDC's Claim is also secured by a valid, first-priority lien in the TIF Revenue. The "TIF Revenue" is the future tax increment revenue associated with the Real Property, as set forth in the TIF Agreements. The Plan Proponent and WDC have stipulated to value the TIF Revenue in the amount of $1,204,061.96. Nothing in this Plan shall terminate or modify the TIF Agreements and WDC shall remain entitled to receive all TIF Revenue assigned to it under the TIF Agreements. Class 2 is not impaired by the Plan and deemed to accept.

2.7.6    *Class 3 General Unsecured Claims.* Class 3 consists of all allowed unsecured Claims for $5,000 or more: the RRSB Deficiency Claim, the WDC Deficiency Claim; and Claim 9 for $12,651.44. Holders of Class 3 Claims shall receive their pro rata share of all future distributions from the Creditor Trust. Class 3 is impaired and entitled to vote.

8

2.7.7   ***Class 4 Convenience Class Claims.*** The Plan Proponent anticipates there will be four holders of general unsecured claims for less than $5,000: George's Sanitation, Inc., White Glove Cleaning, Watertown Municipal Utilities, and Cannon Electric LLC. Holders of Class 4 claims will receive payment in full on the Effective Date.

2.7.8   ***Class 5 – Intercompany Claims.*** Class 5 consists of all claims of Affiliates against the Debtor. The Plan Proponent does not believe Sale Proceeds will be sufficient to pay a distribution to any Class 5 claims. Class 5 is comprised exclusively of Insiders. Pursuant to 11 U.S.C. § 1129(a)(10), Class 6 is disregarded for the purpose of voting. If the Court determines that Class 5 is permitted to vote, they shall be deemed to reject the Plan.

2.7.9   ***Class 6 – Equity.*** Class 6 consists of Holders of Equity Interests. Unless Sale Proceeds are sufficient to pay all Administrative Expenses, Priority Claims, and Classes 1-4 in full, all Equity Interests will be extinguished on the Effective Date. The Plan Proponent does not reasonably anticipate that Sale Proceeds will be sufficient to permit any distribution to Class 6 without violating the absolute priority rule. Class 6 is comprised exclusively of Insiders. Pursuant to 11 U.S.C. § 1129(a)(10), Class 6 is disregarded for the purpose of voting. If the Court determines Class 6 is permitted to vote, they shall be deemed to reject the Plan.

## 3.   SUMMARY OF PLAN IMPLEMENTATION

**3.1   *Retention of Property Management Company.*** On or as soon as practicable after the Confirmation Date, the Plan Proponent shall be authorized to retain an independent third-party management company called HME Properties, LLC to manage the Real Estate (the "Property Manager"). The Property Manager shall be responsible for collecting rents, paying ordinary expenses, repairs and maintenance pending the Sale. The Property Manager will be entitled to customary compensation not to exceed 5% of the monthly rent collected from the Real Property plus reimbursement of normal expenses.

**3.2   *VKB Transaction.*** The Plan Proponent has received an offer from VKB to purchase the Real Estate Collateral for $4,850,000. If the Plan Proponent does not receive a Third Party Overbid and the Bankruptcy Court enters an order confirming the Plan, Debtor will be authorized to sell the Real Estate Collateral to VKB, pursuant to 11 U.S.C. 1123(a)(5)(d) and 1123(b)(4), with the consent of secured creditors, free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan. All terms of the VKB Transaction are set forth in the VKB Purchase Agreement attached to the Plan as Exhibit A.

**3.3   *Third Party Overbid.*** The VKB Transaction is subject to a "Third Party Overbid," which is defined in the Plan as a bid to purchase the Real Estate Collateral on identical terms to the VKB Transaction (excepting the price term), provided the proposed purchase price is at least $100,000 higher than the VKB Transaction. To be valid, a Third Party Overbid must be submitted in the form of a signed copy of the Purchase Agreement delivered to the Plan Proponent and an earnest money deposit equal to

9

10% of the proposed purchase price must be received by First Dakota Title in Sioux Falls, SD, no later than Wednesday, July 1, 2026. All offers to purchase the Real Estate Collateral must be submitted on the same form of Purchase Agreement as the VKB Purchase Agreement. To ensure timely submission of a valid Third Party Overbid, bidders are encouraged to contact counsel for the Plan Proponent to request a Word version of the purchase agreement and wire instructions no later than Monday, June 29, 2026.

**3.4** **Live Auction**. If the Plan Proponent receives one or more valid and timely Third Party Overbid(s), an auction will be conducted by the Bankruptcy Court, with bids to be called from the bench in open court via Zoom or in-person on Thursday, August 6, 2026 or as soon as possible thereafter (the "Live Auction"). Only VKB and parties who have submitted timely, valid Third Party Overbids shall be qualified to bid in the Live Auction. Bidding in the Live Auction will commence with the amount of the Third Party Overbid, or in the event of multiple Third Party Overbids, it will commence with the highest such bid, and it will proceed in $50,000 bid increments. All offers to purchase the Real Estate Collateral must be submitted on the same form of Purchase Agreement as the VKB Purchase Agreement (excepting the price term), provided that the successful bidder may deposit the remaining balance of the Additional Earnest Money no more than 2 Business Days after the Live Auction.

**3.5** **Live Auction Notice Requirements**. If the Plan Proponent receives a valid and timely Third Party Overbid, the Plan Proponent shall file a notice on the docket no later than Thursday, July 2, 2026 ("Auction Notice"). The Auction Notice shall clearly indicate (i) the legal description of the Real Estate Collateral; and (ii) the date, time and location of the Live Auction. The Plan Proponent shall serve the Auction Notice on all of the Debtor's creditors and interested parties via U.S. Mail, postage prepaid, no less than 28 calendar days before the Live Auction. Additionally, the Plan Proponent shall publish the Auction Notice in The Fargo Forum and The Argus Leader once per week for no less than two consecutive weeks before the Live Auction.

**3.6** **Free and Clear Sale Pursuant to Section 363**. At the conclusion of the Live Auction, the Plan Proponent shall move the Court to permit a sale of the Real Estate Collateral to the successful bidder free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under this Plan (the "Sale Motion"). The Plan Proponent shall seek a hearing on the Sale Motion on an expedited basis as needed to facilitate a timely closing.

**3.7** **Deed.** VKB (or the successful bidder, in the event of a Live Auction) shall receive an executed trustee's deed for the Real Estate Collateral, in a form to be prepared by the Plan Proponent and to be reasonably agreeable to the Debtor. If the Debtor or its CRO refuses to execute said deed, the Plan Proponent shall move the Bankruptcy Court to designate a member of the bar to execute such deed on behalf of the Debtor's estate, with said deed to be endorsed by the Bankruptcy Court. Entry of the Confirmation Order shall constitute approval of such conveyance pursuant to the Bankruptcy Code.

**3.8** **Credit Bidding**. Any Holder of an allowed Secured Claim may credit bid at any Sale of the Real Estate Collateral in accordance with 11 U.S.C. § 363(k).

**3.9** **Creditor Trust.** A trust shall be formed on the Effective Date for the benefit of creditors (the "Creditor Trust") pursuant to the Creditor Trust Agreement, the form of which is attached to the Plan as Exhibit B. On the Effective Date, all Causes of Action shall be assigned by Debtor to the

Creditor Trust. The primary asset of the Creditor Trust shall be the potential avoidance of prepetition transfers to Insiders, the gross value of which exceeds $3.4 million, as described Section 2.6 of this Disclosure Statement. The Creditor Trustee shall investigate, litigate and/or settle Causes of Action for the benefit of all Holders of Class 3 Claims. With the consent of secured creditors, on or as soon as practicable after the Effective Date, the Debtor shall transfer no less than $50,000 from proceeds of the Sale of Real Estate Collateral to fund the Creditor Trust.

**3.10   Rent Reserve.** After the Confirmation Date, if Debtor produces any excess monthly cash flow after payment of customary monthly operating expenses and the monthly payments due to Class 1 under this Plan, such funds shall be held in reserve and they shall remain subject to RRSB's Liens (such funds, the "Rent Reserve"). The excess rents held in the Rent Reserve are subject to the first priority lien of RRSB and may not be disbursed without the prior approval of RRSB. On the Effective Date, any excess rents in the Rent Reserve shall be distributed to RRSB.

**3.11   Equitable Subordination of Insider Claims.** On the Effective Date, any proof(s) of claim filed by Insiders seeking allowance of Claims against the Debtor shall be equitably subordinated to all other Holders of Class 3 Claims pursuant to 11 USC § 510, due to the Insiders' prepetition misconduct. Similarly, all late filed proof(s) of claim will be subordinated in right of payment to timely filed proof(s) of claim, in accordance with 11 USC § 502(b)(9).

**3.12   RRSB Settlement.** Pursuant to Federal Rule of Bankruptcy Procedure 9019, on the Effective Date of the Plan, any and all claims against RRSB and/or any of its employees, representatives, officers, and directors, that were raised or could have been raised in the Adversary Proceeding or Foreclosure Proceeding, shall be dismissed with prejudice. In consideration thereof, RRSB has agreed to permit proceeds of the sale of the Real Estate Collateral to be used on the Effective Date to pay all Administrative Expenses, Priority Tax Claims, UST fees, and to fund the Creditor Trust with no less than $50,000. Additionally, RRSB will dismiss the Foreclosure Proceeding with respect to the Debtor as soon as practicable after the Effective Date.

**3.13   Executory Contracts.** On the Confirmation Date, any executory contracts with Insiders, including CP Business Management, Inc., Jesse Craig, and Mulinda Craig will be deemed rejected, including without limitation any property management agreements, employment agreements, or leases with Insiders and/or employees of Insiders. All other residential leases between Parkside and existing tenants who are not Insiders will be assumed.

**3.14   Modification of the Plan.** The Plan Proponent may alter, amend or modify the Plan or any Exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation hearing. After the Confirmation Date and prior to the Effective Date, the Plan Proponent may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims or Equity Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court. From and after the Effective Date and prior to substantial consummation of the

Plan (as defined in Section 1101(2) of the Bankruptcy Code), the Plan Proponent may seek non-material modification or amendment of the Plan as permitted by the Bankruptcy Code.

**3.15 Plan Controls.** In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement, the provisions of the Plan will control.

**3.16 Binding Effect.** The provisions of the Plan and the Confirmation Order are binding and will inure to the benefit of the Holders of Claims against, and Equity Interests in, the Debtor and its respective successors, assigns, heirs and personal representatives, whether or not such persons voted to accept or reject the Plan.

**3.17 Tax Consequences.** The Federal income tax consequences of the Plan to a Holder of a Claim or Equity Interest will depend upon a number of factors and can be complex. In general, a Holder of a Claim that receives cash in satisfaction of its allowed Claim will generally receive a gain or loss with respect to the principal amount of the allowed Claim equal to the difference between: (i) the Holder's basis in the Claim (other than any Claim in respect to accrued interest); and (ii) the balance of the cash received after any allocation to the accrued interest. The Plan Proponent has not determined the character of any gain or loss to be recognized by a Holder with respect to any distribution, if any, such Holder may receive under the Plan. FOR THE FOREGOING REASONS, HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLAN. THE PLAN PROPONENT IS NOT MAKING ANY REPRESENTATION REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, NOR IS THE PLAN PROPONENT RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TREATMENT OF DISTRIBUTIONS MADE UNDER THE PLAN.

## 4. POST-CONFIRMATION ISSUES

**4.1 Exculpation and Limitation of Liability**

4.1.1 **No Liability for Solicitation or Participation.** As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale or purchase of securities.

4.1.2 **Exculpation** Pursuant to § 1125(e) of the Bankruptcy Code; the Plan Proponent and the Creditor Trustee, and their Professionals, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation,

confirmation or consumption of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## 5.    FEASIBILITY

### 5.1    *Financial Feasibility Analysis.*

5.1.1    ***Bankruptcy Code Standard.*** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

5.1.2    ***No Need for Further Reorganization of Debtor.*** The Plan provides for the liquidation of all of the Debtor's assets. Accordingly, the Plan Proponent believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## 6.    ALTERNATIVES TO PLAN

### 6.1    *Chapter 7 Liquidation.*

6.1.1    ***Bankruptcy Code Standard.*** Notwithstanding acceptance of the Plan by the requisite number of Holders of Claims and Equity Interests of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Equity Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

6.1.2    ***Plan is in Best Interest of Creditors.*** The Plan Proponent believes that the Plan satisfies this standard because the Plan provides for an orderly liquidation of the assets. The RRSB Plan Contribution improves the rate of recovery for Holders of Administrative and Class 3 and 4 Claims. A Chapter 7 Liquidation Analysis attached hereto as **Exhibit 1** and Plan Projections are attached hereto as **Exhibit 2**.  Creditors may ascertain the potential benefit of voting in favor of the Plan by comparing their projected recovery in Exhibits 1 and 2.

### 6.2    *Risk Factors.*

13

6.2.1   The amount of Sale Proceeds to be generated by the Sale can be estimated from the amount of the VKB Transaction and Third Party Overbid(s), if any, but there can be no guarantee of success.

6.2.2   The Plan Proponent has reviewed the actual date and amount of potentially fraudulent transfers in this case to estimate the gross value of the Causes of Action that will be transferred to the Creditor Trust. However, the Plan Proponent cannot predict or guarantee the value of future settlements or litigation proceeds to be collected by the Creditor Trust.

**6.3    Recommendations.**    The Plan Proponent believes the Creditor's Plan provides Creditors with the best possible mechanism for selling the Real Estate and ensuring that the Causes of Action are investigated, litigated or settled for the benefit of all Creditors in this bankruptcy case. By contrast, the Debtor's plan is likely to result in an additional bankruptcy filing, which will result in greater delay and financial losses for all Creditors. The Debtor's plan is also designed to enjoin all Creditors from seeking to recover loan proceeds that may have been transferred out of the Debtor to Insiders.  By the time the Debtor's plan fails, critical statutes of limitations will have lapsed and it will be impossible to recover such transfers for the benefit of Creditors. Unless these transfers are clawed back, there will be no recovery for Class 3 Creditors.

### GENERAL DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATES TO A CHAPTER 11 PLAN OF LIQUIDATION FOR PARKSIDE PLACE, LLC FILED BY RED RIVER STATE BANK, AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT IN THE FUTURE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. IT IS THE PLAN PROPONENT'S

POSITION, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY FRE 408. IT IS THE PLAN PROPONENT'S POSITION, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED IN THE PLAN.

**THE DEBTOR'S LARGEST SECURED AND UNSECURED CREDITOR RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN.**

## 7.      CONCLUSION

It is important that you exercise your right to vote on the Plan. It is the Plan Proponent's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against the Debtor and it will not result in a serial bankruptcy filing by the Debtor.

June 11, 2026                                      **VOGEL LAW FIRM**


                                                  */s/ Kesha L. Tanabe*
                                                  Kesha L. Tanabe (#0387520)
                                                  ktanabe@vogellaw.com
                                                  Caren W. Stanley (#06100)
                                                  cstanley@vogellaw.com
                                                  Drew J. Hushka (#08230)
                                                  dhushka@vogellaw.com
                                                  218 NP Avenue
                                                  PO Box 1389
                                                  Fargo, ND 58107-1389
                                                  Telephone: (701) 237-6983
                                                  Fax: (701) 476-7676

                                                  *COUNSEL TO PLAN PROPONENT RED RIVER STATE BANK*

4905-3607-8763 v.4

**EXHIBIT 1**

**(Liquidation Analysis)**

**Parkside Place, LLC**
**Liquidation Analysis**

| | Recoverable Assets: | | $Amount | | Liquidation Analysis Scenarios | | |
|---|---|---|---|---|---|---|---|
| | | | | | LOW | MID | HIGH |
| a | Cash on Hand (rents subject to RRSB liens) | $ | 150,000 | $ | 150,000 $ | 150,000 $ | 150,000 |
| | *Recovery Rate* | | | | 100% | 100% | 100% |
| b | Projected Future Tax Increment Revenue (Passes Outside Estate) | | 1,204,061.96 | | 963,249.57 | 1,083,655.76 | 1,204,061.96 Note |
| | *Recovery Rate* | | | | 80% | 90% | 100% |
| c | Real Property (stipulated value) | $ | 4,850,000 | $ | 3,880,000 $ | 4,365,000 $ | 4,850,000 |
| | *Recovery Rate* | | | | 80% | 90% | 100% |
| d | Prepetition Retainer (Statement of Compensation for Debtor's Counsel) | $ | 9,800 | $ | 7,840 $ | 8,820 $ | 9,800 |
| | *Recovery Rate* | | | | 80% | 90% | 100% |
| e | Litigation against RRSB (Complaint does not seek specific monetary damages) | $ | - | $ | - $ | - $ | - |
| | *Recovery Rate* | | | | 80% | 90% | 100% |
| f | Chapter 5 Claims (Gross Value of Potentially Avoidable Transfers to Insiders) | $ | 1,026,351 | $ | 338,696 $ | 513,176 $ | 677,392 |
| | *Recovery Rate* | | | | 33% | 50% | 66% |
| | **Chapter 7 Priority Claims:** | | | | | | |
| g | Chapter 7 Trustee Compensation | | | $ | 640,774 $ | 734,478 $ | 826,950 |
| h | CH 7 Trustee Professionals/Contingent Fees for CH 5 litigation | | | $ | 67,739.17 $ | 102,635.10 $ | 135,478.33 |
| i | Priority Tax Claims (Codington County RE Tax) | $ | 41,423 | $ | 41,423 $ | 41,423 $ | 41,423 |
| | **Estimated Liquidation Proceeds Available for Debt** | | | $ | 4,589,849 $ | 5,242,115 $ | 5,887,402 |
| | **Senior Secured Lender** | | | | | | |
| j | Red River State Bank (First on Cash + Real Estate) | $ | 5,400,000 | $ | 4,030,000 $ | 4,515,000 $ | 5,000,000 |
| | **Total Senior Secured Lender** | *Recovery Rate* | | | 75% | 84% | 93% |
| | **Funds Available for Junior Secured Debt and Unsecured Debt** | | | $ | - $ | - $ | - |
| | **Junior Secured Debt** | | | | | | |
| k | Watertown Development Corporation (First on Future Tax Revenue) | | 1,605,415.95 | $ | 963,250 $ | 1,083,656 $ | 1,204,062 |
| | *Recovery Rate* | | | | 60% | 67% | 75% |
| | **Net Funds Available for Chapter 11 Claims** | | | $ | (403,401) $ | (316,660) $ | (316,660) |
| l | Administrative Claims - Chapter 11 Professionals | $ | 100,000 | $ | - | | $ - |
| | *Recovery Rate* | | | | 0% | 0% | 0% |
| | **Net Funds Available for Unsecured Debt** | | | $ | (403,401) $ | (316,660) $ | (316,660) |
| | **Unsecured Debt** | | | | | | |
| m | General Unsecured Claims | $ | 4,000,000.00 | $ | - $ | - $ | - |
| | *Recovery Rate* | | | | 0% | 0% | 0% |
| | **Funds Available for Equity** | | | $ | - $ | - $ | - |

**Assumptions:**
b: TIF Revenue Passes Outside of the Estate, not Subject to CH 7 trustee fees
f: Based on gross value of potentially avoidable transfers (ECF 208)

## **EXHIBIT 2**

**(Plan Projections)**

**Parkside Place, LLC**

**Plan Projections**

| | | Asset Value | To be Distributed Under Plan | Estimated Recovery |
|---|---|---|---|---|
| | **Recoverable Assets:** | | | |
| a | Cash on Hand (Pre-Petition Rents Subject to RRSB Liens) | $ 150,000 | $ 150,000 | |
| b | Monthly Payments btw Confirmation Date to VKB Closing on 9/1 | $ 19,500.00 | $ 19,500.00 | |
| c | Real Property (VKB Transaction) | $ 4,850,000 | $ 4,850,000 | |
| d | Prepetition Retainer (Statement of Compensation for Debtor's Counsel) | $ 9,800 | $ 9,800 | |
| e | Initial Funding for Creditor Trust under Plan | $ 50,000 | $ 50,000 | |
| f | Chapter 5 Claims (Gross Value of Potentially Avoidable Transfers to Insiders, per ECF 208) | $ 1,026,351 | $ 513,176 | |
| | | *Est. Recovery Rate* | 50% | |
| f | **Gross Value of Assets to be Liquidated under the Plan** | | $ 5,592,476 | |
| | **Admin Expenses and Priority Claims to be Paid under the Plan** | Claim Amt. | | |
| g | Administrative Claims - Chapter 11 Professionals | $ 100,000 | $ 100,000 | 100% |
| h | Priority Tax Claims (Codington County RE Tax) | $ 41,423 | $ 41,423 | 100% |
| i | UST Fees | $ 48,507.30 | $ 45,538.20 | 100% |
| | **Liquidation Proceeds Available for Classified Debt under the Plan** | | | |
| | **Senior Secured Lender** | | | |
| j | Red River State Bank (First on Rents) | | $ 169,500.00 | |
| k | Red River State Bank (First on Real Estate up to $5.44m) | $ 5,440,000 | $ 4,277,024.36 | |
| | **Total RRSB** | | **$ 4,446,524.36** | 82% |
| | **Funds Available for Junior Secured Debt and Unsecured Debt** | | $ - | |
| | **Junior Secured Debt** | | | |
| l | Watertown Development Corporation (First on Future Tax Revenue, Second on Real Estate) | $ 1,605,415 | $ 1,204,062 | 75% |
| | **Net Funds Available for Unsecured Debt** | | | |
| m | Class 4 Convenience Class Claims <$5,000 | $3,341 | $3,341 | 100% |
| n | Class 3 General Unsecured Claims >$5,000 | $ 4,611,852 | $ 563,176 | 12% |
| | **Funds Available for Equity** | $ - | $ - | 0% |