IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>GENERATIONS ON 1ST, LLC<br><br>    Debtor | Case No.: 25-30002<br>(Chapter 11) |
| In re:<br><br>PARKSIDE PLACE, LLC<br><br>    Debtor | Case No.: 25-30003<br>(Chapter 11)<br><br><br>(Jointly Administered) |

**INTERESTED PARTY JESSE CRAIG'S OBJECTION TO AMENDED JOINT
CHAPTER 11 PLAN FOR GENERATIONS ON 1ST, LLC**

Interested Party Jesse Craig ("Craig") objects to confirmation of the Amended Joint Chapter 11 Plan for Generations on 1st, LLC (Doc. 409) (the "Plan"). The Plan does not comply with the applicable provisions of the Bankruptcy Code, is not submitted in good faith, and cannot satisfy the requirements of 11 U.S.C. § 1129 for confirmation. The Plan does not satisfy the requirements of 11 U.S.C. § 1129 because it is structured around a privately negotiated transaction proposed by the Debtor's principal secured creditor rather than an independent liquidation process reasonably designed to maximize the value of estate assets. The Plan's sale procedures, treatment of estate causes of action, proposed releases, governance of the Creditor Trust, automatic subordination, and elimination of equity all flow from that single premise. As discussed below, the Plan does not comply with the applicable provisions of the Bankruptcy Code, has not been proposed in good faith, and should not be confirmed.

1

Specifically, the Plan fails to satisfy the 11 U.S.C. § 1129 because (a) VKB Transaction proposed in the Plan fails to maximize the value of the estate for the benefit of creditors and other interested parties; (b) the backup plan to market the Generations property if the VKB Transaction does not close is not reasonable under the circumstances; (c) the Plan allows for automatic equitable subordination of insider claims without adjudication from this Court as to the basis for equitable subordination; (d) the Plan summarily and without adequate consideration or justification releases valuable assets—namely, the estate's claims against Red River State Bank ("RRSB"); (e) the Plan improperly diverts $250,000 of sale proceeds to the Creditor Trust by supporting the claims the Creditor Trust could pursue; and (f) the Creditor Trust is not presented in good faith because it will be overseen by people with conflicts of interest contrary to the Creditor Trust and Debtor.  These principles are particularly important where the plan is proposed by the Debtor's principal secured creditor and confirmation necessarily includes approval of the liquidation process selected by that creditor.

### DISCUSSION

Section 1129(a) sets forth the mandatory requirements for confirmation of a Chapter 11 plan. The Plan Proponents bear the burden of proving, by a preponderance of the evidence, that each applicable requirement of 11 U.S.C. § 1129 has been satisfied. Failure to satisfy any single requirement precludes confirmation. Section 1129(a)(1) requires that "the plan complies with the applicable provisions of this title." Section 1129(a)(3) further requires that "the plan has been proposed in good faith and not by any means forbidden by law." As this Court has recognized, the inquiry focuses upon the plan itself and whether it fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code. In re J&J Oilfield Servs., No. 13-30607, 2015 Bankr. LEXIS 1924, at *28-29 (Bankr. D.N.D. June 12, 2015) (quoting In re Reuter, 427 B.R. at

2

770).  The "court should consider whether the plan has been proposed with the legitimate and honest objective of preserving the Debtor's business while maximizing the return available to creditors."  Id. 2015 Bankr. LEXIS 1924, at *29.  RRSB and the Debtor, as the plan proponents of the Plan (collectively, "Plan Proponents"), cannot satisfy these requirements.

Confirmation is not appropriate merely because a secured creditor has proposed a liquidation plan. The Plan Proponents bear the burden of proving each element of 11 U.S.C. § 1129 by a preponderance of the evidence. That burden includes demonstrating that the means selected to implement the liquidation comply with the Bankruptcy Code, that the proposed liquidation is reasonably calculated to maximize estate value, and that the Plan has been proposed in good faith. Those burdens are particularly significant where, as here, the secured creditor proposes to control virtually every material aspect of the liquidation process while simultaneously receiving substantial benefits under the Plan.

A.      **The Proposed Sale Does Not Maximize Estate Value.**

The Plan proposes to sell the Generations on 1st, LLC ("Generations") property to VKB Properties, LLC for $8,840,000. The Plan Proponents state in their Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Generations on 1st, LLC (Doc. 392) (the "Disclosure Statement") that the property is 95% occupied and considered stabilized.  Notably, the Plan assumes that the VKB purchase price of $8,840,000 represents the appropriate value for the Generations property. The Plan Proponents bear the burden of demonstrating that the proposed purchase price represents fair value and reflects the highest and best value reasonably obtainable for the Property. They have failed to satisfy that burden. The Plan is not supported by any meaningful valuation evidence, including appraisals supporting the proposed sale price, a recognized valuation methodology, comparable sales analysis, capitalization rate analysis, broker

opinion of value, or evidence of a marketing process reasonably designed to maximize value. Instead, the Plan simply assumes that the negotiated purchase price is appropriate. That assumption is contradicted by the record. As discussed below, the same purchaser previously offered substantially more for the Property, independent appraisals reflected materially higher values, and additional purchase and refinancing proposals were presented that would have produced greater value for the estate. Accordingly, the proposed sale has not been shown to maximize value for creditors and other parties in interest, including Craig, whose equity interest is extinguished under the Plan.

VKB is not new to the Generations property.  In or about September 2023, VKB submitted an offer to the Debtor, through Craig, proposing to buy the Generations property for $11,500,000. Craig approached RRSB with the offer as a solution, and RRSB would not agree to the sale.  This purchase price was in line with prior CBRE appraisals for the Generations property from December 2020 that reported an as-stabilized value of $9,050,000 and September 2021 that reported an as-stabilized value of $11,220,000.  There is no explanation in the Plan why the proposed sale to VKB for only $8,840,000 is in the best interest of creditors or other interested parties when three years ago, before the Generations property was stabilized and had more financial performance history, the same buyer was willing to pay $11,500,000.

It cannot be the current interest rate environment.  For example, in September 2023, the Wall Street Journal Prime Rate of interest was 8.50%.  See JP Morgan Chase Historical Prime Rate available at https://www.jpmorganchase.com/legal/historical-prime-rate.  The current Wall Street Journal Prime Rate is 6.75%.  See Wall Street Journal Money Rates available at https://www.wsj.com/market-data/bonds/moneyrates.

Furthermore, in December 2025, Kelly Zander, a real estate investor from Fargo, North Dakota, offered to buy the Generations property for $10,385,000.  This offer was contingent on RRSB financing the sale but would still have garnered more for the Debtor and its creditors than the VKB sale proposed in the plan only six months later.

Craig has actively been seeking other financial options for the Generations property as well.  On May 8, 2026, Craig received a loan proposal from Newpoint Real Estate Capital to provide underwriting services for a HUD/FHA refinance of the Generations property.  The proposed loan amount was for $9,300,000, subject to obtaining an appraisal.  This proposal was delivered to the Debtor's Chief Restructuring Officer Michael Schmitz ("Schmitz") the same day.  However, Schmitz took no action on the proposal.  The estimated closing of the loan would have taken approximately six to ten months due to federal underwriting standards, but this proposal would still have garnered approximately $500,000 more for creditors than the current VKB proposal.

This Court is also familiar with The Ruins, LLC ("The Ruins") property from In re: The Ruins, LLC, Case No. 25-30004.  The Ruins property is a 63-unit apartment building whereas the Generations property is a 72-unit apartment building.  (Doc. 410, at 1).  The two buildings are similar in other respects.  Craig recently obtained an appraisal as part of Build LLC's purchase of The Ruins property that reported an as-stabilized value of The Ruins of $12,270,000.  Accordingly, the sale to VKB does not maximize value for the creditors and other interested parties and is not presented in good faith.

Prior to the filing of the Plan, Craig also proposed a reorganization structure to Schmitz by letter to the Debtor's counsel dated May 18, 2026.  In it Craig proposed a refinance period in which he would have exclusive right to refinance the property for an agreed upon amount of $10,200,000

5

by December 31, 2026.  If Craig was not able to refinance the loan for the proposed amount by December 31, 2026, the proposed refinance amount would increase to $10,490,000 provided closing occurred by March 31, 2027.  If closing did not occur by March 31, 2027, the property would be openly marketed with an agreement that Craig could still buy the Generations property for $11,200,000.  This proposal would also have afforded more recovery to the creditors than the proposed VKB Transaction.

**B.**      **The Plan's Sale Procedures Are Not Reasonably Designed to Maximize Value.**

The sale process the Plan Proponents used for the proposed VKB Transaction is also problematic.  This is not simply confirmation of a Chapter 11 plan. Confirmation is the mechanism by which the Court is being asked to approve the disposition of the Debtor's principal asset. Accordingly, the Plan Proponents must demonstrate not merely that a purchaser exists, but that the proposed procedures were reasonably designed to obtain the highest and best value for the estate. Confirmation cannot rest upon the existence of a negotiated transaction alone.

Upon information and belief, RRSB was aware that VKB was interested in purchasing the Generations property since bidding closed on The Ruins.  However, Craig also understands that VKB's proposal was not presented to Schmitz until May 18, 2026.  Despite this, and presumably before any real testing of the proposal could be made, the proposed sale to VKB was memorialized in the Plan only two days later on May 20, 2026.  There is no explanation in the Plan or the Disclosure Statement about the negotiation of the sale price or the means implemented to confirm this price maximized value for the creditors.

The Plan's fundamental defect is not simply that the proposed purchase price is too low. Rather, the Plan asks the Court to confirm a liquidation based upon a Section 363-like sale process that has not been shown in this case to maximize value for the estate. This process is important.

6

The proposed VKB Transaction is effectively incorporated into the Plan before any meaningful exposure of the Property to the marketplace. The Plan therefore seeks confirmation of a liquidation strategy, not merely approval of a purchase agreement.

The Plan contains no evidence demonstrating that the proposed transaction resulted from an adequate marketing process. There is no evidence regarding the number of prospective purchasers contacted, the scope or duration of marketing efforts, any broker opinion regarding value, capitalization rate analysis, comparable sales analysis, or other information ordinarily relied upon to conclude that a proposed transaction reflects fair market value. Instead, the Plan simply assumes that the negotiated purchase price represents the highest and best value reasonably obtainable.

The existing record strongly suggests otherwise. The same purchaser previously offered substantially more for the Property. Independent appraisals reflected materially higher stabilized values. Additional purchase proposals and refinancing alternatives capable of producing greater value were presented before the Plan was filed. Nevertheless, those alternatives were rejected without meaningful explanation, and the Plan instead adopts the lower VKB Transaction as the centerpiece of the proposed liquidation.

At the Disclosure Statement status conference held on May 21, 2026, RRSB analogized VKB's offer as a stalking horse bid. However, the VKB Transaction is not presented as a minimum offer that would then be subject to a competitive bidding process as other stalking horse bids are. It is being presented to the court as the only offer, despite other options being presented that would garner more for the estate. The Plan does contain a Third Party Overbid process, but the Third Party Overbid deadline is stated as "no later than 7 calendar days before the Confirmation Date," which is potentially June 30, 2026, based on the Court's scheduled confirmation hearing date. The

7

Plan also has no meaningful advertising process in which to submit the Generations property to competitive bidding to give some meaningful opportunity for third-party bidding. Therefore, while the Plan appears to have a mechanism to submit the Generations property to third-party bidding, the reality is the process does nothing to put the Generations property, and the VKB Transaction, against the market to see if more value can be realized from the Generations property.

For these reasons, the VKB Transaction provided for in the Plan is not submitted in good faith and should be denied confirmation.

**C.    The Backup Marketing Process Will Not Maximize Value for the Creditors and Other Stakeholders.**

If the VKB Transaction does not close, the Plan proposes the Generations property be listed with Hilco Real Estate Collateral, LLC ("Hilco") and Sioux Falls Commercial, Inc. d/b/a NAI Sioux Falls and sold.  Plan Exhibit C provides for the Bid Procedures & Timeline.  Under the proposed Bid Procedures, the launch date would be July 1, 2026, and the qualifying bid deadline would be only 48 days later.  Since March 2026, The Ruins property, the Generations property, and the Parkside Place, LLC ("Parkside") property have all been either marketed for sale or sales proposed through Chapter 11 sale plan processes.  This is a huge amount of marketing activity for properties this size in the relatively small city of Watertown, South Dakota, which as the Debtor commented to the Court at a recent hearing could have a negative impact on value.  As the Court is aware from the proceedings in The Ruins and in this case, while there has been views and interested buyers, it appears the highest bidding has revolved around VKB and Archer Land Co., in addition to Build, LLC buying The Ruins property.  If VKB does not close, only 48 days is insufficient to expose the Generations property to the market and attract competitive bidding.

Under these circumstances, what Hilco would recommend as its bidding procedure will not attract new buyers and a fair price for the Generations property.

Furthermore, the Bid Procedures state that the transaction must close in 15 days of seller acceptance. That is too short of a time period for any reasonable buyer to close unless the buyer has cash available to close or unless the buyer is a credit bidder, i.e. RRSB. This short of a closing period would have a chilling effect on prospective buyers.

The Plan Proponents will likely argue that in The Ruins case, Craig objected to the bidding procedure and stipulated to a marketing time of 48 days, the same as what is proposed in the Generations case. The Court noted in the hearing on sale confirmation and approval of real estate commission held in The Ruins case on June 3, 2026, that it was concerned about the marketing time but the interested parties eventually stipulated to a timeframe. Craig agrees with the Court's comments made at that hearing that a 48 day marketing period was not adequate. However, as the Court is also aware, the interested parties attempted to mediate all of these related cases on May 12, 2026. More time to market The Ruins property would have been ideal, but Craig was also considering the mediation date because having the bidding concluded and knowing who the successful buyer and price prior to mediation would have helped narrow the issues for mediation. Accordingly, Craig will testify that there was a strategy decision made in The Ruins case to shorten the marketing period in favor of possible finality at mediation. Craig's stipulation to a 48 day marketing period in The Ruins should not be used as a waiver or estoppel in this case under those circumstances.

More fundamentally, the proposed overbid procedures do not function as a true market test. They merely permit competing purchasers to submit bids within the confines of a transaction already negotiated by the secured creditor. A meaningful market test requires procedures

9

reasonably designed to solicit the highest and best offer through adequate exposure to the marketplace. The procedures proposed here instead appear designed to preserve the existing transaction while creating only the appearance of competitive bidding. Such procedures do not satisfy the objectives of a liquidating Chapter 11 plan whose primary purpose should be maximizing value for creditors and parties in interest.

Under the circumstances of this case and the circumstances of the related Parkside and The Ruins cases, the backup sale procedure provided for in the Plan is not proposed in good faith because it will not maximize the value of the estate for the creditors and other interested parties.

**D.     The Plan Improperly Proposes Automatic Equitable Subordination of Insider claims without Adjudication.**

Section 4.9 of the Plan states "On the Effective Date, any proof(s) of claim filed by Insiders seeking allowance of Claims against the Debtor shall be equitably subordinated to all other Holders of Class 3 Claims pursuant to 11 USC § 510, due to the Insiders' prepetition misconduct."  The Plan thus purports to adjudicate the merits of equitable subordination without any evidentiary proceeding, factual findings, or judicial determination that the requirements of 11 U.S.C. § 510(c) have been satisfied. This treatment is contrary to the caselaw in the 8th Circuit.  "Equitable subordination requires proof of inequitable conduct by the claimant that injured other creditors or conferred an unfair advantage."  Kaler v. Bala (In re Racing Servs.), 571 F.3d 729, 731 (8th Cir. 2009) (citing In re Bellanca Aircraft Corp., 850 F.2d 1275, 1282 (8th Cir. 1988)).  A proponent of equitable subordination must satisfy the following three elements:

(i)     The claimant must have engaged in some type of inequitable conduct.
(ii)    The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
(iii)   Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].

10

In re Bellanca Aircraft Corp., 850 F.2d 1275, 1282 (8th Cir. 1988).  These determinations are factual in nature and require evidence. They cannot be established as a matter of law merely by recitals contained in a proposed the Plan.

Although Federal Rule of Bankruptcy Procedure 7001(8) permits subordination to be provided for in a Chapter 11 plan, that procedural exception does not eliminate the substantive requirements for equitable subordination or permit the Plan Proponent to conclusively determine that equitable subordination is warranted simply by including such language in a proposed plan. The Plan Proponents continue to bear the burden of establishing each element required under 11 U.S.C. § 510(c). Because the Plan proposes Insiders are automatically subject to equitable subordination without any adjudication or judicial determination of inequitable conduct by Insiders that injured other creditors or conferred an unfair advantage, the Plan does not comply with the applicable provisions of the Bankruptcy Code and is forbidden by law under 11 U.S.C. § 1129(a) and (c).  See also Fed. R. Bankr. P. 7001(8). Accordingly, the Plan cannot be confirmed.

**E.     The Plan Fails to Support the Releases and Dismissal with Prejudice of Pending Claims against RRSB.**

In addition to the sale of the Generations property, the Plan's other primary feature is a Creditor Trust to which all possible causes of action belonging to the Debtor will be assigned.  In sum, the Creditor Trust allows RRSB to take control of the litigation in the various adversary proceedings related to this case by releasing with prejudice the claims against itself and also by creating the Creditor Trust to pursue causes of action against Insiders.

The first part of this is the release of the adversary proceeding pending against RRSB (Adversary No. 25-7009).  The Disclosure Statement and Plan contain no analysis of RRSB's potential liability.  Importantly, the Plan contains no analysis under Bankruptcy Rule 9019 as to

11

the appropriateness of the proposed release. "In exercising its discretion to approve a proposed settlement under Bankruptcy Rule 9019, a court must weigh four factors bearing on the reasonableness of the settlement: (1) the likelihood of success in the litigation; (2) the difficulties, if any, in collection matters; (3) the complexity of the litigation and the attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and a proper deference to their reasonable views." ReGen Capital III, Inc. v. Official Comm. of Unsecured Creditors (In re Trism, Inc.), 282 B.R. 662, 667 (B.A.P. 8th Cir. 2002).

The release of RRSB must be analyzed under the Rule 9019 compromise framework. However, the Disclosure Statement and Plan have no Rule 9019 analysis of the settlement of the adversary claims against RRSB, no analysis of whether the proposed settlement falls above or below the lowest point in the range of reasonableness required under Rule 9019, no analysis of why the purported consideration for the dismissal is sufficient, no cost-benefit analysis to gauge the strength or weakness of the litigation, and no analysis of how any damages or setoff rights would benefit the bankruptcy estate. Because there is no analysis of this in the Plan, it cannot be confirmed as it does not satisfy the requirement of 11 U.S.C. § 1129.

In fact, the Plan and Disclosure Statement are inaccurate in that they state part of the consideration for the release of RRSB is the use of sale proceeds to pay a priority tax claim of $76,494.98 to Codington County for unpaid property taxes (Doc. 409 at section 4.10; Doc. 410 at section 2.3). A review of the Codington County tax records shows that these property taxes have been paid. Codington County's claim has not been withdrawn. Even if there were unpaid property taxes, these taxes would be a first-priority lien to RRSB's mortgage lien entitled to payment prior to RRSB, so there is no valuable consideration for the release of RRSB as to property taxes.

12

The absence of any meaningful analysis supporting the proposed releases is particularly significant because the released party is also the Plan Proponent and principal beneficiary of the liquidation structure established by the Plan. Under these circumstances, the Court should carefully scrutinize whether the releases represent a fair exercise of business judgment and whether the estate is receiving reasonably equivalent value in exchange for relinquishing potential claims. The Plan contains no such showing. Rather, the releases appear to be an integral component of a negotiated transaction that has not been demonstrated to maximize value for the estate.

Because confirmation necessarily effects dismissal of the estate's claims against RRSB, confirmation cannot occur unless the Court independently concludes that the compromise satisfies Rule 9019. The absence of that showing is itself a sufficient basis to deny confirmation.

**F.      The Plan Improperly Diverts Estate Assets to Fund Speculative Litigation.**

Section 4.7 of the Plan creates a Creditor Trust under which the "Creditor Trustee shall investigate, litigate and/or settle Causes of Action for the benefit of all Holders of Class 3 Claims." (Doc. 409, at 10).  The Disclosure Statement projects approximately $2.88 million in alleged avoidance and insider-related claims and assumes future recoveries ranging from approximately $950,000 to nearly $1.9 million from those claims.  Importantly, however, neither the Plan nor the Disclosure Statement identifies:  the specific transfers at issue; the dates of the transfers; the alleged recipients; the legal theories supporting recovery; the defenses available to recipients; or the factual basis for the asserted claim value.  Presumably the Causes of Action would include the avoidance action RRSB brought without standing against Craig Development, LLC, Craig Properties, LLC, Craig, and Jordan Horner in Adversary Proceeding No. 26-07003.  Craig Development was the developer for the Generations property.  However, a review of the Plaintiff's Adversary Complaint in that case (Doc. 1) shows RRSB makes nothing but conclusory allegations

13

that RRSB advanced loan funds on certain draw requests to Craig Development or Craig Properties, and that <u>upon information and belief</u>, Craig Development or Craig Properties did not provide materials or services to Generations reasonably equivalent to receipt of the loan funds. Contrary to RRSB's arguments, no detail is given that would justify the Court approving diversion of $250,000 in loan proceeds to fund unsubstantiated litigation founded upon information and belief. At this point, presumably Schmitz, as CRO in this case, and the chief restructuring officer appointed in the related Parkside case would know and be able to analyze the purpose of the Creditor Trust for the Court so the Court can determine wither diverting $250,000 in closing proceeds is justifiable. Because this information is lacking, the Plan does not comply with the requirement of 11 U.S.C. § 1129.

**G.     The Creditor Trust is not proposed in good faith because the Oversight Committee appoints a self-interest Oversight Committee.**

The proposed structure further demonstrates that the Plan has been designed primarily to advance the interests of the secured creditor rather than maximize value for the estate. The Plan transfers all remaining causes of action to a Creditor Trust while leaving substantial control over the liquidation process in parties whose interests are not necessarily aligned with those of the estate. The Court should require a showing that the proposed governance structure promotes the independent exercise of fiduciary duties owed to all beneficiaries of the estate rather than facilitating litigation and settlement decisions influenced by parties receiving significant benefits under the Plan.

The Plan appoints Charles Aarestad and Danielle Harless of RRSB and Lane Warzecha of the proposed property manager HME Properties, LLC as the Oversight Committee of the Creditor Trust. In other words, RRSB proposes to kill claims against RRSB that this Court has determined

14

are plausible (Adversary No. 25-07009, Docs. 18 and 25) and create a committee to provide oversight of the Creditor Trustee by two officers of RRSB who have the most knowledge of RRSB's improper actions.  This is not submitted in good faith as it appoints fiduciaries who have been accused of wrongdoing against the Debtor to then pursue claims against the Insiders.  This Court has also heard evidence of how poor HME Properties, Inc. ("HME") did in managing the properties at issue in these cases, but a representative of HME is the third oversight committee member.  HME's negligence could be a claim the Creditor Trust could pursue on behalf of the Creditor Trust.  The Plan does not attempt to justify (a) conflicts of interest these individuals may have in serving as the oversight committee, (b) the qualifications of these individuals to serve in the important fiduciary role of an oversight committee, or (c) why two bank officers of a very small community bank and a property manager have the experience or expertise for overseeing a trust.

These potential conflicts of interest are particularly important because the Liquidation Plan releases RRSB without discussing a basis for doing so under a Rule 9019, transfers claims against Insiders to the Creditor Trust, appoints RRSB officers to oversee the litigation it wants to pursue, allows RRSB to influence pursuit of Estate causes of action, and gives oversight authority to individuals affiliated with parties who are now and may themselves be potential litigation targets. The issue is not simply whether individual members of the Oversight Committee have potential conflicts. The issue is whether the Plan establishes a governance structure that permits persons affiliated with a released party to influence the prosecution and settlement of remaining estate causes of action. The current structure is certainly not designed with a neutral estate fiduciary at the helm.

**H.     The Plan Is Not Proposed in Good Faith.**

This Plan is not an independently-administered liquidating Chapter 11 plan. It is a secured creditor's liquidation plan that seeks to: *select the purchaser; control the sale process; dictate the marketing process; appoint the litigation trustee; select the oversight committee; control trust funding; determine which litigation survives; eliminate equity and current ownership; and **release itself***. The Plan concentrates virtually every material decision concerning liquidation, litigation, releases, trust governance, sale procedures, and distributions in the hands of the secured lender. The cumulative effect of these provisions demonstrates a plan designed primarily to implement the secured lender's preferred exit strategy and immunize itself through releases rather than independently administer the estate and maximize value as required by Chapter 11.

When viewed collectively rather than in isolation, the provisions of the Plan demonstrate a liquidation process structured primarily for the benefit of the secured creditor sponsoring the Plan. The Plan incorporates a privately negotiated sale at a disputed valuation, provides only limited procedures for competitive bidding, channels estate causes of action into a post-confirmation trust subject to a governance structure challenged as conflicted, proposes releases benefiting the Plan Proponent without an adequate evidentiary foundation, and extinguishes equity based upon a liquidation process that has not been shown to maximize estate value.

Chapter 11 affords substantial flexibility in structuring liquidating plans. That flexibility, however, does not relieve the Plan Proponents of their burden to demonstrate that the proposed liquidation complies with the Bankruptcy Code and has been proposed with the honest objective of maximizing value for the benefit of the estate. Because the record instead reflects a liquidation process designed principally to implement the secured creditor's preferred transaction, confirmation should be denied.

## CONCLUSION

The Plan does not comply with the requirements of 11 U.S.C. § 1129.  Therefore, the Court

cannot confirm the plan.  Craig requests the Court deny confirmation of the Plan.

Dated this 26th day of June, 2026.

> */s/ Douglas W. Murch*
> Douglas W. Murch, ND ID #05983
> CONMY FESTE LTD.
> 3369 45th Street South
> Fargo, ND  58104
> (701) 293-9911
> dmurch@conmylaw.com
>
> ATTORNEY FOR JESSE CRAIG

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>GENERATIONS ON 1ST, LLC<br><br>       Debtor | Case No.: 25-30002<br>(Chapter 11) |
| In re:<br><br>PARKSIDE PLACE, LLC<br><br>       Debtor | Case No.: 25-30003<br>(Chapter 11)<br><br>(Jointly Administered) |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that she is an employee at the law firm of Conmy Feste Ltd., and is a person of such age and discretion as to be competent to serve papers.

That on June 26, 2026, she served a copy of:

**INTERESTED PARTY JESSE CRAIG'S OBJECTION TO AMENDED JOINT CHAPTER 11 PLAN FOR GENERATIONS ON 1ST, LLC**

electronically by Notice of Electronic Filing upon all parties who have requested service in this case by filing the same via ECF with the Bankruptcy Court in the District of North Dakota and by United States mail on the following parties:

ATTORNEY FOR CREDITOR
Kesha L. Tanabe
Vogel Law Firm
PO Box 1389
Fargo, ND 58107-1389

UNITED STATES TRUSTEE
Mary R. Jensen, Acting U.S. Trustee
Suite 1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

ATTORNEY FOR DEBTOR
Maurice VerStandig
The Dakota Bankruptcy Firm
1630 1st Avenue North
Suite B PMB 24
Fargo, ND  58102

/s/ *Leslyn A. Anderson*
Leslyn A. Anderson

18