**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

**NOTICE OF FILING OF *PROPOSED***

**SECOND AMENDED JOINT CHAPTER 11 PLAN FOR GENERATIONS ON 1ST, LLC**

PLEASE TAKE NOTICE that, on May 29, 2026, the Debtor, through its Chief Restructuring Officer (the "CRO"), and Red River State Bank ("RRSB", and together with the CRO, the "Plan Proponents"), jointly proposed their *Second Amended Joint Chapter 11 Plan* [ECF 409] (the "Plan") for Generations on 1st, LLC ("Generations" or the "Debtor"), pursuant to Section 1121(b) of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that the hearing to consider confirmation of the Plan was conducted on Tuesday, July 14, 2026, and it has been continued to allow closing arguments on Monday, July 20, 2026 at 2:00 p.m. CST before the Honorable Shon Hastings, at the United States Bankruptcy Court for the District of North Dakota, Courtroom #3, Second Floor, Quentin N. Burdick United States Courthouse, 655 First Avenue North, Fargo, North Dakota, 58102.

PLEASE TAKE FURTHER NOTICE that a proposed amendment of the Plan is attached hereto as Exhibit A in blackline form for the convenience of the Court and all interested parties. Dated:

Dated: July 17, 2026

**VOGEL LAW FIRM**

*/s/ Kesha L. Tanabe*
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Kesha L. Tanabe
ktanabe@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
Telephone: (701) 237-6983

*COUNSEL TO PLAN PROPONENT*
*RED RIVER STATE BANK*

**EXHIBIT A: Blacklined Version of Proposed Amendment**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN FOR GENERATIONS ON 1ST, LLC**

The Debtor, through its Chief Restructuring Officer (the "CRO"), and Red River State Bank ("RRSB", and together with the CRO, the "Plan Proponents"), hereby jointly propose the following Chapter 11 plan (the "Plan") for Generations on 1st, LLC ("Generations" or the "Debtor"), pursuant to Section 1121(b) of the Bankruptcy Code.[1]

**ARTICLE I**

**DEFINITIONS; RULES OF INTERPRETATION; COMPUTATION OF TIME**

1.1     **Scope of Definitions.**  For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings assigned to them in Article I of the Plan.  Any term used herein that is not defined herein, but that is used in Title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

1.2     **Definitions.**

a.     "Administrative Claim" means all Claims that have been allowed pursuant to an order of the Bankruptcy Court and that are entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code.

---

[1] ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT ISSUED PURSUANT TO SECTION 1125(b) OF TITLE 11 OF THE UNITED STATES CODE IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018 AND IN THIS PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

b.      "Administrative Claims Bar Date" means the fourteenth calendar day after the Confirmation Date, subject to the allowances of Section 1.4 hereof.

c.      "Adversary Proceeding" means the adversary proceeding brought by the Debtor AP-25-7009 in the United States Bankruptcy Court for the District of North Dakota.

d.      "Affiliate" shall have the meaning ascribed to such term in 11 USC § 101(2).

e.      "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, provided to each Holder of a Claim entitled to vote to accept or reject this Plan.

f.      "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of North Dakota.

g.      "Business Day" means any day that is not a Saturday, a Sunday or a "legal holiday" in the District of North Dakota as such term is defined in Bankruptcy Rule 9006(a).

h.      "Cash on Hand" means the cash and cash equivalents held by the Debtor on the Effective Date that are not subject to a lien in favor of RRSB.

i.      "Causes of Action" means, any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtor, whether arising before or after the Petition Date, including, without limitation, those which are: (i) against any party that has filed a Claim herein; (ii) property of the Estate under and pursuant to Section 541 of the Bankruptcy Code; (iii) for subrogation and contribution; (iv) for turnover; (v) for avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (vi) to determine the extent, validity and priority of liens and encumbrances; (vii) for surcharge under Section 506(c) of the Bankruptcy Code; (viii) for subordination under Section 510 of the Bankruptcy Code; (ix) related to federal or state securities laws; (x) direct or derivative claims or causes of action of any type or kind; (xi) for professional malpractice against professionals employed by the Debtor; (xii) against any and all current and/or former officers and directors of the Debtor; (xiii) under and pursuant to any policies of insurance maintained by the Debtor; (xiv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xv) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xvi) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; and (xvii) or may be available to the Debtor against any third party(ies) under any legal or equitable theory, whether or not specifically identified or described herein.

j.      "Claim" has the meaning ascribed to it in Section 101(5) of the Bankruptcy Code.

k.      "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

2

l.  "Closing Date" means the closing date for the Sale.

m.  "Confirmation" shall mean the entry of an order of the Bankruptcy Court confirming the Plan in accordance with Section 1129 of the Bankruptcy Code

n.  "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

o.  "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

p.  "Creditor" has the meaning ascribed in Section 101(10) of the Bankruptcy Code and shall refer to any Holder of a Claim against the Debtor or Holder of any Claim against property of Debtor as defined in Section 102(2) of the Bankruptcy Code.

q.  "Creditor Trust" has the meaning ascribed to it in in Article IV of the Plan.

r.  "Creditor Trustee" means the trustee of the Creditor Trust. If the current CRO is not willing or able to serve as Creditor Trustee after the Confirmation Date, the Plan Proponents shall designate a replacement trustee with the consent of a majority of beneficiaries of the Creditor Trust.

s.  "Creditor Trust Agreement" means Plan Exhibit E.

t.  "Disclosure Statement" means the Disclosure Statement with respect to this Plan, as may be amended.

u.  "Distribution" means each distribution of Cash to Holders of allowed Claims pursuant to and under the terms of this Plan.

v.  "Effective Date" shall mean the first business day after the Closing Date. The Plan contemplates the VKB Transaction will close within 30 days of the Confirmation Date.

w.  "Equity Interest" means any ownership interest or share in the Debtor (including, without limitation all rights to obtain such an interest or share in any Debtor).

x.  "Estate" means the estate created in this case for the Debtor pursuant to Section 541 of the Bankruptcy Code.

y.  "File, Filed or Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

z.  "Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired; (ii) in the event of a motion for reconsideration or rehearing is filed, such motion shall have been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event of an appeal is filed and pending, a stay pending appeal has not been entered; provided, however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-

appealable; and provided further, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

aa. "Foreclosure Proceeding" means the lawsuit captioned *RRSB v. Generations on 1st, LLC et al.*, Codington County Circuit Court, South Dakota, Case No. 14CIV24-000064.

bb. "Generations Notes" means that certain Promissory Note dated April 17, 2023 in the original principal sum of $8,100,000.00 ("Eighth Generations Note") and that certain Promissory Note dated April 17, 2023 in the original principal sum of $561,365.10 ("Ninth Generations Note"), copies of which were attached to Proof of Claim No. 1. The non-default rate of interest on the Generations Notes is 6.75% and the maturity date is December 1, 2026. The current outstanding principal balance of the Generations Notes is $9,066,353.07.

cc. "Holder" means a Person holding a Claim or any authorized agent who has completed, executed and delivered a Ballot in accordance with the applicable voting instructions.

dd. "Insiders" shall have the meaning ascribed to such term in 11 USC § 101(31).

ee. "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind affecting any asset or any property of the Debtor contemplated by Section 101(37) of the Bankruptcy Code.

ff. "Person" has the meaning ascribed in Section 101(41) of the Bankruptcy Code.

gg. "Petition Date" means January 6, 2025, the date on which the Debtor commenced this case by filing a petition for relief pursuant to Section 301 of the Bankruptcy Code.

hh. "Plan Payment Commencement Date" shall mean the first business day of the first calendar month next succeeding the Effective Date.

ii. "Priority Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under Sections 507(a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

jj. "Priority" shall mean the priorities for the payment of Claims as set forth in 11 U.S.C. § 507.

kk. "Priority Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under Sections 507(a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

ll. "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

mm. "Professional" means any professional employed or to be compensated pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

4

nn.     "Property Manager" shall have the meaning assigned to such term in Article IV of the Plan. On and after the Confirmation Date, the Property Manager under the Plan shall be HME Properties LLC, unless and until the Property Manager resigns, refuses or is unable to perform its customary duties.

oo.     "Real Estate Collateral" means that certain parcel of real property, and those various improvements thereupon, commonly known as 26 1st Ave SW, Watertown, South Dakota 57201.

pp.     "Real Estate Broker" means Hilco and NAI Sioux Falls as co-brokers, unless and until such Real Estate Broker resigns, refuses or is unable to perform its customary duties.

qq.     "Rents" means all rents generated by the Real Estate Collateral, which were assigned to and remain subject to a validly perfected first priority security interest in favor of RRSB under that certain Assignment of Rents dated April 17, 2023.

rr.     "RRSB Deficiency Claim" means the allowed general unsecured claim of RRSB in the amount of $5,538,457.38, minus any post-petition payments that have decreased the outstanding amount due to RRSB.

ss.     "Sale" means a sale of the Real Estate Collateral.

tt.     "Sale Proceeds" means proceeds of a sale of the Real Estate Collateral.

uu.     "Schedules" means the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

vv.     "Secured Claim" means a Claim that is secured by a Lien on, or security interest in, property of the Debtor, or that has the benefit of rights of setoff under Section 553 of the Bankruptcy Code, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, which value shall be determined as provided in Section 506 of the Bankruptcy Code.

ww.     "Subordination Agreement" means the agreement dated April 7, 2021 between RRSB and WDC, pursuant to which WDC contractually subordinated its lien against the Real Estate Collateral to RRSB.

xx.     "Subordination Amount" means $8,340,000.

yy.     "Third Party Overbid" shall mean: a bid to purchase the Real Estate Collateral on identical terms to the VKB Transaction, provided the proposed purchase price is at least $100,000 higher than the VKB Transaction. To be valid, a Third Party Overbid must be accompanied by a signed purchase agreement and forfeitable earnest money deposit equal to 10% of the proposed purchase price, and it must be received by the Plan Proponents on or before June 26, 2026.

zz.     "TIF" means Tax Increment Financing District No. 13, enacted by the City of Watertown pursuant to SDCL § 11-9-1 *et seq.*

5

aaa. "TIF Agreements" means the TIF-related loan agreements, promissory notes, mortgages, and assignment agreements among the City of Watertown, Generations on 1st LLC, Craig Holdings, LLC, Jesse Craig, and WDC, copies of which are attached to Proof of Claim No. 4 filed on March 7, 2025, as well as the Development Agreement between the City of Watertown and Debtor.

bbb. "TIF Revenue" means the future tax increment revenue associated with the Real Property that exceeds the base value of the Real Property at the time of the creation of the TIF, as set forth in the TIF Agreements. The Plan Proponents estimate the value of the TIF Revenue to be $1,587,005.04.

ccc. "U.S. Trustee" shall mean the Office of the United States Trustee.

ddd. "VKB" means VKB Properties, LLC and/or its assigns.

eee. "VKB Transaction" means a Sale to VKB for $8,840,000.

fff. "VKB Transaction Deadline" means the 30th day after the Confirmation Date, or upon a default or termination of a purchase agreement for the VKB Transaction, whichever date occurs sooner.

ggg. "WDC" means Watertown Development Company.

hhh. "WDC Claim" means the claim of the WDC set forth in Proof of Claim No. 4 filed on March 7, 2025.

iii. "WDC Deficiency Claim" means the unsecured claim of WDC to be allowed in the amount of $535,785.66, minus any post-petition payments that have decreased the outstanding amount due to WDC.

1.3    **Interpretation.** For purposes of the Plan, (a) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference herein to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (c) unless otherwise specified, all references herein to Articles, Sections, Schedules and Exhibits are references to Articles, Sections, Schedules and Exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in their entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.4    **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

6

## ARTICLE II

## UNCLASSIFIED CLAIMS

2.1 **Administrative Expense Claims**. Each Holder of an allowed Administrative Claim shall receive payment in full, in cash, on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III. To facilitate the orderly payment of Administrative Claims, all Administrative Claims must be asserted no later than the Administrative Claims Bar Date in order to be allowed and eligible for payment. Parties who fail to assert Administrative Claims in accordance with the Administrative Bar Date will be forever barred from receiving distributions under the Plan as Administrative Claim Holders. Administrative Claims remain subject to approval of the Bankruptcy Court as a condition precedent to payment.

2.2 **Compensation of Debtor's Professionals.** In addition to the fee application contemplated in Section 2.1 of the Plan, each of the Debtor's Professionals may submit an additional fee application for work performed on behalf of the estate after the Confirmation Date through the Effective Date. To facilitate orderly payment, such additional fee application shall be submitted no later than 14 days after the Effective Date and Debtor may reserve funds for the payment of such fees.

2.3 **Priority Tax Claims.** Each Holder of an allowed Priority Tax Claim against the Debtor shall receive payment in full on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III, in full and final satisfaction of such claim. Codington County shall have an allowed Priority Tax Claim in the amount of $76,494.98.

2.4 **U.S. Trustee's Fees.** The United States Trustee shall receive payment in full, on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. After the Effective Date, the Creditor Trustee shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed. The Creditor Trust will file post-Confirmation reports in conformance with the U.S. Trustee guidelines. The Creditor Trust shall remain responsible for any unpaid fees and reports.

2.5 **Prepetition Retainers.** On the Effective Date, each of the Debtor's Professionals shall be entitled to apply the balance of pre-petition retainers, if any, to payment of its allowed Administrative Claim.

## ARTICLE III

## CLASSIFICATION, IMPAIRMENT AND TREATMENT OF
## CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR

**Class 1 – Allowed Secured Claim of Red River State Bank.** Class 1 consists of the Secured Claim of RRSB. By prior stipulation, RRSB's Class 1 Claim has been allowed in the amount of $11,200,000. [ECF 177].

7

The Generations Notes shall be reinstated at a discounted rate of 6.75% on the Confirmation Date until the Closing Date. Discounted monthly plan payments of $56,000 shall be due to RRSB on the 1st day of each month after the Confirmation Date. No such payments shall be due after the Closing Date.

RRSB's Class 1 Claim is secured by a valid, first-priority Lien in the Real Estate Collateral and Rents. Class 1 shall be entitled to receive Sale Proceeds up to $11,200,000, subject to the Subordination Amount in the Subordination Agreement with WDC. Nothing in this Plan shall modify the validity, scope or priority of RRSB's Liens or its right to credit bid under Section 363(k).

Class 1 is impaired and entitled to vote.

**Class 2 – Allowed Secured Claim of Watertown Development Company.** Class 2 consists of the allowed Secured Claim of WDC. The WDC Claim shall be allowed in the amount of $2,122,790.70.

WDC has a valid, second priority Lien in the Real Estate Collateral, the value of which will be determined by a Sale. If there are sufficient Sale Proceeds, WDC shall be entitled to receive Sale Proceeds up to the full allowed amount of the WDC Claim, subject to the Subordination Agreement. If there are not sufficient Sale Proceeds to fund a distribution to WDC, the Real Estate Collateral shall be sold free and clear of WDC's Liens on the Real Estate Collateral. Nothing in this Plan shall modify the validity, scope or priority of WDC's Liens or its right to credit bid under Section 363(k).

WDC's Claim is also secured by a valid, first-priority lien in the future stream of income referred to as the "TIF Revenue." For the avoidance of doubt, nothing in this Plan shall terminate or modify the TIF Agreements and WDC shall remain entitled to receive all future TIF Revenue assigned to it under the TIF Agreements.

Class 2 is not impaired by the Plan and deemed to accept.

**Class 3 – Allowed General Unsecured Claims**. Class 3 consists of all allowed unsecured Claims for $5,000 or more: the RRSB Deficiency Claim; the WDC Deficiency Claim; and Claim 7 for $22,886.75. Holders of Class 3 Claims shall receive their pro rata share of all future distributions from the Creditor Trust. Class 3 is impaired and entitled to vote.

**Class 4 – Administrative Convenience Class.** Class 4 consists of all general unsecured claims worth less than $5,000: Claim 5 for $4,637; Claim 6 for $1,049; and Claim 8 for $601. Per 11 U.S.C. § 1122(b), to reduce the administrative burden of the Creditor Trust, all holders of Class 4 claims will be paid in full on the Effective Date. Class 4 is unimpaired and deemed to accept.

**Class 5 – Intercompany Claims**. Class 5 consists of all claims of Affiliates against the Debtor. Class 5 is not entitled to receive any distribution under the Plan, unless Sale Proceeds are sufficient to pay all Administrative Expenses, Priority Claims, and Classes 1-4 in full. Pursuant to 11 U.S.C. § 1129(a)(10), Class 5 is deemed to reject the Plan.

8

**Class 6 – Equity.** Class 6 consists of Holders of Equity Interests. ~~All Equity Interests will be extinguished on the Confirmation Date.~~ Class 6 is not entitled to receive any distribution under the Plan unless Sale Proceeds are sufficient to pay all Administrative Expenses, Priority Claims, and Classes 1-5 in full. Class 6 is comprised exclusively of Insiders. Pursuant to 11 U.S.C. § 1129(a)(10), Class 6 is disregarded for the purpose of voting and thus, it is not entitled to vote.[2]

## ARTICLE IV

## MEANS OF IMPLEMENTING THE PLAN

**4**

**4.1    Retention of Property Management Company**. On or as soon as practicable after the Confirmation Date, the ~~Plan Proponents~~CRO shall be authorized to retain an independent third-party management company to manage the Real Estate Collateral (the "Property Manager"). The Property Manager shall be responsible for collecting rents, paying ordinary expenses, repairs and maintenance pending the Sale. The Property Manager will be entitled to customary compensation not to exceed 5% of the monthly rent collected from the Real Property plus reimbursement of normal expenses.

**4.2    VKB Transaction.** Subject to entry of an order by the Bankruptcy Court confirming the Plan, pursuant to 11 U.S.C. 1123(a)(5)(d) and 1123(b)(4), the Real Estate Collateral shall be sold by Debtor to VKB, with the consent of secured creditors, free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan. The terms of the VKB Transaction are set forth in the VKB Purchase Agreement attached to the Plan as Exhibit A.

The VKB Transaction shall remain subject to a Third Party Overbid until June 26, 2026. To be a valid Third Party Overbid, a third party must bid to purchase the Real Estate Collateral on identical terms to the VKB Transaction, provided the proposed purchase price is at least $100,000 higher than the VKB Transaction. Additionally, a valid Third Party Overbid must be accompanied by a signed copy of the Purchase Agreement (on the form of Purchase Agreement attached to the Plan as Exhibit D) and forfeitable earnest money deposit equal to 10% of the proposed purchase price, and it must be received by the Plan Proponents on or before June 26, 2026. If the Debtor receives a Third Party Overbid by June 26, 2026, the Plan Proponents shall file a Sale Notice and Sale Motion in accordance with Section 4.4 of this Plan and Section 363(f) of the Bankruptcy Code.

**4.3    Retention of Broker**. If the VKB Transaction or Third Party Overbid fails to close by the VKB Transaction Deadline, the ~~Plan Proponents~~CRO shall be authorized to retain a Real Estate Broker to market and sell the Real Estate Collateral for the highest and best offer. Broker will be entitled to a commission equal to 5% of gross sale proceeds (to be split at a customary rate

---

[2] If the Court determines Class 6 is permitted to vote, they shall be deemed to reject.

with its co-broker). The terms of the Broker's engagement are set forth in the Broker Agreement attached to the Plan as <u>Exhibit B</u>.

**4.4  Sale Process**. If the VKB Transaction fails to close by the VKB Transaction Deadline, the Real Estate Broker may immediately begin to market the Real Estate Collateral in accordance with the bid procedures attached to the Plan as <u>Exhibit C</u> (the "<u>Bid Procedures</u>"). All offers to purchase the Real Estate Collateral must be submitted on the form of Purchase Agreement attached to the Plan as <u>Exhibit D</u> (the "<u>Purchase Agreement</u>"). The ~~Plan Proponents~~ CRO shall have the discretion, but not the requirement, to designate a stalking horse bidder. The ~~Plan Proponents~~CRO, in consultation with the Broker, shall determine the highest and best bid. Upon identification of a successful bidder and back up bidder, if any, the Plan Proponents shall file a notice on the Court's docket to announce the outcome of the Bid Procedures as soon as practicable (the "<u>Sale Notice</u>"). The Sale Notice shall identify the successful bidder and back-up bidder (if applicable), and their respective bid amounts. The Plan Proponents shall also file a motion seeking an expedited hearing to approve a sale of the Real Estate Collateral to the party or parties identified in the Sale Notice, free and clear of all liens and encumbrances pursuant to 11 U.S.C. § 363(f) (the "<u>Sale Motion</u>").

**4.5  Free and Clear Sale**. Upon approval of the Plan and entry of a Confirmation Order by the Bankruptcy Court, pursuant to Sections 1123(a)(5)(d) and 1123(b)(4) of the Bankruptcy Code, Debtor may transfer the Real Estate Collateral to VKB, free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan. If, however, the VKB Transaction fails to close by the VKB Transaction Deadline, or the Debtor receives a Third Party Overbid by June 26, 2026, the Plan Proponents shall file a Sale Notice and Sale Motion in accordance with Section 4.4 of this Plan and Section 363(f) of the Bankruptcy Code.

**4.6  Credit Bidding**. Any Holder of an allowed Secured Claim may credit bid in accordance with 11 U.S.C. § 363(k) and the Bid Procedures.

**4.7  Creditor Trust.** A trust shall be formed on the Effective Date for the benefit of creditors (the "<u>Creditor Trust</u>") pursuant to the trust agreement, the form of which is attached to the Plan as <u>Exhibit E</u>. On the Effective Date, all Causes of Action shall be assigned to the Creditor Trust. The Creditor Trustee shall investigate, litigate and/or settle Causes of Action for the benefit of all Holders of Class 3 Claims. With the consent of secured creditors, the Creditor Trust shall be funded by Sale Proceeds. On or as soon as practicable after the Effective Date, Debtor shall transfer (or cause to be transferred) no less than $250,000, from the Sale Proceeds, to fund the Creditor Trust.

**4.8  Rent Reserve.** All prepetition rents collected by the receiver and held in the debtor-in-possession account are subject to RRSB's Liens. Debtor shall turnover such funds to RRSB on the Confirmation Date. Additionally, after the Confirmation Date, if Debtor produces any excess monthly cash flow after payment of customary monthly operating expenses and the monthly payments due to Class 1 under this Plan, such funds shall be held in reserve and they shall remain

subject to RRSB's Liens (such funds, the "Rent Reserve"). The excess rents held in the Rent Reserve are subject to the lien of RRSB and may not be disbursed without the prior of approval of RRSB. On the Effective Date, any excess rents in the Rent Reserve shall be distributed to RRSB.

**4.9** **Equitable Subordination of Insider Claims, Subordination of Late Filed Claims.** On the Effective Date, all late filed proof(s) of claim will be subordinated in right of payment to timely filed proof(s) of claim. Additionally, if allegations of prepetition misconduct by Insiders are proven, including actual fraud or fraudulent transfers, any proof(s) of claim filed by such Insider(s) seeking allowance of Claims against the Debtor shall be equitably subordinated to all other Holders of Class 3 Claims. Equitable subordination of Insider Claims may be determined post-confirmation through an adversary proceeding, claim objection, or other appropriate process. ~~Equitable Subordination of Insider Claims. On the Effective Date, any proof(s) of claim filed by Insiders seeking allowance of Claims against the Debtor shall be equitably subordinated to all other Holders of Class 3 Claims pursuant to 11 USC § 510, due to the Insiders' prepetition misconduct. Similarly, all late-filed proof(s) of claim will be subordinated in right of payment to timely filed proof(s) of claim.~~

**4.10** **Debtor-RRSB Settlement**. Pursuant to Federal Rule of Bankruptcy Procedure 9019, on Effective Date of the Plan, any and all claims against RRSB and/or any of its employees, representatives, officers, and directors, that were raised or could have been raised in the Adversary Proceeding or Foreclosure Proceeding, shall be dismissed with prejudice. In consideration thereof, RRSB has agreed to permit proceeds of the sale of its Real Estate Collateral to be used on the Effective Date to pay all Administrative Expenses, Priority Tax Claims, U.S. Trustee fees, and to fund the Creditor Trust. Additionally, RRSB will dismiss the Foreclosure Proceeding with respect to the Debtor as soon as practicable after the Effective Date.

**4.11** **Executory Contracts**. On the Confirmation Date, all executory contracts with Insiders, including CP Business Management, Inc., Jesse Craig, and Mulinda Craig will be deemed rejected, including without limitation any leases with Insiders and/or employees of Insiders, and below-market rent leases for Units 3310 and 3507. All other residential leases between Debtor and existing tenants who are not Insiders and/or employees of Insiders will be assumed.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

**5.1** **Delivery of Distributions**. Distributions and deliveries to Holders of allowed Claims shall be made at the addresses set forth on the proofs of claim filed by such Holders (or at the last known addresses of such Holders if no proof of claim is filed).

**5.2** **No Interest Unless Otherwise Provided**.  No interest shall be paid on any Claim unless, and only to the extent permitted, under the terms of the Plan.

**5.3** **Undistributed Property**.  If any Distribution remains unclaimed for a period of 60 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, such Unclaimed Property shall be forfeited by such Holder.  Unclaimed

Property shall be used to satisfy unpaid Administrative Expenses, if any, or donated to Legal Services of North Dakota.

## ARTICLE VI

### CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

**6.1     Conditions to Effectiveness of Plan.**  The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied or waived by the Plan Proponents: (a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponents, and such Confirmation Order shall be a Final Order; and (b) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to Section 1125 of the Bankruptcy Code.

**6.2     Notice of Confirmation of the Plan.**  Notice of entry of the Confirmation Order shall be provided as required by Bankruptcy Rule 3020(c)(2).

## ARTICLE VII

### RETENTION OF JURISDICTION

**7.1     Retention of Jurisdiction.**  Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 case of the Debtor and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, actions with respect to equitable subordination of Insider Claims, and any remands from any appeals;

(b)     to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c)     to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(d)     to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(e)     to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

12

(f)      to hear and to determine any other matter not inconsistent with the Bankruptcy Code and Title 28 of the United States Code that may arise in connection with or related to the Plan; and

(g)      to enter a final decree closing this Chapter 11 case.

**7.2      Abstention and Other Courts.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 case, this section of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE VIII

## RELEASE FOR PLAN PROPONENTS AND PROFESSIONALS

**8.1      Limitation of Liability in Connection with the Case, the Plan, and Related Documents.**  Pursuant to § 1125(e) of the Bankruptcy Code; the Plan Proponents and the Creditor Trustee, and their Professionals, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11 case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

**9.1      Severability.**  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Plan Proponents may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the Holder of any Claim or Equity Interest.

**9.2      Binding Effect.**  Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the Holders of Claims and Equity Interests, and such Persons' respective successors and assigns.

13

**9.3     Transfer Tax Exemption.**  Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, deeds of trust, mortgages, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, including the sale of the Real Estate Collateral provided for under this Plan, shall not be subject to any stamp tax or other similar tax, including, but not limited to, transfer and recordation tax on the sale of the Real Estate Collateral.

**9.4     Governing Law.**  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of North Dakota shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**9.5     Timing of Distributions.**  Any Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

**9.6     Revocation or Withdrawal of Plan.**  The Plan Proponents reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if a Confirmation Order had not been entered and the Effective Date had not occurred.  If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the such entity or any Person in any further proceedings involving such entity.

**9.7     Nonmaterial Modifications.**  The Plan Proponents may, with the approval of the Bankruptcy Court and without notice to Holders of Claims and Equity Interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**9.8     Material Modifications.**  Modifications of the Plan may be proposed in writing by the Plan Proponents at any time prior to Confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**9.9     Cramdown.**  This section shall constitute the Plan Proponents' request, if necessary, pursuant to Section 1129(b)(1) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of Section 1129(a)(8) of the Bankruptcy Code may not be met.

14

**9.10    No Recourse.**  No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Estate, the Plan Proponents or its professionals, or the Debtor, other than the right to receive Distributions in accordance with the terms of the Plan.

**9.11    Notices.**  Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) email, (b) certified mail, return receipt requested, postage prepaid, (c) hand delivery, or (d) prepaid overnight delivery service and addressed to counsel for the Plan Proponents as follows:

| | |
|---|---|
| Maurice B. VerStandig, Esq.<br>The Dakota Bankruptcy Firm<br>1630 1st Avenue N, Suite B PMB 24<br>Fargo, North Dakota 58102-4246<br>mac@dakotabankruptcy.com | Kesha L. Tanabe<br>Vogel Law Firm<br>218 N.P. Ave.<br>Fargo, ND 58102<br>ktanabe@vogellaw.com |

**9.12    Saturday, Sunday, or Legal Holiday.**  If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**9.13    Successors and Assigns.**  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

**9.14    Entry of a Final Decree**.  The Plan Proponents may file a motion with the Bankruptcy Court to obtain the entry of a final decree upon completion of Plan payments or on such other time as the Debtor determines appropriate.

~~May 29, 2026~~July 17, 2026

15

**THE DAKOTA BANKRUPTCY FIRM**    **VOGEL LAW FIRM**


*/s/ Maurice B. VerStandig*                    */s/ Kesha L. Tanabe*

Maurice B. VerStandig, Esq.            Caren W. Stanley (#06100)
1630 1st Avenue N                      cstanley@vogellaw.com
Suite B PMB 24                         Kesha L. Tanabe
Fargo, North Dakota 58102-4246         ktanabe@vogellaw.com
Phone: (701) 394-3215                  Drew J. Hushka (#08230)
mac@dakotabankruptcy.com               dhushka@vogellaw.com
                                       218 NP Avenue
*COUNSEL FOR THE DEBTOR*               PO Box 1389
                                       Fargo, ND 58107-1389
                                       Telephone: (701) 237-6983

                                       *COUNSEL TO PLAN PROPONENT*
                                       *RED RIVER STATE BANK*


4926-4643-3963 v.124926-4643-3963 v.10

16

<u>**PLAN EXHIBIT A: VKB Purchase Agreement**</u>

<u>**GENERATIONS ON 1ST REAL ESTATE PURCHASE AND SALE AGREEMENT**</u>

**Effective Date:**          ___ 2026

**Address:**          26 1st Avenue SW, Watertown, South Dakota

**PIN:**          9580

<u>**PURCHASER INFORMATION:**</u>

| | |
|---|---|
| NAME(S) | <u>VKB Properties, LLC (or its assigns)</u> |
| ADDRESS | 501 Olson Dr., Ste. 210, Papillon, NE 68046 |
| PHONE: | 402-935-1916 |
| E-mail: | vince@bellinoenterprises.com |

PURCHASER'S ATTORNEY:   Brett Beller, Esq.

Fullenkamp Jobeun Johnson & Beller LLP

11440 W CENTER RD, SUITE C, OMAHA, NE 68144

(402) 691-5264

bbeller@fjjblaw.com

<u>**SELLER INFORMATION**</u>:

| | |
|---|---|
| NAME: | Michael T. Schmitz, solely in his capacity as Chief Restructuring Officer for the bankruptcy estate of Generations on 1st, LLC, Bk. Case No 25-30002 |
| ADDRESS: | Point CPA |
| | 4585 Coleman Street, Suite 101 |
| | Bismarck, ND 58503 |
| EMAIL: | mschmitz@pointcpa.com |

1.     <u>**PURCHASE & DESCRIPTION OF REAL ESTATE**</u>: Seller agrees to sell to Purchaser (also referred to herein as "<u>Purchaser</u>") and Purchaser agrees to purchase from Seller the real estate and improvements, if any, situated in State of South Dakota, County of Codington, commonly known as Generations on 1st, located 26 1st Avenue SW, Watertown, South Dakota, together with any and all buildings, improvements, fixtures owned by the Seller located in, on, attached to the Property; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of Seller in and to adjacent streets, or rights-of-way, Seller's interest in any assignable warranties or guaranties relating to the Property and fixtures located on, attached to, or used in connection with the Property; all of the above hereinafter collectively called "<u>Property</u>", legally described in <u>Exhibit A</u> attached hereto and made a part hereof.

**2.     PURCHASE PRICE AND TERMS**:

(A)     The **Purchase Price** in the amount of $ 8,840,000.00 (the " Purchase Price"), shall be payable in U.S. dollars by Purchaser as follows:

      (1)     **"Initial Earnest Money"** in the amount of $ 200,000.00 shall be paid in the form of a certified or cashier's check made payable to the order of First Dakota Title, as Escrow Agent (the "Escrow Agent").  The Initial Earnest Money is due upon delivery of this Agreement signed by Purchaser, receipt of which is hereby acknowledged and shall be nonrefundable.

      (2)     **Additional Earnest Money** in the amount of $ 684,000.00 shall be paid no later than **June 19, 2026** in the form of a certified or cashier's check made payable to the order of First Dakota Title, as Escrow Agent.

      (3)     The **Balance of the Purchase Price,** in the amount of $7,956,000, plus or minus prorations and closing adjustments, if any, is due at the Closing (defined below) and must be paid by immediately available funds by wire transfer or Purchaser's official cashier's check from a bank, made payable to the Escrow Agent or such other payee(s) as Seller may hereafter designate in writing.

(B)     Delivery of a trustee's deed and acceptance by Purchaser at the Closing shall be deemed to be full performance and discharge of all obligations (either express or implied) on the part of Seller to be performed pursuant to this Agreement. No representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

**3.     ALL-CASH TRANSACTION:**     This is an all-cash sale and purchase; and is NOT contingent upon obtaining financing.  Although, the Purchaser may apply to a lending institution of Purchaser's choice for a loan but,  Purchaser has been advised that neither his receipt of a commitment from such a lending institution, nor his acceptance of said commitment, does not in any way alter Purchaser's obligations under this Agreement.

**4.     CLOSING:**  Closing shall occur at 10:00 a.m. on or before **August 21~~7~~, 2026,** at the offices of the Escrow Agent, or at such other location that Seller may designate ("Closing").

**5.     CLOSING DOCUMENTS:**

    A.     **At the Closing, Seller shall deliver to Purchaser, at Seller's sole cost and expense, the following:**

    (1)     A duly executed and acknowledged Trustee's Deed in recordable form conveying title in fee simple to all of the Property, free and clear of any and all liens, encumbrances, and subject to the Permitted Title Exceptions attached hereto as Exhibit B;

    (2)     Internal Revenue Code reporting requirements or disclosure including FIRPTA;

(3)     Seller shall by written instrument assign all of the Leases if any to Purchaser, and Purchaser shall accept such assignment and agrees to discharge and assume all of the obligations and duties of landlord under the Leases (including, without limitation, all obligations pertaining to security deposits) which accrue or arise under the Leases for the period from and after the closing.

(4)     Letters to the tenants advising the tenants of the sale and directing all future rents to be sent to Purchasers or as Purchaser may direct.

(5)     Bill of Sale, without warranties, for any personal property being transferred free of liens or encumbrances; and

(6)     Seller shall transfer all refundable security deposits and other tenants' deposits under Leases that are in Seller's possession except to the extent applied prior to the Closing Date.

(7)     All other documents that are reasonably customary to close this transaction; in accordance with the terms and conditions of this Agreement.

B.      **At the Closing, Purchaser shall:**

(1)     Pay the cash portion of the Purchase Price including prorations and adjustments, if any;

(2)     If Purchaser is a corporation or a limited liability company, deliver to Seller:

> (a)     Certified resolutions of the board of directors of Purchaser (or managing member) authorizing all the transactions contemplated by this Agreement;

> (b)     An incumbency certificate with respect to those officers (or managing member) of Purchaser executing any documents or instruments in connection with the transactions contemplated herein; and

> (c)     Certificate of Good Standing for the entity acquiring title from the Secretary of State or other appropriate governmental office of the state in which the entity was formed.

(3)     execute such other and further documents necessary to close this transaction; in accordance with the terms and conditions of this Agreement.

6.  **SALES EXPENSES TO BE PAID IN CASH AT OR PRIOR TO CLOSING:**

**A.    SELLER'S EXPENSES:**  All costs of releasing and recording any release of Mortgage required by the terms of this Agreement; All costs of the Owner's Title Policy (if any). State, County, or City transfer taxes (if any) shall be paid by the party that typically pays these expenses based on where the property is located.

**B.    PURCHASER'S EXPENSES:**  All recording costs of the Mortgage, the Deed, and the Collateral Documents, ALTA Mortgage Title Policy and escrow fees charged by the (if Purchaser is using a lender); and expenses stipulated to be paid by Purchaser under other provisions of this Agreement. State, County, or City transfer taxes (if any) shall be paid by the party that typically pays these expenses based on where the property is located.

7.  **PRORATIONS AND ADJUSTMENTS:**  The following shall be prorated and adjusted between Seller and Purchaser as of the time of closing, except as otherwise expressly provided herein:

A.    Water, electricity, sewer, gas, telephone and other utility charges based, to extent practicable, on final meter readings and/or final invoices.

B.    Amounts paid or payable under any assigned maintenance or other service contracts shall be prorated as of the time of closing.

C.    Accrued general real estate taxes shall be prorated as of the time of closing.  If such bills are not available, then such taxes shall be prorated on the basis of 100% of the most recent ascertainable tax bills.

D.    Special Assessments - If at the time of Closing, the Premises are affected by an assessment which is or may become payable in installments, then only those installments due prior to the date of the Closing shall be paid by the Seller, and all installments due subsequent to Closing shall be paid by Purchaser.

E.    Such other items that are customarily prorated in transactions of this nature shall be ratably prorated as of the Closing Date.  Except as expressly provided herein, all prorations shall be final.  The covenants and agreements set forth in this Paragraph shall survive the closing.

F.    As of Closing, Purchaser shall be responsible for the transfer of accounts and establishment of all utility services to the Property to the name of Purchaser, including the making of any new utility deposits with the utility providers.  Seller shall be entitled to receive a refund of utility service deposits, if any, covering the period prior to the Closing Date.

G. Real estate tax assessment reductions, tax refunds, and credits received after the Closing Date after deducting the expenses of collection thereof including attorney's fees which obligation shall survive the Closing that are:

1. attributable to the tax year during which the Closing Date occurs and thereafter shall be prorated between Seller and Purchaser;

2. attributable to all tax years before the year in which the Closing occurs belong to the Seller.

8. **DEFAULTS**: A failure to appear at the time and place stated in the notice of the Closing Date, a failure to pay any amounts due hereunder (including Initial and/or Additional Earnest Money), a failure to enter into, execute and deliver customary closing documents, or Purchaser's failure to perform any obligation of Purchaser required under the Agreement and any supplemental written agreements made a part of the Agreement shall be a default. In the event of Purchaser's default, the Total Earnest Money shall be retained or collected by Seller as liquidated damages, and not as a penalty as Seller's sole and exclusive remedy in law and equity. In the event Seller shall fail or be unable to deliver title to the Property as herein provided on account of title defects which Purchaser is unwilling to waive, this Agreement shall be terminated and the Total Earnest Money shall be returned forthwith to Purchaser. The return of Earnest Money to Purchaser shall be Purchaser's sole and exclusive remedy in the event of any form of Seller's default under this Agreement. **UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES**.

9. **WARRANTY DISCLAIMERS**:

(A) **THE PROPERTY IS BEING SOLD "AS IS".  SELLER HEREBY EXCLUDES AND DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING BY WAY OF ILLUSTRATION AND NOT LIMITATION, WARRANTIES OF FITNESS FOR PARTICULAR PURPOSE, HABITABILITY AND MERCHANTABILITY. SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR SELLER ANY LIABILITY IN CONNECTION WITH THE SALE OR USE OF THE PROPERTY, AND THERE ARE NO AGREEMENTS OR WARRANTIES, EITHER ORAL OR WRITTEN, COLLATERAL TO OR AFFECTING THIS AGREEMENT, THE PROPERTY. PURCHASER ACKNOWLEDGES THAT NO WARRANTY CLAIMS FOR ANY MATTERS RELATING TO THE CONDITION OF THE PROPERTY MAY BE MADE AGAINST SELLER. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER'S ACCEPTANCE OF SELLER'S DISCLAIMER OF WARRANTIES, INCLUDING THE DISCLAIMER OF ANY APPLICABLE IMPLIED WARRANTY OF HABITABILITY, IS AN ESSENTIAL PART OF THE AGREEMENT REACHED BETWEEN PURCHASER AND SELLER.**

(B) Purchaser acknowledges and understands that if a dispute arises with Seller and the dispute results in a lawsuit, Purchaser will not be able to rely on the Implied Warranty of

Habitability described above, as a basis for suing Seller or as the basis of a defense if Seller sues Purchaser.

(C)      Seller shall not be responsible for any incidental or consequential damages.

10**.**      **POSSESSION:** Purchaser shall not take possession of the Premises or commence any work prior to delivery of the Deed and full compliance with the terms of this Agreement.  The Property shall be delivered at Closing.  Purchaser shall be responsible for installing new locks on the Property immediately after the Closing, and Purchaser shall hold Seller and Seller's representatives and agents harmless from any and all damages, claims, liens, liabilities, costs, injuries and expenses of any kind that may be made against Seller as a result of Purchaser's failure to install new locks on the property.

11.      **BROKER'S COMMISSION**: Seller has not retained a broker and it shall not be responsible for payment of any broker's commission upon closing of the sale contemplated in this Agreement. If Purchaser has retained a broker, Purchaser shall pay any commission due to such broker.

12**.**      **CONSULT YOUR ATTORNEY:**  THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT.  READ IT CAREFULLY.  NO REPRESENTATION OR RECOMMENDATION IS MADE BY SELLER OR THEIR AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS DOCUMENT OR THE TRANSACTION RELATING THERETO.  THESE ARE QUESTIONS FOR YOUR ATTORNEY.  CONSULT YOUR ATTORNEY BEFORE SIGNING.  THE SELLER CANNOT GIVE YOU ANY LEGAL ADVICE.

13**.**      **DISCLAIMER:**

(A)      EXCEPT AS OTHERWISE SPECIFICALLY STATED IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE OF, AS TO, OR CONCERNING THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT THEREON.

(B)      EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, SELLER HAS NOT MADE AND IS NOT MAKING ANY REPRESENTATION OR WARRANTY REGARDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ENVIRONMENTAL CONDITIONS, ZONING OR THE AVAILABILITY OF UTILITIES OR PERMITS.

(C)      PURCHASER ACKNOWLEDGES THAT HAVING BEEN GIVEN A SUFFICIENT OPPORTUNITY TO INSPECT THE PROPERTY, AND TO REVIEW OTHER MATERIAL GIVEN TO PURCHASER, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY IN ARRIVING AT ITS DECISION TO PURCHASE THE PROPERTY AND HAS NOT RELIED UPON ANY PLANS SELLING BROCHURES, ADVERTISEMENTS,

REPRESENTATIONS WARRANTES, STATEMENTS OR ESTIMATES OF ANY NATURE WRITTEN OR ORAL BY SELLER OR SELLER'S AGENT IN DECIDING TO PURCHASE THE PROPERTY AT THE STATED PRICE.

(D)    PURCHASER IS PURCHASING THE PROPERTY IN ITS PRESENT CONDITION, "AS IS, WHERE IS", AND SELLER HAS NO OBLIGATION TO CONSTRUCT ANY IMPROVEMENTS THEREON, OR TO PERFORM ANY OTHER ACT REGARDING THE PROPERTY, EXCEPT AS EXPRESSLY PROVIDED HEREIN.

(E)    ANY FACTUAL INFORMATION SUCH AS PROPERTY DIMENSIONS, SQUARE FOOTAGE, OR SKETCHES SHOWN TO PURCHASER OR SET FORTH HEREIN ARE OR MAY BE APPROXIMATE AND PURCHASER REPRESENTS TO SELLER THAT THEY HAVE INSPECTED AND VERIFIED THE FACTS AND INFORMATION PRIOR TO THE EXECUTION OF THIS AGREEMENT.  NO LIABILITY FOR ANY INACCURACIES, ERRORS OR OMISSIONS IS ASSUMED BY THE SELLER OR ITS AGENTS.

(F)    THE PARTIES TO THIS TRANSACTION HAVE NO EXPERTISE WITH RESPECT TO ENVIRONMENTAL MATTERS.  PROPER INSPECTIONS OF THE PROPERTY BY QUALIFIED EXPERTS ARE ENCOURAGED TO DETERMINE WHETHER OR NOT THERE ARE ANY CURRENT OR POTENTIAL ENVIRONMENTAL CONCERNS RELATING TO THE PROPERTY.  THE PARTIES TO THIS TRANSACTION HAVE NOT MADE, NOR WILL THEY MAKE, ANY REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, REGARDING THE EXISTENCE OR NON-EXISTENCE OF ANY SUCH ENVIRONMENTAL CONCERNS IN OR ON THE PROPERTY.

(G)    PURCHASER HAS BEEN MADE AWARE OF ANY DEED RESTRICTIONS THAT ARE ATTACHED TO THIS PROPERTY AND IS BUYING SUBJECT TO THOSE DEED RESTRICTIONS.

14.    **RISK OF LOSS:**    If any material portion of the property is damaged or destroyed prior to the Closing Date, as determined by Seller in its sole discretion, Seller shall give Purchaser written notice thereof.  Purchaser shall have the option, within ten (10) business days after receipt of such written notice, to either (a) terminate this Agreement, or (b) consummate this Agreement in accordance with its terms.  In any event, Seller shall not be deemed in default under this Agreement as a result of such damage or destruction.  Purchaser shall be deemed to have waived his right to terminate this Agreement if Purchaser does not notify Seller in writing of it election to terminate this Agreement within ten (10) business days after receipt of Seller's written notice of material damage.  If within five (5) days after Seller's receipt of such written notice of termination by Purchaser, Seller delivers to Purchaser Seller's written agreement to repair at its sole cost and expense all such damage, then any such termination notice given by Purchaser shall be rendered ineffective.  In such event, the Closing Date shall be deemed automatically extended until such time as the Seller completes the repairs, upon completion Purchaser will be given notice that such repair is complete and will have five (5) business days to close.  Purchaser shall not be

entitled to any insurance proceeds or obtain any rights with respect to any claims Seller may have with respect to the Property.

15. **DISCLOSURES:** Purchaser acknowledges and agrees that Purchaser has received and had adequate opportunity to read and understand all disclosures, if any, made available by Seller regarding the property. Purchaser shall execute at or prior to Closing, all federal, state and local disclosures concerning the property that Purchaser is required to execute under applicable laws and regulations. Purchaser acknowledges that any information provided by or on behalf of Seller with respect to the Property and Disclosures were obtained from a variety of sources and Seller has not verified such information and makes no representation as to the accuracy or completeness of said information.

16. **OCCUPIED PROPERTY:** Seller makes no representations or warranties as to whether the property is occupied as of the Closing Date. Purchaser expressly waives any right to terminate this Agreement based on the status of the occupancy of the Property. Purchaser acknowledges that Purchaser may be subject to any federal, state, or local laws in regards to protecting the rights of tenants who may be occupying the Property.

17. **MISCELLANEOUS:**

(A) NOTICES: All notices and demands required hereunder shall be made in writing and the mailing of notice by first class registered, certified, overnight mail, courier delivery or facsimile transmission with a copy by regular first class mail to Seller or Purchaser or to their attorneys at the addresses given in this Agreement shall be sufficient.

(B) TIME IS OF THE ESSENCE OF THIS AGREEMENT

(C) NO RECORDING: Neither this Agreement nor any type of memorandum thereof shall be recorded with the office of the Recorder of Deeds or with any other governmental agency, and any purported recordation or filing hereof by Purchaser shall constitute a default on the part of Purchaser.

(C) ENTIRE AGREEMENT: This Agreement constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements. There are no representations, agreements arrangements or understandings oral or written between the parties relating to the subject matter contained in this Agreement which is not fully expressed or referred to herein.

(D) SUCCESSORS AND ASSIGNS: The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of the Seller and its successors and assigns.

(E)     PURCHASER ASSIGNMENT TO TAKE TITLE:  Purchaser may request the conveyance be made to another, persons or entity ("Nominee"), upon notification in writing delivered to Seller at least ten days prior to the date of Closing.  Purchaser's designation of a Nominee to take title to the Property shall not relieve the Purchaser of any obligation hereunder.  Any additional transfer taxes due as a result of the designation of a Nominee shall be Purchaser's obligation to pay.

(F)     JOINT PURCHASERS:  The term "Purchaser" shall be read as "Purchasers" if more than one person is the Purchaser of the Property, in which case their obligations shall be joint and several.

(G)     FURTHER ASSURANCES:  Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein at any time and from time to time after execution of this Agreement whether before or after the Closing, as such other party may reasonably request in order to effectuate the provisions of this Agreement or the transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to this transaction, provided that neither party shall be required to incur any material expense in connection therewith.

(H)     SEVERABILITY:  If any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other persons or circumstances shall not be affected thereby.  All other clauses or provisions of this Agreement, not found invalid or unenforceable shall be and remain valid and enforceable.

(I)     STRICT COMPLIANCE:  Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

(J)     GOVERNING LAW:  The provisions of this Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of North Dakota. The parties consent to jurisdiction in Federal court in Fargo, North Dakota.

(K)     WAIVER OF JURY TRIAL:  **EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY**.  With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

(L)   ATTORNEYS FEES:  A party to this Agreement who is the prevailing party in any legal proceeding against any other party brought under or with respect to this Agreement or the transaction contemplated hereby shall be additionally entitled to recover court costs and reasonable attorney's fees from the non-prevailing party.

(M)   GENDER: A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

(N)   CERTAIN REFERENCES:  The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used.  Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraph, subparagraphs or other provisions of this Agreement.

(O)   SINGULAR ALSO MEANS PLURAL:  Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

(P)   CAPTIONS:  The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

(Q)   NO ORAL CHANGES:  This Agreement cannot be changed or any provision waived orally.  ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

(R)   DATE OF PERFORMANCE:  If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state in which the Property is located, the date for such performance shall be the next succeeding business day.

(S)   NO PRESUMPTION REGARDING DRAFTING:  It is acknowledged and presumed that the substance and form of this Agreement have been fully reviewed by the parties hereto and approved as to form by their respective counsel.  It is further acknowledged and agreed that no presumption shall exist against either party hereto by virtue of this Agreement being considered to have been drafted by counsel for either party thereto.

(T)   COUNTERPARTS:  This Agreement may be executed in multiple counterparts all of which when taken together shall constitute an Agreement for the sale of the Property under the laws of this state.  It is binding upon and inures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Purchaser.

(U)      COUNTERPART FACSIMILE EXECUTION:  For purposes of, executing this Agreement, a document signed and transmitted by facsimile machine shall be treated as an original document.  The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document.  At the request of either party, any facsimile document shall be re-executed by both parties in original form.  No party hereto may raise the use of a facsimile machine or the fact that any signature was transmitted through the use of a facsimile machine as a defense to the enforcement of this Agreement or any amendment executed in compliance with this Paragraph.  This Paragraph does not supersede the requirements of the "Notices" Paragraph.

(V)      FIRPTA: Seller represents and warrants to Purchaser that Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA").

**18.      IRREVOCABLE OFFER**: Purchaser further acknowledges that this Agreement is executed and delivered by Purchaser pursuant to a Chapter 11 plan of liquidation conducted on behalf of Seller.  In consideration of the following: (a) preserving the integrity of the liquidation process and assuring that all offers are made in conformity therewith and in reliance thereon; (b) the monies spent by Seller to arrange for the Chapter 11 plan; (c) the opportunity of the Purchaser to bid for the Property; (d) the promise by the Seller to sell the Property to Purchaser if this Agreement is accepted by Seller as hereinafter provided and (e) for other good and valuable consideration, the receipt and adequacy of which is expressly acknowledged by Purchaser, including the mutual promises made by each party, this Agreement constitutes an irrevocable offer to purchase by Purchaser in accordance with this Agreement which cannot be revoked by Purchaser. Such offer to purchase shall not be deemed accepted by Seller until executed by Seller or Seller's duly authorized agent.

**19.      APPROVAL BY BANKRUPTCY COURT:**   Purchaser acknowledges that the sale contemplated by this Agreement shall be made by Seller pursuant to a plan of liquidation under Chapter 11 of the Bankruptcy Code (the "Plan"). This Agreement is expressly subject to and contingent upon the entry of an order approving the sale and confirming the Plan (the "Confirmation Order"), by the United States Bankruptcy Court for the District of North Dakota in Case Number 25-30002.  Seller will seek approval of the Plan at a hearing on July 7, 2026.  Purchaser shall cooperate in good faith with the Seller to secure the Confirmation Order, including, but not limited to, attending the hearing to consider the entry of the Confirmation Order, and, if necessary, testifying before the Bankruptcy Court and providing documentary evidence as to Purchaser's financial wherewithal to perform the obligations of Purchaser under this Agreement.  In the event that the Bankruptcy Court enters an order denying the entry of the Confirmation Order, Seller shall return the Total Earnest Money to Purchaser within five (5) business days of the entry of such order and this Agreement shall be deemed to be null and void.

**20.      EXHIBITS**: The attached Exhibits shall be and hereby are made a part of this Agreement. Any Exhibits attached hereto containing blank spaces, which exhibit is to be executed and

delivered at the Closing shall be completed in accordance with the terms and provisions contained herein, prior to or at the time of execution and delivery thereof.  The exhibits <u>marked</u> below are attached to this Agreement and incorporated herein:

⊠    Legal Description – Exhibit A
⊠    Permitted Title Exceptions – Exhibit B

IN WITNESS WHEREOF, this Agreement has been executed as of the Effective Date.

SELLER:                                                PURCHASER:

By:  _____         _____
Name:                                                  Signature

                                                           _____
                                                           Print Name
Effective Date:  _____

                                                           _____
                                                           Signature

                                                           _____
                                                           Print Name

                                                           Date of Execution:

                                                           _____

## EXHIBIT "A"

## Legal Description

Generations on 1st Addition, Codington County, South Dakota (Parcel ID 9580), also known as 26 1st Avenue SW, Watertown, SD 57201

## EXHIBIT "B"

## Permitted Title Exceptions

A.    General Exceptions

    (1)    Rights of current tenants under existing residential leases

    (2)    [omitted]

B.    Specific Exceptions

    (1)    Covenants, Conditions, Easements and Restrictions of record.

    (2)    General Real Estate Taxes not due and payable and subsequent years.

    (3)    Special Assessments and installments due after the date of Closing.

    (4)    Drainage Ditches and Laterals

## PLAN EXHIBIT B: BROKER AGREEMENT

REAL ESTATE CONSULTING, ADVISORY SERVICES, AND CO-BROKER AGREEMENT

This Real Estate Consulting, Advisory Services, and Co-Broker Agreement (the "Agreement") is entered into as of [ insert date], by and between Hilco Real Estate Collateral, LLC ("Hilco") and Sioux Falls Commercial, Inc. d/b/a NAI Sioux Falls ("Co-Broker" and, together with Hilco, "Broker"), on the one hand, and [Mike Schmitz], solely in his capacity as Chief Restructuring Officer (the "CRO") of Generations on 1st, LLC (the "Debtor" ) and Red River State Bank ("RRSB" and, together with the CRO, the "Plan Proponents") in that certain Chapter 11 case, Case No. 25-bk-30002 (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the District of North Dakota (Fargo) (the "Bankruptcy Court").

Recitals:

WHEREAS, the Plan ProponentsDebtor and Red River State Bank have jointly proposed a Joint Chapter 11 for Generations on 1st, LLC (the "Plan"); and

WHEREAS, in connection with the Plan, the Plan Proponents CRO desires to jointly retain Broker as their the Debtor's exclusive agent to market for sale on its behalf that certain Real Estate Collateral property identified on Exhibit A attached hereto (the "Property") in accordance with the terms set forth herein; and

WHEREAS, Broker is willing to serve as the Plan Proponents' exclusive agent to perform the services described herein on the terms set forth herein.

Agreement:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Plan Proponents and Broker agree as follows:

1.      Consulting and Advisory Services.  At the Plan Proponents' request, Broker shall provide consulting and advisory services in connection with the sale of the Property. Such services shall include:

(a)     Meeting with the Plan Proponents to ascertain the Plan Proponents' goals, objectives and financial parameters in selling the Property.  The sales structure, including reserve pricing, is more specifically described on Exhibit B.

(b)     Soliciting interested parties for the sale of the Property and marketing the Property for sale through a managed qualifying bid process. The bid deadline is anticipated to be on or about February 17, 2027, subject to modification or revision. The sales structure is more specifically described on Exhibit B.

(c)     At the Plan Proponents' direction and on the Plan Proponents' behalf, negotiating the terms of the sale of the Property.

2. _Term_. The term (the "Term") of this Agreement shall commence upon the execution hereof and shall expire six (6) months from the date hereof unless terminated earlier (for cause, as set forth in Section 10 hereof) or extended pursuant to the terms hereof. The Term may be extended for successive thirty (30) day periods upon written agreement by Broker and the Plan Proponents. The parties acknowledge and agree that the effectiveness of this Agreement is contingent upon approval by final order of the Bankruptcy Court and confirmation of the Plan by the Bankruptcy Court.

3. _Authority._ During the Term, Broker shall serve as the Plan Proponents' exclusive agent for the purposes set forth in Section 1 above. Each of the Plan Proponents agrees to use commercially reasonable efforts to redirect to Hilco any communications and inquiries from prospective buyers made to either Plan Proponent regarding a sale of the Property during the Term. The parties hereto agree that Broker is serving as an independent contractor for the Plan Proponents pursuant to this Agreement for the limited purposes set forth herein and nothing herein shall be construed to establish a partnership or joint venture between Broker and either of the Plan Proponents.

4. _Compensation._

(a)     In the event any Property is sold (or the reserve price is met as set forth on _Exhibit B_), Broker shall earn a fee equal to an amount as specified on _Exhibit B_ of this Agreement.

(b)     All fees payable to Hilco hereunder shall be free and clear of any liens, claims and encumbrances, including the liens of any secured parties and shall be payable at the time of closing on a sale or other transaction relating to a Property.

(c)     Except as set forth herein, Broker shall not be responsible for any other fees or commissions in connection with the disposition of the Property, including, but not limited to, any fees or commissions that may be owed to the Plan Proponents' or Debtor's previous Real Estate brokers.

5. _Survival_. If, within ten (10) days after the termination or expiration of the Term, Broker delivers to the Plan Proponents a written list of prospects for the Property (the "Prospect List"), and within one hundred and eighty (180) days after the termination or expiration of the Term, either of the Plan Proponents consummates a sale of the Property to a prospect (or its successor, assignee or designee) set forth on the Prospect List, Broker shall be entitled to a fee, payable by the Plan Proponents, in accordance with Section 4 hereof as if the sale had been agreed to or consummated during the Term of this Agreement. Any prospects identified on the Prospect List shall be limited to potential buyers that have provided written inquiry about purchasing the Property to one of the Plan Proponents or Broker during the Term.

6. _Reimbursable Expenses._ The Plan Proponents jointly and severally agree to reimburse Hilco for all reasonable and customary Reimbursable Expenses (as defined below) incurred in connection with the performance of the services proposed hereunder, for which Hilco and the Plan Proponents shall agree on a proposed budget; provided, further, that such reimbursement obligation shall be capped at thirty-two thousand and five hundred dollars

($32,500). In addition to any other fees due hereunder, the Reimbursable Expenses shall be due and payable at the closing of the sale of the Property to a third party, including a sale to a lender successfully credit bidding on such Property.  If the Property does not sell during the Term of this Agreement, no Reimbursable Expenses shall be due and payable to Hilco pursuant to this Agreement, unless one of the Plan Proponents is the cause of a failure to close a sale of the Property that has been approved by a final order of the Bankruptcy Court. "**Reimbursable Expenses**" means all out-of-pocket expenses incurred in connection with the performance of the contemplated services, including, without limitation, expenses of marketing, advertising, and selling  the Property.

7.      No Guaranty. Broker has not guaranteed, and is not hereby guarantying, any specific result on the sale of the Property.

8.      Reserved.

9.      General Provisions.

(a)     The Plan Proponents and Broker shall deal with each other in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement.

(b)     **Notices**. All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given and received (a) when personally delivered, or delivered by same-day courier; or (b) on the third business day after mailing by registered or certified mail, postage prepaid, return receipt requested; or (c) upon delivery when sent by prepaid overnight express delivery service (e.g., FedEx, UPS); or (d) when sent by email or facsimile and upon the receipt by the sending party of written confirmation by the receiving party; provided, however, that an automated facsimile or email confirmation of delivery or read receipt shall not constitute such confirmation:

If to Hilco:            Hilco Real Estate, LLC
                        5 Revere Drive, Suite 320
                        Northbrook, Illinois 60062
                        Tel.    (847) 418-2703
                        Fax     (847) 897-0826
                        Attn:   Jeff Azuse
                        jazuse@hilcoglobal.com


with a copy to:         Hilco Global
                        5 Revere Drive, Suite 206
                        Northbrook, Illinois 60062
                        Tel.    (847) 504-2462
                        Fax     (847) 897-0874
                        Attn:   Eric Kaup

If to Co-Broker: Sioux Falls Commercial
 2500 W 49th Street
 Suite 101
 Sioux Falls, South Dakota 57105
 Tel. (605) 357-7100
 Attn: Michael Martin, Senior Vice President
  mmartin@naisiouxfalls.com

with a copy to: Sioux Falls Commercial
 2500 W 49th Street
 Suite 101
 Sioux Falls, South Dakota 57105
 Tel. (605) 357-7100
 Attn: Marcus Mahlen, President
  mmahlen@naisiouxfalls.com

If to the CRO: Maurice B. VerStandig, Esq.
 1630 1st Avenue N, Suite B PMB 24
 Fargo, North Dakota 58102-4246
 mac@dakotabankruptcy.com

~~If to RRSB: Red River State Bank~~
~~300 2nd. Ave. W.~~
~~Halstad, MN 56548~~
~~Attn: Charles Aarestad~~
~~charles.aarestad@redriverbank.com~~

~~with a copy to: Vogel Law Firm~~
~~218 N.P. Ave.~~
~~Fargo, ND 58102~~
~~Tel. (701) 237-6983~~
~~Attn: Kesha Tanabe~~
~~ktanabe@vogellaw.com~~

(c) This Agreement shall be deemed drafted by all parties hereto, and there shall be no presumption against any party in the interpretation of this Agreement.

(d) By executing or otherwise accepting this Agreement, Plan Proponents and Broker acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

(e) This Agreement may be executed in original counterparts, and if executed and delivered via facsimile or electronic mail shall be deemed the equivalent of an original.

(f)     This Agreement creates no third-party beneficiaries.

(g)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect, and the invalid or unenforceable provision shall be reformed to the minimum extent required to render it valid and enforceable and to affect the intent of this Agreement.

(h)     Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either party hereto without the prior written consent of the other parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

(i)     No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such party.  The failure by any party to enforce, or the delay by either party in enforcing, any of said party's rights under this Agreement shall not be construed as a continuing waiver of such rights, and said party may, within such time as is provided by the laws established by any government with applicable jurisdiction, commence appropriate suits, actions or proceedings to enforce any or all of such rights.  A waiver by any party of a default in one or more instances shall not be construed as a waiver in other instances.

(j)     This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party to this Agreement except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

(k)     All headings and captions in this Agreement are for convenience only and shall not be interpreted to enlarge or restrict the provisions of the Agreement.

(l)     This Agreement has been made under the laws of the State of North Dakota and such laws will control its interpretation and any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from this Agreement or Broker's services hereunder, shall be settled by the Bankruptcy Court

(m)     The Plan Proponents acknowledge and agree that Broker may present the Property for sale to a potential purchaser who is also exclusively represented by Broker.  In such event, Broker will disclose such arrangement to the Plan Proponents, and Broker shall be considered a co-broker and may be paid a commission as the exclusive agent for the prospective purchaser in addition to any commission owed

for the listing of the Property, except that in no event shall the Plan Proponents be obligated for any commission in excess of the amount provided for herein.

(n)     In the event that Broker receives conflicting instructions or requests from the Plan Proponents, Broker will be entitled to follow the instructions or requests of ~~RRSB~~the CRO.

(o)     THE PLAN PROPONENTS AND BROKER AGREE THAT THE PROPERTY WILL BE OFFERED FOR SALE AND WILL BE SOLD WITHOUT REGARD TO RACE, COLOR, RELIGIOUS CREED, ANCESTRY, AGE, NATIONAL ORIGIN, DISABILITY OR FAMILIAL STATUS.

10. Termination for Cause.

The Plan Proponents may terminate this Agreement for cause upon written notice to Broker at any time prior to the expiration of the Term.  Termination for cause shall mean any termination as a result of Broker's fraud, misrepresentation, negligence, willful misconduct or material breach of any of the terms of this Agreement.  Upon termination of this Agreement pursuant to this Section 10, the Plan Proponents shall be jointly and severally liable for payment of accrued and unpaid Reimbursable Expenses of Hilco as of the effective date of the termination by the Plan Proponents, solely to the extent the closing of the sale of the Property to a third party, including a sale to a lender successfully credit bidding on such Property, occurred prior to any such termination.

*[Rest of Page Left Intentionally Blank]*

IN WITNESS WHEREOF, the Plan Proponents and Broker have executed and delivered this Agreement as of the date first above written.

HILCO REAL ESTATE, LLC

By: _____
Title:
Date:

SIOUX FALL COMMERCIAL, INC. d/b/a NAI SIOUX FALLS

By: _____
Title:
Date:

_____

[MIKE SCHMITZ], SOLELY IN HIS CAPACITY AS
CHIEF RESTRUCTURING OFFICER OF Generations on 1st, LLC

~~RED RIVER STATE BANK~~

~~_____~~

~~By:~~ _____
~~Title:~~
~~Date:~~

**BROKER AGREEMENT EXHIBIT A**

Property

Generations on 1st Addition, Codington County, South Dakota (Parcel ID 9580), also known as 26 1st Avenue SW, Watertown, SD 57201

**BROKER AGREEMENT EXHIBIT "B"**

**Sales Process & Commission Structure**

**SALES STRATEGY & STRUCTURE:** Managed Bid Sales Process

Unless otherwise specified herein or agreed to between Broker and the Plan Proponents in writing, the sale will be conducted as a "**reserve sale**" subject to the approval of the Plan Proponents, and the Bankruptcy Court. The sale of the Property shall be "AS-IS" and the Plan Proponents, as seller, make no disclosures, warranties or representations, express or implied, with respect to the Property. Any conveyance of the Property from the Plan Proponents shall be by Purchase Agreement in the form attached to the Plan. In no event shall any damages, compensation, or Reimbursable Expenses (as defined above) be paid to Broker pursuant to the terms of this Agreement unless either Plan Proponent is the cause of a failure to close a sale of the Property that has been approved by a final order of the Bankruptcy Court.

**COMMISSION**

- **CASH SALE**

In the event of a final closing of a sale of the Property, Hilco and Co-Broker shall earn a total fee/commission equal to five percent (5.0%) of the Gross Sale Proceeds. Hilco and Co-Broker will split the fee three percent (3%) to Hilco and two percent (2%) to Co-Broker. For purposes hereof, "**Gross Sale Proceeds**" shall mean the aggregate cash and non-cash consideration received by the Plan Proponents or the Debtor, including any credit bid, in consideration of a Property. The value of non-cash consideration paid for a Property shall be determined by mutual agreement between Broker and the Plan Proponents.

- CREDIT BID SALE

If title to the Property is transferred to Red River State Bank or its successors or assigns (in each case, the "Secured Creditor") on account of the Secured Creditor's credit bid or deed in lieu, Broker shall earn a flat fee of seventy-five thousand dollars ($75,000), plus reimbursement of out-of-pocket marketing expenses capped at thirty-two thousand and five hundred dollars ($32,500). This fee shall be paid by Secured Creditor at closing and split between Hilco and Co-Broker as follows:  (a) Hilco shall receive $50,000 plus reimbursement of out-of-pocket marketing expenses capped at thirty-two thousand and five hundred dollars ($32,500) and (b) Co-Broker shall receive $25,000.

## PLAN EXHIBIT C: BID PROCEDURES & TIMELINE

The following is an estimated timeline for the sales process. This outline is predicated on running a managed qualifying bid process with a defined series of marketing tools and is representative of what we believe is warranted based on our knowledge of the situation. However, this timeline can be modified or amended as circumstances, facts and real-time feedback may dictate.

**Marketing Setup, Start and End – Upon Expiration of VKB Transaction Deadline**

• As soon as Listing Agreement is fully executed, Hilco and NAI's marketing departments will start putting together all marketing materials. The Plan Proponents, in consultation with the Brokers, shall have the discretion to designate a minimum initial bid or a stalking horse bid.

• **Targeted Marketing Launch - VKB Transaction Deadline + 14 days**. Market and advertise the property to local, regional and national buyers to generate as much interest as possible. Provide
property information to interested buyers and conduct multiple property tours.

**Qualifying Bids Due & Reviewed – VKB Transaction Deadline + 45 days**

• Qualifying bids are due – **VKB Transaction Deadline + 45 days**

• To be a qualified bid, the bid must be submitted on the pre-approved contract with initial earnest money of $200,000.

• Bids are reviewed with Client and other parties of interest. – **VKB Transaction Deadline + 47 days**

• **The best qualifying bids are notified on or about VKB Transaction Deadline + 49 days** and invited to participate in a runoff auction – although if one offer is significantly better than the others, the Plan Proponents may work directly with that buyer and forgo a runoff auction by asking for best and final bid.

**Best & Final, Runoff Auction, Contracts Signed, Earnest Money Deposited and Closing**

• Best & Finals Requested, OR

• Qualifying bids are invited to participate in a runoff auction where the bidding will start at the highest qualifying offer received. All bidders will be notified of this starting bid.

**Conclusion of the Auction – VKB Transaction Deadline + 52 days**

• The winning bidder will be determined upon the conclusion of the auction.

• After the conclusion of the auction, the winning bidder will sign a pre-approved contract with the final winning bid price.

• Within three days from acceptance of the winning offer, the winning bidder is required to deposit additional earnest money to make the total amount of earnest money equal 10% of the purchase price.

• Transactions must close within **15-days of seller acceptance**.

**TOTAL PROGRAM TIME (start to closing): 90 to 120 days**

## PLAN EXHIBIT D: FORM OF PURCHASE AGREEMENT

**THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT ONCE IT IS SIGNED BY BOTH PARTIES. ONCE THIS CONTRACT IS FULLY SIGNED THERE SHALL BE NO FURTHER ATTORNEY REVIEW.**

### REAL ESTATE PURCHASE AND SALE CONTRACT

**Date of Contract:** _____, 2026

**Address:** _____

**PIN:** _____

**PURCHASER INFORMATION:**

NAME(S) _____
*(Print Name)*

_____
*(Print Name)*

ADDRESS _____

_____

_____

PHONE:                Work _____ Home
_____

Cell _____

E-mail or Fax:
_____

SOCIAL SECURITY
OR FEIN NUMBER: _____

PURCHASER'S ATTORNEY: _____

ADDRESS: _____

_____

PHONE: _____Fax: _____

**SELLER INFORMATION**:

NAME: _____

ADDRESS: _____

_____

**1.      PURCHASE & DESCRIPTION OF REAL ESTATE**: Seller agrees to sell to Purchaser (also referred to herein as "Purchaser") and Purchaser agrees to purchase from Seller the Real Estate and improvements, if any, situated in State of South Dakota, County of Codington, commonly known as _____, together with any and all buildings, improvements, fixtures owned by the Seller located in, on, attached to the Property; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of Seller in and to adjacent streets, or rights-of-way, Seller's interest in any assignable warranties or guaranties relating to the Property and fixtures located on, attached to, or used in connection with the Property; all of the above hereinafter collectively called "Property", legally described in Exhibit A attached hereto and made a part hereof.

**2.      PURCHASE PRICE**:

| | | |
|---|---|---|
| (A) | High Bid Price | $_____ |
| (B) | Extras, if, any | $_____ |
| (C) | **Total Purchase Price** (equals A + B) | $_____ |
| (D) | **Initial Earnest Money** ($200,000) | $_____ |
| (E) | **Additional Earnest Money** (equals C x 10% -D) | $_____ |

**3.      PRICE AND TERMS**:

**4.**(A)   The **Total Purchase Price** is the amount set forth in (D) above (the "Total Purchase Price"), payable in U.S. dollars by Purchaser as follows:

(1)      **Initial Earnest Money** shall be paid in the form of a certified or cashier's check made payable to the order of _____**, as Escrow Agent** in the amount set forth in (E) above.  The Initial Earnest Money is due upon delivery of the Agreement signed by Purchaser, receipt of which is hereby acknowledged and shall be nonrefundable.

(2)      The **Balance of the Purchase Price ("Balance"),** plus or minus prorations and closing adjustments, if any, is due at the closing of this transaction ("Closing") and must be paid by immediately available funds by wire transfer or

Purchaser's official cashier's check from a bank, made payable to the Escrow Agent or such other payee(s) as Seller may hereafter designate in writing.

(B)      Delivery of the deed and acceptance by Purchaser at the Closing shall be deemed to be full performance and discharge of all obligations (either express or implied) on the part of Seller to be performed pursuant to this Agreement. No representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

4.      **ALL-CASH TRANSACTION:**      This is an all-cash sale and purchase; and is NOT contingent upon obtaining financing.  Although, the Purchaser may apply to a lending institution of Purchaser's choice for a loan but,  Purchaser has been advised that neither his receipt of a commitment from such a lending institution, nor his acceptance of said commitment, does not in any way alter Purchaser's obligations under this Purchase and Sale Agreement.

5.      **CLOSING:**  Closing shall occur at 10:00 a.m. on or before **15   Days from Seller's Acceptance,** at the offices of the Escrow Agent, or at such other location that Seller may designate.

6.      **CLOSING DOCUMENTS:**
A.      **At the Closing, Seller shall deliver to Purchaser, at Seller's sole cost and expense, the following:**
(1)      A duly executed and acknowledged _____ Deed in recordable form conveying title in fee simple to all of the Real Estate, free and clear of any and all liens, encumbrances, and subject to the Permitted Title Exceptions attached hereto as Exhibit B;

(2)      A Preliminary Title Commitment at Closing and, subsequent to Closing, an Owner's Policy of Title Insurance (the "Title Policy") issued by _____ Title Insurance Company in the full amount of the Purchase Price, dated as of closing, insuring Purchaser's title to the Real Estate subject only to the Permitted Title Exceptions listed on Exhibit B, the standard printed exceptions and additional exceptions contained in the usual form of Owner's Title Policy;

(3)      Internal Revenue Code reporting requirements or disclosure including FIRPTA;

(4)      Seller shall by written instrument assign all of the Leases if any to Purchaser, and Purchaser shall accept such assignment and agrees to discharge and assume all of the obligations and duties of landlord under the Leases (including, without limitation, all obligations pertaining to security deposits) which accrue or arise under the Leases for the period from and after the closing.  Purchaser hereby agrees to indemnify and hold Seller harmless from any claims, demands, suits, damages and expenses related to Landlord's performance under any Lease from and after the Closing Date including, without limitation, the return of the security deposits to the tenants of the Property.  This indemnity shall survive the closing of this transaction;

(5)     Seller shall by written assignment assign all Service Contracts, if any to Purchaser, (except any such contracts which by their terms are non-assignable) and Purchaser shall accept such assignment and agrees to discharge and assume all of the obligations and duties of landlord under the Service Contracts which accrue or arise for the period from and after the closing;

(6)     Customary transfer declarations;

(7)     Bill of Sale, without warranties, for any personal property being transferred free of liens or encumbrances;

(8)     All other documents that are reasonably customary to close this transaction; in accordance with the terms and conditions of this Agreement; and

(9)     Letters to the tenants advising the tenants of the sale and directing all future rents to be sent to Purchasers or as Purchaser may direct.

B.      **At the Closing, Purchaser shall:**

(1)     Pay the cash portion of the Purchase Price including prorations and adjustments, if any;

(2)     If Purchaser is a corporation or a limited liability company, deliver to Seller:

> (a)     Certified resolutions of the board of directors of Purchaser (or managing member) authorizing all the transactions contemplated by this Agreement;

> (b)     An incumbency certificate with respect to those officers (or managing member) of Purchaser executing any documents or instruments in connection with the transactions contemplated herein; and

> (c)     Certificate of Good Standing for the entity acquiring title from the Secretary of State or other appropriate governmental office of the state in which the entity was formed.

(3)     If the entity acquiring title is a partnership, deliver to Seller a certified copy of the partnership agreement and all appropriate resolutions, partnership consents and evidence of authority of said entity;

(4)     Execute such other and further documents necessary to close this transaction; in accordance with the terms and conditions of this Agreement;

(5)     If Purchase Money Financing is applicable:

(a)   Execute and deliver to Seller the Financing Documents; and

(b)   Deliver an ALTA Mortgage Title Insurance Policy insuring the Mortgage as a first lien on the Property subject only to the Permitted Title Exceptions.

(6)   Execute an assignment and assumption agreement pursuant to which Purchaser assumes any obligations of Seller under the Leases and any other contracts relating to the Property.

7.   **SALES EXPENSES TO BE PAID IN CASH AT OR PRIOR TO CLOSING:**

**A.    SELLER'S EXPENSES:**  All costs of releasing and recording any release of Mortgage required by the terms of this Agreement; All costs of the Owner's Title Policy; 1/2 of any escrow fee, if Purchaser does not use commercial lending for the purchase (otherwise the title escrow fee is payable by Purchaser); Real Estate brokerage fees pursuant to the written agreement between Hilco Real Estate and Seller and other expenses stipulated to be paid by Seller under provisions of this Agreement.  State, County, or City transfer taxes (if any) shall be paid by the party that typically pays these expenses based on where the property is located.

**B.    PURCHASER'S EXPENSES:**  All recording costs of the Mortgage, the Deed, and the Collateral Documents, the full amount of any money lender's escrow, expense of ALTA Mortgage Title Policy, if Purchaser is using a commercial lender for the purchase it will pay the entire title company escrow fee (otherwise, 1/2 of any escrow fee); and expenses stipulated to be paid by Purchaser under other provisions of this Agreement. State, County, or City transfer taxes (if any) shall be paid by the party that typically pays these expenses based on where the property is located.

8.   **PRORATIONS AND ADJUSTMENTS:**  The following shall be prorated and adjusted between Seller and Purchaser as of the time of closing, except as otherwise expressly provided herein:

A.   Water, electricity, sewer, gas, telephone and other utility charges based, to extent practicable, on final meter readings and/or final invoices.

B.   Amounts paid or payable under any assigned maintenance or other service contracts shall be prorated as of the time of closing.

C.   Accrued general Real Estate Collateral taxes shall be prorated as of the time of closing.  If such bills are not available, then such taxes shall be prorated on the basis of 100% of the most recent ascertainable tax bills.

D.   Special Assessments - If at the time of Closing, the Premises are affected by an assessment which is or may become payable in installments, then only those installments due

prior to the date of the Closing shall be paid by the Seller, and all installments due subsequent to Closing shall be paid by Purchaser.

E.  Such other items that are customarily prorated in transactions of this nature shall be ratably prorated as of the Closing Date.  Except as expressly provided herein, all prorations shall be final.  The covenants and agreements set forth in this Paragraph shall survive the closing.

F.  As of Closing, Purchaser shall be responsible for the transfer of accounts and establishment of all utility services to the Real Estate Collateral to the name of Purchaser, including the making of any new utility deposits with the utility providers.  Seller shall be entitled to receive a refund of utility service deposits, if any, covering the period prior to the Closing Date.

G.  Real Estate Collateral tax assessment reductions, tax refunds, and credits received after the Closing Date after deducting the expenses of collection thereof including attorney's fees which obligation shall survive the Closing that are:

1.  attributable to the tax year during which the Closing Date occurs and thereafter  shall be prorated between Seller and Purchaser;

2.  attributable to all tax years before the year in which the Closing occurs belong to  the Seller.

I.  To the extent tenants under Leases pay monthly estimates of common area maintenance charges, central plant charges, operating expenses, and similar expenses, but excluding Real Estate Collateral taxes (collectively, "Charges"), Seller shall retain all interim payments of Charges received by Seller prior to the Closing Date. Seller shall pay when due all invoices for the work or services provided which form the basis of the Charges.  Seller retains the right to bill and collect from the tenants under the Leases for any shortfalls in the interim payments of Charges Seller has collected and Purchaser shall cooperate with Seller in collecting such amounts.

J.  To the extent tenants under Leases pay monthly estimates of Real Estate Collateral taxes ("Impounds for Taxes"), Seller shall credit Purchaser at Closing with the total of such Impounds for Taxes actually collected by Seller applicable to Real Estate Collateral taxes not yet due and payable as of the Closing Date. There will be no credit to Purchaser for shortfalls by tenants in any accounts or for tenants who pay portions of Real Estate Collateral taxes upon presentation of Real Estate Collateral tax bills, except to the extent Seller has collected sums from such tenants and not applied such sums to Real Estate Collateral taxes then due and payable.

K.  The amount of all refundable security deposits and other tenants' deposits under Leases that are in Seller's possession except to the extent applied prior to the Closing Date shall be credited to Purchaser.

L.      The amount of any other credits due tenants shall be credited to Purchaser.

9.      **DEFAULTS**:  A failure to appear at the time and place stated in the notice of the Closing Date, a failure to pay any amounts due hereunder (including Earnest Money), a failure to enter into, execute and deliver customary closing documents, or Purchaser's failure to perform any obligation of Purchaser required under the Contract and any supplemental written agreements made a part of the Contract shall be a default. In the event of Purchaser's default, the Earnest Money shall be retained or collected by Seller as liquidated damages, and not as a penalty as Seller's sole and exclusive remedy in law and equity. In the event Seller shall fail or be unable to deliver title to the Property as herein provided on account of title defects which Purchaser is unwilling to waive, this Contract shall be terminated and the Earnest Money shall be returned forthwith to Purchaser. The return of Purchaser's funds shall be Purchaser's sole and exclusive remedy in the event of any form of Seller's default under this Real Estate Collateral contract. **UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES**.

10.     **WARRANTY DISCLAIMERS**:
(A)     **THE PROPERTY IS BEING SOLD "AS IS".  SELLER HEREBY EXCLUDES AND DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING BY WAY OF ILLUSTRATION AND NOT LIMITATION, WARRANTIES OF FITNESS FOR PARTICULAR PURPOSE, HABITABILITY AND MERCHANTABILITY. SELLER NEITHER ASSUMES NOR AUTHORIZES ANY PERSON TO ASSUME FOR SELLER ANY LIABILITY IN CONNECTION WITH THE SALE OR USE OF THE PROPERTY, AND THERE ARE NO AGREEMENTS OR WARRANTIES, EITHER ORAL OR WRITTEN, COLLATERAL TO OR AFFECTING THIS CONTRACT, THE PROPERTY. PURCHASER ACKNOWLEDGES THAT NO WARRANTY CLAIMS FOR ANY MATTERS RELATING TO THE CONDITION OF THE PROPERTY MAY BE MADE AGAINST SELLER. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER'S ACCEPTANCE OF SELLER'S DISCLAIMER OF WARRANTIES, INCLUDING THE DISCLAIMER OF ANY APPLICABLE IMPLIED WARRANTY OF HABITABILITY, IS AN ESSENTIAL PART OF THE AGREEMENT REACHED BETWEEN PURCHASER AND SELLER.**

(D)     Purchaser acknowledges and understands that if a dispute arises with Seller and the dispute results in a lawsuit, Purchaser will not be able to rely on the Implied Warranty of Habitability described above, as a basis for suing Seller or as the basis of a defense if Seller sues Purchaser.

(E)     Seller shall not be responsible for any incidental or consequential damages.
        **6.**

11**.     POSSESSION:** Purchaser shall not take possession of the Premises or commence any work prior to delivery of the Deed and full compliance with the terms of this Agreement.  The Property shall be delivered at Closing.  Purchaser shall be responsible for installing new locks on

the Property immediately after the Closing, and Purchaser shall hold Seller and Seller's representatives and agents harmless from any and all damages, claims, liens, liabilities, costs, injuries and expenses of any kind that may be made against Seller as a result of Purchaser's failure to install new locks on the property.

12.      **BROKER'S COMMISSION**: Seller shall cause to be paid a broker's commission to **Hilco Real Estate Collateral, LLC** (hereinafter referred to as "Seller's Broker") in accordance with its Exclusive Real Estate Collateral Auction Agreement.  Seller and Buyer agree that all Broker's commissions shall be paid at Closing.  This Paragraph and disbursement instructions may not be amended or revoked without the prior written consent of Seller's Broker, unless superseded by an Order of the Bankruptcy Court.

13**.**      **AGENCY DISCLOSURE:** Seller's Listing Broker, and their agents represent Seller.  The Listing Broker owes duties of trust, loyalty and confidence to Seller only.  While the Listing Broker has a duty to treat Purchaser honestly and fairly at all times, the Listing Broker is the Seller's agents and are acting on behalf of Seller and not Purchaser.  Any Cooperating Broker will be recognized as a Purchaser's agent (Purchaser's Broker).  BY SIGNING BELOW, PURCHASER ACKNOWLEDGES PRIOR TIMELY NOTICE BY LISTING OR SELLING BROKER THAT LISTING BROKER IS SELLER'S AGENT.

14**.**      **CONSULT YOUR ATTORNEY:**  THIS IS INTENDED TO BE A LEGALLY BINDING AGREEMENT.  READ IT CAREFULLY.  NO REPRESENTATION OR RECOMMENDATION IS MADE BY SELLER, BROKER OR THEIR AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS DOCUMENT OR THE TRANSACTION RELATING THERETO.  THESE ARE QUESTIONS FOR YOUR ATTORNEY. CONSULT YOUR ATTORNEY BEFORE SIGNING.  NEITHER THE SELLER NOR THE BROKER CAN GIVE YOU ANY LEGAL ADVICE.

15**.**      **DISCLAIMER:**

(A)      EXCEPT AS OTHERWISE SPECIFICALLY STATED IN THIS AGREEMENT, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE OF, AS TO, OR CONCERNING THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT THEREON.

(B)      EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT, SELLER HAS NOT MADE AND IS NOT MAKING ANY REPRESENTATION OR WARRANTY REGARDING MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ENVIRONMENTAL CONDITIONS, ZONING OR THE AVAILABILITY OF UTILITIES OR PERMITS.

(C)      PURCHASER ACKNOWLEDGES THAT HAVING BEEN GIVEN A SUFFICIENT OPPORTUNITY TO INSPECT THE PROPERTY, AND TO REVIEW OTHER MATERIAL GIVEN

TO PURCHASER, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY IN ARRIVING AT ITS DECISION TO PURCHASE THE PROPERTY AND HAS NOT RELIED UPON ANY PLANS SELLING BROCHURES, ADVERTISEMENTS, REPRESENTATIONS WARRANTES, STATEMENTS OR ESTIMATES OF ANY NATURE WRITTEN OR ORAL BY SELLER OR SELLER'S AGENT IN DECIDING TO PURCHASE THE PROPERTY AT THE STATED PRICE.

(D)    PURCHASER IS PURCHASING THE PROPERTY IN ITS PRESENT CONDITION, "AS IS, WHERE IS", AND SELLER HAS NO OBLIGATION TO CONSTRUCT ANY IMPROVEMENTS THEREON, OR TO PERFORM ANY OTHER ACT REGARDING THE PROPERTY, EXCEPT AS EXPRESSLY PROVIDED HEREIN.

(E)    ANY FACTUAL INFORMATION SUCH AS PROPERTY DIMENSIONS, SQUARE FOOTAGE, OR SKETCHES SHOWN TO PURCHASER OR SET FORTH HEREIN ARE OR MAY BE APPROXIMATE AND PURCHASER REPRESENTS TO SELLER THAT THEY HAVE INSPECTED AND VERIFIED THE FACTS AND INFORMATION PRIOR TO THE EXECUTION OF THIS AGREEMENT.  NO LIABILITY FOR ANY INACCURACIES, ERRORS OR OMISSIONS IS ASSUMED BY THE SELLER, THE BROKER OR OTHER AGENTS.

(F)    THE REAL ESTATE COLLATERAL SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NO EXPERTISE WITH RESPECT TO ENVIRONMENTAL MATTERS. PROPER INSPECTIONS OF THE PROPERTY BY QUALIFIED EXPERTS ARE ENCOURAGED TO DETERMINE WHETHER OR NOT THERE ARE ANY CURRENT OR POTENTIAL ENVIRONMENTAL CONCERNS RELATING TO THE PROPERTY.  THE REAL ESTATE COLLATERAL SALESPERSONS AND BROKERS IN THIS TRANSACTION HAVE NOT MADE, NOR WILL THEY MAKE, ANY REPRESENTATIONS, EITHER EXPRESSED OR IMPLIED, REGARDING THE EXISTENCE OR NON-EXISTENCE OF ANY SUCH ENVIRONMENTAL CONCERNS IN OR ON THE PROPERTY.

(G)    PURCHASER HAS BEEN MADE AWARE OF ANY DEED RESTRICTIONS THAT ARE ATTACHED TO THIS PROPERTY AND IS BUYING SUBJECT TO THOSE DEED RESTRICTIONS.  THE SPECIFIC DEED RESTRICTIONS ARE ATTACHED AS EXHIBIT "C".

16.    **RISK OF LOSS:**    If any material portion of the property is damaged or destroyed prior to the Closing Date, as determined by Seller is its sole discretion, Seller shall give Purchaser written notice thereof.  Purchaser shall have the option, within ten (10) business days after receipt of such written notice, to either (a) terminate this Agreement, or (b) consummate this Agreement in accordance with its terms.  In any event, Seller shall not be deemed in default under this Agreement as a result of such damage or destruction.  Purchaser shall be deemed to have waived his right to terminate this Agreement if Purchaser does not notify Seller in writing of it election to terminate this Agreement within ten (10) business days after receipt of Seller's written notice of material damage.  If within five (5) days after Seller's receipt of such written notice of termination by Purchaser, Seller delivers to Purchaser Seller's written agreement to repair at its sole cost and expense all such damage, then any such termination notice given by Purchaser shall

be rendered ineffective.  In such event, the Closing Date shall be deemed automatically extended until such time as the Seller completes the repairs, upon completion Purchaser will be given notice that such repair is complete and will have five (5) business days to close.  Purchaser shall not be entitled to any insurance proceeds or obtain any rights with respect to any claims Seller may have with respect to the Property.

17.   **DISCLOSURES:**   Purchaser acknowledges and agrees that Purchaser has received and had adequate opportunity to read and understand all disclosures made available by Seller, Broker, or auctioneer regarding the property.  Purchaser shall execute at or prior to Closing, all federal, state and local disclosures concerning the property that Purchaser is required to execute under applicable laws and regulations.  Purchaser acknowledges that any information provided by or on behalf of Seller with respect to the Property and Disclosures were obtained from a variety of sources and neither Seller, Broker, nor Auctioneer have verified such information and make no representation as to the accuracy or completeness of said information.

18.   **OCCUPIED PROPERTY:**   Seller makes no representations or warranties as to whether the property is occupied as of the Closing Date.  Purchaser expressly waives any right to terminate this Agreement based on the status of the occupancy of the Property.  Purchaser acknowledges that Purchaser may be subject to any federal, state, or local laws in regards to protecting the rights of tenants who may be occupying the Property.

19.   **MISCELLANEOUS:**

(A)   NOTICES:  All notices and demands required hereunder shall be made in writing and the mailing of notice by first class registered, certified, overnight mail, courier delivery or facsimile transmission with a copy by regular first class mail to Seller or Purchaser or to their attorneys at the addresses given in this Contract shall be sufficient.

(B)   TIME IS OF THE ESSENCE OF THIS CONTRACT

(C)   NO RECORDING**:**  Neither this Agreement nor any type of memorandum thereof shall be recorded with the office of the Recorder of Deeds or with any other governmental agency, and any purported recordation or filing hereof by Purchaser shall constitute a default on the part of Purchaser.

(C)   ENTIRE AGREEMENT:  This Agreement constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.  There are no representations, agreements arrangements or understandings oral or written between the parties, including the Broker, relating to the subject matter contained in this Agreement which is not fully expressed or referred to herein.

(D)   SUCCESSORS AND ASSIGNS:
    (1)   The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall

bind and inure to the benefit of the Seller and its successors and assigns.  This Agreement may not be assigned by Purchaser without prior written consent of Seller.

(2)      The Seller's refusal to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against Seller.

(E)      PURCHASER ASSIGNMENT TO TAKE TITLE:  Purchaser may request the conveyance be made to another, persons or entity ("Nominee"), upon notification in writing delivered to Seller at least ten days prior to the date of Closing.  Purchaser's designation of a Nominee to take title to the Property shall not relieve the Purchaser of any obligation hereunder.  Any additional transfer taxes due as a result of the designation of a Nominee shall be Purchaser's obligation to pay.

(F)      JOINT PURCHASERS:  The term "Purchaser" shall be read as "Purchasers" if more than one person is the Purchaser of the Property, in which case their obligations shall be joint and several.

(G)      FURTHER ASSURANCES:  Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein at any time and from time to time after execution of this Agreement whether before or after the Closing, as such other party may reasonably request in order to effectuate the provisions of this Agreement or the transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to this transaction, provided that neither party shall be required to incur any material expense in connection therewith.

(H)      SEVERABILITY:  If any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other persons or circumstances shall not be affected thereby.  All other clauses or provisions of this Agreement, not found invalid or unenforceable shall be and remain valid and enforceable.

(I)      STRICT COMPLIANCE:  Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

(J)      GOVERNING LAW:  The provisions of this Agreement shall be governed by, and construed and enforced in accordance with the laws of the state in which the Property is located.

(K)      WAIVER OF JURY TRIAL:  **EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS**

**AGREEMENT OR THE RELATIONSHIP CREATED HEREBY**. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

(L)     ATTORNEYS FEES**:** A party to this Agreement who is the prevailing party in any legal proceeding against any other party brought under or with respect to this Agreement or the transaction contemplated hereby shall be additionally entitled to recover court costs and reasonable attorney's fees from the non-prevailing party.

(M)     GENDER: A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

(N)     CERTAIN REFERENCES: The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraph, subparagraphs or other provisions of this Agreement.

(O)     SINGULAR ALSO MEANS PLURAL: Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

(P)     CAPTIONS: The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

(Q)     NO ORAL CHANGES: This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

(R)     DATE OF PERFORMANCE: If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state in which the Property is located, the date for such performance shall be the next succeeding business day.

(S)     NO PRESUMPTION REGARDING DRAFTING: It is acknowledged and presumed that the substance and form of this Agreement have been fully reviewed by the parties hereto and approved as to form by their respective counsel. It is further acknowledged and agreed that no presumption shall exist against either party hereto by virtue of this Agreement being considered to have been drafted by counsel for either party thereto.

(T)     COUNTERPARTS: This Agreement may be executed in multiple counterparts all of which when taken together shall constitute an Agreement for the sale of Real Estate Collateral under the laws of this state. It is binding upon and inures to the benefit of the parties hereto and

their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Purchaser.

(U)     COUNTERPART FACSIMILE EXECUTION:  For purposes of, executing this Agreement, a document signed and transmitted by facsimile machine shall be treated as an original document.  The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect as an original signature on an original document.  At the request of either party, any facsimile document shall be re-executed by both parties in original form.  No party hereto may raise the use of a facsimile machine or the fact that any signature was transmitted through the use of a facsimile machine as a defense to the enforcement of this Agreement or any amendment executed in compliance with this Paragraph.  This Paragraph does not supersede the requirements of the "Notices" Paragraph.

(V)     FIRPTA:  Seller represents and warrants to Purchaser that Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA").

**20.     IRREVOCABLE OFFER**: Purchaser further acknowledges that this Agreement is executed and delivered by Purchaser pursuant to an auction conducted on behalf of Seller.   In consideration of the following: (a) preserving the integrity of the auction process and assuring that all offers are made in conformity therewith and in reliance thereon; (b) the monies spent by Seller to arrange for the auction; (c) the opportunity of the Purchaser to bid for the Property; (d) the promise by the Seller to sell the Property to Purchaser if this Agreement is accepted by Seller as hereinafter provided and (e) for other good and valuable consideration, the receipt and adequacy of which is expressly acknowledged by Purchaser, including the mutual promises made by each party, this Agreement constitutes an irrevocable offer to purchase by Purchaser in accordance with this Agreement which cannot be revoked by Purchaser prior to 5:00 p.m. local time, (based on the location of the Property) on the five (5) business day following Purchaser Execution of this Agreement ("Irrevocable Deadline").

Such offer to purchase shall not be deemed accepted by Seller until executed by Seller or Seller's duly authorized agent prior to revocation thereof. Notice from Seller or its duly authorized agent to accept or reject Purchaser's offer under this Paragraph may be given pursuant to the Notices Paragraph in this Agreement or by telephone and confirmed at a later date by notice given pursuant to Notices Paragraph in this Agreement.

Failure of Seller or its duly authorized agent to notify Purchaser on or prior to the Irrevocable Deadline that Seller accepts or rejects Purchaser's offer shall not constitute acceptance or rejection by Seller of Purchaser's offer, but Purchaser's irrevocable offer shall thereafter become revocable. Execution hereof by Seller prior to the Irrevocable Deadline shall constitute acceptance by Seller without the need for any further notification by Seller to Purchaser and the date of Purchaser's execution hereof, if any, shall be the Effective Date.

**21.** **APPROVAL BY BANKRUPTCY COURT:** Buyer understands, acknowledges and agrees that the sale contemplated by this Agreement shall be made in accordance with Section 363 of the Bankruptcy Code with the premises to be sold free and clear of all liens, claims, taxes and encumbrances of whatever kind or nature (the "Liens") with such Liens, if any, if valid, to attach to the net proceeds of the Purchase Price, that is net of attorney's fees and expenses of the sale reflected in this Agreement, subject to the provisions of any Order approving this sale issued by the Bankruptcy Court (the "Approval Order").

This Purchase and Sale Agreement is expressly subject to and contingent upon the entry of an Order, pursuant to Section 363 of the Bankruptcy Code, approving the sale of the premises by the Bankruptcy Court in **Case Number 25-30002** pending in the United States Bankruptcy Court for the District of North Dakota. Seller shall promptly file its application for the Approval Order upon receipt of a fully executed counterpart of this Agreement and receipt of the Contract Deposit. Buyer shall cooperate in good faith with the Seller to secure the Approval Order , including, but not limited to, attending the hearing to consider the entry of the Approval Order, and, if necessary, testifying before the Bankruptcy Court and providing documentary evidence as to Buyer's financial wherewithal to perform the obligations of Buyer under this Agreement. In the event that the Bankruptcy Court enters an Order denying the entry of the Approval Order, Seller shall return the Contract Deposit to buyer within five (5) business days of the entry of such Order and this Agreement shall be deemed to be null and void ab initio.

**22.** **EXHIBITS**: The attached Exhibits shall be and hereby are made a part of this Agreement. Any Exhibits attached hereto containing blank spaces, which exhibit is to be executed and delivered at the Closing shall be completed in accordance with the terms and provisions contained herein, prior to or at the time of execution and delivery thereof. The exhibits underline marked below are attached to this Agreement and incorporated herein:

☒ Legal Description – Exhibit A
☒ Permitted Title Exceptions – Exhibit B

IN WITNESS WHEREOF, this Agreement has been executed as of the Effective Date.

SELLER:                                             PURCHASER:

By:  _____                _____
Name:                                               Signature


                                                    _____
                                                    Print Name

Effective Date:  _____


                                                    _____
                                                    Signature


                                                    _____
                                                    Print Name


                                                    Date of Execution:

                                                    _____

## EXHIBIT "A"

## Legal Description

Generations on 1st Addition, Codington County, South Dakota (Parcel ID 9580), also known as 26 1st Avenue SW, Watertown, SD 57201

# EXHIBIT "B"

## Permitted Title Exceptions

A.    General Exceptions

   (1)    Rights or claims of parties in possession not shown by the public records

   (2)    Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

   (3)    Easements or claims of easements not shown by the public records and existing water, mineral, oil and exploration rights.

   (4)    Any lien, or right to lien for services labor or material heretofore or hereafter furnished imposed by law and not shown by the public records.

   (5)    Taxes or special assessments which are not shown as existing liens by the public records.

   (6)    Restrictions upon the use of the premises not appearing in the record chain of title.

B.    Specific Exceptions

   (1)    Covenants, Conditions, Easements and Restrictions of record.

   (2)    General Real Estate Collateral Taxes not due and payable and subsequent years.

   (3)    Special Assessments and installments due after the date of Closing.

   (4)    Acts of Purchaser

   (5)    Drainage Ditches and Laterals

## PLAN EXHIBIT E: CREDITOR TRUST AGREEMENT

## ARTICLE I

# Trust Agreement

This Trust Agreement ("**Agreement**" or "**Trust Agreement**") is made this [DATE] day of [MONTH], by and between [DEBTOR], [on behalf of itself and certain of its affiliates, each] a debtor and debtor-in-possession ([collectively, ]the "**Debtor**") in the Chapter 11 case (the "**Cases**") pending in the United States Bankruptcy Court for the District of North Dakota (the "**Bankruptcy Court**") under Case Number [XX-XXXXX] and [NAME OF TRUSTEEMichael Schmitz] (the "**Trustee**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (as hereinafter defined).

WHEREAS, on January 6, 2025, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code;

WHEREAS, on [May 29, 2026], the Debtor and Secured Lender filed a Joint Chapter 11 Plan (as amended or modified from time to time, the "**Plan**");

WHEREAS, on [July 7, 2026], the Bankruptcy Court entered an order confirming the Plan (the "**Confirmation Order**");

WHEREAS, the Plan and the Confirmation Order provide for the establishment of this Agreement and the appointment of the Trustee to administer the Trust for the benefit of holders of Allowed claims in Class 3 ("**Allowed Claims**") under the Plan, and to provide administrative services relating to the Plan's implementation;

WHEREAS, the Trust is established pursuant to the Plan and this Agreement as a liquidating trust in accordance with Treasury Regulation section 301.7701-4(d) for the sole purpose of liquidating the Trust Assets, with no objective to continue or engage in the conduct of a trade or business except, to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust and the Plan;

WHEREAS, The Trust is established for the benefit of the holders Allowed Claims that are entitled to receive Distributions from the Trust under the Plan (each a "**Beneficiary**" and collectively, "**Beneficiaries**"); and

WHEREAS, the Trust is intended to qualify as a "grantor trust" for US federal income tax purposes pursuant to sections 671-677 of the Internal Revenue Code, with the Trust beneficiaries treated as the grantors and owners of the Trust.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Plan, the Debtor, the Secured Lender, and the Trustee agree that the Trust shall be comprised, held, and disposed of as follows:

### Declaration of Trust

The Debtor, the Secured Lender, and the Trustee enter into this Agreement to effectuate the Distribution of the Trust Assets to the holders of Allowed Claims pursuant to the Plan and the Confirmation Order;

Pursuant to the Plan, Confirmation Order, and this Agreement, all right, title, and interest in, under, and to the Trust Assets shall be absolutely and irrevocably assigned to the Trust and to its successors in trust and its successors and assigns;

TO HAVE AND TO HOLD unto the Trustee and its successors in trust; and

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Trust Assets and all other property held from time to time by the Trust under this Agreement and any proceeds thereof and earnings thereon (collectively, **"Trust Assets"**) are to be held by the Trust and applied on behalf of the Trust by the Trustee on the terms and conditions set forth herein and in the Plan, solely for the benefit of the holders of Allowed Claims and for no other party.

### Article I
### Recitals, Definitions, and Interpretations

**Recitals**. The Recitals are incorporated into and made terms of this Agreement.

**Plan Definitions**. All terms used in this Agreement but not defined herein shall have the same meanings set forth in the Plan.

**Interpretation, Headings**. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

**Conflict Among Documents**. In the event of any inconsistency between the Plan or Confirmation Order, as applicable, on the one hand, and this Agreement, on the other hand, the Plan or Confirmation Order, as applicable, shall control and take precedence.

### Article II
### Establishment of Trust

**Effectiveness of Agreement; Name of Trust.** This Agreement shall become effective on the Plan Effective Date. The Trust shall be officially known as the **"[DEBTOR NAME] GO1 Creditor Trust"**.

**Purpose of Trust.** The Debtor and the Trustee, pursuant to the Plan and in accordance with Bankruptcy Code, hereby create the Trust for the primary purpose of collecting, holding, administering, distributing, and liquidating the Trust Assets for the benefit of the holders of Claims in accordance with the terms and conditions of this Agreement and the Plan, and with no objective

to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.

## Article III

### Transfer of Trust Assets.

Conveyance of Trust Assets. The Debtor hereby grants, releases, assigns, transfers, conveys, and delivers, on behalf of the holders of Claims, the Trust Assets to the Trust as of the Effective Date in trust for the benefit of such holders to be administered and applied as specified in this Agreement and the Plan. The Trustee shall have no duty to arrange for any of the transfers contemplated under this Agreement or by the Plan or to ensure their compliance with the terms of the Plan and the Confirmation Order and shall be conclusively entitled to rely on the legality and validity of such transfers.

Title to Trust Assets. All of the Debtor's right, title, and interest in and to the Trust Assets, including all such assets held or controlled by third parties, are automatically vested in the Trust on the Effective Date, free and clear of all liens, claims, encumbrances, and other interests, except as specifically provided in the Plan, and such transfer is on behalf of the holders of Claims to establish the Trust. The Trust shall be authorized to obtain possession or control of, liquidate, and collect all of the Trust Assets in the possession or control of third parties and pursue all of the Causes of Action. On the Effective Date, the Trust shall stand in the shoes of the Debtor for all purposes with respect to the Trust Assets and administration of the Claims. To the extent any law or regulation prohibits the transfer of ownership of any of the Trust Assets from the Debtor to the Trust and such law is not superseded by the Bankruptcy Code, the Trust's interest shall be a lien upon and security interest in such Trust Assets, in trust, nevertheless, for the sole use and purposes set forth in this Agreement shall be deemed a security agreement granting such interest thereon without need to file financing statements or mortgages. By executing this Agreement, the Trustee on behalf of the Trust hereby accepts all of such property as Trust Assets, to be held in trust for the holders of Claims, subject to the terms of this Agreement and the Plan.

Capacity of Trust. Notwithstanding any state or federal law to the contrary or anything herein, the Trust itself shall have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts. The Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.

No Retention of Excess Cash. Notwithstanding anything in this Agreement to the contrary, under no circumstances shall the Trust or Trustee retain cash or cash equivalents in excess of a reasonable amount to meet claims, expenses, and contingent liabilities or to maintain the value of the Trust Assets during liquidation other than reserves established pursuant to this Agreement, and, subject to this Agreement, shall distribute all amounts not required to be retained for such purposes to the holders of Allowed Claims as promptly as reasonably practicable in accordance with the Plan and this Agreement.

<u>Acceptance by Trustee</u>. The Trustee accepts its appointment as  Trustee of the Trust.

**Article IV**
**Trust Administration**

**Rights, Powers, and Privileges of Trustee Generally**. Except as otherwise provided in this Agreement, the Plan, or the Confirmation Order, as of the date that the Trust Assets are transferred to the Trust the Trustee on behalf of the Trust may control and exercise authority over the Trust Assets, over the acquisition, management, and disposition thereof, and over the management and conduct of the affairs of the Trust. In administering the Trust Assets, the Trustee shall endeavor not to unduly prolong the Trust's duration, with due regard that undue haste in the administration of the Trust Assets may fail to maximize value for the benefit of the holders of Allowed Claims and otherwise be imprudent and not in the best interests of such holders.

**Power to Contract**. In furtherance of the purpose of the Trust, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Trustee shall have the right and power on behalf of the Trust, and also may cause the Trust, to enter into any covenants or agreements binding the Trust, and to execute, acknowledge, and deliver any and all instruments that are necessary or deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Trust.

**Ultimate Right to Act Based on Advice of Counsel or Other Professionals**. Nothing in this Agreement shall be deemed to prevent the  Trustee from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trustee determines it is obligated to take or to refrain from taking in the performance of any duty that the Trustee may owe the holders of Claims or any other Person under the Plan, Confirmation Order, or this Agreement.

**Powers of Trustee**. Without limiting the generality of the above section, in addition to the powers granted in the Plan, the Trustee shall have the power to take the following actions on behalf of the Trust and any powers reasonably incidental thereto that the Trustee, in its reasonable discretion, deems necessary or appropriate to fulfill the purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

Hold legal title to the Trust Assets and to any and all rights of the Debtor[s] and the holders of Claims in or arising from the Trust Assets.

Manage, invest, supervise, protect, and where appropriate, cause the Trust to abandon the Trust Assets, including causing the Trust to invest any moneys held as Trust Assets in accordance with the terms of Section 3.08 hereof.

Open and maintain bank accounts on behalf of or in the name of the Trust.

Cause the Trust to enter into any agreement or execute any document or instrument required by or consistent with the Plan, the Confirmation Order or this Agreement, and to perform all obligations thereunder.

Subject to this Agreement, collect and liquidate all Trust Assets, including the sale of any Trust Assets.

Protect and enforce the rights to the Trust Assets (including any Causes of Action) vested in the Trust and Trustee by this Agreement and the Plan by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise.

Investigate any Trust Assets, including potential Causes of Action, and any objections to Claims, and cause the Trust to seek the examination of any Person pursuant to the Federal Rules of Bankruptcy Procedure.

Cause the Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties pursuant to this Agreement.

Cause the Trust to pay all of its lawful expenses, debts, charges, taxes, and other liabilities, and make all other payments relating to the Trust Assets.

Subject to this Agreement, cause the Trust to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all Causes of Action.

Subject to this Agreement, calculate and make all Distributions on behalf of the Trust to the holders of Allowed Claims provided for in, or contemplated by, the Plan and this Agreement.

Establish, adjust, and maintain reserves for Disputed Claims required to be administered by the Trust.

Cause the Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the  Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such Distribution under the income tax or other laws of the United States or of any state or political subdivision thereof.

In reliance initially solely upon the Debtor's schedules and the official claims register maintained in the Debtor's Chapter 11 Case, review, and where appropriate, cause the Trust to allow or object to Claims and Interests; and, subject to this Agreement, supervise and administer the Trust's commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims required to be administered by the Trust.

In reliance upon the Debtor's schedules and the official Claims register maintained in the Chapter 11 Case, maintain a register evidencing the beneficial interest herein held by each Beneficiary and, in accordance with this Agreement, such register may be the official Claims register maintained in the Chapter 11 Case.

Cause the Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, make tax elections by and on behalf of the Trust, and file tax

returns for the Trust as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 pursuant to and in accordance with the Plan, and pay taxes, if any, payable for and on behalf of the Trust; provided, however, that notwithstanding any other provision of this Agreement, the Trustee shall have no personal responsibility for the signing or accuracy of the Debtor's income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto.

Cause the Trust to abandon or donate any Trust Assets that the Trustee determines to be too impractical to distribute to Beneficiaries or of inconsequential value to the Trust and Beneficiaries to Legal Services of North Dakota.

Cause the Trust to send annually to Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Trust and its share of the Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

Cause the Trust to seek a determination of tax liability or refund under section 505 of the Bankruptcy Code.

Cause the Trust to establish such reserves for taxes, assessments, and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of matters incident to the Trust.

Cause the Trust to purchase and carry all insurance policies that the Trustee deems reasonably necessary or advisable and to pay all associated insurance premiums and costs out of the Trust Assets.

If the Trustee has a conflict or if any of the Trust Assets are situated in any state or other jurisdiction in which the Trustee is not qualified to act as trustee, nominate, and appoint a Person duly qualified to act as trustee in such state or jurisdiction in accordance with the terms of this Agreement.

Undertake all administrative functions of the Trust, including overseeing the winding down and termination of the Trust.

Undertake all administrative functions remaining in the Chapter 11 Case, including reporting and making any required payments of fees to the US Trustee and overseeing the closing of the Chapter 11 Case.

Exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement.

Take all other actions consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

**Exclusive Authority to Pursue Causes of Action**. The Trust shall have the exclusive right, power, and interest to pursue, settle, waive, release, abandon, or dismiss the Causes of

Action. The Trust shall be the sole representative of the Estate under section 1123(b)(3) of the Bankruptcy Code with respect to the Causes of Action.

**Abandonment**. If, in the Trustee's reasonable judgment, any non-cash Trust Assets cannot be sold in a commercially reasonable manner or the Trustee believes in good faith that such property has inconsequential value to the Trust or its Beneficiaries, the Trustee shall have the right to cause the Trust to abandon or otherwise dispose of such property, including by donation of such property to Legal Services of North Dakota.

**Responsibility for Administration of Claims**. As of the Effective Date, the Trust shall become responsible for administering and paying Distributions to the holders of Allowed Claims entitled to receive Distributions from the Trust pursuant to the Plan. The Trust shall have the exclusive right to object to the allowance of any Claim on any ground and shall be entitled to assert all defenses of the Debtor and its Estate. The Trust shall also be entitled to assert all of the Estate's rights under, without limitation, section 558 of the Bankruptcy Code. The Trust may also seek estimation of any Claims under and subject to section 502(c) of the Bankruptcy Code.

**Agents and Professionals**. The Trustee may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Trustee believes have qualifications necessary to assist in the administration of the Trust, including professionals previously retained by the Debtor. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Trustee from engaging counsel or other professionals, including the Trustee itself or the Trustee's firm or their affiliates, to do work for the Trust. Trustee may pay the reasonable salaries, fees and expenses of such Persons out of the Trust Assets in the ordinary course of business.

**Safekeeping and Investment of Trust Assets**. All moneys and other assets received by the Trustee shall, until distributed or paid over as provided herein and in the Plan, be held in trust for the benefit of the holders of Claims, but need not be segregated in separate accounts from other Trust Assets, unless and to the extent required by law or the Plan. The Trustee shall not be under any obligation to invest Trust Assets. Neither the Trust nor the Trustee shall have any liability for interest or producing income on any moneys received by them and held for Distribution or payment to holders of Claims, except as such interest shall actually be received by the Trust or Trustee, which shall be distributed as provided in the Plan. Except as otherwise provided by the Plan, the powers of the Trustee to invest any moneys held by the Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Trust's liquidating purpose, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary liquid investments, such as treasury bills; provided, however, that the scope of permissible investments shall be limited to include only those investments that a Trust, within the meaning of Treas. Reg. § 3.01.7701-4(d), may be permitted to hold pursuant to the Treasury Regulations, or any modification of the IRS guidelines, whether set forth in IRS rulings, IRS pronouncements, or otherwise. For the avoidance of doubt, the provisions of section 11-2.3 of the Estates, Power, and Trusts Law of New York shall not apply to this Agreement. Notwithstanding the foregoing, the Trustee shall not be prohibited from engaging in any trade or business on its own account, provided that such activity does not interfere or conflict with the Trustee's administration of the Trust.

**Maintenance and Disposition of Trust Records**. The Trustee shall maintain accurate records of the administration of Trust Assets, including receipts and disbursements and other activity of the Trust. The Trust may engage a claims agent to continue to maintain and update the Claims register maintained in the Chapter 11 Cases throughout the administration of the Trust, and such Claims register may serve as the Trustee's register of beneficial interests held by Beneficiaries. The books and records maintained by the Trustee may be disposed of by the Trustee at the later of (a) such time as Trustee determines that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Trust or its Beneficiaries, or (b) upon the termination and completion of the winding down of the Trust.

**Reporting Requirements**. The Trustee shall provide any Oversight Committee member the information and reports they may reasonably request concerning Trust administration. To the extent feasible and practicable as determined by the Trustee, each Distribution by the Trustee shall be accompanied by a report to the Beneficiaries which details and accounts for the Trust Assets remaining since the prior report. The report shall include a summary of expenses incurred by the Trustee and Distributions made on account of Allowed Claims. After the Trustee makes all Distributions provided by the Plan and this Agreement, the Trustee shall file a final report with the Bankruptcy Court which details and accounts for the Trust Assets and contains a summary of expenses incurred by the Trustee and Distributions made on account of Allowed Claims. Absent any specific reporting requests, the filing of post-confirmation operating reports required by the Office of the United States Trustee shall satisfy all reporting requirements of this section.

**Conflicts of Interest**. Conflicts of interest of the Trustee will be addressed by the Oversight Committee as set forth below in Article VIII. If no Oversight Committee is established or serving, the Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified a conflict of interest or the Bankruptcy Court, on motion of a party in interest, determines one exists. In the event the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Bankruptcy Court, on notice and hearing, may do so.

**No Bond Required; Procurement of Insurance**. Notwithstanding any state or other applicable law to the contrary, the Trustee (including any successor Trustee) shall be exempt from giving any bond or other security in any jurisdiction and shall serve hereunder without bond. The Trustee is hereby authorized, but not required to obtain all reasonable insurance coverage for itself, its agents, representatives, employees or independent contractors, including, without limitation, coverage with respect to the liabilities, duties and obligations of the Trustee and its agents, representatives, employees, or independent contractors under this Agreement. The cost of any such insurance coverage shall be an expense of the Trust and paid out of Trust Assets.

**Article V**
**Distributions**

**Distribution and Reserve of Trust Assets**. Following the transfer of Trust Assets to the Trust, the Trustee shall make continuing efforts on behalf of the Trust to collect, liquidate, and distribute all Trust Assets, subject to the reserves required under the Plan or this Agreement.

**Distributions**. Subject to this Agreement, the Trustee shall cause the Trust to distribute the Trust's net Cash income and net Cash proceeds from the liquidation of the

Trust Assets to holders of Allowed Claims, except the Trust may retain an amount of net income and other Trust Assets reasonably necessary to maintain the value of the Trust Assets or to meet expenses, claims and contingent liabilities of the Trust and Trustee, and retention of such amount may preclude Distributions to holders of Allowed Claims.

**Reserves; Pooling of Reserved Funds**. Before any Distribution can be made, the Trustee shall, in its reasonable discretion, establish, supplement, and maintain reserves in an amount sufficient to meet any and all expenses and liabilities of the Trust, including attorneys' fees and expenses, the fees and expenses of other professionals, and any fees owed the US Trustee. Except with respect to the Professional Fee Reserve, the Trustee need not maintain the Trust's reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Trust; provided, however, that the Trust shall treat all such reserved funds as being held in a segregated manner in its books and records.

**Distributions Net of Reserves and Costs**. Distributions shall be made net of reserves in accordance with the Plan and also net of the actual and reasonable costs of making the Distributions.

**Right to Rely on Professionals**. Without limitation of the generality of this Agreement, in determining the amount of any Distribution or reserves, the Trustee may rely and shall be fully protected in relying on the advice and opinion of the Trust's financial advisors, accountants, or other professionals.

**Method and Timing of Distributions**. Distributions to holders of Allowed Claims will be made from the Trust in accordance with the terms of the Plan and this Agreement. The Trust may engage disbursing agents and other Persons to help make Distributions.

**Withholding from Distributions**. The Trustee, in its discretion, may cause the Trust to withhold from amounts distributable from the Trust to any Beneficiary any and all amounts as may be sufficient to pay the maximum amount of any tax or other charge that has been or might be assessed or imposed by any law, regulation, rule, ruling, directive, or other governmental requirement on such Beneficiary or the Trust with respect to the amount to be distributed to such Beneficiary. The Trustee shall determine such maximum amount to be withheld by the Trust in its sole, reasonable discretion and shall cause the Trust to distribute to the Beneficiary any excess amount withheld.

**Tax Identification Numbers**. The Trustee may require any Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service and may condition any Distribution to any Beneficiary upon receipt of such identification number. If a Beneficiary does not timely provide the Trustee with its taxpayer identification number in the manner and by the deadline established by the Trustee, then the Distribution to such Beneficiary shall be administered in accordance with this Agreement.

**Unclaimed and Undeliverable Distributions**. If any Distribution to a Beneficiary is returned to the Trustee as undeliverable or is otherwise unclaimed, no further Distributions to such Beneficiary shall be made unless and until the Beneficiary claims the Distributions by timely

notifying the Trustee in writing of any information necessary to make the Distribution to the Beneficiary in accordance with this Agreement, the Plan, and applicable law, including such Beneficiary's then-current address or taxpayer identification number. If the Beneficiary timely provides the Trustee such missing information, all missed Distributions shall be made to the Beneficiary as soon as is practicable, without interest. Undeliverable or unclaimed Distributions shall be administered in accordance with the Plan.

**No Responsibility to Attempt to Locate Beneficiaries**. The Trustee may, in its sole discretion, attempt to determine a Beneficiary's current address or otherwise locate a Beneficiary, but nothing in this Agreement or the Plan shall require the Trustee to do so.

**Disallowance of Claims; Cancellation of Corresponding Beneficial Interests**. All Claims in respect of undeliverable or unclaimed Distributions that have become unclaimed property under section 347(b) of the Bankruptcy Code, shall be deemed Disallowed and expunged, and the corresponding beneficial interests in the Trust of the Beneficiary holding such Disallowed Claims shall be deemed canceled. The Holder of any such Disallowed Claim shall no longer have any right, claim, or interest in or to any Distributions in respect of such Disallowed Claims. The Holder of any such Disallowed Claim is forever barred, estopped, and enjoined from receiving any Distributions under this Agreement and from asserting such Disallowed Claim against the Trust or Trustee.

**Inapplicability of Unclaimed Property or Escheat Laws**. Unclaimed property held by the Trust shall not be subject to the unclaimed property or escheat laws of the United States, any state, or any local governmental unit.

**Voided Checks; Request for Reissuance**. Distribution checks issued to Beneficiaries shall be null and void if not negotiated within 60 days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing directly to the Trustee by the Beneficiary that was originally issued such check. All such requests shall be made promptly. Distributions in respect of voided checks shall be treated as unclaimed Distributions under the Plan and this Agreement.

**Conflicting Claims**. If any conflicting claims or demands are made or asserted with respect to the beneficial interest of a Beneficiary under this Agreement, or if there is any disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made in connection with such interest, then, in any of such events, the Trustee shall be entitled, in its sole discretion, to refuse to comply with any such conflicting claims or demands.

The Trustee may elect to cause the Trust to make no payment or Distribution with respect to the beneficial interest subject to the conflicting claims or demand, or any part thereof, and to refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. Neither the Trust nor the Trustee shall be or become liable to any of such parties for their refusal to comply with any such conflicting claims or demands, nor shall the Trust or Trustee be liable for interest on any funds which may be so withheld.

The Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court, or (ii) all differences have been resolved by a valid written agreement among all such parties to the satisfaction of the Trustee, which agreement shall include a complete release of the Trust and Trustee. Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem and treat the Beneficiary as the absolute owner under this Agreement of the beneficial interest in the Trust the Beneficiary identified as the owner of that interest in the books and records maintained by the Trustee. The Trustee may deem and treat such Beneficiary as the absolute owner for purposes of receiving Distributions and any payments on account thereof for federal and state income tax purposes, and for all other purposes whatsoever.

In acting or refraining from acting under and in accordance with this Agreement, the Trustee shall be fully protected and incur no liability to any purported claimant or any other Person to the extent expressly set forth in this Agreement.

**Priority of Expenses of Trust**. The Trust must pay or reserve for all of its expenses before making Distributions.

**Article VI**
**Beneficiaries**

**Interest Beneficial Only**. The ownership of a beneficial interest in the Trust shall not entitle any Beneficiary to any title in or to the Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.

**Ownership of Beneficial Interests Hereunder**. Each Beneficiary shall own a beneficial interest herein, which shall be entitled to a Distribution in the amounts, and at the times, determined by the Trustee.

**Evidence of Beneficial Interest**. Ownership of a beneficial interest in the Trust Assets shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

**No Right to Accounting**. Except as set forth in this Agreement, neither the Beneficiaries nor their successors, assigns, creditors, or any other Person shall have any right to an accounting by the Trustee, and the Trustee shall not be obligated to provide any accounting to any Person. Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition for making any advance, payment, or Distribution out of proceeds of Trust Assets.

**No Standing**. Except as expressly provided in this Agreement, a Beneficiary shall not have standing to direct or to seek to direct the Trust or Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any Person upon or with respect to the Trust Assets.

**Requirement of Undertaking**. The Trustee may request the Bankruptcy Court to require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Trustee for any action taken or omitted by it as Trustee, that the filing party litigant in such suit pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this section shall not apply to any suit by the Trustee.

**Limitation on Transferability**. It is understood and agreed that the beneficial interests herein shall be non-transferable and non-assignable during the term of this Agreement except by operation of law. An assignment by operation of law shall not be effective until appropriate notification and proof thereof is submitted to the Trustee, and the Trustee may continue to cause the Trust to pay all amounts to or for the benefit of the assigning Beneficiaries until receipt of proper notification and proof of assignment by operation of law. The Trustee may rely upon such proof without the requirement of any further investigation.

**Exemption from Registration**. The rights of the Beneficiaries arising under this Agreement may be deemed "securities" under applicable law. However, such rights have not been defined as "securities" under the Plan because (a) the parties hereto intend that such rights shall not be securities, and (b) if the rights arising under this Agreement in favor of the Beneficiaries are deemed to be "securities," the exemption from registration under section 1145 of the Bankruptcy Code is intended to be applicable to such securities. No party to this Agreement shall make a contrary or different contention.

**Delivery of Distributions**. Subject to the terms of this Agreement, the Trustee shall cause the Trust to make Distributions to holders of Allowed Claims in the manner provided in the Plan.

## Article VII
### Indemnification and Third Party Rights

**Parties Dealing With the Trustee**. In the absence of actual knowledge to the contrary, any Person dealing with the Trust or the Trustee shall be entitled to rely on the authority of the Trustee or any of the Trustee's agents to act in connection with the Trust Assets. There is no obligation of any Person dealing with the Trustee to inquire into the validity, expediency, or propriety of any transaction by the Trustee or any agent of the Trustee.

**Limitation of Trustee's and Oversight Committee's Liability**. In exercising the rights granted herein, the Trustee shall exercise the Trustee's best judgment, to the end that the affairs of the Trust shall be properly managed and the interests of all of the holders of Claims safeguarded. But, notwithstanding anything herein or in the Plan to the contrary, neither Trustee, any member of the Oversight Committee, nor their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents, and any of such Person's successors and assigns shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with this Agreement, whether sounding in tort, contract, or otherwise, except for fraud, gross negligence, or willful misconduct that is found by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered. In no event shall the Trustee or Oversight Committee be liable for indirect, punitive, special, incidental,

or consequential damage or loss (including but not limited to lost profits) whatsoever, even if the Trustee or Oversight Committee has been informed of the likelihood of such loss or damages and regardless of the form of action.

**No Liability for Acts of Other Persons**. None of the Persons identified in the immediately preceding section of this Agreement shall be liable for the act or omission of any other Person identified in that section.

**No Liability for Acts of Predecessors**. No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which such successor becomes the Trustee, unless a successor Trustee expressly assumes such responsibility.

**No Liability for Good Faith Error of Judgment**. The Trustee shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Trustee was grossly negligent or engaged in willful misconduct in ascertaining the pertinent facts.

**Reliance by Trustee and Oversight Committee on Documents and Advice of Counsel or Other Persons**. Except as otherwise provided herein, the Trustee and Oversight Committee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties. The Trustee and Oversight Committee also may engage and consult with their respective legal counsel and other agents and advisors, and shall not be liable for any action taken, omitted, or suffered by them in reliance upon the advice of such counsel, agents, or advisors.

**No Liability For Acts Approved by Bankruptcy Court or Oversight Committee**. The Trustee and Oversight Committee shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Trust Assets and the Claims required to be administered by the Trust. Neither the Oversight Committee nor the Trustee shall be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct. The Trustee shall not be liable for any act or omission approved by the Oversight Committee under this Agreement or otherwise, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

**No Personal Obligation for Trust Liabilities**. Persons dealing with the Trustee shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trustee to any such Person in carrying out the terms of this Agreement, and the Trustee shall have no personal, individual obligation to satisfy any such liability.

**Indemnification**. The Trustee and the members of the Oversight Committee, and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents and any of such parties' successors and assigns (collectively, the **"Indemnified Parties"** and each, an **"Indemnified Party"**) shall, to the fullest extent permitted by applicable law, be defended, held harmless, and indemnified by the Trust from time to time and receive

reimbursement from and against any and all loss, liability, expense (including counsel fees), or damage of any kind, type or nature, whether sounding in tort, contract, or otherwise, that the Indemnified Parties may incur or sustain in connection with the exercise or performance of any of the Trust's, Trustee's, or Oversight Committee's powers and duties under this Agreement or in rendering services by the Indemnified Party to the Trust, Trustee, or Oversight Committee (the **"Indemnified Conduct"**), including, without limitation, the costs of counsel or others in investigating, preparing, defending, or settling any action or claim (whether or not litigation has been initiated against the Indemnified Party) or in enforcing this Agreement (including its indemnification provisions), except if such loss, liability, expense, or damage is finally determined by a final judgment (not subject to further appeal or review) of a court of competent jurisdiction to result directly and primarily from the fraud, gross negligence, or willful misconduct of the Indemnified Party asserting this provision.

**Expense of Trust; Limitation on Source of Payment of Indemnification**. All indemnification liabilities of the Trust shall be an expense of the Trust. The amounts necessary for such indemnification and reimbursement shall be paid by the Trust out of the available Trust Assets after reserving for all actual and anticipated expenses and liabilities of the Trust. The Trustee shall not be personally liable for the payment of any Trust expense or claim or other liability of the Trust, and no Person shall look to the Trustee or other Indemnified Parties personally for the payment of any such expense or liability.

**Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay**. The Trust shall reasonably promptly pay an Indemnified Party all amounts subject to indemnification upon submission of invoices for such amounts by the Indemnified Party. The Oversight Committee shall approve the indemnification of any Indemnified Party and thereafter shall approve any monthly bills of such Indemnified Party for indemnification of more than $5,000. All invoices for indemnification shall be subject to the approval of the Trustee. By accepting any indemnification payment, the Indemnified Party undertakes to repay such amount promptly if it is determined that the Indemnified Party is not entitled to be indemnified under this Agreement. The Bankruptcy Court shall hear and finally determine any dispute arising out of this Section.

**No Implied Obligations**. The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Trustee.

**Confirmation of Survival of Provisions**. Without limitation in any way of any provision of this Agreement, the provisions of this Article shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustee, or the termination of the Trust or this Agreement, and shall inure to the benefit of the Trustee's and the Indemnified Parties' heirs and assigns.

**Article VIII**
**Tax Matters**

**Tax Treatment of Trust**. Pursuant to and in accordance with the Plan, for all federal income tax purposes, the Debtors, the Beneficiaries, the Trustee, and the Trust shall treat the Trust

as a  Trust within the meaning of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45, and transfer of the Trust Assets to the Trust shall be treated as a transfer of the Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Claims, followed by a transfer of the Trust Assets by the Beneficiaries to the Trust in exchange for their pro rata beneficial interests in the Trust. The Beneficiaries shall be treated as the grantors and owners of the Trust for federal income tax purposes.

**Annual Reporting and Filing Requirements**. Pursuant to and in accordance with the terms of the Plan and this Agreement, the Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Income Tax Regulation Section 1.671-4(a).

**Tax Treatment of Reserves for Disputed Claims**. The Trustee may, in the  Trustee's sole discretion, determine the best way to report for tax purposes with respect to any reserve for Disputed Claims, including (a) filing a tax election to treat any and all reserves for Disputed Claims as a Disputed Ownership Fund (**"DOF"**) within the meaning of Treasury Income Tax Regulation Section 1.468B-9 for federal income tax purposes rather than to tax such reserve as a part of the Trust, or (b) electing to report as a separate trust or sub-trust or other entity. If an election is made to report any reserve for disputed claims as a DOF, the Trust shall comply with all federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate federal tax return for the DOF and the payment of federal and/or state income tax due.

**Valuation of Trust Assets**. After the Effective Date, but in no event later than the due date for timely filing of the Trust's first federal income tax return (taking into account applicable tax filing extensions), the Trustee shall (a) determine the fair market value of the Trust Assets as of the Effective Date, based on the Trustee's good faith determination, (b) advise the Oversight Committee of such valuation, and (c) establish appropriate means to apprise the Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Trust, the Trustee, and the Beneficiaries) for all federal income tax purposes.

### Article IX
### Oversight Committee

**Appointment, Composition, and Governance of Oversight Committee**. The Plan Proponents may appoint a  Trust Oversight Committee (the **"Oversight Committee"**) shall be comprised of three members, who are: (A) [Charles Aarestad, Red River State Bank], (B) [Danielle Harless, Red River State Bank], and (C) [Lane Warzecha, HME Properties, LLC].

**Rights and Duties of Oversight Committee; Corresponding Limitations on Trustee's Actions**. The rights and duties of the Oversight Committee shall be those set forth in this Agreement and the Plan. The Trustee shall limit its actions on behalf of the Trust in accordance with the limits established by those provisions.

**Approval and Authorization on Negative Notice**. The Trustee may obtain any approval or authorization required under the Plan or this Agreement from the Oversight Committee on three business days' negative notice. The Trustee may make requests on behalf of the Trust for approval

or authorization by the Oversight Committee in writing, which may be made in the form of an e-mail. In the event any Oversight Committee member objects to the Trustee's request, the Trustee shall consult with the members of the Oversight Committee about how to proceed. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section or this Article.

**Compensation of Professionals**. The Oversight Committee shall approve any professional's monthly bill that is for more than [$5,000]. Either the Trustee or the professional submitting the bill may seek such approval. The Trustee may obtain approval as set forth in the preceding section of this Agreement.

**Appointment of Supplemental Trustee**. The Oversight Committee shall approve the Trustee's appointment of any Supplemental Trustee in accordance with this Agreement and the removal and replacement of any Supplemental Trustee under that provision.

**Reimbursement of Oversight Committee Expenses**. The Trustee shall pay from the Trust Assets all reasonable costs and expenses, including attorneys' fees and expenses, of members of the Oversight Committee. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

**Oversight Committee Member's Conflicts of Interest**. The Oversight Committee members shall disclose any actual or potential conflicts of interest that such member has with respect to any matter arising during the administration of the Trust to the other Oversight Committee members and the Trustee and such member shall be recused from voting on any matter on which such member has an actual or potential conflict of interest.

**Trustee's Conflicts of Interest**. The Trustee shall disclose to the Oversight Committee any conflicts of interest that the Trustee has with respect to any matter arising during administration of the Trust. In the event that the Trustee cannot take any action, including without limitation the prosecution of any Causes of Action or the Objection to any Claim, by reason of an actual or potential conflict of interest, the Oversight Committee acting by majority shall be authorized to take any such action(s) in the Trustee's place and stead, including without limitation the retention of professionals (which may include professionals retained by the Trustee) for the purpose of taking such actions. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

**Resignation of Oversight Committee Member**. A member of the Oversight Committee may resign at any time on written notice (including e-mailed notice) to the other Oversight Committee members and the Trustee. The resignation shall be effective on the later of (a) the date specified in the notice delivered to the other Oversight Committee members and the Trustee, or (b) the date that is thirty (30) days after the date such notice is delivered. In no case shall the resignation of the Trustee be effective on less than thirty (30) days' notice.

**Appointment of Replacement Oversight Committee Members**. In the event of the resignation, death, incapacity, or removal of a member of the Oversight Committee, the Trustee shall nominate and the remaining members of Oversight Committee shall approve, by a vote of at least one member of the Oversight Committee, an additional member to the Oversight Committee.

**Absence of Oversight Committee**. In the event that the members of the Creditors' Committee do not appoint an Oversight Committee, an Oversight Committee is not yet formed, no one is willing to serve on the Oversight Committee, or there shall have been no Oversight Committee members for a period of thirty (30) consecutive days, then the Trustee may, during such vacancy and thereafter, ignore any reference in this Agreement, the Plan, or the Confirmation Order to an Oversight Committee, and all references to the Oversight Committee's rights and responsibilities in this Agreement will be null and void.

**Article X**
**Trustee Selection, Removal, Replacement, and Compensation**

**Initial Trustee**. The Trustee is [Mike Schmitz] and is appointed effective as of the Effective Date. The initial trustee shall be the Trustee.

**Term of Service**. The Trustee shall serve until (a) the completion of the administration of the Trust Assets and the Trust, including the winding up of the Trust, in accordance with this Agreement and the Plan; (b) termination of the Trust in accordance with the terms of this Agreement and the Plan; or (c) the Trustee's resignation, death, incapacity or removal. In the event the Trustee's appointment terminates by reason of death, dissolution, liquidation, resignation, or removal, the Trustee shall be immediately compensated for all reasonable fees and expenses accrued through the effective date of termination, whether or not previously invoiced. The provisions of Article VI of this Agreement shall survive the resignation or removal of any Trustee.

**Removal of Trustee**. Any party in interest, on notice and hearing before the Bankruptcy Court, may seek removal of Trustee for cause. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

**Resignation of Trustee**. The Trustee may resign at any time on written notice to the Oversight Committee, US Trustee, and Bankruptcy Court. The resignation shall be effective on the later of (a) the date specified in the notice of resignation, or (b) the date that is thirty (30) days after the date such notice is filed with the Bankruptcy Court and served on the Oversight Committee members and the US Trustee. In no case shall the resignation of the Trustee be effective on less than thirty (30) days' notice. In the event of a resignation, the resigning Trustee shall render to the Oversight Committee and the US Trustee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of that Trustee.

**Appointment of Successor Trustee**. Upon the resignation, death, incapacity, or removal of a Trustee, a successor Trustee shall be appointed by the Oversight Committee. In the event no party in interest seeks the appointment of a successor Trustee, the Bankruptcy Court may do so on its own motion. Any successor Trustee so appointed shall consent to and accept its appointment as successor Trustee, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of its appointment as successor Trustee. Any successor Trustee may be appointed to serve only on an interim basis.

**Powers and Duties of Successor Trustee**. A successor Trustee shall have all the rights, privileges, powers, and duties of its predecessor under this Agreement, the Plan, and Confirmation Order.

**Trust Continuance**. The resignation, death, incapacitation, dissolution, liquidation, or removal of the Trustee shall not terminate the Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee.

**Compensation of Trustee and Costs of Administration**. The Trustee shall receive fair and reasonable compensation for its services, which shall be a charge against, and paid out of, the Trust Assets. All costs, expenses, and obligations incurred by the Trustee (or professionals who may be employed by the Trustee in administering the Trust, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Trust from the Trust Assets prior to any Distribution to the Beneficiaries. The terms of the compensation of Trustee and the timing and manner of payment are set forth on Exhibit A hereto.

**Appointment of Supplemental Trustee**. Subject to this Agreement, if the Trustee has a conflict, the Trustee shall nominate and appoint a Person duly qualified to act as trustee (the **"Supplemental Trustee"**) in such state or jurisdiction and require from each such Supplemental Trustee such security as may be designated by the Trustee in its discretion. The Trustee may confer upon such Supplemental Trustee all of the rights, powers, privileges, and duties of the Trustee hereunder, subject to the conditions and limitations of this Agreement, except as modified or limited by the laws of the applicable state or other jurisdiction (in which case, the laws of the state or other jurisdiction in which such Supplemental Trustee is acting shall prevail to the extent necessary). The Trustee shall require such Supplemental Trustee to be answerable to the Trustee for all monies, assets, and other property that may be received in connection with the administration of all the Trust Assets by the Supplemental Trustee. Subject to this Agreement, the Trustee may remove such Supplemental Trustee, with or without cause, and appoint a successor Supplemental Trustee at any time by executing a written instrument declaring such Supplemental Trustee removed from office and specifying the effective date and time of removal.

## Article XI
## Trust Duration

**Duration**. Once the Trust becomes effective upon the Effective Date of the Plan, the Trust and this Agreement shall remain and continue in full force and effect until the Trust is terminated.

**Termination on Payment of Trust Expenses and Distribution of Trust Assets**. Upon the payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and the Distribution of all Trust Assets in accordance with the provisions of the Plan, the Confirmation Order, and this Agreement, the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant law.

**Termination**. If the Trust has not been previously terminated pursuant to this Agreement, on the second anniversary of the Effective Date, and unless the Trust term has been extended by holders of a majority of the beneficial interests in the Trust, the Trustee shall distribute all of the Trust Assets to the Beneficiaries in accordance with the Plan, and immediately thereafter the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith except to the limited extent set forth in this Agreement.

**Continuance of Trust for Winding Up; Discharge and Release of Trustee**. After the termination of the Trust and solely for the purpose of liquidating and winding up the affairs of the Trust, the Trustee shall continue to act as such until its responsibilities have been fully performed. Except as otherwise specifically provided herein, upon the Distribution of the Trust Assets including all excess reserves, the Oversight Committee members, the Trustee, and the Trust's professionals and agents shall be deemed discharged under this Agreement and have no further duties or obligations hereunder. Upon a motion by the Trustee, the Bankruptcy Court may enter an order relieving the Oversight Committee members and the Trustee, its employees, and the Trust's professionals and agents of any further duties, discharging and releasing the Trustee from all liability related to the Trust, and releasing the Trustee's bond, if any.

## Article XII
## Miscellaneous

**Cumulative Rights and Remedies**. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

**Notices**. All notices to be given to Beneficiaries may be given by ordinary mail, or may be delivered personally, to the Holders at the addresses appearing on the books kept by the  Trustee. Any notice or other communication which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

<u>If to the Trust or the  Trustee:</u>

[TRUSTEE NAME]

[ADDRESS]

[PHONE]

[E-mail]

with a copy to its counsel:

[COUNSEL NAME]

[COUNSEL FIRM]

[ADDRESS]

[PHONE]

[E-mail]

or to such other address as may from time to time be provided in written notice by the  Trustee.

**Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of North Dakota, without giving effect to rules governing the conflict of laws.

**Successors and Assigns**. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

**Particular Words**. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

**Execution**. All funds in the Trust shall be deemed in *custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary, and no Beneficiary or any other Person can execute upon, garnish or attach the Trust Assets or the Trustee in any manner or compel payment from the Trust except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

**Amendment**. This Agreement may be amended by written agreement of the Trustee and the Oversight Committee or by order of the Bankruptcy Court; provided, however, that such amendment may not be inconsistent with the Plan, Confirmation Order, or Sale Order.

**No Waiver**. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

**No Relationship Created**. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership, or joint venture of any kind.

**Severability**. If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable, or against its regulatory policy, the remainder of the terms, provisions, covenants, and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

**Further Assurances**. Without limitation of the generality of this Agreement, the Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

**Counterparts**. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**Jurisdiction**. The Bankruptcy Court shall have jurisdiction over the Trust, Trustee, and Trust Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Trust. The Bankruptcy Court shall have exclusive jurisdiction and venue to hear and finally determine all matters among the Parties arising out of or related to this Agreement or the administration of the Trust.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date set forth above.

[DEBTOR]

By_____

Name:

Title:

[TRUSTEE]

By_____

Name:

Title:

[SECURED LENDER]

By_____

Name:

Title:

**EXHIBIT A**

**Terms of Compensation of Trustee**

Compensation. In consideration for the services of the Trustee under this Agreement, the Trustee shall receive the following compensation from the Trust Assets: (a) an annual fee of $1,000; (b) the Trustee's normal hourly rate for services rendered; and (c) reimbursement of reasonable and necessary expenses, including payment of all fees and expenses of the Trustee's attorneys.

Means and Timing of Payment. The Trustee's annual fee shall be automatically paid in advance by wire transfer or equivalent electronic means in the Trustee's discretion on the Effective Date. Thereafter, the Trustee may submit invoices to the Trust for payment on the first day of each month though and including the month in which the Trustee is discharged.