**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30002 |
| | ) | (Chapter 11) |
| GENERATIONS ON 1ST, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

**NOTICE OF FILING OF *PROPOSED* AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN FOR GENERATIONS ON 1ST, LLC**

PLEASE TAKE NOTICE that, on May 29, 2026, the Debtor, through its Chief Restructuring Officer (the "CRO"), and Red River State Bank ("RRSB", and together with the CRO, the "Plan Proponents"), filed their *Amended Disclosure Statement* [ECF 410] (the "Disclosure Statement") for their *Amended Joint Chapter 11 Plan* [ECF 409] (the "Plan") for Generations on 1st, LLC ("Generations" or the "Debtor"), pursuant to Section 1121(b) of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that the hearing to consider confirmation of the Plan was conducted on Tuesday, July 14, 2026, and it has been continued to allow closing arguments on Monday, July 20, 2026 at 2:00 p.m. CST before the Honorable Shon Hastings, at the United States Bankruptcy Court for the District of North Dakota, Courtroom #3, Second Floor, Quentin N. Burdick United States Courthouse, 655 First Avenue North, Fargo, North Dakota, 58102.

PLEASE TAKE FURTHER NOTICE that a proposed amendment of the Plan is attached hereto as Exhibit A in blackline form for the convenience of the Court and all interested parties.

1

Dated: July 17, 2026

**VOGEL LAW FIRM**

*/s/ Kesha L. Tanabe*
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Kesha L. Tanabe
ktanabe@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
Telephone: (701) 237-6983

*COUNSEL TO PLAN PROPONENT*
*RED RIVER STATE BANK*

4926-4643-3963 v.10

2

**<u>EXHIBIT A: Blacklined Version of Proposed Amendment</u>**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| **In Re:** | Case No.:  25-30002 |
| | Chapter 11 |
| GENERATIONS ON 1ST, LLC, | |
| **Debtor.** | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR GENERATIONS ON 1ST, LLC**

## 1.    INTRODUCTION

### 1.1    *What is the Purpose of this Disclosure Statement?*

The Debtor, through its Chief Restructuring Officer (the "CRO"), and Red River State Bank ("RRSB", and together with the CRO, the "Plan Proponents"), have filed atheir Second Amended Joint Chapter 11 Plan (the "Plan") for Generations on 1st, LLC (the "Debtor"). This Disclosure Statement is intended to provide "adequate information", as defined in Section 1125(b) of Bankruptcy Code, to allow creditors to make an informed judgment about the Plan. If this Disclosure Statement is approved by the Bankruptcy Court, it will be used to solicit votes from creditors for or against the Plan. The Plan Proponents strongly urge you to read this Disclosure Statement because it contains a  summary of the Plan and important information concerning the Debtor's history and finances. The Disclosure Statement also provides information about the alternative to the Plan, which is a liquidation of the Debtor in Chapter 7 or under non-bankruptcy law. A copy of the  Plan accompanies this Disclosure Statement as a separate document. Note, the Plan includes a table of definitions. You should refer to the Plan for the definitions of capitalized terms used in the Disclosure Statement. Cites to "ECF" numbers are references to motions, affidavits, and orders that have been filed on the docket in the Bankruptcy Case.

### 1.2    *Brief Description of the Debtor and Its Bankruptcy Filing*

The Debtor is owned by Mr. Jesse Craig and historically, it was managed by his spouse, Ms. Mulinda Craig, through a business entity they own called CP Business Management, Inc. The Debtor's principal asset is an apartment building located at 26 1st Avenue SW (the "GO1 Project") in Watertown, South Dakota (the "City"). The GO1 Project consists of a single, five-story apartment building with attached parking. The gross building area, including the parking garage, is 119,859 square feet. The building was built in 2021 and 2022 and it has a useful life of approximately 55 years total. The non-residential/commercial area of the building includes an enclosed parking garage. Additionally, the first floor of the building is currently used to operate a senior center with a large community room, craft room, conference room, game room and a full commercial kitchen (the "Watertown Senior Center"). The residential portion of the building includes 72 apartment units. The

apartments are 1-2 bedrooms.. The occupancy rate of the building is approximately 95%, which is considered "stabilized" for a building of its kind. Monthly rents in the GO1 Project range from $1050-1580 per month, depending on size.

Prior to the Petition Date, the GO1 Project went into default. Gross rents were not sufficient to pay all expenses and debt service as they came due. In October 2024, a South Dakota state court appointed a receiver called HME Properties LLC, an independent third party, to collect rents and operate the GO1 Project. Debtor filed this Chapter 11 bankruptcy case on January 6, 2025. [ECF 1] Notwithstanding the fact that construction is complete and rental income is stabilized, the GO1 Project is still insolvent. Debtor's cashflow is not sufficient to make all monthly payments on the Debtor's debt as it comes due. The Debtor simply has too much debt.

### 1.3     Brief Summary of the  Plan

The Plan provides two sources of recovery for creditors: a sale process and a creditor trust. First, RRSB has agreed to liquidate 100% of its Real Estate Collateral to fund the Plan. Sale Proceeds will be used to pay Administrative Claims, Priority Tax Claims, U.S. Trustee quarterly fees, RRSB's Class 1 Secured Claim, and all Class 4 Convenience Class claims.

Second, the Plan will establish a Creditor Trust to fund the investigation and prosecution of any and all Causes of Action owned by the Debtor. Proceeds from the Sale of Real Estate Collateral of no less than $250,000 will be allocated to fund the work of the Creditor Trust.  All proceeds of litigation or settlement will be distributed pro rata to Class 3 general unsecured Creditors.

### 1.4     Confirmation of Plan.

1.4.1   **Requirements.** The requirements for Confirmation of the Plan are set forth in detail in Section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

(a)     **Acceptance by Impaired Classes.** Except to the extent that the cramdown provisions of Section 1129(b) of the Bankruptcy Code may be invoked, each Class of Claims must either vote to accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b)     **Feasibility.** The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c)     **"Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all Holders of Claims. To satisfy this requirement, the Bankruptcy Court must determine that each Holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d)　**"Cramdown" Provisions.** Under certain circumstances which are set forth in detail in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even though a Class of Claims or Equity Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of Insiders (as defined in the Bankruptcy Code), if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Plan Proponents will invoke the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code as to holders of Equity Interests since under the Plan, the Class in which Equity Interests reside are deemed to have rejected the Plan. Should any voting Class fail to accept the Plan, the Plan Proponents will also invoke the "cramdown" provisions as to such Class.

1.4.2　*Procedure.* To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code (the "*Confirmation Hearing*"). The Bankruptcy Court has set July 7, 2026, at 10:00 a.m. Central Standard Time, for the Confirmation Hearing. The Confirmation Hearing will take place in Courtroom #3, Second Floor, Quentin N. Burdick United States Courthouse, 655 First Avenue North, Fargo, North Dakota. If no objections are received by June 26, 2026, the Court may confirm the Plan and cancel the Confirmation Hearing without further notice.

1.4.3　*Objection to Confirmation.* Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set June 26, 2026, as the deadline for filing and serving upon the Plan Proponents' counsel, and the United States Trustee's Office, objections to Confirmation of the Plan. Objections to Confirmation must be filed with the Clerk of the Bankruptcy Court at the following address:

>　Clerk, U.S. Bankruptcy Court for the District of North Dakota
>　655 1st Avenue North, #210
>　Fargo, ND  58102-4932

with a copy served upon counsel to the Plan Proponents:

| | |
|---|---|
| Maurice B. VerStandig, Esq. <br> The Dakota Bankruptcy Firm <br> 1630 1st Avenue N, Suite B PMB 24 <br> Fargo, North Dakota 58102-4246 <br> mac@dakotabankruptcy.com | Kesha L. Tanabe <br> Vogel Law Firm <br> 218 N.P. Ave. <br> Fargo, ND 58102 <br> ktanabe@vogellaw.com |

and a copy served upon the Office of the United States Trustee:

>　United States Trustee
>　Suite 1015 U.S. Courthouse
>　300 South Fourth Street
>　Minneapolis, MN 55415

1.4.4　*Effect of Confirmation.* Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall  irrevocably vest in the liquidating Debtor for purposes of administration, by the Plan Proponents, of all of its respective

rights, title, and interest in and to all assets. The Plan provides for the wind down of the Debtor's affairs, administration of all of the Debtor's remaining assets to cash, and the distribution of the net proceeds realized therefrom to Holders of allowed Claims in accordance with the relative priorities established in the Bankruptcy Code. The Plan does not provide for a distribution to Holders of Equity Interests, and their votes are not being solicited. The Plan contemplates the creation of a Creditor Trust and the appointment of a Creditor Trustee to pursue any unreleased Causes of Action and to make Distributions to Holders of allowed Claims. Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Holders of Equity Interests, and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

### 1.5     *Voting on the Plan.*

1.5.1     *Impaired Claims or Equity Interests.* Pursuant to Section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving distributions or other treatment under the Plan may vote on the Plan. Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.

1.5.2     *Eligibility.* In order to vote on the Plan, a Holder of a Claim must have timely filed or been assigned a timely filed proof of Claim, unless its Claim is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules. Holders having a Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

1.5.3     *Binding Effect.* Whether a Holder of a Claim votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, a Holder of a Claim will not be included in the vote: (i) for purposes of accepting or rejecting the Plan; or (ii) for purposes of determining the number of Persons voting on the Plan.

1.5.4     *Procedure.* Members of Classes 2 and 4 are unimpaired and not entitled to vote. Classes 1 and 3 may vote to accept or reject the Plan. Classes 5 and 6 are comprised entirely of Insiders and their votes are disregarded for purposes of plan confirmation. In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

Kesha L. Tanabe
Vogel Law Firm
218 NP Avenue
PO Box 1389
Fargo, ND  58107-1389

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery at the address set forth above on or before June 26, 2026. Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(i) Ballots received that do not evidence the amount or evidence an incorrect amount of such Holder's Claim shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim has been filed by such Holder, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan upon request to the Court by either the Debtor or such Holder of a Claim;

(ii) Ballots received that do not identify the Holder of the Claim, whether or not signed by the Holder, shall not be counted as a vote to accept or reject the Plan;

(iii) Ballots received that do not reflect the Class in which such Ballot is cast or incorrectly classify such Holder's Claim and that are otherwise properly completed may be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan upon approval by the Court; and

(iv) Ballots that are completed, except that such Holder of a Claim failed to vote to accept or reject the Plan, shall not be counted as a vote to accept or reject the Plan.

### 1.6 Acceptance of the Plan.

1.6.1 *Holder Acceptance.* As a Holder of a Claim, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for "cramdown" of any non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code. At least one impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan. You are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim and the name of the Holder of the Claim.

1.6.2 *Cramdown Election.* If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of Insiders, the Plan Proponents may attempt to invoke the "cramdown" provisions of the Bankruptcy Code. Cramdown may be an available remedy, because the Plan Proponents believe that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

*1.7 Sources of Information.* The information contained in this Disclosure Statement has been obtained from the Debtor's books and records, from formal discovery in the bankruptcy case, and from motions and other papers filed with the Bankruptcy Court by the Debtor, the Plan Proponents and other parties-in-interest. Every reasonable effort has been made to present accurate information

and such information is believed to be correct as of the date hereof. Any value given as to the assets of the Debtor is based upon an estimation of such value. You are strongly urged to consult with your financial and legal advisors to understand fully the Plan and Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits. If any conflicts exist between the Plan and Disclosure Statement, the terms of the Plan shall control.

### 1.8   Additional Information.

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact counsel for the Plan Proponents:

| | |
|---|---|
| Maurice B. VerStandig, Esq.<br>The Dakota Bankruptcy Firm<br>1630 1st Avenue N, Suite B PMB 24<br>Fargo, North Dakota 58102-4246<br>mac@dakotabankruptcy.com | Kesha L. Tanabe<br>Vogel Law Firm<br>218 N.P. Ave.<br>Fargo, ND 58102<br>ktanabe@vogellaw.com |

## 2.   THE DEBTOR

### 2.1   Description of the Debtor.

The Debtor's principal asset is a single, five-story apartment building with attached parking located in Watertown, South Dakota. The Debtor filed a Chapter 11 bankruptcy case on January 6, 2025. Prior to filing for bankruptcy, the secured creditor commenced a foreclosure proceeding in Codington County, South Dakota. The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### 2.2   The Debtor's Ownership and Other Statutory Insiders.

The Debtor is wholly owned by Mr. Jesse R. Craig. Other statutory "Insiders" include Mr. Craig's spouse, Mulinda "Mindy" Craig, as well as his two daughters: Jordan Horner and Sydney Craig. Mr. Craig also owns and controls several related entities such as Craig Holdings, LLC, Craig Properties, LLC, Craig Development, LLC, and CP Business Management, Inc. Ms. Craig currently performs the majority of the Debtor's administrative and management services through an entity called CP Business Management, Inc. Two Affiliates of the Debtor are currently in bankruptcy proceedings pending before the Bankruptcy Court: The Ruins, LLC and Parkside Place, LLC.

### 2.3    The Debtor's Prepetition Debt.

As of the Petition Date, Debtor has two secured creditors. By prior stipulation, Debtor has allowed RRSB's Class 1 Claim in the amount of $11,200,000. [ECF 177]. RRSB has a valid first priority Lien in the Real Estate Collateral, up to the Subordination Amount under the Subordination Agreement.   RRSB's collateral also includes all Rents produced by the Real Estate Collateral, pursuant to an Assignment of Rents. Watertown Development Company ("WDC") also has a Secured Claim against the Debtor. WDC submitted Proof of Claim No. 4 for $2,122,790.70. WDC's Claim is secured by a valid second priority Lien in the Real Estate Collateral, per the Subordination Agreement. WDC is also secured by a valid first priority Lien in the TIF Revenue. The TIF Revenue is a future stream of income resulting from payment of real estate tax associated with the GO1 Project, in the ordinary course, over the remaining life of the TIF Agreements. The Debtor was managed by a prepetition receiver, and thus most of its prepetition expenses were paid in the ordinary course. As a result, the Debtor has 4 or fewer unpaid trade creditors and all but one of such unsecured claims is under $5,000. Debtor's does, however, owe a substantial deficiency claim to RRSB and WDC, and a prepetition Priority Tax Claim of $76,494.98 to Codington County. Insiders have asserted unsecured claims against the Debtor, but the Plan Proponents dispute such Claims in part due to standard claim objections and in part because such parties have unresolved liability to the estate and thus, they are not currently entitled to receive a distribution under the Plan.

### 2.4    The Debtor's Employment of Professionals.

The Debtor requested and obtained the authority to employ the Dakota Bankruptcy Firm as its counsel. The Bankruptcy Court also appointed Mr. Mike Schmitz, CPA to serve as the Chief Restructuring Officer of the Debtor.

### 2.5    Claims Against the Debtor.

2.5.1    *Administrative Expenses.* Plan Proponents estimate Administrative Expenses as of the Effective Date will be approximately $80,000 or less, part of which will be satisfied by a prepetition retainer of approximately $10,000. Administrative Expenses will be paid in full on the Effective Date of the Plan.

2.5.2    *Priority Tax Claims.* As of the date of the Disclosure Statement, the amount of Priority Tax Claims filed against the Debtor is approximately $76,494.98.   The Plan Proponents estimate that $76,494.98 in Priority Tax Claims will be allowed and paid on the Effective Date of the Plan.

2.5.3    *U.S. Trustee Fees.* The Plan Proponents estimate that the distributions under the Plan will obligate the estate to pay U.S. Trustee fees of approximately $78,300. Such fees will be paid in full on the Effective Date.

2.5.4    *Class 1 Secured Claim.* By prior stipulation, RRSB's Class 1 Claim has been allowed by the Debtor in the amount of $11,200,000 [ECF 177]. Pursuant to the Subordination Agreement between RRSB and WDC, RRSB has a first priority lien in the Real Estate Collateral up

to $8,340,000. As a result, RRSB will receive Sale Proceeds in partial satisfaction of its Allowed Secured Claim and RRSB will have a general unsecured claim for its deficiency in Class 3.

2.5.5    ***Class 2 Secured Claim.*** Class 2 consists of the allowed Secured Claim of WDC. The WDC Claim shall be allowed in the amount of $2,122,790.70. WDC's secured claim is junior to RRSB on the Real Estate Collateral, but WDC has a first-priority security interest in the TIF Revenue. Nothing in the Plan shall terminate or modify the TIF Agreements and WDC shall remain entitled to receive all future TIF Revenue assigned to it under the TIF Agreements.

2.5.6    ***Class 3 General Unsecured Claims.*** Class 3 consists of general unsecured claims against the Debtor that exceed $5,000: the RRSB Deficiency Claim; the WDC Deficiency Claim; and Claim 7 for $22,886.75. Holders of Class 3 claims will receive their pro rata share of all distributions made by the Creditor Trust.

2.5.7    ***Class 4 Convenience Class Claims.*** Class 4 consists of general unsecured claims for less than $5,000 held by Watertown Municipal Utilities, White Glove Cleaning and Cannon Electric LLC. The Plan expressly allows the following claims: POC 5 for $4,637, POC 6 for $1069, and POC 8 for $601. Holders of Class 4 claims will receive payment in full on the Effective Date.

2.5.8    ***Class 5 Intercompany Claims***. Class 5 consists of claims of Affiliates against the Debtor. The Plan Proponents do not reasonably anticipate the Sale Proceeds will be sufficient to provide a distribution for Class 5. Class 5 is deemed to reject. .

2.5.9    ***Class 6 Equity Interests***. Class 6 consists of Holders of Equity Interests. The Plan Proponents do not reasonably anticipate the Sale Proceeds will be sufficient to provide a distribution for Class 6. Class 6 is comprised exclusively of Insiders. Pursuant to 11 U.S.C. § 1129(a)(10), Class 6 is disregarded for the purpose of voting and thus, it is not entitled to vote. If the Court determines Class 6 is permitted to vote, they shall be deemed to reject.

3.      **SUMMARY OF PLAN IMPLEMENTATION**

3.1     ***In General.***

The Plan is proposed by the Debtor and RRSB. The Holders of allowed Claims will be paid from the Sale of Real Estate Collateral in accordance with priorities set forth in the Bankruptcy Code, a structure that the Plan Proponents believe will produce an expedient and equitable outcome for all Creditors.

***Retention of Property Management Company***. On or as soon as practicable after the Confirmation Date, the ~~Plan Proponents~~ CRO ~~intend~~ shall be authorized to retain HME Properties, LLC ("HME") to manage the Real Estate Collateral. HME is an independent third-party management company with prior experience managing similar buildings in Watertown, SD, including the GO1 Project. The Property Manager shall be responsible for collecting rents, paying ordinary expenses, repairs and maintenance pending the Sale. The Property Manager will be entitled to customary compensation not to exceed 5% of the monthly rent collected from the Real Property plus reimbursement of normal expenses.

*VKB Transaction*. Subject to entry of an order by the Bankruptcy Court confirming the Plan, pursuant to 11 U.S.C. 1123(a)(5)(d) and 1123(b)(4), the Real Estate Collateral shall be sold by Debtor to VKB, with the consent of secured creditors, free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan. All terms of the VKB Transaction are set forth in the VKB Purchase Agreement attached to the Plan as Exhibit A. The Purchase Price for the Real Estate Collateral under the VKB Purchase Agreement is $8,840,000, and it is due within 30 days of the Confirmation Date. If the VKB Transaction closes, Debtor shall transfer the Real Estate Collateral to VKB free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan.

The VKB Transaction shall remain subject to a Third Party Overbid on or before June 26, 2026. To be a valid Third Party Overbid, a third party must bid to purchase the Real Estate Collateral on identical terms to the VKB Transaction, provided the proposed purchase price is at least $100,000 higher than the VKB Transaction. Additionally, a valid Third Party Overbid must be accompanied by a signed copy of the Purchase Agreement (on the form of Purchase Agreement attached to the Plan as Exhibit D) and forfeitable earnest money deposit equal to 10% of the proposed purchase price, and it must be received by the Plan Proponents on or before June 26, 2026.. If the Debtor receives a Third Party Overbid by June 26, 2026, the Plan Proponents shall file a Sale Notice and Sale Motion in accordance with Section 4.4 of this Plan and Section 363(f) of the Bankruptcy Code.

*Retention of Broker*. If the VKB Transaction fails to close by the VKB Transaction Deadline, the ~~Plan Proponents~~CRO shall be authorized to retain a Real Estate Broker to market and sell the Real Estate Collateral for the highest and best offer. Broker will be entitled to a commission equal to 5% of gross sale proceeds (to be split at a customary rate with its co-broker). The terms of the Broker's engagement are set forth in the Broker Agreement attached to the Plan as Exhibit B.

*Sale Process.* If the VKB Transaction fails to close by the VKB Transaction Deadline, the Real Estate Broker may immediately begin to market the Real Estate Collateral in accordance with the bid procedures attached to the Plan as Exhibit C (the "Bid Procedures"). All offers to purchase the Real Estate Collateral must be submitted on the form of Purchase Agreement attached to the Plan as Exhibit D (the "Purchase Agreement"). The ~~Plan Proponents~~ CRO shall have the discretion, but not the requirement, to designate a stalking horse bidder. The ~~Plan Proponents~~CRO, in consultation with the Broker, shall determine the highest and best bid. Upon identification of a successful bidder and back up bidder, if any, the Plan Proponents shall file a notice on the Court's docket to announce the outcome of the Bid Procedures as soon as practicable (the "Sale Notice"). The Sale Notice shall identify the successful bidder and back-up bidder (if applicable), and their respective bid amounts. The Plan Proponents shall also file a motion seeking an expedited hearing to approve a sale of the Real Estate Collateral to the party or parties identified in the Sale Notice, free and clear of all liens and encumbrances pursuant to 11 U.S.C. 363(f) (the "Sale Motion").

*Free and Clear Sale*. Upon approval of the Plan and entry of a Confirmation Order by the Bankruptcy Court, pursuant to Sections 1123(a)(5)(d) and 1123(b)(4) of the Bankruptcy Code, Debtor may transfer the Real Estate Collateral to VKB, free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by the Bankruptcy Code, with any such security interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, for subsequent distribution under the Plan. If, however, the VKB Transaction fails to close by the VKB Transaction Deadline, or the Debtor receives a Third Party Overbid by June 26, 2026, the Plan Proponents shall file a Sale Notice and Sale Motion in accordance with Section 4.4 of this Plan and Section 363(f) of the Bankruptcy Code.

*Credit Bidding*. Any Holder of an allowed Secured Claim may credit bid in accordance with 11 U.S.C. § 363(k) and the Bid Procedures.

*Creditor Trust*. A trust shall be formed on the Effective Date for the benefit of creditors (the "Creditor Trust") pursuant to the trust agreement, the form of which is attached to the Plan as Exhibit E. On the Effective Date, all Causes of Action shall be assigned to the Creditor Trust. The Creditor Trustee shall investigate, litigate and/or settle Causes of Action for the benefit of all Holders of Class 3 Claims. The Creditor Trust shall be funded by Sale Proceeds. On or as soon as practicable after the Effective Date, Debtor shall transfer no less than $250,000 to fund the Creditor Trust.

*Rent Reserve*. All prepetition rents collected by the receiver and held in the debtor-in-possession account are subject to RRSB's Liens. Debtor shall turnover such funds to RRSB on the Confirmation Date. Additionally, after the Confirmation Date, if Debtor produces any excess monthly cash flow after payment of customary monthly operating expenses and the monthly payments due to Class 1 under this Plan, such funds shall be held in reserve and they shall remain subject to RRSB's Liens (such funds, the "Rent Reserve"). The excess rents held in the Rent Reserve are subject to the lien of RRSB and may not be disbursed without the prior of approval of RRSB. On the Effective Date, any excess rents in the Rent Reserve shall be distributed to RRSB.

*Equitable Subordination of Insider Claims*. On the Effective Date, all late-filed proof(s) of claim will be subordinated in right of payment to timely filed proof(s) of claim. Additionally, if allegations of prepetition misconduct by Insiders are proven, including actual fraud or fraudulent transfers, any proof(s) of claim filed by such Insider(s) seeking allowance of Claims against the Debtor shall be equitably subordinated to all other Holders of Class 3 Claims. ~~pursuant to 11 U.S.C. § 510, due to the Insiders' prepetition misconduct. Similarly, all late-filed proof(s) of claim will be subordinated in right of payment to timely filed proof(s) of claim.~~ Equitable subordination of Insider Claims may be determined post-confirmation through an adversary proceeding, claim objection, or other appropriate process.

*Debtor-RRSB Settlement*. Pursuant to Federal Rule of Bankruptcy Procedure 9019, on Effective Date of the Plan, any and all claims against RRSB and/or any of its employees, representatives, officers, and directors, that were raised or could have been raised in the Adversary Proceeding or Foreclosure Proceeding, shall be dismissed with prejudice. In consideration thereof, RRSB has agreed to permit proceeds of the sale of the Real Estate Collateral to be used on the Effective Date to pay all Administrative Expenses, Priority Tax Claims, U.S. Trustee quarterly fees,

and to fund the Creditor Trust. Additionally, RRSB will dismiss the Foreclosure Proceeding with respect to the Debtor as soon as practicable after the Effective Date.

*Executory Contracts*. On the Confirmation Date, all executory contracts with Insiders, including CP Business Management, Inc., Jesse Craig, and Mulinda Craig will be deemed rejected, including without limitation any leases with Insiders and/or employees of Insiders, and below-market rent leases for Units 3310 and 3507. All other residential leases between Debtor and existing tenants who are not Insiders will be assumed.

**3.2    *Modification of the Plan.*** The Plan Proponents may alter, amend or modify the Plan or any Exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation hearing. After the Confirmation Date and prior to the Effective Date, the Plan Proponents may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims or Equity Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court. From and after the Effective Date and prior to substantial consummation of the Plan (as defined in Section 1101(2) of the Bankruptcy Code), the Plan Proponents may seek non-material modification or amendment of the Plan as permitted by the Bankruptcy Code.

**3.3    *Plan Controls.*** In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement, the provisions of the Plan will control.

**3.4    *Binding Effect.*** The provisions of the Plan and the Confirmation Order are binding and will inure to the benefit of the Holders of Claims against, and Equity Interests in, the Debtor and its respective successors, assigns, heirs and personal representatives, whether or not such persons voted to accept or reject the Plan.

**3.5    *Tax Consequences.*** The Federal income tax consequences of the Plan to a Holder of a Claim or Equity Interest will depend upon a number of factors and can be complex. In general, a Holder of a Claim that receives cash in satisfaction of its allowed Claim will generally receive a gain or loss with respect to the principal amount of the allowed Claim equal to the difference between: (i) the Holder's basis in the Claim (other than any Claim in respect to accrued interest); and (ii) the balance of the cash received after any allocation to the accrued interest. The Plan Proponents have not determined the character of any gain or loss to be recognized by a Holder with respect to any distribution, if any, such Holder may receive under the Plan. FOR THE FOREGOING REASONS, HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLAN. THE PLAN PROPONENTS ARE NOT MAKING ANY REPRESENTATION REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, NOR ARE THE PLAN PROPONENTS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX

CONSEQUENCES. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TREATMENT OF DISTRIBUTIONS MADE UNDER THE PLAN.

## 4. POST-CONFIRMATION ISSUES

### 4.1 Exculpation and Limitation of Liability

4.1.1 *No Liability for Solicitation or Participation.* As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale or purchase of securities.

4.1.2 *Exculpation* Pursuant to § 1125(e) of the Bankruptcy Code; the Plan Proponents and the Creditor Trustee, and their Professionals, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## 5. FEASIBILITY

### 5.1 Financial Feasibility Analysis.

5.1.1 *Bankruptcy Code Standard.* The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

5.1.2 *No Need for Further Reorganization of Debtor.* The Plan provides for the liquidation of all of the Debtor's assets. Accordingly, the Plan Proponents believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

**6.**      **ALTERNATIVES TO PLAN**

*6.1      Chapter 7 Liquidation.*

6.1.1   *Bankruptcy Code Standard.* Notwithstanding acceptance of the Plan by the requisite number of Holders of Claims and Equity Interests of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Equity Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

6.1.2   *Plan is in Best Interest of Creditors.* The Plan Proponents believe that the Plan satisfies this standard because the Plan provides for an orderly liquidation of the assets. The RRSB Plan Contribution improves the rate of recovery for Holders of Administrative and Class 3 and 4 Claims. A Chapter 7 Liquidation Analysis attached hereto as **Exhibit 1** and Plan Projections are attached hereto as **Exhibit 2**.  Creditors may ascertain the potential benefit of voting in favor of the Plan by comparing their projected recovery in Exhibits 1 and 2.

*6.2      Risk Factors.*

6.2.1   The amount of Sale Proceeds to be generated by the Sale can be estimated from the appraised value of the Real Property and the Broker's advice, but there can be no guarantee of success.

6.2.2   The Plan Proponents have reviewed the actual date and amount of potentially fraudulent transfers in this case to estimate the gross value of the Causes of Action that will be transferred to the Creditor Trust. However, the Plan Proponents cannot predict or guarantee the value of future settlements or litigation proceeds to be collected by the Creditor Trust.

*6.3      Recommendations.*  The Plan Proponents believe the Plan provides Creditors with the best possible mechanism for selling the Real Estate Collateral and ensuring that the Causes of Action are investigated, litigated or settled for the benefit of Creditors.

**GENERAL DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATES TO A CHAPTER 11 PLAN OF LIQUIDATION FOR GENERATIONS ON 1ST, LLC FILED BY THE PLAN PROPONENTS, AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT IN THE FUTURE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. IT IS THE PLAN PROPONENTS' POSITION, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY FRE 408. IT IS THE PLAN PROPONENTS' POSITION, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERNS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED IN THE PLAN.

**THE PLAN PROPONENTS RECOMMEND YOU VOTE IN FAVOR OF THE PLAN.**

## 7. CONCLUSION

It is important that you exercise your right to vote on the Plan. The Plan Proponents recommend that you vote in favor of the Plan because it is an efficient and effective way to liquidate the Debtor's assets, and it provides a fair and equitable way of allocating funds to holders of Allowed Claims.

~~May 29, 2026~~July 15, 2026                          **VOGEL LAW FIRM**

BY: */s/ Kesha L. Tanabe*
        Kesha L. Tanabe
        ktanabe@vogellaw.com
        Caren W. Stanley (#06100)
        cstanley@vogellaw.com
        Drew J. Hushka (#08230)
        dhushka@vogellaw.com
        218 NP Avenue
        PO Box 1389
        Fargo, ND 58107-1389
        Telephone: (701) 237-6983
        Fax: (701) 476-7676

        *COUNSEL TO PLAN PROPONENT RED RIVER
        STATE BANK*

4922-1459-4943 v.3

## <u>EXHIBIT 1</u>

**(Liquidation Analysis)**

**Generations on First, LLC**

**Liquidation Analysis**

| Recoverable Assets: | | $ Amount | Liquidation Analysis Scenarios | | |
|---|---|---|---|---|---|
| | | | LOW | MID | HIGH |
| Cash (DIP Account Balance) | $ | 125,000 | $ 125,000 | $ 125,000 | $ 125,000 |
| *Recovery Rate* | | | 100% | 100% | 100% |
| NPV of Future TIF Revenue (Assigned for the benefit of WDC only) | | 1,985,598.39 | $ 1,985,598 | $ 1,985,598 | $ 1,985,598 |
| *Recovery Rate* | | | 100% | 100% | 100% |
| Real Property (FMV based on VKB Offer) | $ | 8,840,000 | $ 7,072,000 | $ 7,956,000 | $ 8,840,000 |
| *Recovery Rate* | | | 80% | 90% | 100% |
| Turnover of Prepetition Retainer | $ | 9,000 | $ 9,000 | $ 9,000 | $ 9,000 |
| Litigation against RRSB (Complaint does not seek specific monetary damages) | $ | - | $ - | $ - | $ - |
| Chapter 5 Claims (Gross Value of Potentially Avoidable Transfers to Insiders minus 33% Contingent Fee) | $ | 2,883,110 | $ 637,456 | $ 965,842 | $ 1,274,911 |
| *Recovery Rate* | | | 33% | 50% | 66% |
| **Chapter 7 Priority Claims:** | | | | | |
| Chapter 7 Trustee Compensation | | | $ 1,179,486 | $ 1,324,973 | $ 1,468,141 |
| | | | $ - | $ - | $ - |
| Priority Tax Claims (Codington County RE Tax) | $ | 76,495 | $ 76,495 | $ 76,495 | $ 76,495 |
| **Estimated Liquidation Proceeds Available for Debt** | | | $ 8,573,073 | $ 9,639,973 | $ 10,689,874 |
| **Senior Secured Lender** | | | | | |
| Red River State Bank (First on Cash + Real Estate Proceeds Net of Trustee Commission, Real Estate Tax Paid at Closing) | $ | 13,878,457 | $ 5,941,019 | $ 6,679,532 | $ 7,420,364 |
| **Total Senior Secured Lender** | | *Recovery Rate* | 43% | 48% | 53% |
| **Funds Available for Junior Secured Debt and Unsecured Debt** | | | $ - | $ - | $ - |
| **Junior Secured Debt** | | | | | |
| Watertown Development Corporation (Second on Real Estate; First on TIF revenue, passes outside the Bankruptcy Estate) | $ | 2,052,628 | $ 1,985,598 | $ 1,985,598 | $ 1,985,598 |
| *Recovery Rate* | | | 97% | 97% | 97% |
| **Net Funds Available for Chapter 11 Claims** | | | $ - | $ - | $ 1,283,911 |
| Administrative Claims - Chapter 11 Professionals (Debtors Counsel + CRO) | $ | 80,000 | $ - | $ - | $ 80,000 |
| *Recovery Rate* | | | 0% | 100% | 100% |
| **Net Funds Available for Unsecured Debt** | | | $ - | $ - | $ 1,203,911 |
| **Unsecured Debt** | | | | | |
| General Unsecured Claims (RRSB deficiency claims, plus POC Nos. 2, 5-8) | $ | 6,000,000.00 | $ - | $ - | $ 1,203,911 |
| *Recovery Rate* | | | 0% | 0% | 20% |
| **Funds Available for Equity** | | | $ - | $ - | $ - |

**EXHIBIT 2**

**(Plan Projections)**

**Generations on First, LLC**

**Plan Projections**

| | | $ Amount | | Waterfall LOW | | Waterfall MID | | Waterfall HIGH |
|---|---|---|---|---|---|---|---|---|
| | **Assets:** | | | **LOW** | | **MID** | | **HIGH** |
| a | Cash on Hand (DIP Account Balance) | $ 125,000 | $ | 125,000 | $ | 125,000 | $ | 125,000 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| b | Future Tax Increment Revenue | 1,558,447.66 | $ | 1,558,448 | $ | 1,558,448 | $ | 1,558,448 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| c | Real Property (VKB Transaction) | $ 8,840,000 | $ | 8,840,000 | $ | 8,840,000 | $ | 8,840,000 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| d | Prepetition Retainer (Statement of Compensation for Debtor's Counsel) | $ 9,000 | $ | 9,000 | $ | 9,000 | $ | 9,000 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| e | Creditor Trust Payment | $ 250,000 | $ | 250,000 | $ | 250,000 | $ | 250,000 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| f | Chapter 5 Claims (Gross Value of Potentially Avoidable Transfers to Insiders) | $ 2,883,110 | $ | 951,426 | $ | 1,441,555 | $ | 1,902,853 |
| | *Recovery Rate* | | | 33% | | 50% | | 66% |
| | **Gross Value of Assets to be Liquidated under the Plan** | | $ | 11,733,874 | $ | 12,224,003 | $ | 12,685,300 |
| | | | | | | | | |
| | **Admin Expenses and Priority Claims to be Paid under the Plan** | | | | | | | |
| g | Administrative Claims - Chapter 11 Professionals | | $ | 80,000 | $ | 80,000 | $ | 80,000 |
| h | Priority Tax Claims (Codington County RE Tax) | | $ | 76,495 | $ | 76,495 | $ | 76,495 |
| i | UST Fees on Effective Date | | $ | 80,685.00 | $ | 80,685.00 | $ | 80,685.00 |
| | **Liquidation Proceeds Available for Classified Debt under the Plan** | | $ | **11,496,694** | $ | **11,986,823** | $ | **12,448,120** |
| | | | | | | | | |
| | **Senior Secured Lender** | | | | | | | |
| j | Class 1 RRSB Secured Claim (First on Cash + Real Estate) | $ 11,200,000 | $ | 8,965,000 | $ | 8,965,000 | $ | 8,965,000 |
| | **Total Senior Secured Lender** | *Recovery Rate* | | 80% | | 80% | | 80% |
| | **Funds Available for Junior Secured Debt and Unsecured Debt** | | $ | - | $ | - | $ | - |
| | | | | | | | | |
| | **Junior Secured Debt** | | | | | | | |
| k | Class 2: WDC Secured Claim (First on Future Tax Revenue, Second on Real Estate) | $ 2,122,791 | $ | 1,558,448 | $ | 1,558,448 | $ | 1,558,448 |
| | *Recovery Rate* | | | 73% | | 73% | | 73% |
| | **Net Funds Available for Unsecured Debt** | | $ | **973,246** | $ | **1,463,375** | $ | **1,924,673** |
| | | | | | | | | |
| l | Convenience Class Claims (<$5,000) | $6,307 | | $6,307 | | $6,307 | | $6,307 |
| | *Recovery Rate* | | | 100% | | 100% | | 100% |
| m | General Unsecured Claims (>$5,000) | $ 6,000,000.00 | $ | 966,939 | $ | 1,457,068 | $ | 1,918,366 |
| | *Recovery Rate* | | | 16% | | 24% | | 32% |
| | **Funds Available for Equity** | | $ | - | $ | - | $ | - |