IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>GENERATIONS ON 1ST, LLC<br><br>Debtor | Case No.:  25-30002<br>(Chapter 11) |
| In re:<br><br>PARKSIDE PLACE, LLC<br><br>Debtor | Case No.:  25-30003<br>(Chapter 11)<br><br><br>(Jointly Administered) |

**INTERESTED PARTY JESSE CRAIG'S OBJECTION TO
CREDITOR'S FIRST AMENDED PLAN OF LIQUIDATION
FOR PARKSIDE PLACE, LLC**

Interested Party Jesse Craig ("Craig") respectfully objects to confirmation of the Creditor's

First Amended Plan of Liquidation for Parkside Place, LLC (Doc. 442) (the "Plan").

**INTRODUCTION**

Although styled as a liquidating Chapter 11 plan, the Plan is, in substance, a secured

creditor's privately negotiated liquidation strategy that asks this Court to approve far more than

the sale of the Debtor's principal asset. Confirmation would approve the liquidation process itself,

including the selection of the purchaser, the disposition of estate causes of action, broad releases

in favor of the Plan proponent, the creation and governance of a post-confirmation Creditor Trust,

the appointment of fiduciaries who possess significant conflicts of interest, and the elimination of

equity. Each of those provisions arises from a single premise:  that Red River State Bank

("RRSB"), as the Debtor's principal secured creditor and defendant subject to pending adversary

proceedings, should be permitted to control virtually every material aspect of the Debtor's

1

liquidation while simultaneously receiving substantial benefits under the Plan, including absolving itself through releases and exculpations.

That is not the purpose of Chapter 11. Once a bankruptcy case commences, the process no longer belongs to the secured lender. It belongs to the bankruptcy estate and all stakeholders whose rights are affected by the administration of that estate. A liquidating Chapter 11 plan must therefore be structured to maximize the value of estate assets through a fair and independent process, not merely to facilitate a transaction negotiated by one creditor or to implement that creditor's preferred exit strategy. The Bankruptcy Code requires more than a privately negotiated purchase agreement. It requires a liquidation process that complies with the applicable provisions of the Bankruptcy Code, is proposed in good faith, and is reasonably designed to maximize value for the benefit of all creditors and parties in interest.

The Plan fails to satisfy those requirements. RRSB has not demonstrated that the proposed liquidation process maximizes value, that the proposed releases of estate claims satisfy the standards governing compromises under Bankruptcy Rule 9019, that the proposed Creditor Trust serves a legitimate bankruptcy purpose, or that the governance of that Trust is free from disabling conflicts of interest. Instead, the Plan concentrates virtually every significant decision concerning the liquidation in the hands of the party seeking confirmation and release from liability.

Moreover, Craig has presented a viable alternative that provides greater value to the estate, preserves the benefits of Chapter 11 for all stakeholders, and eliminates many of the provisions that make the current Plan unconfirmable. The existence of that alternative further demonstrates that confirmation of the Plan is neither necessary nor consistent with the objectives of Chapter 11.

Accordingly, the Plan fails to satisfy the confirmation requirements of 11 U.S.C. § 1129 for multiple independent reasons, including:

2

1.  Craig has presented a superior alternative that provides greater value to the estate and its stakeholders;

2.  the proposed liquidation has not been shown to maximize the value of estate assets;

3.  the Plan impermissibly provides for equitable subordination without satisfying the requirements of 11 U.S.C. § 510(c);

4.  the Plan releases valuable estate claims against RRSB without satisfying the standards governing compromises under Bankruptcy Rule 9019;

5.  the proposed Creditor Trust provides no demonstrated benefit to the estate and unnecessarily increases the costs of administration;

6.  the governance structure of the Creditor Trust places conflicted fiduciaries in positions of control over estate litigation; and

7.  when viewed as an integrated whole rather than as isolated provisions, the Plan has not been proposed in good faith as required by 11 U.S.C. § 1129(a)(3).

Each of these defects precludes confirmation. Collectively, they demonstrate that the Plan is designed principally to implement RRSB's preferred liquidation strategy rather than to accomplish the fundamental objective of Chapter 11: maximizing value for the bankruptcy estate for all stakeholders through a fair, independent, and transparent process. Confirmation should therefore be denied.

## DISCUSSION

Section 1129(a) imposes mandatory requirements for confirmation of every Chapter 11 plan.  RRSB, as the Plan proponent, bears the burden of proving by a preponderance of the evidence that every applicable requirement of 11 U.S.C. § 1129 has been satisfied. Failure to establish any one requirement precludes confirmation.

Among the most significant requirements are §§ 1129(a)(1) and (3). Section 1129(a)(1) requires that the Plan comply with the applicable provisions of the Bankruptcy Code. Section 1129(a)(3) further requires that the Plan be proposed in good faith and not by any means forbidden

3

by law. As this Court has recognized, the inquiry is not limited to whether the Plan technically satisfies isolated statutory provisions. Rather, the Court must determine whether the Plan "fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code." *In re J&J Oilfield Servs.*, No. 13-30607, 2015 Bankr. LEXIS 1924, at *28-29 (Bankr. D.N.D. June 12, 2015) (quoting *In re Reuter*, 427 B.R. 727, 770). The Court should consider whether the Plan has been proposed with the legitimate and honest objective of maximizing value for creditors and the estate. *Id.* at *29.

Those principles are particularly important where, as here, the Plan is proposed not by the Debtor, but by its principal secured creditor. Although Chapter 11 affords flexibility in structuring liquidating plans, it does not permit a secured creditor simply to substitute its preferred liquidation strategy for the independent estate-administration process contemplated by the Bankruptcy Code. Confirmation is not an endorsement of a negotiated purchase agreement. It is judicial approval of the entire liquidation process. The issue before the Court is not whether Archer Land Co. LLC ("ALC") is a satisfactory purchaser. The issue is whether the Bankruptcy Code permits confirmation of a liquidation plan in which virtually every material component of the liquidation— from the purchaser, to the releases, to the litigation, to the trust governance—has been selected by the party receiving the greatest benefit from confirmation.

**A.**   **The Plan Must Be Evaluated in Its Totality as an Integrated Transaction Rather than as Isolated Plan Provisions.**

The Court should evaluate the Plan as a whole rather than considering each challenged provision in isolation. The proposed sale, releases, exculpation provisions, Creditor Trust, trust governance, treatment of estate causes of action, and distributions are not independent transactions. They are interdependent components of a single liquidation structure. Each provision provides

consideration for the others, and each advances the same objective:  implementing RRSB's preferred liquidation strategy while conferring substantial additional benefits upon RRSB.

RRSB cannot compartmentalize these provisions to avoid scrutiny. The proposed sale cannot be separated from the releases because confirmation of the Plan simultaneously accomplishes both. Likewise, the releases cannot be divorced from the Creditor Trust because the Plan dismisses the Estate's claims against RRSB while transferring the remaining estate causes of action to a trust whose governance is largely controlled by individuals affiliated with RRSB or parties aligned with its interests. The Trust, in turn, cannot be evaluated apart from its governance because the identity and independence of the fiduciaries charged with prosecuting estate claims directly affects whether those claims will be pursued impartially and for the benefit of the estate.

The integrated nature of these provisions is particularly significant because RRSB occupies multiple roles in this case. It is the Debtor's principal secured creditor, the Plan proponent, the beneficiary of the proposed releases, the principal economic beneficiary of the proposed sale, and the party proposing the governance structure that will control the remaining estate litigation. These overlapping roles require careful judicial scrutiny. The Court must determine not only whether each individual provision is legally permissible, but whether the overall structure complies with the Bankruptcy Code and fulfills Chapter 11's fundamental objective of maximizing value for the bankruptcy estate.

When viewed collectively, the Plan reveals a consistent pattern. RRSB negotiated the proposed purchaser, selected the sale process, proposes to receive broad exculpations and releases from liability, seeks dismissal of pending litigation against itself, proposes the creation of a Creditor Trust to pursue only those causes of action that benefit RRSB, selects the fiduciaries who

will oversee that litigation, and proposes the elimination of existing equity. Every material aspect of the liquidation remains under the influence or control of the party seeking confirmation.

That integrated structure drives each of Craig's objections. The question before the Court is therefore not whether one or two isolated provisions of the Plan might independently withstand scrutiny. Rather, the question is whether the Plan, viewed in the totality as an integrated transaction, complies with §§ 1129(a)(1) and (3), reflects a liquidation process reasonably designed to maximize estate value, and has been proposed in good faith consistent with the purposes of Chapter 11. *It does not.*

When viewed collectively, the Plan reflects a lender-directed exit strategy rather than a fair and independently administered Chapter 11 liquidation designed to maximize value for all stakeholders. The deficiencies discussed below therefore are not isolated drafting issues. They demonstrate that the Plan fails to comply with §§ 1129(a)(1) and (3) because the liquidation process itself has not been shown to satisfy the objectives of Chapter 11.

**B.     Craig Has Presented a Superior Alternative That Provides Greater Value to the Estate.**

Throughout these proceedings, RRSB has repeatedly suggested that no viable alternative exists to the transaction embodied in the Plan. That assertion is no longer accurate.

Subject to receipt of a final term sheet or commitment letter and customary commercial due diligence, Craig has received a proposal for financing that would permit him, or an entity owned by him, to acquire the Real Estate for $5,000,000, approximately $100,000 *more* than the proposed ALC transaction, while also assuming responsibility for payment of the Administrative Convenience Class contemplated by the Plan. Craig anticipates that this transaction could close before September 1, 2026, earlier than the closing contemplated under the Plan.

The significance of Craig's proposal extends beyond the additional purchase price. The proposal demonstrates that the estate has a realistic opportunity to realize greater value than that offered under the Plan while avoiding many of the provisions that render the Plan unconfirmable. Unlike the Plan, Craig's proposal does not depend upon the Court approving broad exculpations and releases in favor of RRSB, dismissing estate claims against RRSB without the analysis required by Bankruptcy Rule 9019, or creating a post-confirmation Creditor Trust governed by fiduciaries whose independence has been challenged. Those issues simply disappear if they are omitted from any subsequently proposed plan.

Craig's proposal also preserves the treatment of Watertown Development Company ("WDC") contemplated by the Plan and provides payment to the Administrative Convenience Class without requiring the additional expense and complexity associated with administration of a post-confirmation Creditor Trust.

Craig recognizes that additional implementation details would necessarily be addressed through the ordinary Chapter 11 process. The existence of those implementation issues, however, does not diminish the significance of the proposal for purposes of confirmation. The question presently before the Court is not whether Craig's proposal should itself be confirmed. Rather, the question is whether RRSB has carried its burden of proving that the Plan before the Court represents the highest and best result reasonably available to the estate. *It has not.*

The existence of a financially superior alternative capable of closing on a comparable or earlier timetable demonstrates that the Plan is not the only feasible liquidation strategy and substantially undermines RRSB's contention that its proposed transaction maximizes value for creditors and parties in interest. At a minimum, the existence of Craig's proposal confirms that

additional value is reasonably attainable and that confirmation should not proceed on the present record.

**C.** **RRSB Has Not Demonstrated that the Proposed Liquidation Maximizes Estate Value.**

The central purpose of a liquidating Chapter 11 plan is to maximize the value of estate assets for the benefit of creditors and parties in interest. While the Bankruptcy Code does not prescribe a single method for accomplishing that objective, the plan proponent bears the burden of demonstrating that the proposed liquidation process is reasonably designed to obtain the highest and best value reasonably available under the circumstances. Confirmation cannot rest merely upon the existence of a privately negotiated purchaser or a purchase agreement acceptable to the secured creditor.

Here, the Plan assumes without meaningful support that the proposed sale of the Real Estate to ALC for $4,900,000 represents fair market value and the highest and best price reasonably obtainable. The present record does not support that conclusion. The Disclosure Statement acknowledges that the Property is approximately ninety-five percent occupied and stabilized. Yet the Plan is unsupported by the types of evidence ordinarily relied upon to establish that a negotiated sale price reflects fair market value. RRSB has not presented evidence of a comprehensive marketing effort, broker opinion of value, capitalization rate analysis, comparable sales analysis, or other recognized valuation methodology demonstrating that the negotiated purchase price represents the highest value reasonably obtainable.

Instead, the existing record suggests precisely the opposite. Over the past several years, multiple third parties have expressed a willingness to acquire the Property for amounts exceeding the proposed purchase price. In September 2023, VKB Properties, LLC ("VKB") submitted an offer to purchase the Property for $5,500,000. More recently, in December 2025, Kelly Zander

8

offered approximately $5,230,000, subject to financing by RRSB. Both offers exceeded the purchase price now incorporated into the Plan.

Those offers are significant for two reasons. First, they demonstrate sustained market interest in the Property at prices materially above the negotiated purchase price. Second, they undermine any suggestion that $4,900,000 necessarily represents the highest value reasonably attainable.

The market environment has likewise improved since those earlier offers. Interest rates have declined materially since September 2023, reducing financing costs and generally improving commercial real estate purchasing conditions. Although market conditions alone do not establish value, they further call into question whether the Plan's proposed purchase price represents the highest and best value reasonably obtainable today.

Craig also intends to present evidence of a current independent appraisal reflecting a value materially exceeding the purchase price proposed under the Plan. That appraisal provides additional evidence that the negotiated transaction does not necessarily maximize estate value. At a minimum, the conflicting evidence demonstrates that substantial questions remain concerning fair market value. Those questions underscore why confirmation should not proceed on the present record.

Nor has RRSB demonstrated that the marketing process was reasonably designed to expose the Property to the marketplace. Rather, the record indicates that RRSB negotiated directly with ALC after contacting only a limited number of potential purchasers. While RRSB apparently sought to generate interest between ALC and VKB, there is no evidence that the Property was broadly marketed through customary commercial real estate channels or exposed to the marketplace for a sufficient period to determine whether additional purchasers existed.

To be clear, Craig does not contend that a liquidating Chapter 11 plan must employ any particular marketing strategy or that every plan requires an auction. Nor does Craig contend that the recently implemented overbid procedures are necessarily improper. The issue is more fundamental. The burden remains on RRSB to demonstrate that the liquidation process, viewed as a whole, was reasonably designed to maximize value for the estate. The existence of an overbid procedure does not relieve the Plan proponent of that burden.

Indeed, the proposed overbid process appears to be designed primarily to preserve the existing ALC Transaction while allowing limited competing bids under procedures established *after* the purchaser had already been selected. Although those procedures may provide an opportunity for additional bids, they do not establish that the negotiated transaction itself resulted from a market process reasonably designed to maximize value. Confirmation requires more than the existence of a negotiated purchaser coupled with a limited opportunity for competing bids. It requires evidence demonstrating that the liquidation process itself was reasonably calculated to obtain the highest and best value for the estate.

The Court should also consider this issue in conjunction with Craig's competing proposal. Craig has presented evidence of a transaction that exceeds the Plan purchase price while eliminating many of the legal defects inherent in the Plan. The existence of that proposal further demonstrates that additional value is reasonably attainable and substantially undermines RRSB's contention that its proposed liquidation represents the best available outcome.

Taken together, the prior offers, the improved financing environment, the current appraisal evidence, the limited marketing efforts reflected in the record, and Craig's competing proposal demonstrate that RRSB has not carried its burden of proving that the proposed liquidation

10

maximizes estate value. Because maximizing value is one of the central objectives of a liquidating Chapter 11 plan, confirmation should be denied.

**D.      The Plan Impermissibly Compromises and Releases Valuable Estate Claims Against RRSB Without Satisfying Bankruptcy Rule 9019.**

The Plan does not merely provide for the sale of the Debtor's principal asset. It also requires the Court to approve the dismissal with prejudice of the Estate's pending claims against RRSB while simultaneously transferring the estate's remaining causes of action to a newly created Creditor Trust sponsored by RRSB. As a practical matter, confirmation will determine which Estate claims survive, which claims are forever extinguished, and who will control the prosecution of those that remain.

That relief cannot be approved simply because it is incorporated into a Chapter 11 plan. The proposed dismissal and release of the estate's claims against RRSB constitutes a compromise of estate litigation and therefore must satisfy the standards governing compromises under Bankruptcy Rule 9019. The Eighth Circuit has long required bankruptcy courts to independently evaluate proposed settlements before approving them. In determining whether a compromise is fair and equitable, the Court must consider, among other things:

1.      the probability of success in the litigation;

2.      the difficulties, if any, associated with collection;

3.      the complexity, expense, inconvenience, and delay of the litigation; and

4.      the paramount interests of creditors and proper deference to their reasonable views.

*ReGen Capital III, Inc. v. Official Comm. of Unsecured Creditors (In re Trism, Inc.)*, 282 B.R. 662, 667 (B.A.P. 8th Cir. 2002).

Those standards exist because causes of action belonging to a bankruptcy estate are themselves estate assets. A plan proponent may not simply extinguish potentially valuable claims

11

without demonstrating that the proposed compromise falls within the range of reasonableness and serves the best interests of the estate. The requirement of independent judicial review under Rule 9019 serves an important bankruptcy purpose. Estate causes of action are assets belonging to all creditors, not bargaining chips that may simply be exchanged by a plan proponent for provisions favorable to itself. Particularly where the released party is also the plan proponent, the Court's obligation to independently evaluate the compromise is at its highest. Without findings satisfying Rule 9019, confirmation would effectively deprive creditors of potentially valuable estate assets without any determination that the compromise falls within the range of reasonableness required by Eighth Circuit precedent.

*The Plan makes no such showing*. Neither the Disclosure Statement nor the Plan analyzes the estate's claims against RRSB under Rule 9019. Neither document evaluates the likelihood that the estate could prevail in the pending adversary proceeding. Neither discusses the potential amount of recoverable damages, possible offsets, litigation risks, anticipated costs of continued litigation, collectability concerns, or the value of the consideration purportedly being received by the estate in exchange for dismissing those claims. Nor does either document explain why dismissal of those claims falls above the lowest point in the range of reasonableness required for approval of a compromise under Rule 9019.

Instead, the Plan simply presumes that the estate's claims against RRSB should be extinguished as part of the overall transaction without demonstrating that the compromise satisfies Bankruptcy Rule 9019. That assumption is insufficient.

The absence of a Rule 9019 analysis is particularly significant because the party receiving the benefit of the release is also the Plan proponent, the Debtor's principal secured creditor, the beneficiary of the proposed sale transaction, and the party proposing the governance structure that

12

will control all remaining estate litigation. Under these circumstances, careful judicial scrutiny is especially important. The Court cannot presume that dismissal of estate claims is appropriate merely because the secured creditor proposes it as one component of a broader liquidation plan.

Nor does the purported consideration identified in the Plan justify the compromise. For example, both the Disclosure Statement and the Plan identify payment of Codington County real estate taxes as part of the consideration supporting the release. The public tax records, however, reflect that those taxes have already been paid. Moreover, even if unpaid, those taxes constitute a first-priority lien entitled to payment ahead of RRSB's mortgage interest. Payment of an obligation that would necessarily be paid from sale proceeds before RRSB receives any distribution cannot constitute meaningful consideration for extinguishing valuable estate claims against RRSB.

Likewise, the proposed contribution of $50,000 to capitalize the Creditor Trust provides little, if any, meaningful consideration for the compromise. As discussed below, the Plan has not demonstrated any legitimate need for the Creditor Trust. RRSB is, for all practical purposes, the principal economic beneficiary of any litigation the Trust would pursue. RRSB already alleged that it possesses independent contractual rights against Craig under his guaranty and has separately pursued avoidance-related litigation. The Plan does not explain why the estate receives reasonably equivalent value by exchanging potentially valuable claims against RRSB for funding a litigation vehicle that principally benefits RRSB itself.

The integrated nature of the Plan further confirms why Rule 9019 scrutiny is indispensable. The proposed releases do not stand alone. In exchange for dismissal of the estate's claims against itself, RRSB proposes that it receives exculpations typically sought by estate fiduciaries, and that all remaining causes of action be transferred to a Creditor Trust whose governance structure is largely influenced by individuals affiliated with RRSB or aligned with its interests. Thus, the Plan

13

simultaneously eliminates litigation against RRSB while preserving litigation that RRSB wishes to pursue against others. That asymmetrical treatment underscores the need for careful judicial review.

Ultimately, confirmation cannot be used as a substitute for the independent findings required by Rule 9019. Before the Court may approve dismissal of the estate's claims against RRSB, the Court must determine that the proposed compromise is fair, equitable, and in the best interests of the bankruptcy estate. Because neither the Disclosure Statement nor the evidentiary record presently before the Court provides the analysis necessary to make those findings, the Plan fails to satisfy §§ 1129(a)(1) and 1129(a)(3) and cannot be confirmed.

**E.      The Plan Impermissibly Provides for Equitable Subordination Without Satisfying 11 U.S.C. § 510(c).**

The Plan also fails to comply with the Bankruptcy Code because it purports to mandate equitable subordination of Insider claims based upon a legal standard that is inconsistent with 11 U.S.C. § 510(c) and controlling Eighth Circuit precedent. Section 4.9 of the Plan provides that, if allegations of prepetition misconduct by an Insider are proven, including actual fraud or fraudulent transfers, any claim asserted by that Insider "shall be equitably subordinated to all other Holders of Class 3 Claims." Although the Plan contemplates future litigation regarding whether certain misconduct occurred, it effectively predetermines the legal consequence of any such finding by requiring equitable subordination once specified conduct is established.

That approach is contrary to the Bankruptcy Code. Equitable subordination is not an automatic remedy arising from proof of misconduct. Rather, it is an extraordinary equitable remedy that may be imposed only after satisfaction of each element required under § 510(c) and the controlling decisions of the Eighth Circuit. In *Kaler v. Bala (In re Racing Services, Inc.)*, 571 F.3d 729, 731 (8th Cir. 2009), the Eighth Circuit reaffirmed the three-part test originally articulated in

14

*In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir. 1988). Under that test, the proponent of equitable subordination must establish:

1. that the claimant engaged in inequitable conduct;

2. that the misconduct resulted in injury to creditors or conferred an unfair advantage upon the claimant; and

3. that equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.

Each element must be established before equitable subordination may be imposed. Proof of alleged misconduct alone is insufficient. The Plan, however, effectively collapses this analysis into a single inquiry. Once certain categories of misconduct are established, the Plan directs that Insider claims "shall" be subordinated. In doing so, the Plan removes from the Court the independent determination required under the second and third elements of the *Bellanca* test. Whether alleged misconduct actually injured creditors, conferred an unfair advantage, or warrants equitable subordination under the particular facts of the case remains a judicial determination that cannot be predetermined through plan language.

Nor does Federal Rule of Bankruptcy Procedure 7001(8) alter this analysis. Although Rule 7001(8) permits equitable subordination to be addressed through a Chapter 11 plan rather than a separate adversary proceeding, the Rule affects only procedure. It does not eliminate the substantive requirements imposed by § 510(c) or authorize a plan proponent to rewrite the governing legal standard.

Indeed, confirmation of the Plan would effectively predetermine the remedy before the factual record has been fully developed. The Plan asks the Court to approve, in advance, the legal consequence of future findings without requiring the Court to determine whether all statutory

15

elements of equitable subordination have been satisfied. That approach is inconsistent with both § 510(c) and longstanding Eighth Circuit precedent.

Because the Plan mandates a remedy broader than that authorized by § 510(c) and controlling Eighth Circuit precedent, it does not comply with the applicable provisions of the Bankruptcy Code as required by § 1129(a)(1). Confirmation should therefore be denied.

**F.      The Proposed Creditor Trust Is Neither Necessary Nor Structured to Fulfill the Fiduciary Obligations Required of an Estate Representative.**

The Plan's next defining feature is the creation of a post-confirmation Creditor Trust. Under the Plan, substantially all remaining estate causes of action will be transferred to that Trust for investigation, prosecution, settlement, or abandonment by the proposed Creditor Trustee under the supervision of an Oversight Committee. Before approving that structure, however, the Court should determine both whether the Trust serves any legitimate bankruptcy purpose and whether the proposed governance structure ensures that estate causes of action will be administered by independent fiduciaries acting solely in the interests of the estate. The Plan fails on both fronts.

**1.      The Plan Does Not Demonstrate That a Creditor Trust Is Necessary or Beneficial to the Estate.**

Neither the Plan nor the Disclosure Statement explains why continued administration of this bankruptcy estate through a post-confirmation Creditor Trust is necessary. Although the Plan broadly refers to potential causes of action, it does not identify the specific claims to be transferred, the factual basis supporting those claims, the estimated costs of prosecution, the likelihood of recovery, or the expected benefit to the bankruptcy estate.

For example, the proposed litigation appears to include the avoidance claims currently asserted against Craig Development, LLC, Craig Properties, LLC, Craig, and Jordan Horner in Adversary Proceeding No. 26-07003. The complaint in that proceeding consists largely of

conclusory allegations asserting, upon information and belief, that transfers lacked reasonably equivalent value. It contains little factual detail identifying the specific transfers, the services allegedly not provided, or the basis for concluding that the challenged transactions are avoidable. The Plan likewise provides no meaningful explanation regarding the strength or anticipated value of those claims.

More fundamentally, the Plan never explains why a Creditor Trust is needed at all. For all practical purposes, RRSB is the principal economic beneficiary of any additional recoveries. RRSB contends that it has independent contractual remedies under Craig's guaranty and has separately pursued litigation. Regardless of the procedural vehicle employed, RRSB is entitled to only one recovery of its debt. The Plan therefore does not explain why the bankruptcy estate should remain open, incur the administrative expense of a Creditor Trustee, legal counsel, accountants, insurance, reporting obligations, and ongoing trust administration merely to pursue litigation that primarily benefits RRSB.

Chapter 11 exists to maximize value for creditors, not to create unnecessary administrative structures that consume estate resources. On the present record, the Plan has not demonstrated that the anticipated benefits of the proposed Creditor Trust outweigh the substantial costs associated with its continued administration.

2.    **The Proposed Governance Structure Creates Significant and Unnecessary Conflicts of Interest.**

Even if a Creditor Trust were appropriate, the governance structure proposed by the Plan raises substantial concerns regarding the independence of the fiduciaries responsible for administering estate causes of action. The Plan proposes that Michael Schmitz serve as Creditor Trustee. At the same time, Schmitz serves as the Chief Restructuring Officer in the jointly administered Generations on 1st, LLC bankruptcy proceedings and is also proposed to serve in a

17

similar fiduciary capacity under the liquidation structure in those cases. The Disclosure Statement contains no meaningful discussion of these overlapping fiduciary roles or the conflicts they may create. Those conflicts are not hypothetical.

Throughout these jointly administered proceedings, RRSB has repeatedly suggested that claims may exist between Parkside Place and Generations on 1st or that transactions involving the two debtors warrant investigation. If such claims exist, the proposed Creditor Trustee could simultaneously occupy positions requiring him to pursue claims on behalf of one estate while defending or evaluating those same claims on behalf of another estate.

RRSB previously argued that similar overlapping fiduciary responsibilities created an unacceptable conflict when opposing appointment of a common restructuring fiduciary. (Doc. 300, p. 3). Having previously asserted that such conflicts were improper, RRSB now proposes a governance structure that creates many of the same concerns. The inconsistency cannot be reconciled.

The Oversight Committee presents additional concerns. The Plan appoints RRSB officer Danielle Harless, Lane Warzecha of the proposed property manager HME Properties, LLC ("HME"), and an unnamed individual from Watertown Development Company as the Oversight Committee with responsibility for supervising the Creditor Trustee. Yet the Plan simultaneously seeks dismissal with prejudice of the estate's claims against RRSB while preserving claims against insiders and others. As a result, individuals affiliated with a released party would exercise substantial influence over decisions regarding which remaining claims should be pursued, compromised, or abandoned.

The appearance of conflict is further compounded because HME itself has been the subject of testimony concerning its management of the Property. The Plan contains no analysis of whether

18

HME could become the subject of estate claims or how that possibility would affect the independence of its representative serving on the Oversight Committee.

The Court need not conclude that any proposed fiduciary has acted improperly to recognize these concerns. The issue is structural. Estate representatives must be positioned to exercise independent judgment free from divided loyalties or the appearance that litigation decisions may be influenced by relationships with parties who benefit from the Plan's releases or who may themselves possess interests adverse to the estate.

**3.      The Proposed Creditor Trust Reinforces the Plan's Fundamental Structural Defect.**

The proposed Creditor Trust cannot be viewed independently from the remainder of the Plan. It is one component of the integrated transaction before the Court.  The Plan first extinguishes the estate's claims against RRSB through broad exculpations and releases. It then transfers the remaining estate causes of action to a newly created Trust. Finally, it places administration of those claims under a governance structure influenced by individuals affiliated with RRSB or parties whose interests may not be fully aligned with those of the estate.

That sequence illustrates why the Trust is so significant. Rather than preserving an independent fiduciary to maximize value for the estate, the Plan channels estate litigation into a structure that selectively preserves some claims while permanently extinguishing others, all within a governance framework proposed by the principal beneficiary of the Plan.

Chapter 11 permits flexibility in designing post-confirmation trusts. It does not, however, permit estate litigation to be administered through a structure whose necessity has not been established and whose independence is reasonably subject to question. Because the Plan has failed to demonstrate either that the proposed Creditor Trust is necessary or that it is governed by an

19

appropriately independent fiduciary structure, the Plan fails to satisfy the confirmation requirements of §§ 1129(a)(1) and 1129(a)(3).

**G.      The Plan, Viewed as a Whole, Was Not Proposed in Good Faith.**

Section 1129(a)(3) requires that a Chapter 11 plan be proposed in good faith and not by any means forbidden by law. The inquiry focuses not upon the subjective motivations of the plan proponent alone, but upon whether the Plan itself achieves a result consistent with the purposes and objectives of the Bankruptcy Code. *In re J&J Oilfield Servs.*, No. 13-30607, 2015 Bankr. LEXIS 1924, at *28-29 (Bankr. D.N.D. June 12, 2015). A plan proposed primarily to advance the interests of one constituency at the expense of the bankruptcy estate does not satisfy that standard.

The Court should evaluate the Plan as an integrated transaction rather than as a collection of unrelated provisions. When viewed in its entirety, the Plan consistently concentrates control over every significant aspect of the Debtor's liquidation in the hands of RRSB while simultaneously conferring substantial additional benefits upon RRSB.

Specifically, the Plan permits RRSB to:

- implement a privately negotiated sale that has not been shown to maximize estate value;

- obtain broad releases, exculpations and dismissal with prejudice of the estate's pending claims against itself without the showing required by Bankruptcy Rule 9019;

- create and fund a post-confirmation Creditor Trust to pursue only those causes of action that remain after the releases become effective;

- select the governance structure responsible for administering those remaining claims;

- place conflicted individuals in positions of oversight over estate litigation;

- predetermine the treatment of Insider claims through provisions inconsistent with § 510(c); and

20

- eliminate existing equity through a liquidation process whose fairness and value have not been established.

The cumulative effect of these provisions is significant and demonstrates that the Plan is not presented in good faith. Each operates in concert with the others to produce a liquidation structure in which the principal secured creditor not only negotiates the disposition of the Debtor's principal asset but also controls which estate claims survive, which claims are extinguished, who prosecutes the remaining litigation, and how that litigation will be supervised after confirmation. That is not the independent estate administration contemplated by Chapter 11.

## CONCLUSION

This Court is not confronted with a choice between confirmation and liquidation. Nor is it confronted with a choice between confirmation and foreclosure. It is confronted with a choice between approving a lender-controlled liquidation structure and requiring a Chapter 11 process that complies with the Bankruptcy Code. The Code requires the latter. For all of the foregoing reasons, Interested Party Jesse Craig respectfully requests that the Court deny confirmation of the Creditors First Amended Plan of Liquidation.

Dated this 21st day of July, 2026.

/s/ Douglas W. Murch
Douglas W. Murch, ND ID #05983
CONMY FESTE LTD.
3369 45th Street South
Fargo, ND  58104
(701) 293-9911
dmurch@conmylaw.com

ATTORNEY FOR JESSE CRAIG

21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>GENERATIONS ON 1ST, LLC<br><br>         Debtor | Case No.:  25-30002<br>(Chapter 11) |
| In re:<br><br>PARKSIDE PLACE, LLC<br><br>         Debtor | Case No.:  25-30003<br>(Chapter 11)<br><br>(Jointly Administered) |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that she is an employee at the law firm of Conmy Feste Ltd., and is a person of such age and discretion as to be competent to serve papers.

That on July 21, 2026, she served a copy of:

**INTERESTED PARTY JESSE CRAIG'S OBJECTION TO
CREDITOR'S FIRST AMENDED PLAN OF LIQUIDATION
FOR PARKSIDE PLACE, LLC**

electronically by Notice of Electronic Filing upon all parties who have requested service in this case by filing the same via ECF with the Bankruptcy Court in the District of North Dakota and by United States mail on the following parties:

ATTORNEY FOR CREDITOR
Kesha L. Tanabe
Vogel Law Firm
PO Box 1389
Fargo, ND 58107-1389

UNITED STATES TRUSTEE
Mary R. Jensen, Acting U.S. Trustee
Suite 1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

ATTORNEY FOR DEBTOR
Maurice VerStandig
The Dakota Bankruptcy Firm
1630 1st Avenue North
Suite B PMB 24
Fargo, ND  58102

                                            */s/ Leslyn A. Anderson*
                                            Leslyn A. Anderson

22