**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

---

In re:

Generations on 1st, LLC,

     Debtor.

Case No.: 25-30002
Chapter 11 Case

---

**ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN**
**FOR GENERATIONS ON 1ST, LLC**

---

Red River State Bank (RRSB) and Debtor filed their Amended Joint Chapter 11 Plan for Generations on 1st, LLC, on May 29, 2026.  Doc. 409.  Debtor and RRSB also filed their Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Liquidation for Generations on 1st, LLC, on May 29, 2026.  Doc. 410.  On May 22, 2026, the Court entered an Order Scheduling Disclosure Statement Hearing and Setting Deadline for Return of Ballots and Objections to Confirmation and Scheduling Confirmation Hearing.  Doc. 399.

RRSB served the Confirmation Order, which included a ballot, on interested parties on May 26, 2026.  Doc. 403. On May 30, 2026, RRSB served the Amended Joint Chapter 11 Plan and Amended Disclosure Statement. Doc. 411.

On June 29, 2026, RRSB filed the Chapter 11 Computations summarizing the ballots for or against the Amended Joint Chapter 11 Plan.  Doc. 449.  It also filed an Omnibus Memorandum of Law in Support of Confirmation of Joint Chapter 11 Plan for Generations on 1st, LLC.  Doc. 467.   Debtor filed a Joinder to the arguments asserted by RRSB.  Doc. 468.  Interested Party Jesse Craig filed an objection.  Doc. 447.  The

United States Trustee filed a Reply of No Objection to the Amended Joint Chapter 11 Plan.  Doc. 469.

The Court held a confirmation hearing on July 14, 2026, and oral argument on July 20, 2026.  Following the confirmation hearing, the Plan Proponents filed their Second Amended Joint Chapter 11 Plan for Generations on 1st, LLC.  Doc. 487.  Additionally, the Plan Proponents agreed to replace one of the RRSB representatives on the Creditor Trust Oversight Committee with a representative of the Watertown Development Company.  See Doc. 487 at 76.  Chris Clifton, the Executive Director of Watertown Development Company, agreed to serve on the Oversight Committee.  Doc. 494.

For the reasons stated below and based on the contents of the Second Amended Joint Plan, Amended Disclosure Statement, Ballot Report, Omnibus Memorandum of Law, evidence received during the confirmation hearing, and the complete record of this case, the Court finds that the Second Amended Joint Chapter 11 Plan for Generations on 1st, LLC, with representations the Plan Proponents will substitute a member on the Creditor Trust Oversight Committee in the Trust Agreement, meets all requirements of 11 U.S.C. § 1129 and other applicable provisions of the Bankruptcy Code and confirms the Plan.

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

A.    The Court has jurisdiction over this matter and this case pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Second Amended Joint Chapter 11 Plan is a core proceeding pursuant to 28

U.S.C. § 157(b)(2)(L), and this Court has jurisdiction and authority to enter a final order confirming a plan of liquidation.

B.      Debtor properly served its Amended Joint Chapter 11 Plan, Disclosure Statement, and Confirmation Hearing Order.

C.      The Second Amended Joint Chapter 11 Plan includes revisions based on objections and Court concerns.  Additionally, the Plan Proponents agreed to replace one of the RRSB representatives on the Creditor Trust Oversight Committee with a representative of the Watertown Development Company.  The Court finds that these revisions do not adversely affect the substantive rights of creditors and other interested parties that did not receive notice of these revisions.  The Plan Proponents are not required to re-notice and serve the Second Amended Joint Chapter 11 Plan.

D.      Debtor solicited votes for acceptance and rejection of the Amended Joint Chapter 11 Plan in compliance with 11 U.S.C. §§ 1125 and 1126, Fed. R. Bankr. P. 3017 and 3018, the Disclosure Statement, and the Confirmation Hearing Order.

E.      Interested Party Jesse Craig filed an objection.

F.      The Court makes the following specific findings for each applicable provision of 11 U.S.C. § 1129:

1.      <u>11 U.S.C. § 1129(a)(1).</u>

The Plan Proponents did not separately classify identical claims and demonstrated a reasonable and good faith basis for their classifications in the Second Amended Joint Chapter 11 Plan, and their Plan contains the necessary components.

Under section 1123(b)(3), settlement of claims may be included in a plan. The Plan Proponents propose to settle all claims against RRSB and/or any of its employees,

representatives, officers, and directors, that were raised or could have been raised in the Adversary Proceeding or Foreclosure Proceeding in consideration for RRSB's agreement to release proceeds from the sale of its collateral to pay certain claims and to fund the Creditor Trust.

Jessie Craig objected to the settlement of claims against RRSB, arguing that the Plan contained no analysis of the RRSB's potential liability and the CRO conducted little or no investigation of this claim and cause of action.

In deciding whether the Plan Proponents agreed to dismiss with prejudice all claims against RRSB and include in the exculpation provision for consideration sufficient to meet the business judgment and/or 9019 standards, the Court considered evidence offered at the hearing and the terms of the Plan, which provides:

> In consideration [for a dismissal of claims with prejudice, injunction and exculpation clauses], RRSB has agreed to permit proceeds of the sale of its Real Estate Collateral to be used on the Effective Date to pay all Administrative Expenses, Priority Tax Claims, U.S. Trustee fees, and to fund the Creditor Trust. Additionally, RRSB will dismiss the Foreclosure Proceeding with respect to the Debtor as soon as practicable after the Effective Date.

Doc. 487 at § 4.10.

Some of the United States Trustee fees have been paid and the priority tax claims were paid. While these debts were satisfied from rent proceeds that secure Debtor's debt to RRSB, it is apparent that these expenses are not consideration for the release. Consideration fairly includes future United States Trustee fees, which Plan Proponents anticipate will exceed $70,000, $250,000 to fund the Creditor Trust[1] and

---

[1] Craig argues the $250,000 contribution to the Creditor Trust is illusory consideration because RRSB received derivative standing to pursue insider claims and filed an adversary proceeding seeking to recover on these claims. He maintains RRSB

professional fees due and owing on confirmation which will likely total more than $30,000.

The CRO testified that he considered the low probability of recovery exceeding the consideration offered even if successful, the expense of litigation, the delay caused by litigation, and the need to fund the pursuit of claims against insiders.  In its examination of the CRO, RRSB highlighted that the only counts of the complaint against RRSB that suggest a possible recovery (Counts 3 and 4), show the maximum recovery under these claims totals $206,882.88.

While Craig suggested that the CRO should have conducted more investigation into the allegations against RRSB, he offered no evidence showing the CRO's decision to support the release in exchange for the consideration offered by RRSB was unreasonable.  In other words, there is nothing in the record that suggests Debtor's claims against RRSB could have resulted in damages in excess of $350,000.

Craig also maintains that the CRO's testimony is insufficient to meet the Bankruptcy Rule 9019 standards.  The Court is not entirely convinced that a nondebtor/trustee plan proponent must meet Rule 9019 standards.  Nevertheless, based on the CRO's testimony, Debtor's allegations against RRSB and evidence

---

would have spent money on litigation regardless of the commitment in the Plan.  While Craig fairly summarized RRSB's litigation pursuit, this does not make the $250,000 entirely illusory consideration.  By designing a Creditor Trust and appointing the CRO to serve as an independent Trustee, the Plan Proponents relinquished control of the litigation.  The Trust Agreement provides that the Trustee may "cause the Trust to pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, or resolve all Causes of Action."  Doc. 487 at 66. There appears to be no other limitation on this discretion unless the Trustee seeks Court approval of the settlement.  If the Trustee seeks Court approval, RRSB may object, but its input is not controlling.

received at the hearing, the Court finds the settlement in the Plan is fair and equitable

and in the best interests of the bankruptcy estate.  In reaching this conclusion, the Court

considered the allegations and prayer for relief in the complaint against RRSB and the

CRO's testimony regarding the probability of recovering in excess of the consideration

offered in the Plan; the probability that the Creditor Trust could collect the judgment if it

prevailed; the complexity of the litigation and the cost and delay necessary to obtain a

resolution; and the interests of the creditors—who filed no objection to the release,

exculpation provisions or any other provision in the Second Amended Joint Chapter 11

Plan.  The Court also finds that the CRO's decision to release the claims against RRSB

and include it in the exculpation provision in exchange for the consideration offered is

an exercise of sound business judgment.  Craig's objections are overruled.  The Second

Amended Joint Chapter 11 Plan complies with applicable provisions of the Bankruptcy

Code, including 11 U.S.C. §§ 1122, 1123 and 1126.  The requirements of 11 U.S.C. §

1129(a)(1) are satisfied.

2.       11 U.S.C. § 1129(a)(2).

For the reasons outlined below, RRSB and Debtor, as proponents of the Second

Amended Joint Chapter 11 Plan, complied with all applicable provisions of the

Bankruptcy Code and the Bankruptcy Rules, including the solicitation of acceptances

and rejections of the Plan.  Craig's objections are overruled.  The requirements of 11

U.S.C. § 1129(a)(2) are satisfied.

3.       11 U.S.C. § 1129(a)(3).

Section 1129(a)(3) requires that the Plan must be proposed in good faith and not

by any means forbidden by law.  Craig argues that the Plan Proponents failed to meet

6

this burden.  Specifically, Craig argues that the Plan fails to maximize the value of the estate for the benefit of creditors and interested parties because the property Plan Proponents seek to sell was not properly marketed; the Plan allows for automatic equitable subordination of insider claims without adjudication; the Plan releases the estate's claim against RRSB without adequate consideration or justification; the Plan improperly diverts $250,000 of sale proceeds to the Creditor Trust by supporting the claims the Creditor Trust could pursue; and the Creditor Trust will be overseen by people with conflicts of interest.

"[A] plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.), 933 F.3d 918, 927 (8th Cir. 2019) (quoting Hanson v. First Bank of S.D., N.A., 828 F.2d 1310, 1315 (8th Cir. 1987)).  "These standards include serving Bankruptcy Code objectives, such as 'preserving going concerns and maximizing property available to satisfy creditors, giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice.'" Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.), 582 B.R. 771, 783 (E.D. Mo. 2017), aff'd, 933 F.3d 918 (8th Cir. 2019) (quoting In re WR Grace & Co., 729 F.3d 332, 346 (3d Cir. 2013)).  Courts consider the totality of the circumstances surrounding the creation of a plan in determining whether the plan was proposed in good faith. In re Peabody Energy Corp., 933 F.3d at 927.  "The proper [good faith] inquiry is whether the plan constitutes an abuse of the

7

provisions, purpose or spirit of the Code." In re J & J Oilfield Servs., Inc., 2015 WL 3750143, at *9 (Bankr. D.N.D. June 12, 2015) (quoting Cutcliff v. Reuter (In re Reuter), 427 B.R. 727, 770 (Bankr. W.D. Mo. 2010))

In response to concerns expressed by the Court after the close of evidence, the Plan Proponents filed the Second Amended Joint Chapter 11 Plan, which included revisions to § 4.9, Equitable Subordination of Insider Claims.  The revised section provides that equitable subordination of insider claims may be determined postconfirmation through an adversary proceeding, claim objection, or other appropriate process.  The Plan Proponents also deleted the sentence in the description of Class 6, providing that all equity interests will be extinguished on confirmation.  These changes resolve Craig's objections to automatic equitable subordination.

To the extent Craig argues that the Plan Proponents' release of claims against RRSB for the consideration offered demonstrates lack of good faith, this objection is overruled for the reasons stated in section F.3. above.

Craig also argues that the Plan improperly diverts $250,000 of sale proceeds to the Creditor Trust to fund speculative litigation.  More specifically, Craig argues that RRSB's Complaint against Craig Development, LLC, Craig Properties, LLC, Craig, and Jordan Horner in Adversary Proceeding No. 26-7003 includes "nothing but conclusory allegations" that do not support the diversion of funds to support litigation against insiders.  The adversary complaint is not the only evidence in the record that arguably supports these claims.  For example, the affidavit of Danielle Harless suggests that "the total value of all transfers out of the [First Community Credit Union] Craig Accounts for purposes wholly unrelated to the Debtors, the Parkside Project or the Generations

8

Project" totals $5,253,640.24.  Doc. 271 at 9.  Also, the CRO testified that he reviewed

transactions allegedly supporting the claims against insiders.  While this evidence alone

is not sufficient to prove a cause of action against the insiders, this evidence and the

allegations in Adversary Proceeding 25-7003 are sufficient to show that the CRO's

decision to pursue funding the Creditor Trust was a proper exercise of business

judgment and to show that investing $250,000 in sale proceeds was proposed in good

faith and not for an improper purpose.

Additionally, Craig asserts that the composition of the Creditor Trust Oversight

Committee was not proposed in good faith because the Plan appoints fiduciaries who

have been accused of wrongdoing against Debtor to pursue claims against insiders.

Under the Trust document proposed in the Second Amended Joint Chapter 11

Plan, the Oversight Committee is comprised of Charles Aarstad and Danielle Harless

from RRSB and Lane Warzecha from HME Properties, Inc.  RRSB and HME Properties

are creditors who will benefit if the Creditor Trust is successful in pursuing the

bankruptcy estate's claims.  It is not uncommon for a plan proponent to appoint a

creditor representative to serve on a creditor trust committee.  The CRO testified that it

would be helpful to have representatives of RRSB on the Oversight Committee because

they have crucial knowledge of Debtor's finances and the relationship between Debtor

and RRSB.  Since the Plan releases the bankruptcy estate's claims against RRSB, the

Creditor Trust's claims are less likely to raise a conflict of interest with RRSB

employees.  It is not clear that two representatives from RRSB would be necessary or

helpful, however.

9

During oral argument and following the hearing, the Plan Proponents agreed to replace one of the RRSB representatives on the Creditor Trust Oversight Committee with a representative of Watertown Development Company.  See Doc. 487 at 76.  Chris Clifton, the Executive Director of Watertown Development Company, agreed to serve on the Oversight Committee.  Doc. 494.

At the confirmation hearing, Craig offered the testimony of Mulinda Craig, who provided several examples of HME Properties' poor performance as a property manager.  To the extent the estate holds claims against HME Properties that the CRO decides to pursue, the Trust Agreement provides a recusal process.  The CRO testified that he understands conflicts of interest may arise, and he would put safeguards in place to address them.  Additionally, the CRO emphasized that he holds sole discretion to bring claims on behalf of the Trust and credibly testified that he would exercise independent judgment in doing so.  His decision to appoint creditor representatives to the Oversight Committee was a proper exercise of business judgment.

Based on the CRO's testimony and the terms of the Trust Agreement, the Court finds that the Plan Proponents met their burden of showing that they proposed the Creditor Trust Oversight Committee (as modified during oral argument) in good faith and not for any improper purpose.

Craig's most compelling argument in opposition to confirmation of the Second Amended Joint Chapter 11 Plan is his claim that the proposed sale and overbid procedures were not designed to maximize the value of the estate for the benefit of creditors and other interested parties.  In the Plan, the Plan Proponents propose to sell Debtor's real property for $8,840,000 to VKB Properties, LLC.  Prior to receiving the

10

offer from VKB Properties, the CRO reviewed Generations' financial statements from 2023, 2024, 2025 and year-to-date 2026 and concluded that the value of the property ranged from $8 million to $9.5 million using an income-based valuation method. After receiving the VKB offer, the CRO declined to market the property, concluding that it was unlikely he would receive offers high enough to offset the accruing interest, delay, 5% brokerage fee and other expenses necessary to sell the property. He also declined to advertise the Third Party Overbid opportunity outlined in the Plan, electing instead to serve interested parties. RRSB supported this approach, and the Plan Proponents designed the Plan accordingly. The Plan Proponents served the Amended Joint Chapter 11 Plan on May 30, 2026, less than 30 days before the Third Party Overbid opportunity expired on June 26, 2026.

Craig argues that "[t]he Plan is not supported by any meaningful valuation evidence, including appraisals supporting the proposed sale price, a recognized valuation methodology, comparable sales analysis, capitalization rate analysis, broker opinion of value, or evidence of a marketing process reasonably designed to maximize value." Doc. 447 at 3-4. In support of his objection, Craig explained that construction on Generations was completed in August 2020, and the apartment complex income has stabilized at over a 95% occupancy rate which maximizes its value. Craig, who has been a property manager and developer since 1991, opined that the 2021 value of the Generations property totaled in the high $12 million or low $13 million range. In 2023, Generations offered the property for sale at the urging of RRSB. After considering the property's appraised value and consulting with a real estate agent, Generations listed the property for a price of $13,240,000. VKB submitted a $10,750,000 offer on July 31,

11

2023.  Craig did not respond to this offer.  VKB submitted a second offer of $11,500,000 on September 11, 2023, contingent on VKB's ability to assume the in-place financing RRSB provided to Generations.  RRSB refused to approve the financing request, prompting VKB to withdraw its offer.

In December 2023, RRSB sent Generations a notice of default that included terms of a proposed purchase agreement.  In the notice of default letter, RRSB proposed a sale of the Generations property for $10,645,702.97.  According to Craig, RRSB would forgive $1.2 million in interest and late fees, bringing the total consideration to more than $11 million.  Craig did not elucidate why Generations refused this offer.

Kelly Zander, a former business partner of Craig's from the early 2000s, submitted the next purchase offer.  Zander offered to purchase all three properties, Generations, Parkside Place and The Ruins, on December 17, 2025.  Ex. E7.  Specifically, he offered to purchase Generations for $10,385,000. According to Craig, the offer required RRSB to provide financing to Zander for 12 months, after which he would refinance with Wells Fargo.   This offer did not result in a sale.

Since the Zander offer fell through, Craig has been working on obtaining between $9,300,000 and $10,000,000 in financing through Housing and Urban Development (HUD) to purchase Debtor's property.  In May 2026, Craig met with the CRO to discuss the HUD funding proposal and timeline for the purchase. Craig told the CRO that 6 to 8 months "would be great" but he also asked for a 2-month "buffer."  According to Craig, it would have been feasible for him to pay $10,100,000 for Generations by December 2026 when he pitched his proposal to the CRO.  Recognizing RRSB's concern about

12

timing, Craig also proposed a "toggle" approach, which contemplated increasing

purchase prices at set dates. As an illustration of this "toggle" approach, Craig was

willing to increase the purchase price to $10,490,000 if he could not complete the

purchase by December 2026.  His proposal included supplementing cash flow as

necessary with capital contributions.  If Craig was unable to complete the purchase by

March 2027, he agreed that the CRO could list the property for sale.  Craig's proposal

also included releasing Jesse and Mindy Craig of any personal liability.  The CRO never

responded to Craig's proposal.  Craig testified that he recently secured bridge financing

to pay for the purchase until HUD financing is approved.

Craig maintains Debtors' property is currently worth $12,500,000.

This summary, together with pleadings filed and testimony received in the record,

demonstrates Craig's extraordinary efforts to sell Debtor's property for the best possible

price.   Yet, there has been no sale.

The Second Amended Joint Chapter 11 Plan does not include a commercially

reasonable marketing approach to selling Debtor's property.  Instead, the Plan

Proponents propose a private sale with an unadvertised Third Party Overbid opportunity

allowing a prohibitively short deadline.  It comes as no surprise that the Plan

Proponents received zero overbids.  Without citing authority, Craig argues that the "Plan

Proponents bear the burden of demonstrating that the proposed purchase price

represents fair value and reflects the highest and best value reasonably obtainable for

the Property," and claims the Plan Proponents failed to meet this burden.

This is not an accurate summary of the Plan Proponents' burden.  While efforts

to sell the bankruptcy estate's property for the highest value reasonably obtainable

13

would certainly support the Plan Proponents' efforts to maximize value for the estate, this is only one factor in the totality of the circumstances that the Plan Proponents must show and the Court must consider. As the Eighth Circuit concluded in analyzing the totality of circumstances in In re Peabody Energy Corp., "We cannot look merely at the potential virtues of the [committee's] proposed alternative while ignoring the potential risks involved." In re Peabody Energy Corp., 933 F.3d at 928.

The evidence shows that the CRO valued the Generations property at between $8 million and $9.5 million, and the $8,840,000 VKB offer fell within that range.  In deciding whether to accept the offer, the CRO considered the expense and delay necessary to market the property more aggressively and determined that accepting a cash offer now was the best choice.

While the record includes significantly higher value estimates and unconsummated offers, the estimates are not offers and each of the former offers were presented with contingencies left unsatisfied.  RRSB, the first priority secured lien holder, would benefit from a higher price, but it asks the Court to confirm the private sale it proposed as one of the Plan Proponents.  Likewise, Watertown Development Company maintains that the sale included in the Second Amended Joint Chapter 11 Plan is in its best interests.  No creditor objected to the proposed sale or any provision in the Second Amended Joint Chapter 11 Plan. In the creditors' view, the expeditious liquidation and distribution of the bankruptcy estate to its creditors offsets the speculative possibility of a higher offer.  In reviewing the totality of circumstances unique to this case, the Court finds that the CRO's decision to propose a private sale outlined in the Second Amended Joint Chapter 11 Plan is a sound exercise of business judgment.

14

In summary, the Plan Proponents proposed the Second Amended Joint Chapter 11 Plan in good faith and not by any means forbidden by law. Craig's objections are overruled.  The requirements of 11 U.S.C. § 1129(a)(3) are satisfied.

4.      11 U.S.C. § 1129(a)(4).

The Second Amended Joint Chapter 11 Plan provides that professional fees and expenses, as well as other allowed administrative expense claims, are subject to Court approval and will be paid in full in cash on the Effective Date from proceeds of the collateral sale.  The requirements of 11 U.S.C. § 1129(a)(4) are satisfied.

5.      11 U.S.C. § 1129(a)(5).

After confirmation of the Second Amended Joint Chapter 11 Plan, the CRO will administer, collect and liquidate Debtor's assets and implement the Plan.  There appear to be no insiders or affiliates of Debtor who will serve as a director, officer or voting trustee of the reorganized debtor.  The requirements of 11 U.S.C. § 1129(a)(5) are satisfied.

6.      11 U.S.C. § 1129(a)(6).

This section appears to be inapplicable in this case.

7.      11 U.S.C. § 1129(a)(7).

The Second Amended Joint Chapter 11 Plan is a liquidating plan.  Chapter 7 fees will reduce distribution to creditors, and the liquidation process will be delayed if the case were converted.  Accordingly, the Court finds that each holder of an allowed claim or interest has voted to accept the Plan or will receive under the Plan on account of such claim property of a value, as of the Effective Date, that is not less than the amount

15

such holder would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code.  The requirements of 11 U.S.C. § 1129(a)(7) are satisfied.

        8.      11 U.S.C. § 1129(a)(8).

Of the two impaired classes entitled to vote, two classes accepted the Amended Joint Chapter 11 Plan: Classes 1 and 3.  Classes 2 and 4 are not impaired by the Plan and are conclusively presumed to have accepted the Plan under section 1126(f).

The Second Amended Joint Chapter 11 Plan includes revisions based on objections and Court concerns.  Additionally, the Plan Proponents agreed to replace one of the RRSB representatives on the Creditor Trust Oversight Committee with a representative of the Watertown Development Company.  The Court finds that these revisions do not adversely affect the substantive rights of creditors and other interested parties that voted but did not receive notice of these revisions.

Classes 5 and 6 are deemed to reject the Plan.  The requirements of 11 U.S.C. § 1129(a)(8) are not satisfied.

Although the Court finds that two classes did not accept the Plan, this finding does not preclude confirmation because the Court also finds that the Second Amended Joint Chapter 11 Plan satisfies 11 U.S.C. § 1129(b).

        9.      11 U.S.C. § 1129(a)(9).

The Second Amended Joint Chapter 11 Plan provides that administrative expense claims, priority tax claims and United States Trustee fees will be paid on the effective date of the Plan.  The requirements of 11 U.S.C. § 1129(a)(9) are satisfied.

10.    11 U.S.C. § 1129(a)(10).

Classes 1 and 3 are impaired classes that voted to accept the Amended Joint Chapter 11 Plan.  Because at least one impaired class voted to accept the Plan, the requirements of 11 U.S.C. § 1129(a)(10) are satisfied.

11.    11 U.S.C. § 1129(a)(11).

Based on the record, the Court finds that confirmation of the Second Amended Joint Chapter 11 Plan is not likely to be followed by the need for further reorganization. The Plan appears workable, the sale process and alternatives viable and the Creditor Trust funded.  There is a reasonable likelihood the Plan can be performed.  The Plan is feasible.  The requirements of 11 U.S.C. § 1129(a)(11) are satisfied.

12.    11 U.S.C. § 1129(a)(12).

Section 2.4 of the Second Amended Joint Chapter 11 Plan provides that all fees owed under 28 U.S.C. § 1930 have been paid or will be paid.  The requirements of 11 U.S.C. § 1129(a)(12) are satisfied.

13.    11 U.S.C. § 1129(a)(13).

The Debtor is not obligated to pay, and the Second Amended Joint Chapter 11 Plan offers no "retiree benefits," as that term is defined by 11 U.S.C. § 1114(a). Accordingly, 11 U.S.C. § 1129(a)(13) is inapplicable in this case.

14.    11 U.S.C. § 1129(a)(14).

Section 1129(a)(14) is inapplicable in this case.

15.    11 U.S.C. § 1129(a)(15).

The Plan Proponents are not individuals.  Consequently, 11 U.S.C. § 1129(a)(15) is inapplicable in this case.

17

16.   11 U.S.C. § 1129(a)(16).

This section is not applicable to Debtor, which is a for-profit business.

17.   11 U.S.C. § 1129(b).

Although several classes did not accept the Plan, the Court finds that the Second

Amended Joint Chapter 11 Plan satisfies 11 U.S.C. § 1129(b)(1) because it does not

discriminate unfairly and is fair and equitable to the classes that failed to vote and the

classes that rejected the Plan.

18.   11 U.S.C. § 1129(c).

The Second Amended Joint Chapter 11 Plan is the only plan before the Court.

19.   11 U.S.C. § 1129(d).

No party in interest, including, but not limited to, any governmental unit, has

requested that this Court deny confirmation of the Second Amended Joint Chapter 11

Plan on grounds that the principal purpose of the Plan is "the avoidance of taxes or the

avoidance of the application of section 5 of the Securities Act of 1933," and the principal

purpose of the Plan is not tax avoidance.  Accordingly, the Second Amended Joint

Chapter 11 Plan satisfies the requirements of 11 U.S.C. § 1129(d).

20.   11 U.S.C. 1129(e).

This case is not a small business case.  Therefore, 11 U.S.C. § 1129(e) is

inapplicable.

**Accordingly, IT IS ORDERED:**

Confirmation of Plan.  The Second Amended Joint Chapter 11 Plan is

**CONFIRMED** pursuant to 11 U.S.C. § 1129.  Plan Proponents are ordered to substitute

18

Chris Clifton, Executive Director of Watertown Development Company, for one of the RRSB representatives in the Trust Agreement.

Notice of Entry of Confirmation Order and Occurrence of Effective Date. After the occurrence of the Effective Date, Debtor shall file a notice of the Effective Date with the Court and serve such notice on all creditors, the United States Trustee, and any other parties in interest.

Final Order. This Order is a final order.

Immediately Effective Order. In accordance with Fed. R. Bankr. P. 3020(e), 6004(h), and 6006(d) and, notwithstanding any other provisions of the Bankruptcy Code or the Bankruptcy Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

Retention of Jurisdiction. Subject to applicable law, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of or relating to this case and the Plan pursuant to 11 U.S.C. §§ 105(a) and 1142, including those matters listed in the Second Amended Joint Chapter 11 Plan.

Dated: July 24, 2026.

Shon Hastings, Judge
United States Bankruptcy Court

19