**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re: | Case No.:  25-30003 |
| Parkside Place, LLC, | Chapter 11 |
| Debtor. | |

**RED RIVER STATE BANK'S PRECONFIRMATION HEARING BRIEF**

Plan Proponent Red River State Bank ("RRSB"), in support of the plan proposed by it respectfully represents:

**Introduction**

The Plan should be confirmed.  It complies with the applicable provisions of the Bankruptcy Code, it is feasible, and it is in the best interests of the creditors.

**BACKGROUND**

On January 6, 2025 (the "Petition Date"), Debtor Parkside Place, LLC ("Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of North Dakota.  On June 22, 2026, RRSB filed the First Amended Plan of Liquidation for Parkside Place, LLC (the "Plan")[1] [ECF No. 442] and the Amended Disclosure Statement for the First Amended Plan of Liquidation for Parkside Place, LLC (the "Disclosure Statement") [ECF No. 440].  On June 23, 2026, the Court entered its Order Scheduling Disclosure Statement Hearing and Setting Deadline for

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Plan.

Return of Ballots and Objections to Confirmation and Scheduling Confirmation Hearing (the "Disclosure Statement Order") [ECF No. 444].

The Plan is a liquidation plan funded by two sources for the recovery of creditors: a sale process and a creditor trust.  First, RRSB has agreed to liquidate 100% of its Real Estate Collateral to fund the Plan.  Sale Proceeds will be used to pay Administrative Claims, UST quarterly fees, RRSB's Class 1 Secured Claim, and all Class 4 Convenience Class claims. Second, the Plan will establish a Creditor Trust to fund the investigation and prosecution of any and all Causes of Action owned by the Debtor.  As discussed in the Disclosure Statement, the Creditor Trust is expected to pursue the avoidance of certain prepetition transactions to Insiders. RRSB is not the trustee of the Creditor Trust; rather, the Plan proposes to appoint an independent third-party to act as a fiduciary on behalf of the Creditor Trust. Proceeds from the Sale of Real Estate Collateral of no less than $50,000 will be allocated to fund the work of the Creditor Trust.  All proceeds of litigation or settlement will be distributed pro rata to Class 3 general unsecured Creditors.

As reflected in the Chapter 11 Computations, *see* ECF No. 495, the voting results were as follows:

| Class | Percentage Voting in Favor (in number) | Percentage Voting in Favor (in amount) |
|---|---|---|
| Class 3 – Allowed General Unsecured Claims | 100.00% | 100.00% |

The Plan meets all the requirements of Section 1129(a).

## **LAW AND ARGUMENT**

To confirm the Plan, the Court must find that RRSB has satisfied the provisions of Section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *In re J & J Oilfield*

2

*Servs., Inc.*, Bankr. No. 13-30607, 2015 WL 3750143, at *9 (Bankr. D.N.D. June 12, 2015) (citing *In re Bryant*, 439 B.R. 724, 738 (Bankr. E.D. Ark. 2010)); *see also In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the Plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."). RRSB submits the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law. In particular, the Plan fully complies with the requirements of Sections 1122, 1123, and 1129 of the Bankruptcy Code. This memorandum addresses each requirement individually.

## I.     The Plan complies with all applicable provisions of the Bankruptcy Code (§ 1129(a)(1))

Section 1129(a)(1) of the Bankruptcy Code, requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of Section 1129(a)(1) of the Bankruptcy Code explains that the provision encompasses the requirements of Sections 1122 and 1123 of the Bankruptcy Code, which govern the classifications of claims and contents of a plan, respectively. *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 95-595, 95th Cong., 1ˢᵗ Sess. 412 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the legislative history of [Section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was more directly aimed at were sections 1122 and 1123."). As demonstrated below, the Plan complies with the requirements of Sections 1122 and 1123, as well as all other applicable provisions of the Bankruptcy Code.

A.        Compliance with Section 1122 of the Bankruptcy Code

The Plan satisfies the classification requirements of Section 1122 of the Bankruptcy

Code.    Under Section 1122 of the Bankruptcy Code, plan proponents have significant

flexibility in placing similar claims into different classes, provided there is a rational basis to

do so.  *See Hanson v. First Bank of S.D.*, 828 F.2d 1310, 1313 (8th Cir. 1987), *overruled on*

*other grounds by Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380

(1993); *see also Boston Post Rd. L.P. v. FDIC (In re Boston Post Road, L.P.)*, 21 F.3d 477,

483 (2d Cir. 1994) (finding that courts cannot prohibit separate classification of substantially

similar claims); *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944,

956-57 (2d Cir. 1993) (finding separate classification appropriate because classification

scheme had a rational basis; separate classification based on bankruptcy court approved

settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("the only

express prohibition on separate classification is that it may not be done to gerrymander an

affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018

(Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of

reorganization has considerable discretion to classify claims and interests according to the facts

and circumstances of the case"); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723,

757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the

identical classification of dissimilar claims.  It does not require that similar claims be grouped

together . . . ."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) ("a debtor

may place claimants of the same rank in different classes and thereby provide different

treatment for each respective class").

The Plan's classification of claims and equity interests satisfies the requirements of Section 1122 because the claims and equity interests in each class differ from claims and equity interests in each other class in a legal or factual nature or based on other relevant criteria. Moreover, each of the claims or equity interests in a particular class is substantially similar to the other claims or equity interests in such class. Specifically, the Plan provides for the separate classification of claims and equity interests into the following six (6) classes based upon difference in the legal nature and/or priority of such claims and equity interests:

- Class 1 Allowed Secured Claim of Red River State Bank

- Class 2 Allowed Secured Claim of Watertown Development Company

- Class 3 Allowed General Unsecured Claims

- Class 4 Administrative Convenience Class

- Class 5 Intercompany Claims

- Class 6 Equity

Secured claims are classified separately from unsecured claims, and equity interests are classified separately from claims. Claims or equity interests assigned to each particular class described above are substantially similar to the other claims or equity interests in such class. Accordingly, the Plan satisfies Section 1122(a) of the Bankruptcy Code, and no objection has been made otherwise.

B.     Compliance with Section 1123(a) of the Bankruptcy Code

Section 1123(a) of the Bankruptcy Code sets forth seven items that every Chapter 11 plan for a non-individual debtor must contain. *See* 11 U.S.C. § 1123(a). The Plan contains each of these items.

5

1.     *Designation of classes of claims and interests (§ 1123(a)(1))*

Section 1123(a)(1) of the Bankruptcy Code requires that the Plan "designate . . . classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests[.]"  11 U.S.C. § 1123(a)(1).  As discussed above, Article III of the Plan properly designates classes of claims and equity interests, and thus, satisfies the requirement of Section 1122 of the Bankruptcy Code.  No party in interest has contended the Plan violates Section 1123(a)(1).

2.     *Specification of unimpaired classes (§ 1123(a)(2))*

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  The Plan meets this requirement by identifying in Article III each class that is not impaired.  No party in interest has contended the Plan violates Section 1123(a)(2).

3.     *Treatment of impaired classes (§ 1123(a)(3))*

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).  The Plan meets this requirement by setting forth the treatment of impaired classes in Articles III & IV.  No party has contended the Plan violates Section 1123(a)(3).

4.     *Equal treatment within classes (§ 1123(a)(4))*

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interests of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The Plan meets this requirement because the holders of allowed claims will receive the same rights and treatments as other holders of allowed claims within their

6

respective class, except to the extent they agree to less favorable treatment.  No party has contended the Plan violates Section 1123(a)(4).

### 5. *Means of implementation (§ 1123(a)(5))*

Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  The Plan satisfies this requirement through Article IV and various other provisions of the Plan which together provide for the means by which the Plan will be implemented.  No party has contended the Plan violates Section 1123(a)(5).

### 6. *Issuance of non-voting securities (§ 1123(a)(6))*

Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.  11 U.S.C. § 1123(a)(6).  The Plan does not contemplate the issuance of non-voting equity securities.  No party has contended the Plan violates Section 1123(a)(6).

### 7. *Officers and directors (§ 1123(a)(7))*

Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy . . . ." 11 U.S.C. § 1123(a)(7).  As the Plan is a liquidating plan, there will be no officers or directors of Debtor after plan confirmation.  Rather, the Plan Administrator and Creditor Trustee will be tasked with administering, collecting, and liquidating Debtor's remaining assets and implementing the Plan. The Plan complies with Section 1123(a)(7) of the Bankruptcy Code.   No party has contended the Plan violates Section 1123(a)(7).

Based on the foregoing, the Plan complies fully with each of the requirements of Section 1123(a) of the Bankruptcy Code.

      C.      <u>Compliance with Section 1123(b) of the Bankruptcy Code</u>

          *1.      Overview of the Plan's compliance with Section 1123(b) of the Bankruptcy Code*

Section 1123(b) of the Bankruptcy Code sets forth various permissive provisions that may be incorporated in a Chapter 11 plan. *See* 11 U.S.C. § 1123(b). For example, Section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of Chapter 11. 11 U.S.C. § 1123(b)(1)-(6). The Plan is consistent with Section 1123(b) of the Bankruptcy Code.

Interested Party Jesse Craig ("Mr. Craig") objected to the Plan as including an inappropriate settlement of the adversary claims asserted against RRSB. *See* ECF No. 496 Specifically, Mr. Craig argued the Plan cannot be confirmed because neither the Plan, nor the Disclosure Statement, contains a Rule 9019 analysis regarding the settlement of the adversary claims against RRSB.

Section 1123(b)(3) expressly contemplates that a Chapter 11 plan may incorporate a settlement. "'[T]he standards for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr.P. 9019.'" *In re Wigley*, 557 B.R. 678, 685 (8th Cir. BAP 2016) (quoting *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008)). The release of RRSB through the Plan is a recognized

mechanism under Chapter 11, and the adequacy of consideration for that release is properly evaluated at the confirmation hearing where RRSB will present the full Rule 9019 analysis.

>2.    *The Plan Complies with the Applicable Legal Standard for Approving a Plan Settlement*

The standard for evaluating a proposed settlement in the Eighth Circuit is whether the settlement is fair and equitable and in the best interests of the estate. *Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008); *Wigley v. Wigley (In re Wigley)*, 557 B.R. 678, 685 (B.A.P. 8th Cir. 2016). Critically, the settlement need not be the best possible result obtainable. *Tri-State Fin.*, 525 F.3d at 654; *cf. In re Wigley*, 557 B.R. at 685 ("A settlement need not be perfect."). Instead, the settlement needs to only fall at or above the lowest point in the range of reasonableness. *Tri-State Fin.*, 525 F.3d at 654 ("[T]he court need only . . . determine that the settlement does not fall below the lowest point in the range of reasonableness." (citation and internal quotation omitted) (omission in original)); *In re Wigley*, 557 B.R. at 685 ("[T]he bankruptcy court must 'determine that the settlement does not fall below the lowest point in the range of reasonableness.'" (citation omitted)). That is because "[c]ompromise is an art, not a science," *Nangle v. Surratt-States (In re Nangle)*, 288 B.R. 213, 220 (BAP 8th Cir. 2003), and so long as the settlement falls within the range of reasonableness, it may be approved. *PW Enter., Inc. v. Kaler (In re Racing Services, Inc.)*, 332 B.R. 581, 586 (BAP 8th Cir. 2005). A bankruptcy court abuses its discretion to approve a settlement only if no reasonable person could agree with the decision to approve the settlement. *Petters Co., Inc. v. Kelley (In re Petters Co., Inc.)*, 455 B.R. 166, 168 (BAP 8th Cir. 2011).

In assessing whether a settlement is reasonable, courts in the Eighth Circuit must consider the *Flight Transportation* or *Drexel* factors. *In re Wigley*, 557 B.R. at 685. Those

factors are: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Id.* (quoting *In re Flight Transp. Corp. Sec. Lit.*, 730 F.2d 1128, 1135 (8th Cir. 1984)).

As to the first factor, the court must determine the estate's litigation risk and then assess whether the amount tendered in settlement is commensurate with that risk. *In re Meyer*, 105 B.R. 920 (Bankr. D. Minn. 1989). If success on the merits of the adversary claims is unlikely, settlement is favored. *See TooBaRoo, LLC v. Western Robidoux, Inc.*, 135 F.4th 1133, 1139 (8th Cir. 2025) (finding that estate was unlikely to succeed weighted in favor of settlement approval); *see also In re Petters Co., Inc.*, 455 B.R. 166 (BAP 8th Cir. 2011) (low likelihood of success, the unsettled nature of applicable law, and the skill and tenacity the opposing party had demonstrated in prior litigation weighed in support of settlement).

On the second factor, difficulty in collecting on any judgment obtained in an adversary action favors settlement. *In re Petters Co.*, 455 B.R. at 175-76. And even where collection would not be difficult, the factor only becomes a neutral consideration. *TooBaRoo*, 135 F.4th at 1140.

The third factor essentially weighs the costs and burdens of continued litigation against the certainty of settlement. *In re Petters Co.*, 455 B.R. at 176. The necessity of protracted and complex litigation favors settlement. *Id.*; *see also Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 654-55 (8th Cir. 2008) (bankruptcy court did not err in approving settlement when the litigation necessary to dispute the claim would be complex and protracted); *TooBaRoo*, 135 F.4th at 1140 (the bankruptcy court did not err in approving settlement based on "the complexity of

the claims, the thousands of pages of discovery that had already been produced, and the fact that the litigation required expert testimony, all of which would only increase the costs to the estate if the litigation continued").

As to the final factor—the paramount interest of the creditors and proper deference to their reasonable views—a court must carefully consider the interests of creditors. This assessment is not limited to the interests of general unsecured creditors; a court must consider the interests of all creditors—even parties holding administrative expenses. *TooBaRoo*, 135 F.4th at 1141. Support among a debtor's creditors favors settlement. *See In re Petters*, 455 B.R. at 176-77 (bankruptcy court gave proper deference to creditors' views where only one creditor objected and the creditors' committee endorsed the settlement after thorough due diligence).

In assessing the foregoing factors, while a court is obligated to exercise independent judgment in assessing the reasonableness of a settlement, a court must not substitute its judgment for that of the trustee. A court does not second-guess the trustee's business judgment, and instead merely determines whether the proposed settlement is reasonable in the given circumstances. *TooBaRoo*, 135 F.4th at 1138.

RRSB will demonstrate at confirmation: the litigation risks associated with Adversary No. 25-7009, including the limited potential benefits to Parkside even if successful; the costs and delay of prosecuting complex lender liability claims through trial; and the concrete, certain benefits RRSB is providing through the Plan, including ensuring the administrative solvency of the case on the Effective Date, facilitating the ALC Transaction and funding the Creditor Trust. Additionally, this Court's prior determination that the adversary claims were "plausible" for purposes of Rule 12(b)(6) is not a finding on the merits and does not establish that the

11

claims would succeed at trial, which is precisely the kind of litigation risk that justifies a compromise.

> 3. *The Plan's Creation of and Funding of a Creditor Trust does not violate any provision of the Bankruptcy Code*

Mr. Craig also objected to the Plan as inappropriately funding the Creditor Trust to pursue causes of action, including avoidance claims against insiders. *See generally* ECF No. 496, at 16-17. RRSB's decision to allocate $50,000 of sale proceeds (that are otherwise subject to its own lien) to fund the Creditor Trust is a legitimate exercise of RRSB's discretion in structuring a liquidating plan. At the confirmation hearing, RRSB will provide supplemental testimony and other evidence beyond that already in the record regarding the factual basis and projected value of the causes of action. A liquidating plan is not required to provide full adversary-proceeding-level pleading detail regarding every cause of action to be transferred to a creditor trust; the plan need only provide sufficient disclosure for creditors to make an informed voting decision. The Disclosure Statement's projection of $1 million in potential claims with $330,000 to $990,000 in projected recoveries, while general, provides a range of expected value that creditors can evaluate. The $50,000 funding amount is modest relative to the projected recovery range and represents a reasonable investment in pursuing claims that, if successful, would provide a material benefit to Class 3 creditors. Without such funding, Class 3 would not receive any distribution at all. Mr. Craig's personal interest as a defendant in Adversary No. 26-07003 creates an obvious conflict that colors his objection to the Creditor Trust funding.

4.  *Equitable Subordination under a Plan is Permitted, but RRSB Proposes a Plan Modification to Reduce the Number of Disputed Issues for the Confirmation Hearing[2]*

Mr. Craig objected to the Plan as inappropriately equitably subordinating claims of Insiders.  ECF No. 496, at 14-16.  As a threshold matter, Craig—as an equity holder rather than an insider claimant whose claim is being subordinated—may lack standing to objection to this provision on behalf of third-party insider claimants.  Standing issues notwithstanding, RRSB has proposed confirmation language that expressly preserves the right of any insider claimant to contest subordination through a post-confirmation adversary proceeding or contested matter, converting the provision from an automatic adjudication into a rebuttable presumption or a reservation of rights.  *Cf. Wisconsin Cent. Ry. Co. v. Zelle*, 210 F.2d 113, 117-18 (8th Cir. 1954) (stockholders could not successfully object to the plan on the ground that the question of subordination of such claims to the claims of the stockholders was left open).

5.  *The Plan's Exculpation and Injunction Provisions satisfy Section 1123(b) of the Bankruptcy Code*

The Plan includes: (a) an exculpation provision; and (b) an injunction provision prohibiting parties from pursuing claims subject to the exculpation provision under the Plan.  As explained below, these provisions are proper under existing law.

The Exculpation Provision in Section 8.1 of the Plan exculpates parties critical to the formulation of the Plan for any acts or omissions in connection with the Plan (the "Exculpation").  The exculpated parties include RRSB and the Creditor Trustee, and their

---

[2]

13

Professionals, representatives, successors, and assigns. *See* Plan, Section 8.1. The Exculpation is permissible. An exculpation provision is not a mandatory release of all liability, but instead, establishes the appropriate standard of liability with respect to the parties exculpated. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability."). First, this Court must find, under Section 1129(a)(2), that the plan proponent (RRSB) complies with the applicable provisions of the Bankruptcy Code. Additionally, the Court must find, under Section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. § 1129(a)(3). These findings apply to RRSB and, by extension, to RRSB's officers, directors, employees and professionals. Further, these findings evidence that the Plan was negotiated at arm's length and in good faith. Insofar as RRSB negotiated the terms of the Plan with ALC, VKB, the Debtor's CRO and obtained the acceptance of all voting creditors, the Court's good faith findings with respect to Debtor's Chapter 11 cases should extend to RRSB.

Second, it is well established that the liability of statutory committees and their professionals under Section 1103 of the Bankruptcy Code is limited. *See PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 is "willful misconduct or ultra vires acts," and approving an exculpation of the creditors committee and its professionals subject only to liability for willful misconduct or gross negligence). Also, exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the

14

Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.").

RRSB asks that the Court find that the Exculpated Parties have participated in good faith with respect to formulating and negotiating the Plan and that they are entitled to protection from lawsuits from disgruntled creditors or any other parties in interest. *See* Plan, Section 8.1. Negotiation and compromise was crucial to the formulation of a feasible Plan and could not have occurred without the protection from liability that the Exculpation provides to the Exculpated Parties. Further, the Exculpation is entirely consistent with established practice. *See, e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2003) (approving exculpation provision that covered prepetition lenders, DIP lenders, creditor committees and their members, and the respective affiliates of each except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see also In re DJK Residential LLC*, No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct without unresolved objections); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (same). Therefore, the Court should approve the Exculpation and adopt the appropriate standard of liability for the Exculpated Parties with respect to Debtor's Chapter 11 case. The Exculpation does not amount to a departure from other Chapter 11 plans confirmed in other districts. *See, e.g.*, *In re ACG Holdings*, No. 08-11467 (Bankr. D. Del. Aug. 6, 2008); *In re Hilex Poly Co. LLC*, No. 08-10890 (Bankr. D. Del. June 26, 2008); I*n re Remy Worldwide Holdings Inc.*, No. 07-11481 (Bankr. D. Del. Nov. 20, 2007); *In re Foamex Int'l Inc.*, No. 05-12685 (Bankr. D. Del. Feb. 1,

15

2007).   Moreover, the Exculpation does not amount to a release, but rather represents a

conclusion of law that flows inevitably from several different findings of fact that the Court

must reach in confirming the Plan. Based upon the foregoing, the Exculpation complies with

the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and thus, satisfies the

requirements of Section 1129(a)(1) of the Bankruptcy Code.

The injunction provision in Section 8.1 of the Plan (the "Injunction") is also necessary

to preserve and enforce the Exculpation and is narrowly tailored to achieve that purpose.  Thus,

the Court should approve the Injunction.

D.      Compliance with Section 1123(d) of the Bankruptcy Code

Section 1123(d) of the Bankruptcy Code states that "if it is proposed in a plan to cure a

default the amount necessary to cure the default shall be determined in accordance with the

underlying agreement and nonbankruptcy law."  *See* 11 U.S.C. § 1123(d).  There is no such

default or cure in the Plan, and no party has contended the Plan violates Section 1123(d).

**II.     RRSB has complied with the applicable provisions of the Bankruptcy Code
          (§ 1129(a)(2))**

The Plan satisfies Section 1129(a)(2) of the Bankruptcy Code, that requires that the

proponent of a plan comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C.

§ 1129(a)(2).  The legislative history to Section 1129(a)(2) of the Bankruptcy Code reflects

that this provision is intended to encompass the disclosure and solicitation requirements set

forth in Section 1125 and 1126 of the Bankruptcy Code.  *See In re Lapworth*, No. 97-34529,

1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of

§ 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as

a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at

16

*49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that Section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code"); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977). As discussed below, RRSB has complied with Sections 1125 and 1126 of the Bankruptcy Code, regarding disclosure and solicitation of the Plan.

A.   Compliance with Section 1125 of the Bankruptcy Code

Section 1125 of the Bankruptcy Code provides, in pertinent party, that:

(b)   An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

(c)   The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125(b) & (c).

The Court approved the Disclosure Statement on June 23, 2026, and entered the Disclosure Statement Order, setting a hearing on confirmation of the Plan.

RRSB did not solicit the acceptance or rejection of the Plan from any creditor or equity interest holder before approval the Disclosure Statement Order. Moreover, appropriate materials were distributed to all parties in interest. The docket in this case confirms, and RRSB is prepared to offer evidence at the Confirmation Hearing if needed, including the certificate of service for the Disclosure Statement Order, the First Amended Plan of Liquidation and the

17

Amended Disclosure Statement [ECF No. 445], filed on June 23, 2026 , which confirms that the correct materials were sent to appropriate parties as required by the terms of the Disclosure Statement Order.  Accordingly, claimholders entitled to vote received: the Plan, the Disclosure Statement, and the Disclosure Statement Order with a blank ballot attached.  *See* Certificates of Service.  In addition, holders of claims and equity interests that were not entitled to vote or accept or reject the Plan were provided with certain non-voting materials approved by the Court in the Disclosure Statement Order.  *See* Certificates of Service.  Accordingly, RRSB has satisfied the notice and solicitation requirements of Section 1125 of the Bankruptcy Code.  No party has contended the Plan violates Section 1125.

      B.      <u>Compliance with Section 1126 of the Bankruptcy Code</u>

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan.  Specifically, in accordance with Section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed equity interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)      The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

. . .

(f)      Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)      Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests

18

to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f) & (g).

As set forth in the Disclosure Statement, in accordance with Section 1126 of the Bankruptcy Code, RRSB solicited acceptances or rejections of the Plan from the holders of allowed claims in each class of impaired claims that are to receive distributions under the Plan. Classes 1, 2 and 4 are not impaired under the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, Classes 1, 2 and 4 are conclusively presumed to have accepted the Plan. Classes 5 and 6 will receive no distribution under the Plan. Thus, in accordance with Section 1126(g) of the Bankruptcy Code, Classes 5 and 6 may be conclusively presumed to have rejected the Plan. Alternatively, because Classes 5 and 6 are compromised exclusively of statutory insiders, such classes may be disregarded for the purpose of voting to accept the Plan.

Class 3 is impaired and will receive a distribution under the Plan. As a result, in accordance with Section 1126(a) of the Bankruptcy Code, holders of Class 3 claims were entitled to vote to accept or reject the Plan. As to impaired classes entitled to vote to accept or reject a plan, Section 1126(c) and 1126(d) of the Bankruptcy Code specify the requirements for acceptance of a plan by classes of claims and classes of equity interests, respectively:

(c)     A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

(d)     A class of interests has accepted the plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other

19

than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c) & (d).

Here, the voting results were as follows:

| Class | Percentage Voting in Favor (in number) | Percentage Voting in Favor (in amount) |
|---|---|---|
| Class 3 – Allowed General Unsecured Claims | 100.00% | 100.00% |

Based upon the foregoing, RRSB submits that the Plan satisfies the requirements of Sections 1129(a)(2) & (7) of the Bankruptcy Code.  No party has contended otherwise.

### III.    The Plan was proposed in good faith (§ 1129(a)(3))

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."   11 U.S.C. § 1129(a)(3).    "[A] plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'"  *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 927 (8th Cir. 2019) (quoting *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)).  "These standards include serving Bankruptcy Code objectives, such as 'preserving going concerns and maximizing property available to satisfy creditors, giving debtors a fresh start in life, discouraging debtor misconduct, the expeditious liquidation and distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice.'" *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 582 B.R. 771, 783 (E.D. Mo. 2017), *aff'd*, 933 F.3d 918 (8th Cir. 2019) (quoting *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013)).  Courts consider the totality of the circumstances surrounding the creation of a plan in determining whether the plan was proposed

in good faith. *In re Peabody Energy Corp.*, 933 F.3d at 927.  "The proper [good faith] inquiry is whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code." *In re J & J Oilfield Servs., Inc.*, 2015 WL 3750143, at *9 (Bankr. D.N.D. June 12, 2015) (quoting *Cutcliff v. Reuter (In re Reuter)*, 427 B.R. 727, 770 (Bankr. W.D. Mo. 2010)).

Mr. Craig argues that RRSB has not proposed the Plan in good faith for three (3) reasons, arguing: (1) the Plan's sale procedures fail to maximize value for creditors; (2) the Creditor Trust Oversight Committee is conflicted; and (3) viewed as a whole, the Plan primarily benefits RRSB.  As addressed below, and as will be further addressed at the Confirmation Hearing, the Plan was proposed with proper intentions, by an economically rational actor, and, as will be further outlined at the confirmation hearing, there is a reasonable likelihood that it will achieve a result consistent with the Bankruptcy Code.  Thus, the Plan meets the requirements of Section 1129(a)(3).

A.      The Plan's sale procedures and contingencies provide a reasonable means of maximizing value of the Parkside property for creditors.

1.      *RRSB will demonstrate that Sale Procedures Proposed by the Plan are a reasonable way to maximize value for the estate.*

Mr. Craig argues the Plan was not offered in good faith because RRSB bears the burden of proving by a preponderance of the evidence that the proposed $4,900,000 ALC Transaction represents the highest and best value obtainable for the Parkside property.  *See* ECF No. 496, at 8-11.

First, RRSB will demonstrate that the sale and related procedures set forth in the Plan satisfy the good faith and best interests requirements of 11 U.S.C. § 1129 through evidence presented at the confirmation hearing.  The absence of pre-filed valuation exhibits does not preclude RRSB from introducing evidence of value at confirmation.  Moreover, the Plan

21

incorporates a Third Party Overbid process that allows the market itself to validate or improve upon the ALC price, meaning the ALC Transaction functions as a price floor rather than a ceiling.  RRSB is not required to prove that no higher price is theoretically conceivable, only that the proposed transaction was negotiated in good faith and that the procedures established are reasonably calculated to maximize value.  *In re Dakota Rail, Inc.*, 946 F.2d 82, 85 (8th Cir. 1991) (Ross argues that the plan proponent should have ordered an appraisal.  Ross does not, however, bring to our attention any evidence that such an appraisal is required by law.  We agree with the district court that the 'Bankruptcy Court itself is the finder of fact; the law does not pass the responsibility on to independent appraisers.'" (citation omitted)).  The existence of the overbid mechanism, combined with the backup Hilco marketing process, provides the market test Craig claims is lacking.

Additionally, maximization of value for the estate is only one factor in the totality of the circumstances that RRSB must show, and the Court must consider.  As the Eighth Circuit concluded in analyzing the totality of the circumstances in *In re Peabody Energy Corp.*, a court "cannot look merely at the potential virtues of the [plan proponent's] proposed alternative while ignoring the potential risks involved."  *In re Peabody Energy Corp.*, 933 F. 3d at 928. The Plan is RRSB's good faith attempt to maximize value for the estate, while accounting for the potential delay, costs and other risks and uncertainties in the alternatives advocated for by Mr. Craig, and the possibilities that his recommended actions may result in a lower recovery for the estate.

> 2.    *The Purchase Price for the ALC Transaction is adequate.*

Mr. Craig also argue the $4,900,000 ALC sale price is inadequate because his proposed alternative returns more value for the estate.  *See* ECF No. 496, at 6-8.

As a threshold matter, Mr. Craig's alternative is not certain to provide a greater return for the estate. As explicitly conceded by Mr. Craig, his alternative is contingent, and there is no guaranty that such contingencies will be satisfied. *Cf. In re Peabody Energy Corp.*, 933 F.3d at 928. a court "cannot look merely at the potential virtues of the [plan proponent's] proposed alternative while ignoring the potential risks involved."). By contrast, the Plan Proponent is prepared to introduce evidence that the ALC Transaction is more credit-worthy, and it is already secured by a deposit equal to 10% of the purchase price, which is forfeited to the estate as liquidated damages in the event that ALC fails to close.

And even if Mr. Craig's alternative were certain, its potential proves the efficacy of the procedures of the Plan—with the Plan's overbid procedures specifically allowing for Mr. Craig to purchase the Real Estate Collateral at his cited price. Specifically, Section 4.3 of the Plan contemplates accepting overbids up to August 3, 2026. If Mr. Craig can obtain and offer $5,000,000 to purchase the Real Estate Collateral, as is claimed in his objection, the Plan allows him to purchase the Real Estate Collateral at that value through the Plan. Mr. Craig's objection is clear evidence that RRSB's Plan and overbid procedures will maximize value for the estate.[3]

B.   The Plan's Oversight Committee was proposed in good faith.

Mr. Craig also argues the Plan's Creditor Trust is not proposed in good faith because: (1) RRSB is simultaneously being released from adversary claims this Court has found plausible while one of its own officer is appointed to oversee the Creditor Trust that will pursue

---

[3] RRSB will provide evidence at the confirmation hearing regarding how the overbid procedures were specifically tailored to the specifics of this case to best maximize value for the estate, while still providing finality to interested parties.

23

claims against insiders; (2) RRSB's representatives have the most knowledge of RRSB's alleged improper actions and are being appointed as fiduciaries; (3) this Court has heard evidence of HME's poor property management performance, and HME's negligence could itself be a claim the Creditor Trust pursues; and (4) Michael Schmitz cannot serve as Trustee for both the Plan Trust, as well as trustee for the Generations on 1st, LLC creditor trust. *See* ECF No. 496, at 17-19

The composition of the Creditor Trust Oversight Committee was not offered in bad faith. The Creditor Trustee—and not the Oversight Committee—holds the primary fiduciary duty to pursue causes of action for the benefit of Class 3 creditors. And as for any potential conflict created by Mr. Schmitz "wearing two hats," the Plan Proponent has confirmed that both RRSB and WDC, who hold nearly all of the beneficial interests in the Creditor Trust, are in favor of appointing Mr. Schmitz as Creditor Trustee. Creditors have already borne the cost of getting multiple professionals up to speed in the case. They would be harmed by yet another duplicative round of professional fees. It is also important to note that the Creditor Trusts in Parkside and Generations have the same three beneficiaries. No useful, economic purpose would be served by appointing two different trustees so that each Creditor Trust could sue the other. Ergo, the alleged "conflict of interest" for Mr. Schmitz is purely hypothetical. In any event, RRSB believes that the conflict provisions included in both trusts would resolve any potential conflicts. Nonetheless, in an abundance of caution, RRSB is willing to name an alternative independent third-party to serve as a "back up" Creditor Trustee under the Plan. RRSB is unaware of any meritorious objection that Craig would have to Steven Huff, Esq. exercising his independent judgment as the Creditor Trustee.

As to the composition of the Oversight Committee, the committee is comprised of members of Class 3, who are all beneficiaries of the Creditor Trust. It is not uncommon or per se improper for a Creditor Trustee to seek input from the beneficiaries of a Creditor Trust. Moreover, the Plan enjoys the support of 100% of the trust's beneficiaries and the only party raising such concerns is an insider who is a defendant in litigation to be transferred to the trust.

Additionally, RRSB officer Ms. Harless was invited to the committee because she brings direct institutional knowledge of the loan history, draw requests, and financial transactions at issue in the insider avoidance claims, making her a useful resource to the Creditor Trustee who must undertake and/or oversee future litigation. Indeed, the alleged conflict identified by Mr. Craig would already be moot by the time they became members of the Oversight Committee because confirmation of the Plan would necessitate a finding that settlement with RRSB was appropriate. *See* Sec. I(C)(1), *supra*.

Regarding HME Properties, Mr. Craig's assertion that HME's management negligence could itself be a Creditor Trust claim is speculative. Moreover, the Trust already includes contingencies for the potential conflict of a member of the Oversight Committee, including that the Creditor Trustee retains ultimate authority to pursue worthwhile and meritorious claims.

C.      The Plan, as a whole, is proposed in good faith.

Lastly, Mr. Craig argues the Plan, in the aggregate, is not proposed in good faith because the Plan concentrates material decision concerning liquidation, litigation, releases, trust governance, sale procedures, and distributions in the hands of RRSB, the secured lender and Plan Proponent, and that this cumulative structure demonstrates a plan designed primarily to implement the secured lender's preferred exit strategy and immunize itself from claims

25

rather than independently administer the estate and maximize value as required by Chapter 11. ECF No. 496, at 20-21.

A secured creditor's active role in proposing and structuring a Chapter 11 liquidating plan does not establish lack of good faith under 11 U.S.C. § 1129(a)(3). *See In re Yagow*, 60 B.R. 543, 547 (Bankr. N.D. 1986) ("The fact that a creditor proposes a liquidating plan is not evidence of bad faith." (citation omitted)). Secured creditors have a recognized economic interest in maximizing the value of their collateral and are legitimate plan proponents under the Bankruptcy Code. The good faith inquiry focuses on whether the Plan fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code, not on whether the Plan was proposed by a wholly disinterested party. Here, the Plan provides for payment of all secured and priority claims, establishes a Creditor Trust to pursue insider claims for the benefit of unsecured creditors, and includes overbid and backup marketing procedures that give the market an opportunity to improve upon the ALC purchase price. The fact that RRSB benefits from the Plan's release provision does not render the entire Plan a bad faith exercise; RRSB is providing consideration in the form of facilitating the transaction and funding administrative claims, as well as funding the Creditor Trust. Mr. Craig's cumulative bad faith argument is essentially a restatement of his individual objections to specific plan provisions, and any remaining objections can be addressed through plan modifications or confirmation hearing evidence. Moreover, Mr. Craig's own equity interest—which will receive no distribution under the plan, as required by the absolute priority rule—gives him a personal financial incentive to object to any plan that does not preserve the status quo, which the Court should weigh in evaluating the credibility and weight of his objections.

26

**IV.**    **The Plan provides that payments made for professional fees and expenses are subject to Court approval (§ 1129(a)(4))**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.  *See* 11 U.S.C. § 1129(a)(4).  Specifically, Section 1129(a)(4) requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to approval of, the court as reasonable.

*Id.*  Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all payments of professional fees using funds from estate assets be subject to review and approval by the Court as to their reasonableness.  *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation.").

All such fees and expenses, as well as all other fees and expenses of professionals through the Effective Date, remain subject to final review for reasonableness by the Court in accordance with Section 330 of the Bankruptcy Code.  *See* 11 U.S.C. § 330.  Further, all payments to be made in connection with the Effective Date, have been disclosed previously or will be disclosed. Based on the foregoing, the Plan complies with the requirements of Section 1129(a)(4) of the Bankruptcy Code.  No party has contended the Plan violates Section 1129(a)(4).

27

**V.  RRSB has disclosed all necessary information regarding directors, officers, and insiders (§ 1129(a)(5))**

Section 1129(a)(5)(A) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor.  11 U.S.C. § 1129(a)(5)(A).  The Bankruptcy Code further provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.  Section 1129(a)(5)(B) of the Bankruptcy Code also requires a plan proponent to disclose the identity of an "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.  *Id.*

As the Plan is a liquidating plan, there will be no officers or directors of Debtor after Plan confirmation.  Rather, as previously explained, the Plan Administrator and Creditor Trustee will be tasked with administering, collecting, and liquidating Debtor's remaining assets and implementing the Plan.

Based upon the foregoing, RRSB has satisfied the requirements of Section 1129(a)(5) of the Bankruptcy Code.  No party has contended the Plan violates Section 1129(a)(5).

**VI.  The Plan is in the best interests of all of the Debtor's Creditors (§ 1129(a)(7))**

Section 1129(a)(7) of the Bankruptcy Code—the "best interests test"—provides, in relevant part, that:

With respect to each impaired class of claims or interests—

> (A)  each holder of a claim or interests of such class—
>
>> (i)  has accepted the plan; or
>>
>> (ii)  will receive or retain under the plan on account of such claim or interest property of a value, as of the effective

> date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . .

11 U.S.C. § 1129(a)(7)(A).

The best interests test applies to individual dissenting holders of claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recovery in a hypothetical Chapter 7 liquidation of the debtor's estate, against the estimated recovery under that debtor's plan. *See Bank of Am.*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Advance-United Expressways, Inc.*, 86 B.R. 602, 603-04 (Bankr. D. Minn. 1988). As Section 1129(a)(7) makes clear, the best interests test applies only to non-accepting impaired claims or interests. The Plan contemplates a distribution to one impaired class—Class 3 for general unsecured claims over $5,000. Accordingly, to satisfy the best interests test, RRSB must demonstrate that each objecting creditor holding a claim in these classes will receive at least as much under the Plan as that creditor would receive in a Chapter 7 liquidation. *See In re Advance-United Expressways*, 86 B.R. at 603-04; *see also In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

With respect to each impaired class, each holder of a claim or equity interest against Debtor either has accepted the Plan and will receive or retain under the Plan on account of such claim or equity interest property of a value, as of the Effective Date, that is not less than the amount that such holder would have received or retained had Debtor been liquidated under Chapter 7 of the Bankruptcy Code on such date (the "Liquidation Date").

There are added costs and expenses of a Chapter 7 liquidation, including the fees payable to a Chapter 7 trustee and his or her professionals. The Chapter 7 trustee's statutory fee is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee. Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors. *See* 11 U.S.C. § 326(a). These Chapter 7 trustee fees would reduce the assets available for distribution to the Estate's creditors from additional recoveries such as preferential payments, expunged administrative claims, and the proceeds of successful Estate litigation or settlement.

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in payments being made to creditors. Bankruptcy Rule 3002(c) provides that conversion of Chapter 11 cases to Chapter 7 will trigger a new bar date for filing claims against the Estate, and that a new bar date will be 90 days after the first date set for the meeting of creditors called under Section 341 of the Bankruptcy Code. Not only would a Chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the Chapter 11 case, or were late-filed, could be filed against the Estate. Reopening the bar date in connection with conversion to Chapter 7 would provide these and other claimants and additional opportunity to timely file claims against the Estate, which would dilute existing allowed claims. If the case were to convert to a Chapter 7, there would certainly be additional costs and possibly additional claims to be paid. However, conversion to a Chapter 7 would not result in increased assets or cash to pay creditors. Therefore, the non-accepting impaired classes are receiving more through the Plan than they would in a liquidation under Chapter 7 and the Plan passes the best interests test. Based upon the foregoing, the Plan satisfies the

30

requirements of Section 1129(a)(7) of the Bankruptcy Code.  No opponent has contended the

Plan violates Section 1129(a)(7).

## VII. The Plan can be confirmed notwithstanding the requirements of section 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests must either accept a plan or be unimpaired under a plan.  11 U.S.C. § 1129(a)(8).

Class 1, 2, 3 and 4 have accepted the Plan.  Classes 5 and 6 are deemed to have rejected the

Plan.  Thus, while the Plan does not satisfy Section 1129(a)(8) of the Bankruptcy Code with

respect to Classes 5 and 6, the Plan is confirmable nonetheless because, as discussed below, it

satisfies Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

## VIII. The plan provides for payment in full of all allowed priority claims (§ 1129(a)(9))

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims

entitled to priority under Section 507(a) of the Bankruptcy Code receive specified cash

payments under the plan.  11 U.S.C. § 1129(a)(9).  Unless the holder of a particular claim

agrees to a different treatment with respect to such claim, Section 1129(a)(9) of the Bankruptcy

Code requires the plan to provide as follows:

(A)    with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)    with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive—

(i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

31

(C)     with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9).

In accordance with Section 1129(a)(9), Sections 2.1, 2.2, and 2.3 of the Plan provide, respectively, as follows:

**2.1     Administrative Expense Claims.**  Each Holder of an allowed Administrative Claim shall receive payment in full, in cash, on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III. To facilitate the orderly payment of Administrative Claims, all Administrative Claims must be asserted no later than the Administrative Claims Bar Date in order to be allowed and eligible for payment. Parties who fail to assert Administrative Claims in accordance with the Administrative Bar Date will be forever barred from receiving distributions under the Plan as Administrative Claim Holders.

**2.2     Priority Tax Claims.**  Each Holder of an allowed Priority Tax Claim against the Debtor shall receive payment in full on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III, in full and final satisfaction of such claim. Codington County shall have an allowed Priority Tax Claim in the amount of $76,494.98.

**2.3     U.S. Trustee's Fees.** The United States Trustee shall receive payment in full, on the Effective Date, from proceeds of a sale of the Real Estate Collateral, before the distributions described in Article III, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. After the Effective Date, the Creditor Trustee shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed. The Creditor Trust will file post-Confirmation reports in conformance with the U.S. Trustee guidelines. The Creditor Trust shall remain responsible for any unpaid fees and reports.

Plan, §§ 2.1-2.3.

Based upon the foregoing, the Plan satisfies the requirements of Section 1129(a)(9) of the Bankruptcy Code.  No party has contended the Plan violates Section 1129(a)(9).

32

IX.    **At least one class of impaired, non-insider claims will have accepted the plan (§ 1129(a)(10))**

Section 1129(a)(10) of the Bankruptcy Code is an alternative to compliance with the requirement of section 1129(a)(8) that each class of claims or interests must either accept the plan or be unimpaired under the plan. Section 1129(a)(10) provides that to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10); *see In re Martin*, 66 B.R. 921, 924 (Bankr. D. Mont. 1986) (where three classes of impaired creditors accepted plan, exclusive of insiders, requirement of Section 1129(a)(10) was satisfied). Because Class 3 voted in favor of the Plan—unanimously, the Plan satisfies the requirements of Section 1129(a)(10) of the Bankruptcy Code. No party has contended the Plan fails to satisfy Section 1129(a)(10).

X.    **The plan is feasible (§ 1129(a)(11))**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation. Specifically, the Court must determine that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). As will be demonstrated at the Confirmation Hearing, the Plan is feasible within the meaning of this provision.

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed. *See United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the

33

certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986). Rather, a bankruptcy court must determine whether a plan is workable and has a reasonable likelihood of success. *Energy Res. Co., Inc.*, 495 U.S. at 549; *In re J & J Oilfield Servs.*, 2015 WL 3750143, at *13; *see also Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (A "'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting *In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003))).

The key element to feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed.  The purpose of the feasibility test is to protect against highly speculative plans.  As noted by the United States Court of Appeals for the Ninth Circuit: "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted).

However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985).

Importantly, "the feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute . . . . There is a relatively low threshold of proof necessary to satisfy the feasibility requirement." *Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006), *remanded*, No. 04-30511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008), *stay denied*, No. 04-330511, 2008 WL 2003118 (Bankr. D. Conn. May 7, 2008), *appeal denied*, No. 08-107, 2008

WL 2079126 (D. Conn. May 16, 2008) ("[A] 'relatively low threshold of proof' will satisfy the feasibility requirement.") (quoting *In re Brotby*, 303 B.R. 177, 191–92 (B.A.P. 9th Cir. 2003)); *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 304–05 (D.N.J. 1996); *In re Eddington Thread*, 181 B.R .at 833 ("[T]he feasibility inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively broad parameters articulated in the statute."). Specifically, in assessing feasibility, courts consider a number of probative factors, including the soundness and adequacy of the capital structure and working capital for the business in which the debtor will engage post-confirmation, the prospective availability of credit, whether the reorganized debtor will have the ability to meet its requirements for capital expenditures and economic and market conditions. *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *58; *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005), *aff'd*, No. 05-7075, 2008 WL 4379035 (N.D. Ill, Mar. 24, 2008).

An analysis of these factors provide a strong indication the Plan is feasible. Under the Plan, the remaining assets of Debtor will be liquidated and distributed to Debtor's creditors. RRSB has analyzed the costs required to satisfy its obligations under the Plan and has concluded that Debtor will have sufficient funds to accomplish this goal under the Plan. Therefore, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of Debtor, and thus the Plan satisfies section 1129(a)(11) of the Bankruptcy Code. No party has contended the Plan violates Section 1129(a)(11).

**XI.     All statutory fees have been or will be paid (§ 1129(a)(12))**

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [Section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(1). In accordance with Sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan provides that

> all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. After the Effective Date, the Creditor Trustee shall pay quarterly fees to the U.S. Trustee until the Chapter 11 case is closed. The Creditor Trust will file post-Confirmation reports in conformance with the U.S. Trustee guidelines. The Creditor Trust shall remain responsible for any unpaid fees and reports

Plan, § 2.3. Thus, the Plan satisfies the requirements of Section 1129(a)(12) of the Bankruptcy Code. No party has contended the Plan violates Section 1129(a)(12).

**XII.    Sections 1129(a)(13) through Sections 1129(a)(16) do not apply to the plan**

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with Section 1114 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(13). Debtor does not have any obligations on account of retiree benefits (as such term is used in Section 1114). *See* 11 U.S.C. § 1129(a)(14) (Under section 1114 of the Bankruptcy Code "'retiree benefits' means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purpose

36

of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under [chapter 11].").  Therefore, Section 1129(a)(13) of the Bankruptcy Code is inapplicable to this Chapter 11 case.

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  *See* 11 U.S.C. § 1129(a)(14).  Debtor is not subject to any domestic support obligations, and therefore, the requirements of Section 1129(a)(14) of the Bankruptcy Code do not apply.

Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(15).  Debtor is not an "individual" and, therefore, the requirements of Section 1129(a)(15) of the Bankruptcy Code do not apply.

## XIII. The plan satisfies the "cram down" requirements of Section 1129(b) of the bankruptcy code

Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) are satisfied.  *See* 11 U.S.C. § 1129(b)(1). To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy Section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  *See e.g.*, *In re Yagow*, 60 B.R. 543, 545 (Bankr. D.N.D. 1986); *see also John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . .

37

found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

Class 5 is made up of claims of Affiliates against Debtor, each of which are impaired under the plan, and are deemed to reject the Plan.  Similarly, Class 6 is made up of equity interest holders, each of which are impaired under the Plan, and are deemed to reject the Plan. However, as described below, the Plan does not discriminate unfairly, and is fair and equitable, with respect to Classes 5 and 6.

A.     The Plan is fair and equitable (§ 1129(b)(2)(B)(ii))

A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.  11 U.S.C. § 1129(b)(2)(B)(ii); *see also Bank of Am. v. 203 N. LaSalle P'ship*, 526 U.S. 434, 441-42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.  *See id.*

The Plan does not discriminate unfairly with respect to Classes 5 and 6, the impaired classes that are deemed to not accept the Plan.  The threshold inquiry to assess whether a proposed plan unfairly discriminates against a dissenting class is whether the dissenting class

38

is equally situated to the class allegedly receiving more favorable treatment.  Here, the Plan's treatment of insider and equity interests is proper because no similar class of equity interests is receiving different or better treatment.  Thus, the Plan's treatment of Classes 5 and 6 is proper because all similarly situated holders of claims or equity interests will receive substantially similar treatment than Classes 5 and 6.

     B.     <u>The Plan does not unfairly discriminate with respect to the impaired classes that have not voted to accept the Plan (§ 1129(b)(1))</u>

Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.  *See In re J & J Oilfield Servs.*, 2015 WL 3750143, at \*12; *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

> In determining whether or not unfair discrimination exists under a Chapter 11 plan, courts have applied the following four-part test, which requires that:  (1) a reasonable basis for the discrimination exist[s]; (2) the debtor cannot consummate its plan without discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly proportional to its rationale.

*In re J & J Oilfield Servs.*, 2015 WL 3750143, at \*12 (quotation omitted).

The threshold inquiry to assess whether a proposed plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to the class allegedly receiving more favorable treatment.  The Plan's treatment of Classes 5 and 6 is proper because no similar classes of claims or equity interests are receiving different or better treatment than Classes 5 and 6.  Thus, the Plan's treatment of claims and equity interests is proper because all

similarly situated holders of claims and equity interests will receive substantially similar treatment.

The Plan does not discriminate unfairly and is fair and equitable with respect to Classes 5 and 6 as required by Sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because no holder of any claim or equity interest that is junior to Classes 5 and 6 will receive or retain any property under the Plan on account of such junior claim or interest, and no holder of a claim in any class is receiving more than 100% on account of its claim.  Thus, the Plan may be confirmed notwithstanding the deemed rejection of the Plan by Classes 5 and 6.

## XIV.   RRSB has complied with Section 1129(d) of the Bankruptcy Code

The purpose of the Plan is not to avoid taxes or the application of Section 5 of the Securities Act of 1993.  Moreover, RRBS does not anticipate that any governmental unit or any other party will request that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of Section 1129(d) of the Bankruptcy Code.

## CONCLUSION

For all the foregoing reasons, the Plan complies with and satisfies all of the requirements of Section 1129 of the Bankruptcy Code, and, therefore, should be confirmed.

Dated: July 27, 2026.

**VOGEL LAW FIRM**


BY: */s/ Kesha L. Tanabe* _____
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Kesha L. Tanabe
ktanabe@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND  58107-1389
Telephone:  701.237.6983
ATTORNEYS FOR PLAN PROPONENT RED
RIVER STATE BANK

4914-8947-4239 v.1